UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| **THE INTERNATIONAL ASSOCIATION OF**  ) <br> **MACHINISTS AND AEROSPACE WORKERS,** ) <br> **AFL-CIO, LOCAL LODGE NO. 1821**, on behalf ) <br> of its individual members employed at the           ) <br> Bucksport Paper Mill; **RICHARD GILLEY,**        ) <br> individually and as IAMAW District 4 Business  ) <br> Representative for Local Lodge 1821;              ) <br> **COREY DARVEAU,** individually and as          ) <br> President of Local Lodge 1821;                    ) <br> **BRIAN SIMPSON,** individually and as Vice      ) <br> President of Local Lodge 1821;                    ) <br> **BRIAN ABBOTT,** individually and as Recording ) <br> Secretary of Local Lodge 1821; and               ) <br> **HAROLD PORTER,** individually and as Financial ) <br> Secretary for Local Lodge 1821,                   ) <br>              Plaintiffs,            ) <br> v.                                                ) <br>                                               ) <br> **VERSO PAPER CORP.,** a Delaware Corporation; ) <br> **VERSO PAPER LLC**, a Delaware Limited        ) <br> Liability Company (LLC) and a wholly owned       ) <br> subsidiary of Verso Paper Corp.,                  ) <br>                                               ) <br> **AIM DEVELOPMENT (USA) LLC**, a               ) <br> Delaware Limited Liability Company and indirect  ) <br> wholly-owned subsidiary of American Iron &       ) <br> Metal Company, Inc.,                              ) <br>             Defendants.        ) | CIVIL ACTION NO. : |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I.  SUMMARY OF THIS ACTION**

1.      This action for Declaratory and Injunctive relief against Verso Paper Corp. and its

subsidiary Verso Paper LLC (hereinafter collectively referred to as "Verso") arises out of Verso's

intentional decision to shut down and ultimately destroy the operational capability of its coated

printing paper mill at Bucksport, Maine ("Bucksport").  Verso seeks to reduce output in the

market for coated paper, which it will dominate as a consequence of its acquisition of its largest

rival, NewPage Holdings Inc. ("NewPage").  In accordance with the terms of its acquisition

agreement with NewPage, Verso has arranged to transfer Bucksport to AIM Development (USA)

LLC ("AIM"), a buyer that intends to close Bucksport as a paper manufacturing facility and

convert the property for non-paper manufacturing uses.  Through these agreements, Verso will

achieve dominance in the relevant national market for coated paper and simultaneously reduce

output in that market substantially.  The claims asserted herein are based on both federal and state

law and are brought by five individuals who are employees of Bucksport as well as consumers of

end products incorporating coated paper, and also by the union that is the collective bargaining

agent for these individuals and 54 other employees at Bucksport.

2.      The federal claims under Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§1

and 2) challenge Verso's concerted action in shutting down Bucksport and destroying its

operational capability (a) by its public refusal to consider any offers to purchase Bucksport from

other paper-manufacturing companies (i.e. competitors), and (b) its deliberate decision to select a

buyer with a prior history of scrapping paper making mills, AIM Development (USA) LLC

(hereinafter "AIM") under a contract that contemplates the paper-making parts of Bucksport are to

be used for scrap metal and as a landfill.[1]

3.      These actions will (i) destroy the opportunities for the individual Plaintiffs and other

experienced paper mill workers to obtain future employment at Bucksport, (ii) prevent printing

paper competitors from buying Bucksport, and (iii) injure buyers of coated printing paper and

consumers of books, magazines, and other products printed on or containing such paper by

---

[1] Purchase Agreement between AIM Development and Verso, Dec. 8, 2014, available at:
http://www.sec.gov/Archives/edgar/data/1421182/000119312514436360/d834648dex21.htm

causing them to pay higher prices as a result of reducing the productive capacity committed to their market.

4.      The federal claim under Section 7 of the Clayton Act (15 U.S.C. §18) challenges AIM's acquisition of Verso's subsidiary that owns the paper-making capability of Bucksport for the contractually-express purpose of scrapping a plant that has 350,000 metric tons of coated printing paper making capacity on the ground that the acquisition will substantially lessen competition, and tend to create a monopoly, in the relevant national market for coated printing paper.  The state law claims under Maine Antitrust Law (10 M.R.S. §§1101, 1102 and 1102-A) are based upon allegations similar to Verso's federal law antitrust claims.

5.      Plaintiffs' antitrust claims allege that Defendant Verso has: (1) entered into an unlawful agreement to restrain trade with NewPage under Section 1 of the Sherman Act, (2) attempted to monopolize the market for North American coated printing paper under Section 2 of the Sherman Act; and (3) entered into a conspiracy to monopolize the market for North American coated printing paper with and Defendant AIM under Section 2 of the Sherman Act.

6.      Verso also seeks to evade its legal obligation to make payments for statutorily-mandated severance and accrued 2015 vacation time pay to terminated employees at the Bucksport Mill. The state law claims arise out of Verso's refusal to comply with the laws of the State of Maine governing the timely payment of severance pay and final wages, including accrued 2015 vacation time.  Specifically, Verso has stated that it has no intention of paying severance of accrued 2015 vacation time within the time limits mandated by 26 M.R.S.A. §§ 625-B and 626 – the next regular pay period after the employee's "last full day of work."  Verso has acknowledged that it owes severance pay and accrued 2015 vacation time pay to the Plaintiffs, and other similarly situated Bucksport employees, in Memoranda of Agreement ("MOA") with unions representing

all hourly wage employees, and in publicly available filings with the Securities and Exchange

Commission (S.E.C.), including the October 1, 2014 8-K and November 13, 2014 10-K.  Indeed,

Verso has acknowledged that it owes severance pay in an amount equal to or greater than the

amount mandated by the formula in 26 M.R.S.A. § 626-B, sub-§§ 2.  However, Verso has

attempted to evade the timely payment of severance and vacation time, by refusing to agree to

comply with the time requirements for paying severance and vacation time final wages in 26

M.R.S.A. §§ 625-B and 626.

7.      The Verso contract with AIM contains provisions, detailed below, that are part of a broader

scheme designed to defraud the individual Plaintiffs, and most other hourly workers at the

Bucksport Mill, out of the severance and final wage payments to which they are entitled under 26

M.R.S.A. §§ 625-B and 626.

8.      These federal and state claims are closely related to Verso's decision, announced on

January 6, 2014, that it would acquire its largest competitor in the coated printing paper market,

NewPage Holdings, Inc. ("NewPage"), for a price of $1.4 billion (hereinafter "the NewPage

Acquisition").  Without the acquisition of NewPage's eight coated printing paper mills, it is highly

unlikely that Verso would have decided to close down and disable one of its own mills,

representing roughly 26% of its 2014 production capacity.[2]

9.      The NewPage Acquisition would cause Verso to become the dominant supplier of coated

printing paper in North America with a market share estimated to be almost 50%.  The NewPage

Acquisition has been under investigation for at least nine months by the Antitrust Division of the

U.S. Department of Justice ("DOJ") for potential violation of Section 7 of the Clayton Antitrust

Act, outlawing a corporate acquisition "whose effect may be to substantially lessen competition or

---

[2] See Verso Paper, 2014 Annual Report, Form 10-K, filed on March 6, 2014, p. 5.
http://www.sec.gov/Archives/edgar/data/1395864/000142118214000024/vrs12312013-10k.htm

tend to create a monopoly" in a relevant market.  The DOJ has not at this time concluded its investigation or permitted even a conditional closing of the NewPage Acquisition.

10.     This federal antitrust action seeks a determination that Verso has: (i) violated conspiracy prohibitions in Section 1 of the Sherman Act by acting in concert with NewPage to shut down The Bucksport Mill and cause it to permanently cease to be capable of producing coated printing paper; and (ii) violated the "attempted monopoly" and the "conspiracy to monopolize" prohibitions in Section 2 of the Sherman Act by selling the Bucksport Mill to AIM with a contract calling for this salvage company to destroy Bucksport's productive capability; and (iii) by refusing to offer the Bucksport Mill for sale as a going concern to any competitor (or new entrant) willing to continue to operate the Bucksport Mill as a competitive source of coated printing paper.

11.     As relief for these antitrust claims, plaintiffs seek an injunction that would:  (i) temporarily prohibit Verso from selling the Bucksport Mill to AIM or any other salvage company;  (ii) require Verso to publicize the availability of the Bucksport Mill for sale at a reasonable price to be determined by the Court to any bona fide buyer willing to continue to operate it as a printing paper miller; (iii) prohibit Verso from rejecting any offer to purchase the Bucksport Mill at or exceeding such minimum price set by the Court to any bona fide buyer willing to continue operating it as a printing paper mill;  (iv) prohibit Verso from taking any actions or refusal to act with respect to Bucksport that would be inconsistent with the continued operations of the Bucksport Mill after a brief shutdown of a few weeks; and (v) prohibit Verso from selling or trying to sell the electric power plant or any other assets associated with Bucksport separately from the Bucksport Mill itself.

12.     Plaintiffs request that these injunctions remain in effect until June 1, 2015 or 60 days after consummation of the Verso-NewPage acquisition, whichever is later, in order that there be

adequate time for interested buyers who wish to continue operating the Bucksport Mill to produce coated printing paper, to make a bona-fide offer for Bucksport.

13.     On December 10, 2014, the Director of the Maine Bureau of Labor Standards, Pamela Megathlin, determined that December 31, 2014, will be the "last full day of work," within the meaning of 26 M.R.S.A. § 625-B, sub-§ 2, *for all Bucksport employees' who will be terminated by Verso as a result of the closure of the Bucksport Mill*, whether these employees will actually work after December 17, 2014 or not.  This determination was made because Verso has agreed to pay employees full, straight-time wages and benefits through December 31, 2014 in its MOAs wwith the various unions, including Plaintiff IAMAW Local Lodge 1821.

14.     In the same December 10, 2014, determination letter, Director Megathlin also determined that Verso is obligated to pay all severance owed by or on January 8, 2015.  Likewise, all final wages, including accrued 2015 vacation time must be paid by or on January 8, 2015, pursuant to 26 M.R.S.A. §626.

15.     The Plaintiffs' state law claims seek an expedited legal determination that: (i) consistent with the December 10, 2014 Determination Letter issued by Director Pamela Megathlin, for all of Bucksport's employees being terminated as a result of Verso's closure of the Bucksport Mill (whether salaried or hourly wage) December 31, 2014, constitutes their "last full day of work" for purposes of § 625-B, sub-§ 2; (ii) a determination that Verso is required to pay all of Bucksport's employees (whether salaried or hourly wage) who will be terminated by or on December 31, 2014, severance pay in an amount that is equal to or greater than the amount mandated by 26 M.R.S.A. § 625-B, by January 8, 2015; and (iii) a determination that Verso is required to pay all Bucksport employees (whether salaried or hourly wage) who will be terminated on or by December 31, 2014, accrued 2015 vacation time pay, on or by January 8, 2015, pursuant to 26 M.R.S.A. § 626.

16.     The Plaintiffs seek, injunctions (i) requiring Verso to timely make statutorily-mandated severance and accrued 2015 vacation time payments to each employee by January 8, 2015, pursuant to 26 M.R.S.A. § 625-B, sub-§ 2 and § 626; and (ii) prohibiting any transfer of title to the Bucksport Mill to AIM or any other entity, until Verso has paid all severance and vacation pay obligations under 26 M.R.S.A. §§ 625-B and 626, as well and all other penalties, interest, liquidated damages and costs, including attorneys' fees due to be paid under 26 M.R.S.A. § 625-B, sub-§§ 4 and 9 and § 626.  Plaintiffs are filing a separate Motion for Attachment and Trustee's Process to secure the funds and assets required to pay Plaintiffs' the amount of severance and accrued 2015 vacation time pay that Verso has previously acknowledged that they are owed under the requirements of 26 M.R.S.A. §§ 625-B and 626.

## II.  PARTIES

A.     **PLAINTIFFS:**

17.     **Plaintiff  "THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, LOCAL LODGE NO. 1821"** ("IAMAW" "IAM Local 1821" or "Local Lodge 1821") is a labor organization engaged in representing or acting for employees who are employed at the Bucksport Mill, owned and operated by Verso Paper Corp., the controlling interest in which is held by its parent Apollo Global Management.  Verso Paper Corp. manages the Bucksport Mill's operations through various subsidiaries.  Local Lodge 1821 is the union that represents 59 hourly wage employees employed as mechanics by Verso Paper Corp. and/or its various subsidiaries operating the paper mill in Bucksport, Maine ("Bucksport Mill" or "Bucksport").  Local Lodge 1821 brings this civil action in their representative capacity on behalf of all bargaining unit employees who are members of Local Lodge 1821, and all similarly situated

employees at the Bucksport Mill who are being or would be adversely impacted by Verso's, and its agents' acts and omissions which are the subject of this declaratory judgment action. All of the members of Local Lodge 1821 are citizens and residents of the State of Maine, domiciled in the State of Maine, and employed at the Bucksport Mill for at least three (3) years; and indeed, some of Local 1821's members have been employed at Bucksport over forty-two (42) years. On information and belief, all but 3 of Local Lodge 1821's members employed at the Bucksport Mill, and the power plant connected to and associated with the Bucksport Mill, will lose their jobs on or before December 31, 2014, as a result of the closure of the Bucksport Mill by Verso Paper Corp. and/or Apollo Global Management, the entity which controls the vast majority of Verso Paper Corp. stock. The principal place of business of Local Lodge 1821 is Bucksport, Maine.

18. **Plaintiff RICHARD GILLEY ("Gilley")** is a resident of Maine, domiciled in the State of Maine, at East Orland, Maine, and employed as the IAMAW District 4 Business Representative, representing Local Lodge 1821. Prior to assuming his role as IAMAW District 4 Business Representative in 2014, Plaintiff Gilley worked as a mechanic in the Maintenance Department at the Bucksport Mill for thirty-eight (38) years. Plaintiff Gilley is also a consumer who has purchased products containing Verso paper, including various magazine publications utilizing coated printing paper. Plaintiff Gilley is a beneficiary of the December 3, 2014 Memorandum of Agreement (MOA) between Verso and IAMAW Local Lodge 1821 and is entitled to receive severance pay and final wages, including accrued 2015 vacation time pay, from the Defendants, within the time requirements mandated in 26 M.R.S.A. §§ 625-B and 626.

19. **Plaintiff COREY DARVEAU ("Darveau")** is a resident of Maine, domiciled in the State of Maine, in Bucksport, Maine. Plaintiff Darveau is employed in the Mechanical Maintenance Department at the Bucksport Mill, where he has worked as machinist for eight (8) years. Plaintiff

Darveau is the President of Local Lodge 1821.  Plaintiff Darveau is covered under the terms of a collective Bargaining Agreement ("CBA" or "Labor Agreement") between "Verso Paper, Bucksport Mill" and the "International Association of Machinists Local No. 1821, effective from November 1, 2011 through April 30, 2015 (Exhibit 1), and a beneficiary of the December 3, 2014 Memorandum of Agreement (MOA) between Verso and IAMAW Local Lodge 1821 (Exhibit 10). Plaintiff Darveau is entitled to timely payment of severance pay and final wages, including accrued 2015 vacation time pay, from the Defendants, as mandated by 26 M.R.S.A. §§ 625-B and 626.  Plaintiff Darveau is also a consumer who has purchased magazines and other products utilizing coated printing paper.  Plaintiff Darveau will be irreparably harmed if Verso is permitted to neglect, sell, damage or destroy the paper making capability of the Bucksport Mill, rendering this facility incapable of being sold to a competitor capable of operating it for further operations as a paper mill, which could provide Plaintiff Darveau the ability to continue to work at this Mill. Further, Plaintiff Darveau will be irreparably harmed if Defendants are allowed to delay payment of severance pay and final wages, including accrued 2015 vacation time, by impeding or denying Plaintiff Darveau: (1) the ability to properly provide for his family and heat his home during the coming harsh Maine winter; (2) the resources needed to obtain health insurance under either COBRA or the Affordable Care Act from March 2015 through the end of 2015; and (3) the ability and resources required to sign up for health insurance through the Affordable Care Act, during the open enrollment period that closes on or before February 15, 2015, for the coverage period March 1, 2015 through December 31, 2015.

20.     **Plaintiff BRIAN SIMPSON ("Simpson")** is a resident of Maine, domiciled in the State of Maine, and is employed as a journeyman pipefitter/millwright at the Bucksport Mill.  Currently Plaintiff Simpson is a roll wrapper area mechanic lubrication specialist at the Bucksport Mill,

where he has worked as a mechanic for twenty-seven (27) years. Working at the Bucksport Mill and working to make the Bucksport Mill a success and integral part of the Bucksport community and an economic force in the Maine economy is a family tradition in Plaintiff Simpson's family. In fact, Plaintiff Simpson's Great-Grandfather was the original Mill Manager of the Bucksport Mill when it opened in the 1930's. Plaintiff Simpson is the Vice President of Local Lodge 1821. Plaintiff Simpson is covered under the terms of a Collective Bargaining Agreement ("CBA" or "Labor Agreement") between "Verso Paper, Bucksport Mill" and the "International Association of Machinists Local No. 1821, effective from November 1, 2011 through April 30, 2015 (Exhibit 1), and a beneficiary of the December 3, 2014 Memorandum of Agreement (MOA) between Verso and IAMAW Local Lodge 1821 (Exhibit 10). Plaintiff Simpson is entitled to timely payment of severance pay and final wages, including accrued 2015 vacation time pay from the Defendants, as mandated by 26 M.R.S.A. §§ 625-B and 626. Plaintiff Simpson is also a consumer who has purchased magazines and other products utilizing coated printing paper. Plaintiff Simpson will be irreparably harmed if Verso is permitted to neglect, sell, damage or destroy the paper making capability of the Bucksport Mill, rendering this facility incapable of being sold to a competitor capable of operating it for further operations as a paper mill, which could provide Plaintiff Simpson the ability to continue to work at this Mill. Further, Plaintiff Simpson will be irreparably harmed if Defendants are allowed to delay payment of severance pay and final wages, including accrued 2015 vacation time, by impeding or denying Plaintiff Simpson: (1) the ability to properly provide for his family and heat his home during the coming harsh Maine winter; (2) the resources needed to obtain health insurance under either COBRA or the Affordable Care Act from March 2015 through the end of 2015; and (3) the ability and resources required to sign up for health

insurance through the Affordable Care Act, during the open enrollment period that closes on or before February 15, 2015 for the coverage period March 1, 2015 through December 31, 2015.

21.     **Plaintiff BRIAN ABBOTT ("Abbott")** is a resident of Maine, domiciled in the State of Maine, and currently employed as a Millwright/pipefitter, currently assigned to the Precision Maintenance shop at the Bucksport Mill, where he has worked as a mechanic for forty-two (42) years and nine (9) months.  Plaintiff Abbott is the Recording Secretary of Local Lodge 1821. Plaintiff Abbott is covered under the terms of a Collective Bargaining Agreement ("CBA" or "Labor Agreement") between "Verso Paper, Bucksport Mill" and the "International Association of Machinists Local No. 1821, effective from November 1, 2011 through April 30, 2015 (Exhibit 1), and a beneficiary of the December 3, 2014 Memorandum of Agreement (MOA) between Verso and IAMAW Local Lodge 1821 (Exhibit 10).  Plaintiff Abbott is entitled to timely payment of severance pay and final wages, including accrued 2015 vacation time pay from the Defendants, as mandated by 26 M.R.S.A. §§ 625-B and 626.  Plaintiff Abbott is also a consumer who has purchased magazines and other products utilizing coated printing paper.  Plaintiff Abbott will be irreparably harmed if Verso is permitted to neglect, sell, damage or destroy the paper making capability of the Bucksport Mill, rendering this facility incapable of being sold to a competitor capable of operating it for further operations as a paper mill, which could provide Plaintiff Abbott the ability to continue to work at this Mill.  Further, Plaintiff Abbott will be irreparably harmed if Defendants are allowed to delay payment of severance pay and final wages, including accrued 2015 vacation time, by impeding or denying Plaintiff Abbott: (1) the ability to properly provide for his family and heat his home during the coming harsh Maine winter; (2) the resources needed to obtain health insurance under either COBRA or the Affordable Care Act from March 2015

through the end of 2015; and (3) the ability and resources required to sign up for health insurance

through the Affordable Care Act, during the open enrollment period that closes on or before

February 15, 2015 for the coverage period March 1, 2015 through December 31, 2015.


22.    **Plaintiff HAROLD PORTER ("Porter")** is a resident of Maine, domiciled in the State of

Maine, and employed as a Millwright in the Maintenance Department at the Bucksport Mill,

where he has worked as a mechanic for twenty-two (22) years.  Plaintiff Porter is the Financial

Secretary of Local Lodge 1821.  Plaintiff Porter is covered under the terms of a Collective

Bargaining Agreement ("CBA" or "Labor Agreement") between "Verso Paper, Bucksport Mill"

and the "International Association of Machinists Local No. 1821, effective from November 1,

2011 through April 30, 2015 (Exhibit 1), and a beneficiary of the December 3, 2014 Memorandum

of Agreement (MOA) between Verso and IAMAW Local Lodge 1821 (Exhibit 10).  Plaintiff

Porter is entitled to timely payment of severance pay and final wages, including accrued 2015

vacation time pay from the Defendants, as mandated by 26 M.R.S.A. §§ 625-B and 626.  Plaintiff

Porter is also a consumer who has purchased magazines and other products containing coated

printing paper.  Plaintiff Porter will be irreparably harmed if Verso is permitted to neglect, sell,

damage or destroy the paper making capability of the Bucksport Mill, rendering this facility

incapable of being sold to a competitor capable of operating it for further operations as a paper

mill, which could provide Plaintiff Porter the ability to continue to work at this Mill.  Further,

Plaintiff Porter will be irreparably harmed if Defendants are allowed to delay payment of

severance pay and final wages, including accrued 2015 vacation time, by impeding or denying

Plaintiff Porter: (1) the ability to properly provide for his family and heat his home during the

coming harsh Maine winter; (2) the resources needed to obtain health insurance under either

COBRA or the Affordable Care Act from March 2015 through the end of 2015; and (3) the ability

and resources required to sign up for health insurance through the Affordable Care Act, during the

open enrollment period that closes on or before February 15, 2015 for the coverage period March

1, 2015 through December 31, 2015.


**B.  DEFENDANTS:**

23.     **Defendant VERSO PAPER CORP.** is a publicly-traded Delaware corporation, which

maintains its principal place of business and headquarters in Memphis, Tennessee.  Apollo Global

Management controls greater than 50% of Verso Paper Corp. stock.  Verso Paper Corp. is the

indirect Employer of Bucksport Mill employees, including all of the members of Local Lodge

1821 at the Bucksport Mill, pursuant to the statutory definition of "Employer" in 26 M.R.S.A §

625-B, sub-§ 1.C., which considers a parent corporation the indirect owner and operator of any

covered establishment that is directly owned and operated by its corporate subsidiary.  The

Bucksport Mill is directly owned and operated by Verso Paper Corp.'s wholly owned subsidiaries:

Verso Bucksport LLC and Verso Paper LLC, all of which are Delaware Limited Liability

Companies, registered as foreign LLCs in Maine. Verso Paper LLC is the record and beneficial

owner of all outstanding membership interests in Verso Bucksport LLC.  Verso Maine Power

Holdings LLC is the record and beneficial owner of all outstanding membership interests in Verso

Bucksport Power LLC, which has a controlling interest in the power-generating facilities at the

Bucksport Mill.[3]

24.     **Defendant VERSO PAPER LLC** is a Delaware Limited Liability Company (LLC) and a

wholly owned subsidiary of Verso Paper Corp.  Verso Paper LLC was formed under the laws of

---

[3] Agreement, Preamble and Definitions,
http://www.sec.gov/Archives/edgar/data/1421182/000119312514436360/d834648dex21.htm

the State of Delaware on May 3, 2006, File No. 4152614.  Verso Paper LLC is the name that

appears on the paychecks for all of the employees of the Bucksport Mill who are members of

Plaintiff IAMAW Local Lodge 1821.  Verso Paper LLC is registered as a foreign LLC with the

Maine Secretary of State, Division of Corporations, on September 22, 2006, Charter No.

20070125FC.

25.     **Defendant AIM DEVELOPMENT (USA) LLC,** is a Delaware Limited Liability

Company (LLC) filed on January 24, 2011. The company's File Number with the Delaware

Secretary of State is listed as 4931204.  Defendant AIM Development (USA) LLC ("AIM") is an

indirect wholly-owned subsidiary of American Iron & Metal Company, Inc.  The State of

Delaware's Certificate of Formation, was issued ton January 24, 2011 to AIM Demolition USA

LLC, and a Certificate of Amendment changing the name of the LLC to "AIM Development

(USA) LLC was issued on February 20, 2012, by the Delaware Secretary of State.  The operating

agreement between AIM Demolition USA LLC [now AIM Development (USA) LLC and

American Iron & Metal (USA) Inc., a Delaware Corporation, was executed on February 1, 2011,

and listed AIM Demolition USA LLC's principal Place of Business (in § 2.4 of this Agreement)

as:  "8295 Bavaria Drive East, Suite A, Macedonia, Ohio 44056," but stated that: "The location of

the principal office may be changed by the Member at any time and from time to time."

Plaintiffs have found no record that AIM is registered with the Maine Secretary of State as a

foreign LLC; however it is listed as a foreign LLC with the Minnesota Secretary of State as a

foreign LLC with a "Home Office Address" of: "1209 Orange Str, Wilmington, DE 19801, USA"

and a Principal Place of Business Address reported as of January 28, 2013 of: "9100 Henri-

Bourassa E., Montreal QB, H1E 2SA."  On information and belief AIM's principal place of

business is outside the State of Maine and on the December 5, 2014 MIPA between Defendant

Verso Paper Corp. and AIM, the location of the designated contact for "AIM Development (USA)

LLC" is identified as:

>AIM Development (USA) LLC
>100 E. Sartell Street
>Sartell, Minnesota 56377-1947
>Attention: Walter Griesseier
>E-mail: walterg@aimrecyclinggroup.com

25.     On January 31, 2013, Verso and AIM Development (USA) LLC, file an "Application for

Approval of Transfer of License for the Sartell Project," Project No. 8315,[4] requesting that the

Federal Energy Regulatory Commission (FERC) transfer a license for the power plant at the Verso

Sartell Mill from Verso Sartell LLC ("Verso"), the existing licensee, to AIM Development (USA)

LLC ("AIM").  All communications on behalf of "Verso Sartell" for the transaction transferring

the Verso Sartell license to AIM Development (USA) LLC were requested to go to Dennis

Castonguay, the Bucksport Mill's current Mill Manager, at the Bucksport Mill's address:

>Communications with respect to this Application should be directed to:
>On behalf of Verso Sartell LLC
>
>Dennis J. Castonguay
>Manufacturing Support Manager,
>Pulp and Fiber Verso Paper Corp.
>2 River Road PO Box 1200
>Bucksport, ME 04416
>(207) 469-4224 (phone)
>(207) 902-1205 (fax)
>dennis.castonguayl@versopaper.com

Two of the contacts for AIM Development (USA) LLC, listed in the January 31, 2013 FERC

Request for Transfer, are the same two contacts listed for AIM Development (USA) LLC on the

---

[4] http://elibrary.ferc.gov/idmws/file_list.asp?document_id=14086980

December 5, 2014 MIPA to transfer the Bucksport Mill to AIM Development (USA) LLC.[5]

On behalf of AIM Development (USA) LLC

Walter Griesseier                 Kamila Wirpszo, Esq.
President                          General Counsel
120 Bentley Avenue                 9100 Henri Bourassa
Ottawa, Ontario, K2E 6T9           Montreal (Quebec) H1E 2S4
613 223-4900 (phone)               514-494-2000 (5666) (phone)
613746-2291 (fax)                  514-494-3008 (fax)
walterg@aimrecyclinggroup.com      kwirpszo@aim-rg.com

### III. FACTUAL BACKGROUND

### A. The NewPage Acquisition

26.     On January 6, 2014, Verso announced that it would acquire NewPage.[6]  This transaction ("the NewPage Acquisition") involves direct competitors that are two of the nation's leading producers of coated and uncoated groundwood paper used for printing ("coated printing paper market").  NewPage is much the larger party with eight manufacturing facilities in six states, while Verso has two mills in Maine and one mill in Michigan. The value that Verso and NewPage placed on this deal was $1.4 Billion.

27.     If the NewPage Acquisition is completed, the concentrated North American coated printed paper market will become even more highly concentrated, with only two companies – the new Verso-NewPage merged entity and a South African company, Sappy, together controlling roughly eighty-percent (80%) of the North American coated printed paper making capacity and supply.

---

[5]  (Exhibit 19).

[6]  See the Form 8-K filed with the S.E.C. on January 6, 2014.
http://www.sec.gov/Archives/edgar/data/1578086/000119312514002329/d652043d8k.htm

28.     It has been widely reported that if the companies simply merged the capacity both presently control, the merged Verso-NewPage entity would control almost fifty percent (50%) of the North American coated printing paper market.  Specifically, estimates are that Verso and NewPage currently control 54% of the North American coated printing paper market when their respective market shares are added together.[7]

29.     In the January 3, 2014, agreement for Verso to acquire NewPage, both parties agreed to use their "reasonable best efforts" to gain regulatory approval from the U.S. antitrust agencies for the acquisition.[8]  The agreement also provides that neither Verso nor NewPage will take any action to sell, divest or dispose any assets belonging to either party, without written consent of the other party, where such action is taken in order to gain DOJ approval.[9]

30.     On April 3, 2014, Verso and NewPage announced that they each had received a request for additional information (the "Second Requests") from the U.S. Department of Justice (the "DOJ") in connection with Verso's proposed acquisition of NewPage.  The DOJ issued the Second Requests pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), 15 U.S.C. §18A, in connection with its investigation of whether a pending merger or acquisition transaction would violate Section 7 of the Clayton Act, 15 U.S.C. §18.  Verso's press announcement regarding DOJ's Second Request stated that:

---

[7] See, e.g. Capitol Forum: "Verso/NewPage: Near-Term Close Unlikely; Deal Risk Driven by NewPage's Out; A Closer Look at Product Market Definition", available at:
http://thecapitolforum.com/wp-content/uploads/2014/09/VRS-NWP-2014.08.14.pdf
Jesse Marzouk, Verso to acquire NewPage, Hilco Valuation Services:
http://www.hilcovaluationservices.com/docs/librariesprovider5/perspectives/hilco_paper_industry_perspective_q4_2013.pdf

[8] Sale Agreement, p. 53-54,
http://www.sec.gov/Archives/edgar/data/1395864/000119312514002326/d647650dex21.htm

[9] Sale Agreement, p.54-55,
http://www.sec.gov/Archives/edgar/data/1395864/000119312514002326/d647650dex21.htm

The effect of the Second Requests is to extend the waiting period imposed by the HSR Act until 30 days after Verso and NewPage have substantially complied with the Second Requests, unless that period is extended voluntarily by the parties or terminated sooner by the DOJ. [10]

## B. The Shutdown of the Bucksport Mill

31.     Plaintiffs are informed that the DOJ antitrust investigation of the NewPage Acquisition is still ongoing seven months later; the waiting period under the HSR Act has yet to expire; and therefore Verso and NewPage still remain entirely separate legal entities for all legal purposes.

32.     Verso and NewPage have cooperated, and are cooperating, on various efforts to meet their legal obligations to each other and to get the NewPage Acquisition approved and closed:

> (a)     On August 7, 2014, Verso filed an 8-K announcing that it had consummated certain debt-restructuring transactions necessary to meet the financial criteria in its merger agreement with NewPage, stating that: "The closing of the Merger is conditioned upon consummation of [these] exchange offers."[11]

> (b)     On October 30, 2014, NewPage and Verso announced that "in order to address potential antitrust considerations related to the NewPage acquisition" by Verso, NewPage has agreed to sell its Rumford, ME and Biron, WI paper mills to the U.S. subsidiary of a Canadian company (Catalyst Paper Corp, based in Richmond, B.C.).  See Verso's October 31, 2014 Form 8-K filing. According to this 8-K filing, "In connection with the Divestiture, NewPage and Verso each guaranteed to Catalyst the obligations of the Seller Parties under the Divestiture Agreement….The completion of the Divestiture is subject to customary closing conditions, including completion of the NewPage acquisition…." Both these mills currently make the same types of paper that the Bucksport Mill produces and thus NewPage is a direct competitor of Verso in the coated printing paper market.[12]

33.     Part of a cooperation agreement between Verso and NewPage is designed (i) to assure that Verso's financial condition remained satisfactory until closing of the NewPage Acquisition (as apparently required by the Verso-NewPage merger agreement) and (ii) to increase future coated

---

[10] http://investor.versopaper.com/releasedetail.cfm?ReleaseID=837818

[11] http://investor.versopaper.com/secfiling.cfm?filingID=1193125-14-300906&CIK=1421182

[12] http://investor.versopaper.com/secfiling.cfm?filingID=1421182-14-59&CIK=1421182

printing paper prices and thereby make the NewPage Acquisition more attractive to Verso economically than it otherwise would have been.  To achieve the goal of increasing paper prices the parties have agreed that Verso would permanently shut down the Bucksport Mill before the end of December, 2014, thus reducing market output substantially.

34.     Specifically, on October 1, 2014, Verso announced that it was shutting down the Bucksport Mill with its production capacity of, according to Verso, "approximately 350,000 tons and its specialty paper production capacity by approximately 55,000 tons."  *See,* Verso's October 1, 2014 8-K.[13]

35.     Verso and NewPage promptly realized financial benefits from removing Bucksport's paper making capacity from the North American coated printing paper market.  Specifically, in June 2014, Moody's had downgraded Verso's bond rating from B3 to Caa3, a change that reflected Moody's belief that Verso's debt obligations were "judged to be of poor standing and are subject to very high credit risk."[14]  The investors' service also speculated that the future of the acquisition was unclear.  In taking this action, Moody's wrote in its report that: "The rating action reflects Moody's view that the announced agreement to acquire NewPage is becoming less likely to occur as the Department of Justice continues its review."[15]   However, within two days of Verso's announcement of the closure of the Mill in Bucksport, Moody's Rating Service upgraded Verso's

---

[13] http://investor.versopaper.com/secfiling.cfm?filingID=1421182-14-56&CIK=1421182

[14] Portland Press Herald, "*Verso's finances benefit from Bucksport mill closure, Moody's analyst says*," by Whit Richardson (October 8, 2014).
http://www.pressherald.com/2014/10/08/versos-finances-helped-by-bucksport-mill-closure-moodys-analyst-says/

[15] postcrescent.com, "*Verso CEO expects NewPage merger to close by year's end*," by Melanie Lawder (July 14, 2014).
http://www.postcrescent.com/story/money/2014/07/14/verso-ceo-expects-newpage-merger-close-years-end/12541509/

rating, on October 3, 2014, and identified the closure of the Bucksport Mill and layoffs of more than 500 people by year's end as "a credit positive event."

36.    Indeed, it was the anticompetitive results of the Bucksport Mill's closure that resulted in this upgrade.  Ed Sustar, the vice president and senior credit officer for Moody's Canada who wrote the issuer comment and is reported by the Portland Press Herald to have said the following:

> a. "Basically, Verso is on the edge of default, Sustar said. If the merger with NewPage is not successful, Sustar expects Verso is headed for bankruptcy. But even if the merger goes forward, Moody's would consider it a "limited default" because the deal includes a debt exchange offer that results in debt holders not receiving all the principal that was promised. The U.S. Department of Justice is currently reviewing the deal for antitrust concerns."

> b. "We've got (Verso) rated as far down as we can," Sustar said. "They are the lowest-rated forest-paper products company we rate in North America, so we're starting out with a company with a very low credit rating."

> c. *That's why the closure makes sense, he said. Although it will incur some short-term costs associated with the closure, the long-term effects on the company's bottom line will be a benefit, Sustar said. Verso estimates that the closure of the Bucksport mill will cost between $35 million and $45 million.*

> d. *Besides saving money, the closure will also help the remaining coated paper mills by reducing supply. Verso's coated groundwood and specialty-paper production capacity will decrease by roughly 28 percent. It also reduces by about 10 percent the total North American coated capacity, a grade of paper that Moody's expects to decline by about 6 percent per year going forward.*

> e. *The industry should be in a better balance on a supply-demand basis by taking this excess capacity out of the marketplace," Sustar said. "It will help all remaining mills that sell this product."* Those other mills include Verso's Androscoggin Mill in Jay and NewPage's mill in Rumford. (emphasis added).[16]

---

[16] "*Verso's finances benefit from Bucksport mill closure, Moody's analyst says*," by Whit Richardson, Portland Press Herald October 8, 2014 (emphasis added). http://www.pressherald.com/2014/10/08/versos-finances-helped-by-bucksport-mill-closure-moodys-analyst-says/

37.     On information and belief, the Plaintiffs' allege that Verso has intentionally exaggerated the Bucksport Mill's "unprofitability" by the following actions that have occurred and/or are continuing to occur:

- Transferred debt associated with operations from Verso's other facilities, especially the Androscoggin Mill in Jay, Maine ("Jay facility"), to the Bucksport Mill's books in recent years and possibly as part of the debt restructuring undertaken to facilitate approval by DOJ of the NewPage acquisition;

- Required the Bucksport Mill to purchase Kraft paper, that the Bucksport Mill had no need to buy at all, from Verso's Jay facility at above-market rates;

- Recently began having the Bucksport Mill pay for and accept delivery of hardwood used only in other Verso facilities (particularly the Jay facility), not useable in any product manufactured at the Bucksport Mill, and then shipping that hardwood from Bucksport to Verso's Jay facility for their use;

- After all paper-making operations at Buckport had ceased on December 4, 2014, had wood deliveries for the Jay facility routed through the Bucksport Mill, more than forty (40) miles out of the way trucks would normally travel to Jay.

38.     On information and belief, Plaintiffs allege that the purpose of these Verso efforts have been to persuade both the DOJ and the political leadership in the State of Maine that Verso's decision to close the Bucksport Mill was a reasonable business judgment. Verso has reported that the Bucksport Mill has the capacity to produce about 350,000 metric tons of coated printing paper, and 55,000 metric tons of uncoated/specialty printing paper.[17]  Including the Bucksport Mill and Verso's two other paper mills, Verso had the capacity to produce 1,305,000 metric tons of coated printing paper, as of October 1, 2014, when it announced the prospective closure of Bucksport.

---

[17] See Verso Paper, 2014 Annual Report, Form 10-K, filed on March 6, 2014, p. 5.
http://www.sec.gov/Archives/edgar/data/1395864/000142118214000024/vrs12312013-10k.htm

With the closure and planned destruction of the Bucksport Mill, Verso's capacity to produce

coated printing paper has now dropped by about 26% to about 955,000 metric tons.[18]

### C. Threatened Failure to Maintain the Productive Capability of the Bucksport Mill

39.     More alarmingly, during meetings with IAMAW union representatives, including several

of the Plaintiffs, on November 17, 2014, and November 19, 2014, Verso's agents and

representatives made clear that, during the "decommissioning" of the Bucksport Mill in

preparation for its scheduled closure of Bucksport on December 17, 2014, Defendant Verso is

planning to take steps that are likely to cause injury to and/or *permanently destroy* the paper

making capability of the Bucksport Mill, rendering this facility incapable of being sold to a

competitor able to operate as a paper mill, thereby providing (i) employment opportunities to the

individual Plaintiffs and other current employees, and (ii) consumers of coated printing paper with

another source of competitive supply.  These destructive acts and omissions include the following:

a.  Giving instructions to the IT Department to wipe, damage, alter, delete or remove the hard drives or portions thereof of computer systems that operate the paper making machines and administrative support apparatus of the Bucksport Mill and to, at a minimum, remove the current paper making "recipes" from the paper making machinery – a threat Plaintiffs got Verso to temporarily withdraw on November 28, but with the MIPA with AIM in place now looms again as an imminent threat according to the email Plaintiffs' counsel received from Verso's General Counsel Peter Kesser on December 9, 2014, stating: "Verso does not intend to wipe them of our proprietary information *until a few days before the transaction is completed.*"  (Exhibit 21) (emphasis supplied);

b.  Failing to release the tension on all belts and felts on the paper making machinery as part of the tasks to be performed during the "decommissioning" process;

c.  Failing to maintain the heated water in all tanks at the Bucksport Mill to ensure that the tile linings of these tanks are not damaged or destroyed during any extended period during which the plant is idle;

---

[18] *Id.*

d.  Failing to rotate and lubricate all metal rollers; and

e.  Damaging, altering, deleting or removing any computer or hard paper files from the Bucksport Mill, or Verso Paper Corp.'s corporate files maintained outside Bucksport, including outside the State of Maine, including files maintained by Verso's parent and controlling shareholder Apollo Global Management or any of Verso's subsidiaries, agents, representatives, officers or employees, that would relate to the Bucksport Mill and its operations, "profitability" or the proposed Verso-NewPage acquisition – again this threat has re-emerged with the announcement of the AIM sale MIPA (Exhibit 21).

40.  Cumulatively, these actions or inactions will have clear and almost certain anticompetitive effects:

(a)  Failure to protect, preserve and maintain the rollers, gears and other essential elements of the paper making equipment of the Bucksport Mill, are likely to render this equipment useless, and/or too cost-prohibitive for any potential buyer to restore for making coated paper that could compete in the highly concentrated coated printing paper market against the merged Verso-NewPage entity and the other remaining companies producing such paper.

(b)  These acts and omissions, combined with Verso's refusal to entertain offers to purchase the Bucksport Mill as a going concern, will significantly reduce industry capacity and thereby be likely to enhance prices received for coated printing paper by a merged Verso-NewPage which will become the dominant producer in a much more concentrated North American coated printing paper market.

41.  All attempts by Plaintiffs or their counsel to obtain clarification and verification of the extent of hard drive alteration, damage, deletion, destruction or removal that will occur during the "shut down" process were rebuffed by Verso's Bucksport personnel and Memphis Headquarter's leadership personnel prior to the presentation of a Complaint and TRO on November 28, 2014, and now this problem has re-emerged with the Verso assertion that it will wipe unspecified data that it claims to be "proprietary" off of the hard drives prior to the consummation of the sale with AIM.  (See, Exhibit 21). [19]

_____

[19] See e.g. November 24 Letter from Kim Ervin Tucker to Verso (Exhibit 6) and November 25 (2:10:26 pm) email from Kenny Sawyer to Kim Ervin Tucker (Exhibit 23).  However, after Plaintiffs and their counsel requested information and indicated that they were considering filing for an injunction to prevent destruction of the Bucksport

D. **Agreement to Permanently Eliminate the Bucksport Mill Capacity from the Market**

42.     On October 2, 2014, at the first meeting with employees after the closure of the Bucksport Mill was announced, Dennis Castonguay, current Bucksport Mill Manager, expressly told employees that: "Verso will not sell the Bucksport Mill to one of its competitors."[20]  Thereafter, Verso made good on this promise, when it announced on December 8, 2014 that it would sell the Bucksport Mill to Defendant AIM Development (USA) LLC ("AIM") for a purchase price of $58 million ("the AIM Acquisition").  AIM is an affiliate of American Iron & Metal Company Inc. ("American Iron"), a company incorporated in Canada, whose website is accessible at: http://www.scrapmetal.net/en/.[21]  The Verso/AIM Membership Interest Purchase Agreement ("MIPA") includes in Sec. 1.01 ("Definitions"), a highly relevant definition of what AIM intends to do with the Bucksport Mill:

> "Buyer's Intended Use" means: (i) Buyer's or the Companies' (or any of their respective assignees' or successors') use of the Included Assets for the generation of steam and electricity and for the marketing and sale of electric power and ancillary products and services, including electric generating capacity and renewable energy credits, (ii) Buyer's or the Companies' (or any of their respective assignees' or successors') use and operation of the Landfill as a landfill consistent with VB's [Verso Bucksport LLC's] operations thereof in connection with VB's operation of the Facilities prior to the date hereof, and (iii) activities involving the Mill that are consistent with Buyer's and its Affiliates' current principal business operations.[22]

---

Mill's paper machines' hard drives and data, Verso accelerated the date on which the machine shut down would commence, sending the notice in an email to Plaintiff Darveau at 2:11 p.m. – only seconds after Mr, Sawyer's email was sent advising Plaintiffs' counsel that Verso would respond to Plaintiffs' inquiry about the "shut down" process in "due course." (Exhibit 24, p. 1).

[20] See the attached statements of Plaintiffs Porter and Simpson and IAM members Chad Cote and Alfred George, all of who were present at the October 2, 2014 meeting. (Exhibits 28 through 31).

[21] http://www.sec.gov/Archives/edgar/data/1421182/000119312514436360/d834648dex21.htm

[22] Purchase Agreement between AIM and Verso, Dec. 8, 2014, Sec. 1.01 ("Definitions"), available at: http://www.sec.gov/Archives/edgar/data/1421182/000119312514436360/d834648dex21.htm

43.     Verso ended paper production at the Bucksport Mill on or before December 4, 2014,[23] and on December 9, Verso told most employees that they need not return to work until December 16 to sign termination related papers and collect their belongings.  Verso has retained a small number employees (about 46) to work at the power island portion of the Bucksport Mill, until December 31, 2014 this group will assist in "moth-balling" and maintenance of the Bucksport Mill and thereafter will run the power plant.

44.     Verso announced the sale of the Bucksport Mill to AIM on December 8, 2014.  The closing of the sale of the Bucksport Mill under their December 5th sale agreement is due to be completed on or before January 9, 2015.

45.     Verso has agreed to sell the Bucksport Mill at a heavily discounted price to AIM, and has foregone profits from the sale of the Bucksport Mill to a paper-producer, in order to ensure that the paper production capacity of the Bucksport Mill is permanently removed from the market.

Reportedly, the Bucksport Mill property is assessed by the Town of Bucksport for tax purposes at $360 million, with the Power Island portion of the plant alone valued at $86 million.[24]

46.     The $58 million purchase price that AIM has agreed to pay Verso for the Bucksport Mill is far below even the tax assessed value or likely market value of just Bucksport's power plant alone. .  In contrast, in 2011, NewPage sold another energy generating facility (with 103MW capacity) located at its paper mill in Rumford, ME for $61 million,[25] which is roughly the same price that

---

[23] http://www.pressherald.com/2014/12/05/mill-town-braces-for-impact-of-eerie-quiet/

[24] Bangor Daily News, "This Mill Has Always Seemed to Be the Suvivor," by Bill Trotter (December 11, 2014). http://bangordailynews.com/2014/12/10/business/this-mill-has-always-seemed-to-be-the-survivor-bucksport-officials-absorb-news-of-mills-demise/?utm_source=BDN+News+Updates&utm_campaign=485a045fd8-BDN_Business_Newsletter_201412_2_2014&utm_medium=email&utm_term=0_715eed3192-485a045fd8-82421111

[25] http://www.risiinfo.com/techchannels/powerenergy/NewPage-to-sell-Rumford-ME-cogeneration-energy-assets-for-61-million.html

AIM has agreed to pay Verso for the whole Bucksport Mill including its power-generating facilities (with at least 173MW capacity) and the paper making capacity of the Bucksport Mill.[26]

47.     The Verso-AIM MIPA makes clear that Bucksport's electric power generation facility is the only part of the Bucksport Mill that AIM intends to keep operating after it takes over Bucksport on or before January 9, 2015.

48.     Verso and NewPage have prior experience using AIM or its affiliates to scrap a paper mill in order to eliminate its capacity from the coated printing paper market.

49.     In January 2013, Verso sold AIM the paper mill that Verso owned in Sartell, Minnesota for about $12.5 million.[27] This mill had been damaged in a fire, and while initially Verso indicated it would rebuild the damaged portions of the Sartell mill, it later unexpectedly sold the Sartell Mill to AIM.  AIM subsequently demolished the remaining paper-producing facilities at this site.[28] Since their purchase, AIM Development has not restarted paper production at this site.

50.     Verso's merger partner NewPage has also employed an affiliate of AIM for the same kind of capacity-eliminating mission.  In January 2011, a company called "AIM Demolition LLC", which is a sister company of AIM and also an affiliate of American Iron & Metal, purchased a paper mill owned by NewPage, located in Kimberly, Wisconsin.[29]   The purchase price for this transaction is unknown.  AIM Demolition LLC subsequently demolished the remaining paper-

---

[26] http://www.mainebiz.biz/article/20140127/NEWS0101/140129960/verso-acquiring-bucksport-power-plant).
Two other public sources have described the generating capacity at the Mill in Bucksport as being 273MW.
http://bangordailynews.com/2014/10/01/news/hancock/verso-mill-in-bucksport-to-close-by-years-end-570-to-lose-jobs/
http://enipedia.tudelft.nl/wiki/Bucksport_Mill_Powerplant

[27] http://www.startribune.com/local/188940541.html
http://www.twincities.com/minnesota/ci_22798469/developer-pays-12-5-million-verso-property?source=rss

[28] http://www.twincities.com/localnews/ci_23926214/minnesota-verso-paper-mill-demolition-permit-approved

[29] http://investors.newpagecorp.com/index.php?s=43&item=195

producing facilities at this site, which up until it was acquired by NewPage had been profitable (with a profit of $66 million in 2007).[30]  Since their purchase of this facility from NewPage, AIM Demolition LLC has not restarted paper production at this site.  Rather, AIM auctioned off the paper-making equipment in Kimberly.[31]

51.     Upon information and belief, neither AIM nor any affiliate of American Iron have ever operated a printing paper plant.  The Verso-AIM agreement makes clear that AIM only intends to continue to operate the electric power plant at Bucksport.  The contract does include a catch all provision that AIM's intended use includes all "activities involving the Mill that are consistent with Buyer's and its Affiliates' *current* principal business operations."[32] (emphasis supplied). American Iron has described the services its corporate group provides as follows: "Once AIM [American Iron] is contacted by a potential client, specialists arrive on location – free of charge – to evaluate your needs and create a scrap metal recuperation system that is custom-made for your business."[33]

---

[30] In These Times, "Pulp Friction," by Roger Bybee (January 9, 2009)
http://inthesetimes.com/article/4122/pulp_friction

[31] http://www.postcrescent.com/article/20120329/APC0101/203290553/Iconic-smoke-stacks-coming-down
http://www.vokimberly.org/media/146836/new%20page%20mill%20site%20nov%202012.pdf

[32] December 5, 2014 Verso-AIM MIPA, Article I, § 1.01 (Definitions), provides in relevant part:

> "Buyer's Intended Use" means (i) Buyer's or the Companies' (or any of their respective assignees' or successors') use of the Included Assets for the generation of steam and electricity and for the marketing and sale of electric power and ancillary products and services, including electric generating capacity and renewable energy credits, (ii) Buyer's or the Companies' (or any of their respective assignees' or successors') use and operation of the Landfill as a landfill consistent with VB's operations thereof in connection with VB's operation of the Facilities prior to the date hereof, and (iii) *activities involving the Mill that are consistent with Buyer's and its Affiliates'* ***current*** *principal business operations***.**

(Emphasis supplied).

[33] http://aimrecyclinggroup.com/en/products/iron-and-steel#pq=QezOon

52.     Verso's intent and purpose in selling the Bucksport Mill to AIM are to ensure that the Bucksport Mill would not be used by any competitor as a producer of coated printing paper, and thereby reduce future competition in the market for coated printing paper.

53.     Indeed, the experience of the Community of Kimberly, WI in the wake of the NewPage transaction with AIM, also designed to reduce the supply of coated paper through closing an otherwise productive and previously profitable paper mill, is a harbinger of where Verso-AIM intend for the Mill in Bucksport to be at the end of the anticompetitive AIM Acquisition transaction.   Specifically, what happened in Kimberly is described as follows:[34]

> The Kimberly closing was a devastating blow to workers, whose years of experience were key to the plant's success.
>
> "It was like family," says Sue Anderson, who put in 31 years at the mill. "So many people had been there for so long together. It hurts. They [NewPage] threw it in our face like it didn't matter to them. All your hard work all those years meant nothing."
>
> The Anderson family's ties to the plant spanned 75 years. Sue's father retired after 44 years at the mill.
>
> Steelworkers' Nirschl says NewPage and Cerberus are determined to keep the plant closed, *even spurning offers by other corporations to buy the facility and keep it operating.*
>
> "Our village administrator has heard from three companies that are interested in buying the plant, and the union has been contacted by another potential buyer," he says. "*But even if a new owner wouldn't make a competitive product, [NewPage officials] say it's not for sale.*"
>
> Spokeswoman Hall says the company has "not heard from" these prospective buyers.
>
> On Sept. 24, several Wisconsin legislators – Democratic Sens. Herb Kohl and Russ Feingold, and Reps. Tom Petri (R) and Steve Kagan (D) – met with NewPage President Mark Suwyn to persuade him to keep the Kimberly plant running or to

---

[34]  In these Times, "Pulp Friction," by Roger Bybee (January 9, 2009)
http://inthesetimes.com/article/4122/pulp_friction

sell it to someone who would. Suwyn told the lawmakers that *the company is willing to lease the plant to a **non-competing** firm*.

But Nirschl challenges that claim: "If they're going to lease the plant, who is out publicizing that?" he asks. "They won't be able to lease it unless they're letting companies know it's available and are actively marketing it."

*Asked if the company has a marketing plan for the plant, NewPage's Hall responded, "No."*

(emphasis supplied).

54.     It is apparent that Verso's sole purpose in shutting down the Bucksport Mill and selling it for scrap is to reduce competition in the North American market for coated paper, and increase its chances for obtaining monopoly power.  These conspiratorial acts in concert with AIM are patently anti-competitive, and completely contrary to the purpose of the antitrust laws.

55.     While Verso's and NewPage's scrapping of the Sartell and Kimberly Mills went largely unnoticed outside the States where they inflicted the most obvious direct harm, now that Verso proposes to engage in this anticompetitive conduct in the context of the NewPage merger – revealing more directly the nexus between the closure of the Bucksport Mill and the adverse impact on competition in the North American coated paper market – the connection of all three of these closures (which have occurred in quick succession) to a Verso-NewPage-AIM scheme to reduce capacity and supply in the North American coated paper market can be discerned and understood.

56.     There is no coincidence in the fact that the record evidence demonstrates that – more than a year prior to the announcement of the merger between Verso and NewPage -- the Bucksport Mill Manager, Dennis Castonguay, while acting as Bucksport's Mill Manager, had the dual assignment of working on the Verso Sartell/AIM transaction, in which the Sartell Mill was scrapped by AIM and only the power plant assets were retained by AIM in an operational condition to sell to a third

party.  Indeed, on January 31, 2013, Verso and AIM Development (USA) LLC, filed

an "Application for Approval of Transfer of License for the Sartell Project," Project No.

8315,[35] requesting that the Federal Energy Regulatory Commission (FERC) transfer a license for

the power plant at the Verso Sartell Mill from Verso Sartell LLC ("Verso"), the existing licensee,

to AIM Development (USA) LLC ("AIM").  All communications on behalf of "Verso Sartell" for

the transaction transferring the Verso Sartell license to AIM Development (USA) LLC were

requested to go to Dennis Castonguay, the Bucksport Mill's current Mill Manager, at the

Bucksport Mill's address:

Communications with respect to this Application should be directed to:
On behalf of Verso Sartell LLC
Dennis J. Castonguay
Manufacturing Support Manager,
Pulp and Fiber Verso Paper Corp.
2 River Road PO Box 1200
Bucksport, ME 04416
(207) 469-4224 (phone)
(207) 902-1205 (fax)
dennis.castonguayl@versopaper.com

57.    Two of the three contacts for AIM Development (USA) LLC, listed in the January 31,

2013 FERC Request for Transfer, are the same two contacts listed for AIM Development (USA)

LLC on the December 5, 2014 MIPA to transfer the Bucksport Mill to AIM Development (USA)

LLC.

On behalf of AIM Development (USA) LLC
Walter Griesseier                              Kamila Wirpszo, Esq.
President                                      General Counsel
120 Bentley Avenue                             9100 Henri Bourassa
Ottawa, Ontario, K2E 6T9                       Montreal (Quebec) H1E 2S4
613 223-4900 (phone)                           514-494-2000 (5666) (phone)
613746-2291 (fax)                              514-494-3008 (fax)
walterg@aimrecyclinggroup.com                  kwirpszo@aim-rg.com

---

[35] http://elibrary.ferc.gov/idmws/file_list.asp?document_id=14086980

58.     Further, at the exact same time that the Verso Sartell-AIM transaction and Mill destruction was being executed, another AIM entity was doing the same transaction and same capacity-reducing Mill destruction in Kimberly, WI at NewPage's Mill there.  Thus, Bucksport is the third Mill to be subjected to the Verso-NewPage-AIM scheme to reduce the supply of coated paper using AIM's scrapping services.

### E. Verso's Anticompetitive Strategies

59.     Verso stands to gain from its anticompetitive conduct in that the higher prices that it will be likely to receive as the leading seller of coated printing paper in the future will more than offset the lost opportunity costs of only selling the paper-making facilities at Bucksport for scrap, rather than as a going concern to a potential operator.  The Portland Press Herald reported in a news story on the printing paper industry shortly after Verso had announced closure of the Bucksport Mill:  "[A] company that is selling one of its mills is loath to do so to a competitor, said Mark Wilde, a senior analyst of the pulp, paper and forest product sectors for the Bank of Montreal. If the competitor buys the plant on the cheap, it could be in a position to undercut the previous owner.  That leaves selling the mill for scrap as the only alternative, said Wilde." [36]

60.     Evidence of Verso's all out intent to restrict competition in the market for coated printing paper can be clearly seen in the way Verso has impeded employees from the soon-to-be-closed Mill from obtaining new employment with other, "competing" Maine paper mills.  Specifically, Verso refused to allow competitors to participate in a job fair in Bucksport's union hall, arranged by the State Labor Department's Rapid Response Team and the AFL-CIO.  Verso even posted

---

[36] The Portland Press Herald, "Buyers for Paper Mills Don't Grow on Trees," by Edward D. Murphy (October 12, 2014)
http://www.pressherald.com/2014/10/12/buyers-for-paper-mills-dont-grow-on-trees/

security guards outside the union hall where the job fair took place in mid-October, just weeks after Bucksport's closure was unexpectedly announced by Verso, to ensure no "unapproved" companies participated in interviewing Bucksport employees for new employment.

61.     Verso's anticompetitive purposes in taking these actions have been revealed in various ways, including, but not limited to the following:

> (a)     At an October 2, 2014, meeting with union representatives for the hourly wage employees of Bucksport – many of who have worked at the Bucksport Mill for decades – Verso's representatives told employees that Verso would make *no effort to sell the Bucksport Mill to its competitors*, but would close this facility permanently by the beginning of December.  (Exhibits 28 through 31).

> (b)     On information and belief, since October 2, 2014, Verso officers have told the Governor and other State officials that they are "willing to sell" and "want to sell the entire island' (i.e., the Bucksport mill and the associated power plant).  But several prospective buyers interested in purchasing these facilities as a going concern have reported to state officials that they have been rebuffed when approached by Verso for such a purchase.

62.     Verso is not merely exercising the right of a normal business in a competitive market to shut down a (purportedly) unprofitable plant.  Verso's monopolistic and conspiratorial scheme involved acquiring market dominance through acquisitions of rivals; colluding with AIM to shut down coated paper plants so as to reduce output in the relevant markets over which it exercises dominance; and most importantly selling off plant assets on unprofitable terms to a scrap metal company while refusing to entertain more profitable bids for the same plants from rival paper companies. By reducing market capacity substantially while foregoing the profitable sales of these shuttered plants to competitors Verso is assuring itself of long-term monopoly profits for the much smaller investment in foregone profits that could legitimately accrue from profitable sales of the plants in question.

F. **The Market for Coated Printing Paper**

63.     The relevant market for the purposes of this Complaint is the North American market for "coated printing paper" (also often referred to as "coated paper").   This specialized and high-quality paper is purchased and used by publishers of magazines, newspaper inserts and catalogs. According to Verso's website, "coated paper" is described as  "freesheet and groundwood papers for publishers, catalogers, advertisers and commercial print producers."[37]  This market may also include some "SC paper" (i.e., supercalendared uncoated groundwood paper) which some, but not all, publishers may use as a substitute for coated printing paper.

64.     NewPage and Verso are the two largest producers of coated printing paper.  New Page and Verso would have a combined 56% market share for coated printing paper in North America, (if SC paper is not included in the relevant market).[38]  If SC paper is deemed to be a viable substitute, and included in the market for coated printing paper, then NewPage and Verso combined would still control 46% of the market.  The next largest producer, Sappi, controls only 11% of the market (including SC paper).  (See Declaration of Richard Gilley and attached exhibit.)

65.     The relevant geographic market for coated printing papers is North America.  But even if the geographic market is defined more narrowly, such as the United States, New England or Maine, Verso and NewPage's market share would only be larger than it is for North America.

66.     Additionally, there are high barriers to entering the market for coated printing paper.  "The paper industry is one of the most capital intensive industries in the world.  In 1990, the U.S. paper industry made capital investments equivalent to more than 13 % of sales - higher than any other industry sector.  Each employee in the U.S. pulp and paper industry was supported by more than

---

[37] See, https://www.versopaper.com/OurProducts/CoatedPapers/

[38] http://thecapitolforum.com/wp-content/uploads/2014/09/VRS-NWP-2014.08.14.pdf

$100,000 of capital equipment - over twice the average of other domestic manufacturing industries."[39]

67.     Thus, a combined Verso-NewPage entity would become overwhelmingly the largest competitor in the market for coated printing paper, and create a dangerous probability of achieving monopoly power by the types anticompetitive activities alleged in Counts I-VII of this Complaint

68.     Additionally, there are several existing smaller producers of coated paper who would be capable of purchasing and continuing paper manufacturing at the Bucksport Mill, including: Catalyst Paper, Sappi and Resolute Forest Products, among others.


### G. The Dispute with Verso over Severance & Vacation Pay Due under Maine Law

69.     While Verso continued Effects Bargaining with employee unions since October 28, including bargaining relating to the amount and timing of payments for severance and other final wages, including accrued 2015 vacation time, Verso also continued to obstinately refuse to acknowledge its liability to pay severance and 2015 vacation time within the time requirements in Maine law, in 26 M.R.S.A. §§ 625-B and 626.

70.     Verso has received two opinion letters from Pamela Megathlin, Director of the Maine Bureau of Labor Standards, expressly explaining Maine law with respect to the payment of severance pay, explaining the meaning in 26 M.R.S.A. § 625-B, sub-§ 2 of the phrase "last full day of work" in the context of the Bucksport Mill closing, and stating that Verso could not mitigate its liability under this provision of Maine law unless it ***actually paid*** employees an amount of severance that was equal to or greater that the amount required under Maine law, *on or before the next regularly scheduled pay period at the Bucksport Mill after each employee's "last*

---

[39] Ben Bonifant, "The Pulp and Paper Industry", p. 24, 1994, available at: http://yosemite.epa.gov/ee/epa/eerm.nsf/vwAN/EE-0045-01.pdf/$file/EE-0045-01.pdf

*full day of work." See,* November 25, 2014 Letter from Director Megathlin to Verso (Exhibit 9); and December 10, 2014 Letter from Director Megathlin to Verso (Exhibit 27).

71.     Under the express requirements in these Maine statutes, an employer is liable to pay severance and all final wages, including accrued vacation time, within the next regular pay period after an employee's last full day of work.  Here, Director Megathlin had determined that "the last full day of work" for all Bucksport Mill employees who are not being retained to work at the power plant, will be December 31, 2014, pursuant to 26 M.R.S.A. §§ 625-B, sub-§ 2; and that, Defendant Verso is required to pay severance and final wage payments, including accrued 2015 vacation time, on or by January 8, 2014.  *Id.*

72.     It is doubtful that the identification of the 12:01 a.m. January 9, 2015, time for closing the Verso-AIM MIPA transaction is coincidence – especially in the context of the purported transfer of the liability for severance to the asset-less "VB" Verso subsidiary, and self-proclaimed lack of liability of either the "Buyers" or "Sellers" in this transaction for severance and other employee benefits that the AIM Buyer and Verso Paper Corp. Seller, detailed in ¶ 3.10 of the MIPA agreement.  This purported "agreement" between Verso and AIM to shift Verso's (or its successors') statutorily imposed liability for severance payments (imposed by and owed to the State of Maine for the benefit of employees) to "VB" on the effective date of the MIPA (i.e. January 9 or before) – an entity which will have no assets after the MIPA transaction – evidences a fraudulent intent to evade the statutory obligation to pay severance and accrued 2015 vacation time pay, pursuant to 26 M.R.S.A. § 625-B, and final wages pursuant to 26 M.R.S.A. § 626, to all Bucksport's employees who will be terminated as a result of Verso's decision to close the Bucksport Mill.

73.     Although at least three subsidiaries of Verso Paper Corp. have direct involvement in the Bucksport Mill's ownership and operations (Verso Paper LLC, Verso Bucksport LLC and Verso Bucksport Leasing LLC), Verso Paper Corp. is the  "Employer" of Bucksport Mill employees for purposes of liability for timely payment of Severance Pay under Section 625-B, sub-§ 2, because Verso Paper Corp. is the indirect owner and operator of the Bucksport Mill (the "covered establishment" that Verso seeks to close).

74.     Verso Paper LLC is the entity the name of which appears on employees' paychecks and is thus the presumed direct Employer for purposes of the Maine statute.

75.     As noted by Dir. Pamela Megathlin, Director of the Maine Bureau of Labor Standards, in her December 10, 2014 Determination Letter (Exhibit 27), Apollo Global Management (Apollo) also meets the definition of "employer" under Section 625-B as the indirect owner and operator of both Verso Paper Corp. and the Bucksport Mill, as a consequence of the controlling interest Apollo holds in Verso Paper Corp. and its apparent role in the decision to close the Bucksport Mill which demonstrates both ownership and control within the meaning of the statutory definition of "Employer" in 26 M.R.S.A. § 625-B, sub-§ 1.C.  Apollo is not being named as a party in this litigation at this time.  (See also, Exhibits 28 through 31).

76.     Verso and its hourly wage employees, through the unions that represent these employees, have Collective Bargaining Agreements (CBAs) that provide for the payment of severance pay in certain circumstances.  See, Exhibit 1, CBA between Verso and Plaintiff IAMAW Local Lodge 1821, effective November 1, 2011 through April 30, 2015.

77.     All of the CBAs state that they are between "Verso Paper – Bucksport Mill" and each of the specific employee organizations that represent the hourly wage employees, including the IAMAW Local Lodge 1821, and all of the CBAs were executed by the Bucksport Mill's Manager

and Human Resources Director in the Fall of 2011.  However, "Verso Paper – Bucksport Mill" is not a legally registered entity name in the State of Maine or Delaware.

78.     The relevant provisions in the operative CBA(s) relating to the payment of Severance Pay are contained in Sections 7, 11.15(a), 12 and 29 of the IAMAW CBA between Verso and IAMAW Local #1821.  (Exhibit 1).  Identical provisions are contained in the CBAs between Verso and the other unionized hourly wage employees, although with slightly different numbering of the relevant sections and paragraphs.

79.     The applicable CBA between Verso and IAMAW Local Lodge 1821 is effective from November 1, 2011 through April 30, 2015.  The other CBAs have similar, but not identical, effective periods.

80.     The provisions of the 2011-2015 Verso-IAMAW CBA that are most relevant to this Complaint state as follows:

SECTION 7.  SENIORITY

7.5  In the event of a layoff, the employees with the least department seniority shall be the first laid off in each department and shall be returned to work in reverse order. This section also applies to vacations.

7.6  Seniority referenced in this section shall refer to Mill Seniority as defined in Section 7.2.   If an employee with one (1) year seniority or less is laid off for less than twelve (12) months due to lack of work, their seniority remains unbroken.  If an employee with more than one (1) year seniority is laid off for less than eighteen (18) months due to lack of work, their seniority remains unbroken.  If more than twelve (12) months or eighteen (18) months respectively, their seniority starts anew.  If an employee is recalled and offered employment at their regular kind of work within the twelve (12) month or eighteen (18) month period respectively, and does not report, their seniority will be broken.

7.7  In the event of a temporary curtailment of operations which does not exceed twenty-one (21) continuous days, the following guidelines are established IAM members Mechanical Maintenance Department.

   1.  Every reasonable effort will be made to give people time off during the

37

curtailment if they request it.  Scheduled vacations will be honored first.

2. Positions will be filled by department seniority.  Seniority means most senior qualified.

3. The parties may mutually agree to change the schedule.

4. Unanticipated openings will be offered to the most senior qualified person not scheduled by department seniority

## SECTION 11.  VACATIONS

11.15   The following provisions will govern the administration of the vacation clause relating to (a) retiring and terminated employees, (b) employees who have otherwise met the eligibility requirements but have failed to meet the required 1,200 work hour qualification because of absence due to sickness and (c) employees who are absent from work due to an occupational injury.

(a) Retiring and Terminated Employees
Employees who retire or resign giving proper notice of at least two weeks to the Company or die will be granted accrued vacation pay on the following basis:

Employees who retire or resign from the Company or die will be granted vacation pay for the current vacation year prorated on the basis of one-twelfth (1/12) normal vacation pay for each full month completed on the active payroll by the employee during the vacation year in which they retire, resign or die.

## SECTION 12.  SEVERANCE PAY

a.        12.1   In instances of addition, elimination or modification of equipment which results in employment of fewer employees, the company will provide a severance payment equal to 40 hours x the employee's current card rate for each year of service.

b.        12.2   Such severance pay shall only apply to employees permanently laid off for three (3) months or more and payment will not be made until three (3) months following the date of layoff.

c.        12.5  The Company agrees that when exercising its rights under the current labor agreement, it will undertake any reductions in force through voluntary severance and/or attrition except in situations involving temporary lay-offs or permanent reductions due to complete or partial closure.  In situations involving temporary lay-offs, current labor agreement provisions will apply.  In situations involving permanent reductions due to complete or partial closures, employees will

be laid-off in accordance with the current labor agreement and effect bargaining will take place.

d.      12.6  It is understood that should the State or Federal law provide a greater severance allowance those affected employees would receive the higher amount.  In order to qualify for these higher benefits, such employees would have to be terminated per the conditions of the applicable law.

SECTION 29.  CONTRAVENTION OF LAW

e.      29.1  If any provision or section of this Agreement is in contravention of the laws or regulations of the United States or of the State in which this Agreement is located, such provisions shall be superseded by the appropriate provisions of such law or regulations, so long as same is in force and effect, but all other provisions of the Agreement shall continue in full force and effect.

81.    The 3-month delay in the time for paying severance pay contained in Section 12.2 of the 2011 Verso-IAMAW CBA is in direct contravention of the time requirements for paying severance in Maine law, established in and mandated by 26 M.R.S.A. § 625-B, sub-§ 2, which requires severance pay to be paid within the next regularly pay period after the employee's last full day of work.

*82.*    Accordingly, pursuant to Section 29.1, the time frame for paying severance in Section 12.2 is *superseded* by the time requirements in 26 M.R.S.A. § 625-B, sub-§ 2.  In other words, *by operation of Section 29.1, the time requirements of 26 M.R.S.A. § 625-B, sub-§ 2 are the time requirements for paying severance under the Collective Bargaining Agreement as well.*

83.    In the 8-K that Verso filed on October 1, 2014, and in the 10-K Verso filed on November 13, 2014, Verso expressly acknowledged that it owes approximately $30-35 million in severance costs relating to the closure of the Bucksport Mill to be recorded in 2014 and 2015:

a.      …pre-tax cash severance and other shutdown charges of approximately $35-45 million to be recorded in 2014 and 2015. The estimated cash charges

consist of approximately $30-35 million in severance costs and approximately $5-10 million in other shutdown costs. October 1, 2014, Verso 8-K.[40]

84.     Verso has been informed, in writing and/or in person, of its liability under Maine law to timely pay severance, not just by Plaintiffs, but also (on information and belief) by the highest ranking officials in the State of Maine, including (but not limited to): U.S. Senator for the State of Maine Susan Collins and her most senior Maine staff; Maine Governor Paul LePage; the Governor's Senior Economic Advisor, John Butera; Commissioner of the Maine Department of Labor Jeanne Paquette and her staff; Director of the Bureau of Labor Standards Pamela Megathlin; Maine Attorney General Janet Mills, through AAG Nancy Macirowski; Maine Speaker of the House Mark W. Eves; Maine Senate President Michael D. Thibodeau; Maine Senate Democratic Leader Justin L. Alfond; Maine House Republican Leader Kenneth W. Fredette; Maine State Senator Kimberly Rosen, Senator for the District in which the Bucksport Mill is located; Maine State Representative Richard H. Campbell, Representative for the District in which the Bucksport Mill is located; and, United States Senator for the State of Maine Angus King, in person through his most senior Maine staff member, former State Senator Chris Rector.

85.     Despite being informed by the highest ranking officials in the State of Maine that they owe a duty to the State of Maine and to Verso's Bucksport Maine Mill employees, under unequivocal State law mandates, to **_timely_** pay severance and other final wages, by January 8, 2015, as of December 12, 2014, Verso Paper Corp. and the agents and representatives of the Verso Paper entities continue to refuse to comply with this obligation and have expressly stated that they will not honor nor acknowledge this liability and will not pay severance or accrued 2015 vacation time to its employees prior to April Fool's Day 2015.  *See, e.g.* November 19, 2014 Letter from the

---

[40] http://investor.versopaper.com/secfiling.cfm?filingID=1421182-14-56&CIK=1421182

Honorable Susan Collins, United States Senator for the State of Maine to Verso (Exhibit 3);

November 19, 2014 Verso Response Letter to Sen. Collins (Exhibit 4); November 25, 2014 Letter

from Dir. Megathlin, Maine Bureau of Labor Standards to Verso (Exhibit 9); December 10, 2014

Letter from Dir. Megathlin to Verso (Exhibit 27); and December 12, 2014 email from Charles

Welch, Human Resources Manager at the Bucksport Mill for Verso (Exhibit 18)[41].

## IV.  JURISDICTION AND VENUE

86.     This action arises under federal antitrust law, 15 U.S.C. § 1, et seq.; Maine antitrust laws

(10 M.R.S. §§ 1101 and 1102); and the Maine State statutes compelling the timely payment of

severance pay, 26 M.R.S.A. § 625-B, and final wages, including accrued 2015 vacation time pay,

26 M.R.S.A. § 626.  Here, the amount of severance pay and final wages, including accrued 2015

vacation pay at issue exceeds the sum or value of $3 million for just the Plaintiffs Local 1821

members, and an estimated $30-$35 million in severance pay and final wages for all similarly

situated Bucksport Mill employees who the Defendants are refusing to timely pay in accordance

with the express mandates in Maine law.  Mandatory interest, liquidated damages, penalties and

costs, including attorneys' fees, required in any judgment entered for violation of 26 M.R.S.A. §

625-B, sub-§ 2, and § 626, raise this liability much higher.  See, e.g. 26 M.R.S.A. § 625-B, sub-§§

4 and 9, and § 626.

---

[41] Mr. Welch's December 12, 2014 email to Plaintiffs' counsel Kim Ervin Tucker states in relevant part that:

The following answers are in response to questions posed in your email on December 11. Specifically:

*       Has Verso changed its position on the date on which it will pay severance and 2015 vacation time pay?  Verso's position on timing of severance pay and the payment required by Section 10 (2015 Vacation) of the MOA has not changed, but we continue to evaluate circumstances as they arise.

87.     This Court has jurisdiction over the subject matter of this action under:  28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States" and 28 U.S.C. § 1332 (diversity jurisdiction), which grants the district courts "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States."

88.     This Court has the authority to grant the relief sought in this action, pursuant to 28 U.S.C. § 2201 (Declaratory Relief) and 28 U.S.C. § 2202 (Injunctive Relief).

89.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), as this civil action is brought concerning the Defendants' improper and illegal actions, in violation of federal and State law, in connection with the Defendants' closure of the Bucksport Mill in Bucksport, Maine. Accordingly, this judicial district is the district in which a substantial part of the events, actions or omissions giving rise to the claims raised by this Complaint have occurred or imminently will occur, and in which a substantial part of property that is the subject of the action is situated.

## V.  STANDING

90.     The individual Plaintiffs are directly injured by the Defendants' agreement to shut down the Bucksport Mill.  They are participants in the competitive local market to provide a specialized input (i.e., skilled printing mill labor).  Many of the individual Plaintiffs, other members of Local Lodge 1821, and similarly situated Bucksport Mill employees, have lived in Bucksport for several decades or even several generations.  Alternative employment opportunities for such skilled workers are not available in the Bucksport area and appear limited in the State of Maine or New England, as a result of the continuing decline in the coated printing paper markets.  Thus, as

participants in the market for skilled printing plant labor, the individual Plaintiffs have antitrust standing and would suffer antitrust injury if Defendant Verso were allowed to sell the Bucksport Mill to an entity that does not intend to continue operating its paper-production facilities, while also seeking to destroy its operational capability and to prevent all attempts to have it continue in operation under an alternative owner willing to do so.  In addition, all of the individual named plaintiffs have also purchased magazines printed on coated printing paper and other products using coated printing paper, and therefore also have standing as consumers.

91.    Plaintiff IAMAW Local Lodge 1821 has antitrust standing to represent the interest of the 59 union members employed at the Bucksport Mill for whom IAMAW Local 1821 is the certified collective bargaining agent.  IAMAW Local Lodge 1821 is the collective bargaining agent and representative for roughly seventy-percent (70%) of the mechanics employed by Defendant Verso entities at the Bucksport Mill in the Maintenance Department.  All of Local Lodge 1821's members are participants in the market for skilled printing plant labor, and would suffer antitrust injury if the Defendants were allowed to sell the Bucksport Mill to an entity that does not intend to continue operating its paper-production facilities.

92.    In addition, both the individual Plaintiffs and IAMAW Local Lodge 1821 have express statutory standing to enforce the mandates relating to the payment of severance pay to the members of Local 1821.  The individual Plaintiffs, have statutory authority to maintain an action for themselves and all similarly situated Bucksport employees, including those employees who are members in other unions; and Plaintiff IAMAW Local Lodge 1821 has the statutory authority to bring an action on behalf of its members.  Specifically, 26 M.R.S.A. § 625-B, sub-§ 4 states in

relevant part that:

> **4. Suits by employees.**   Any employer who violates the provisions of this section shall be liable to the employee or employees affected in the amount of their unpaid severance pay.  Action to recover liability may be maintained against any employer in any state or federal court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and any other employees similarly situated.  Any labor organization may also maintain an action on behalf of its members.  The court in such action shall, in additional to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant and the costs of the action.

93.     Similarly, the individual Plaintiffs also have express statutory standing to enforce the mandates relating to the payment of final wages, including accrued 2015 vacation time, for themselves and all similarly situated Bucksport employees.  Specifically, 26 M.R.S.A. § 626 states in relevant part that:

> An action for unpaid wages under this section may be brought by the affected employee or employees or by the Department of Labor on behalf of the employee or employees. An employer found in violation of this section is liable for the amount of unpaid wages and, in addition, the judgment rendered in favor of the employee or employees must include a reasonable rate of interest, an additional amount equal to twice the amount of those wages as liquidated damages and costs of suit, including a reasonable attorney's fee.

## VI.  STATUTORY BACKGROUND

### A. Antitrust Laws

94.     Section 1 of the Sherman Antitrust Act (15 U.S.C. Section 1), originally passed in 1890 and occasionally amended thereafter, makes it illegal for competitors to enter into or implement any "contract, combination or conspiracy" agreements to unreasonably restrict competition in the market(s) where they compete.  Some categories of agreement are categorized as *per se* illegal; and these (some of which are also treated as criminal felonies) include agreements fixing prices, allocating customers or territories, *or reducing production output or capacity in the market*.  Other

agreements among competitors are subject to the so-called "Rule of Reason"; and these include agreements to set industry standards, establish joint ventures, license intellectual property, or mergers. When an agreement is subject to the Rule of Reason, the court must consider the market power of the parties, efficiencies likely to be generated by the cooperation, pro-competitive purposes, and also the availability of less anticompetive alternatives to achieve the same positive benefits. It is also unlawful for competitors to reach agreements on any aspect of their business operations prior to the expiration of the waiting period for any filing made to the DOJ and/or Federal Trade Commission under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (Public Law 94-435).

95.     Maine has an almost identically worded provision dealing with such restraints in local commerce. 10 M.R.S. §1101.

96.     Section 2 of the Sherman Act (15 U.S.C. Section 2) makes it illegal to monopolize a market, or conspire or attempt to do so. It also makes illegal any conspiracy to monopolize. The basic goal of this provision is to prevent a firm with substantial market power from excluding others from effectively participating in or entering a market that the defendant dominates. A dominant market participant may not intentionally remove manufacturing capacity from the market with the intention or the effect of reducing competition in the relevant market.

97.     Maine has an almost identically worded provision dealing with attempts to monopolize that injure competition in local commerce. 10 M.R.S. §1102.

98.     Section 7 of the Clayton Act (15 USC § 18) makes it illegal for a corporation engaged in commerce (as AIM is) to share capital or the assets of another such corporation where "the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly" in some product and geographic market.

99.     Maine has an almost identically worded provision dealing with anticompetitive mergers and asset acquisitions in local markets within the state.  10 M.R.S. §1102.

## B. Maine Statutes Requiring Payment of Severance and Vacation Pay

100.    Express provisions in Maine statutory and regulatory law require that Verso pay its employees severance pay under the circumstances under which the Bucksport Mill is being closed. See, 26 M.R.S.A. § 625-B.

101.    The State of Maine imposes an obligation on any employer who relocates or terminates a "covered establishment" to pay severance pay to employees employed at that covered establishment for more than three (3) years.  *See,* 26 M.R.S.A. § 625-B, sub-§ 3.D.

102.    A "Covered Establishment" means any industrial or commercial facility or part thereof which employs or has employed at any time in the preceding 12-month period 100 or more persons.  *See,* 26 M.R.S.A. § 625-B, sub-§ 1.A.

103.    The duty to pay severance is characterized as a "liability" and is an obligation owed to the State of Maine, the direct benefit of which is provided to individual employees.  26 M.R.S.A. § 625-B, sub-§§ 2 and 3.

104.    The liability to pay severance in Maine law can be enforced by a legal action undertaken by any one or more employees on behalf of himself or themselves and any other similarly situated employees, by any labor organization on behalf of its members, or by the State of Maine through an enforcement action brought by the Director of the Bureau of Labor Standards.  *See, e.g.* 26 M.R.S.A. § 625-B, sub-§§ 4 and 5.

105.    This statute on severance pay includes two distinct requirements for the severance to be

paid:  (1) the *amount* to be paid; and (2) the *time* within and by which such payment *shall be paid*

to the employee(s).  *See,* 26 M.R.S.A. §625-B, sub-§ 2.

106.    Specifically, 26 M.R.S.A. §625-B, sub-§ 2 mandates in relevant part as follows:

> **2.  Severance pay.**  Any employer who relocates or terminates a covered
> establishment ***shall be liable to his employees for severance pay at the rate of one
> week's pay for each year of employment by the employee in that establishment***.
> The severance pay to eligible employees shall be in addition to any final wage
> payment to the employee and ***shall be paid within one regular pay period after the
> employee's last full day of work,*** notwithstanding any other provisions of law.

(emphasis supplied).

107.        In 2003, the Maine Legislature amended 26 M.R.S.A. § 625-B, sub-§ 3 to clarify

that the Severance Pay liability in this law can only be "mitigated" by ***actual*** payment of

Severance Pay in an amount that is equal to or greater than the statutorily-mandated amount of

severance – not the mere promise that such a payment will be made at some future time.   The

Maine Legislature's intent to make mitigation of the liability to pay severances contingent upon

"*actual payment*" is evidenced by the Legislature's use of past tense in the criteria for mitigation.

Indeed, the Committee Summary explaining the reason for this amendment states that:

> **SUMMARY**
>
> *This amendment more clearly expresses the intent of the Legislature that severance
> pay liability imposed by state law is mitigated as a result of a contract providing
> for severance pay* **only if the contractual severance pay has actually been paid
> pursuant to the terms of the contract.** The amendment applies to all claims for
> severance pay that have not been paid, adjudicated or finally resolved and to those
> claims that are pending on the date of enactment, including, but not limited to,
> claims by the former employees of Great Northern Paper Company.

Legislative History of Committee Amendment "A" to H.P. 1255, L.D. 1733 during the second

special session of the 121st Maine Legislature (emphasis supplied) (Exhibit 13).

108.    As is evident from the Summary above, this 2003 amendment was necessitated by an effort

of the Great Northern Paper Company to circumvent the Maine severance statute's purpose of

providing a mechanism to set a minimum level of severance guaranteed to all employees in a mass

layoff or shut down situation, and a specific time within which that severance is to be paid.  The

Legislature's actions demonstrate that lawmakers are keenly aware that employers should not be

able to evade the requirements in the severance statute through any contract with employees,

which are bargained by employers that have an inherently unequal bargaining power over their

employees -- in a situation that is likely fraught with elements of duress and coercion.

109.    Specifically, 26 M.R.S.A. § 625-B, sub-§ 3.B, as amended in 2003, states:

> (a)    **3. Mitigation of severance pay liability.** There is no liability under this
> section for severance pay to an eligible employee if:
> (b)    **B.** The employee is covered by, ***and has been paid under the terms of***, an
> express contract providing for severance pay that is equal to or greater than the
> severance pay required by this section;

(The emphasis supplied in the underlined and italicized passages (above) in Section 625-B, sub-§

3.B is the language added to this provision in the 2003 amendments by the Maine Legislature).

Under this revised language, simply making a *promise* to pay under the terms of an express

contract with employees is no longer sufficient to evade the requirements to timely pay at a

minimum the amount of severance pay established by law in Maine – assuming that such a

promise alone was ever sufficient under the Maine severance law (since the amendment was to

*clarify* – not change – the law as earlier issued and was made retroactively applicable to the

pending GNP situation).

110.    Since at least the time of enactment of the 2003 amendment, in order to mitigate the

liability to pay severance under Maine law, an employer *must have actually paid* a sum equal to or

greater than the amount mandated in 26 M.R.S.A. § 625-B, sub-§ 2, by or prior to expiration of

the time prescribed in 26 M.R.S.A. § 625-B, sub-§ 2 (i.e. the next regularly scheduled pay period after the last full day of work), in order for the employer to satisfy or mitigate its liability to pay severance pursuant to the requirements in 26 M.R.S.A. § 625-B (emphasis added).

111.    In 2009, the Maine Legislature provided a loophole that could allow a parent company that is liable to pay Severance Pay under this law to evade its liability to pay severance to its employees if "a covered establishment" files for Chapter 11 bankruptcy protection.

112.    Specifically, that 2009 amendment states:

> a.     **3. Mitigation of severance pay liability.** There is no liability under this section for severance pay to an eligible employee if:
> *(a)     E. A covered establishment files for protection under 11 United States Code, Chapter 11 unless the filing is later converted to a filing under 11 United States Code, Chapter 7.*

(The 2009 additions are in italics and underlined).

113.    The statutory definitions that are most relevant to the Bucksport Mill's closure are below:

> A.  "Covered establishment" means any industrial or commercial facility or part thereof which employs or has employed at any time in the preceding 12-month period 100 or more persons….
>
>  C.  "Employer" means any person who directly or indirectly owns and operates a covered establishment. For purposes of this definition, a parent corporation is considered the indirect owner and operator of any covered establishment that is directly owned and operated by its corporate subsidiary.
>
> D.  "Person" means any individual, group of individuals, partnership, corporation, association or any other entity….
>
> G.   "Termination" means the substantial cessation of industrial or commercial operations in a covered establishment.
>
> H.  "Week's pay" means an amount equal to the employee's gross earnings during the 12 months previous to the date of termination or relocation as established by the director or the date of the termination or layoff of the employee, should it occur earlier, divided by the number of weeks in which the employee worked during that period.

114.    Here, the Bucksport Mill is the "Covered Establishment," employing 570 hourly wage and salaried employees.

115.    December 31, 2014, has been determined by the Director of the Maine Bureau of Labor

Standards, to be the "last full day of work" for all of the terminated Bucksport employees for

purposes of 26 M.R.S.A. § 626-B, sub-§ 2. (Exhibits 9 and 27).

116.    January 8, 2015, has been determined by the Director of the Maine Bureau of Labor
Standards, to be the date on or by which Verso is obligated to have paid severance to all of the
terminated Bucksport employees, pursuant to 26 M.R.S.A. § 626-B, sub-§ 2, and by or on which
accrued 2015 vacation time must be paid, pursuant to 26 M.R.S.A. § 626. (Exhibits 9 and 27).


**COUNT ONE:  VIOLATION OF FEDERAL ANTITRUST LAW –**
**AGREEMENT TO REMOVE PAPER**
**MAKING CAPACITY OF THE BUCKSPORT MILL**
**FROM THE HIGHLY CONCENTRATED**
**NORTH AMERICAN MARKET FOR COATED PRINTING PAPERS**

117.    Plaintiffs reallege the allegations contained in paragraphs 1 through 110 and incorporate

them herein.

118.    Defendant Verso and NewPage (i) are the leading direct competitors in the market for

coated printing papers in North America, and (ii) they have cooperated extensively in

implementing the terms of their merger agreement and seeking to obtain approval of the NewPage

Acquisition by the DOJ and other relevant authorities.  This cooperation has been specifically

acknowledged by one or both of the companies in (i) a Form 8-K filing on August 7, 2014 in

which Verso announced certain debt-restructuring transactions and announced that, under the

January 3, 2014, merger agreement with NewPage: "The closing of the Merger is conditioned

upon consummation of [these] exchange offers"; (ii) a Form 8-K filing on October 30, 2014, in

which Verso announced that NewPage was selling two of its paper mills in Biron, Wisconsin and

Rumford, Maine to a Canadian paper company, "in order to address antitrust considerations

related to the NewPage Acquisition;" and (iii) the Agreement and Plan of Merger filed with the

S.E.C. on January 3, 2014, which provided that NewPage and Verso would use their reasonable best efforts to obtain regulatory approval, and would not sell, dispose or divest any assets without the written consent of the other.[42]

119.    Based on the foregoing allegations, Plaintiffs allege that Verso's decision to shut down the Bucksport Mill, announced on October 1, 2014, was part of a cooperation agreement between Verso and NewPage designed (i) to assure that Verso's financial condition remained satisfactory until closing of the NewPage Acquisition (as apparently required by the Verso-NewPage merger agreement) and (ii) to increase future coated printing paper prices and thereby make the NewPage Acquisition more attractive to Verso economically than it otherwise would have been.   Plaintiffs further allege that discovery of internal communications between Verso and NewPage, and depositions of executives for both parties which were engaged in discussions between the parties, is likely to provide evidentiary support to show that Verso and NewPage unlawfully agreed to shut down and sell the Bucksport Mill to a non-paper manufacturer in order to make the pending NewPage Acquisition more attractive economically to Verso – as both NewPage and Verso have done with AIM in prior transactions involving Verso's Sartell Mill and NewPage's Kimberly Mill.

120.    The pendency of the DOJ investigation and the continuation of the mandatory waiting period under the HSR Act do not give Verso and NewPage a license to engage in agreements or understandings that unreasonably restrain competition between them.

121.    Verso's action in implementing this understanding with NewPage by closing the Bucksport Mill, and then entering into a contract (MIPA) to sell the Bucksport Mill to an entity that intends to demolish it and sell it as scrap (AIM), will have the effect of: (1) reducing competition in the market for coated printing paper in North America; and (2) largely eliminating demand in the

---

[42] http://www.sec.gov/Archives/edgar/data/1395864/000119312514002326/d647650dex21.htm

competitive market for employees with specialized skills to work at plants producing printing paper in Northeastern Maine.

122.    Verso's decision to shutdown the Bucksport Mill and thereby reduce Verso's own 2014 - coated printing paper production capacity by about 26%,[43] as a way of implementing its merger-related understandings with NewPage: (i) affects interstate commerce; and (ii) is an unreasonable contract, combination or conspiracy in restraint of trade that is *per se* illegal under of Section 1 of the Sherman Act (15 U.S.C. Section 1).

123.    Even if Verso's decision to shut down the Bucksport Mill pursuant to its broader cooperation arrangement with NewPage were found to be subject only to the Rule of Reason, the facts surrounding the decision clearly establish that it is an unreasonable restraint of trade.  Verso and NewPage collectively have market power, with over 50% of the sales in the North American market for coated printing paper in 2014.  Even if Verso could offer an "efficiency" justification for its action to close Bucksport, its subsequent action in selling the Bucksport Mill to a salvage company, rather than to a competitor willing to continue to operate the Bucksport Mill as a paper-manufacturing facility, destroys any such justification and makes the original shutdown understanding with NewPage clear.  Verso's clear purpose by shutting down the Bucksport and later selling it to AIM for scrap is to profit by reducing productive capacity thereby generating higher prices in the market where it will be the clearly leading supplier.

---

[43] See Verso Paper, 2014 Annual Report, Form 10-K, filed on March 6, 2014, p. 5.
http://www.sec.gov/Archives/edgar/data/1395864/000142118214000024/vrs12312013-10k.htm

## COUNT TWO:  VIOLATION OF FEDERAL ANTITRUST LAW –
## ATTEMPTED MONPOLIZATION OF THE ALREADY HIGHLY CONCENTRATED
## NORTH AMERICAN MARKET FOR COATED PRINTING PAPERS

124.    Plaintiffs reallege the allegations contained in paragraphs 1 through 117 and incorporate them herein.

125.    Verso has entered into a corporate acquisition agreement with its largest competitor in the industry, NewPage, in order to become the dominant supplier in the declining market for coated printing papers in North America.[44]  If the NewPage Acquisition is permitted by DOJ to go forward, even subject to the announced divestitures of two NewPage mills, Verso would have more than doubled in size and become the clear market leader with about a 50% share of the relevant market for coated printing paper in North America.

126.    Verso's actions and statements, as described herein, demonstrate that Verso has the specific intent to monopolize the North American market for "coated printing paper" by intentionally closing the Bucksport Mill, refusing to discuss potential offers for the Bucksport Mill from any entities wishing to continue using Bucksport to produce paper, and finally selling the Bucksport Mill to an entity that specializes in scrap metal and has no experience or intention of continuing to operate the Bucksport Mill as a paper-manufacturing facility.  Verso's purpose in deliberately destroying the Bucksport Mill's productive capability is to prevent continued operation of Bucksport by a smaller competitor in the coated printing paper market or a qualified potential competitor into that market, and thereby generate higher prices made possible by reduced industry capacity in the North American market for coated printing paper.

---

[44] Verso-NewPage joint press release on January 6, 2014
http://investor.versopaper.com/releasedetail.cfm?ReleaseID=817170

Form 8-K filed with the S.E.C. on January 6, 2014
http://www.sec.gov/Archives/edgar/data/1578086/000119312514002329/d652043d8k.htm

127.    Verso's "decommissioning" plans to disable the Bucksport Mill from continued capability to produce coated printing paper, coupled with its deliberate efforts to prevent its sale as a going concern and its intentional sale of the Bucksport Mill to a scrap metal company, constitute an illegal attempt to monopolize the North American market for coated printing paper in violation of Section 2 of the Sherman Act.

128.    Verso's acts and statements, as alleged herein, show that Verso has engaged in predatory and/or anticompetitive conduct, and that it has the specific intent to monopolize the North American coated printing paper market.  The specific purpose of Verso's refusal to sell the Bucksport Mill to any competitor, and its decision to sell the Bucksport Mill to AIM instead, is anticompetitive.  Verso's clear purpose is to profit by reducing productive capacity and thus generating higher prices in the market for North American coated printing paper where Verso will be the leading supplier, especially if the Verso-NewPage merger is allowed to proceed.

129.    Taken in conjunction with Verso's prior destruction of printing paper production capability in Sartell, Minnesota, and its acquisition of its largest competitor (NewPage – who has also used AIM to perpetrate a similar scheme to reduce supply in Kimberly, WI), Verso's additional destruction of the Bucksport Mill's productive capability creates a dangerous probability that an already dominant Verso will be able to become a monopoly, and/or achieve monopoly power, in the North American market for coated printing paper in the future after any merger with NewPage.

**COUNT THREE:**
**CONSPIRACY TO MONOPOLIZE**
**UNDER SECTION 2 OF THE SHERMAN ACT**

130.    Plaintiffs reallege the allegations contained in paragraphs 1 through 123 and incorporate them herein.

131.    Verso and AIM are participants in an ongoing undertaking to help Verso monopolize the North American coated printing paper market by destroying paper mills historically committed to producing coated printing papers.

132.    This is not the first time that Verso has contracted with AIM to reduce coated printing paper making capacity.  In 2012, Verso contracted with AIM to take over Verso's closed printing paper making plant in Sartell, Minnesota – closed after a warehouse fire damaged the electrical wiring system for the plant.  Initially after the fire, Verso had been expected to rebuild the plant and continue operations, then – unexpectedly – Verso announced that it would sell the Sartell Mill to AIM.  Promptly thereafter, AIM proceeded to scrap and demolish the Sartell mill's paper making capacity, while continuing to operate the Sartell Mill's electric power plant.

133.    AIM has extensive experience in buying up closed printing paper mills and making sure that they are never committed again to the market.  In 2012-13, it took over, scrapped, and ultimately demolished the NewPage printing paper mill in Kimberly, Wisconsin.  Simultaneously, it performed the same function for Verso--taking over, stripping and ultimately demolishing Verso's paper mill in Sartell, Minnesota.

134.    On information and belief, AIM has never made any attempt in either the Kimberly or Sartell cases to sell its newly acquired asset as an operational printing paper mill, even if doing so could have generated a higher price than it had just paid for it, or generate lower cost than scrapping the equipment and demolishing the structure.  And prior to selling the Kimberly plant to

AIM, NewPage's President and CEO reportedly told federal and state legislators that it would only lease to a "non-competing firm."[45] AIM obviously knows that if it ever did anything like that, it would never be offered another printing paper mill for purchase and demolition, as it has previously done for Verso and NewPage.

135.    Verso's just-announced December 5, 2014, contract (MIPA) with AIM for the Bucksport Mill is very elaborate running 62 printed pages. The contract is very clear that Verso expects AIM to destroy the Bucksport Mill as a potential producer of coated printing paper going forward and AIM promises to do it, while retaining only Bucksport's power plant as an operational facility.

136.    Verso's steadfast refusal to sell the Bucksport Mill as a going concern, and instead to contract with AIM to have it destroyed is plainly exclusionary because it prevents (i) potential new entry into the North American market for coated printed paper or (ii) expansion of capacity by one of the small competitors already in the market.

137.    The collective acts and statements of Verso and AIM, as alleged herein, show that each party has the specific intent that Verso should monopolize the North American coated printing paper market and has agreed to take actions to achieve that end.


**COUNT FOUR:**

**ILLEGAL CORPORATE ACQUISITION IN
VIOLATION OF SECTION 7 OF THE CLAYTON ACT (15 U.S.C. § 18)**

138.    Plaintiffs reallege and incorporate herein paragraphs 1 through 131 of this Complaint.

139.    AIM, a salvage company that has never operated a paper mill, is acquiring the corporate entity that owns the paper-making capability of Bucksport, Verso Paper LLC, for the purposes set forth in the Verso-AIM MIPA agreement dated December 5, 2014 (hereinafter "the AIM

---

[45] See, e.g. Paragraph 53, and footnote 32, *supra,* pp. 26-27.

Acquisition" or "AIM MIPA").  These purposes are to scrap the paper-making equipment in the Bucksport Mill and demolish the Mill's building(s) related to the production of paper.

140.    Thus, the competitive effect of the AIM Acquisition is to permanently remove 350,000 metric tons of printing paper capacity from the North American coated printing paper market.

141.    The likely (and intended) competitive effect of this significant reduction in capacity caused by the AIM Acquisition is that future consumers of coated printing paper will pay higher prices than they would if the Bucksport Mill remained operational in Verso's hands or those of a competitor.

142.    Because the AIM Acquisition permanently eliminates this possibility, it violates Section 7 of the Clayton Act (15 USC § 18), which provides that:

> [N]o corporation engaged in commerce shall acquire, directly or indirectly the whole or any part of the stock or other share capital  [or] the assets of another corporation also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly.

143.    Verso and AIM are both engaged in interstate commerce.  The relevant product market in which the AIM Acquisition "may...substantially lessen competition" is the market for "coated printing papers" and the relevant geographic market is "North America" or the "United States".

144.    Verso and AIM can make no claim that the AIM Acquisition, by eliminating competitive facilities from the market, somehow generates efficiencies that would benefit consumers of coated printing paper.

145.     Plaintiffs also have standing to seek injunctive relief under 15 U.S.C. § 26 because they have been employees at Bucksport, and are potential suppliers of labor to the Bucksport Mill, and Bucksport's destruction can be avoided by a determination that the AIM Acquisition is illegal and its performance is enjoined.

## COUNT FIVE:

## ILLEGAL CORPORATE ACQUISITION IN
## VIOLATION OF MAINE ANTITRUST LAW
## (10 M.R.S. § 1102-A)

146.    Plaintiffs reallege and incorporate herein paragraphs 1 though 139 of this Complaint.

147.    Verso has violated Maine Antitrust law, 10 M.R.S. § 1102-A, by selling Verso Paper LLC

to AIM, a salvage company that has never operated a paper mill, under a contract that

contemplates the destruction of the paper-making capability of the Bucksport Mill.  This section

provides:

> No person engaged in commerce in this State may acquire, directly or indirectly,
> the whole or any part of the stock or other share capital, or the whole of any part of
> the assets of another person also engaged in commerce in this State, where in any
> line of commerce or any activity affecting commerce in any section of this State,
> the effect of the acquisition or use of that share capital, or the acquisition of those
> assets, may be substantially to lessen competition or tend to create a monopoly.

148.    Because the AIM Acquisition causes the destruction of substantial printing paper capacity,

it "may...substantially lessen competition" is the market for "coated printing papers" and the

relevant geographic market is "Maine".

149.    For the same reason, the AIM Acquisition also " may...substantially lessen competition" in

the market for skilled printing paper factory labor in Hancock County, Maine.

## COUNT SIX:
## VIOLATION OF MAINE ANTITRUST LAW—
## UNREASONABLE TRADE RESTRAINTS (10 M.R.S. § 1101)

150.    Plaintiffs reallege and incorporate herein paragraphs 1 though 143 of this Complaint.

151.    Verso, in combination with NewPage, has violated Maine Antitrust law, 10 M.R.S. § 1101,

which states in part:   "Every contract, combination in the form of trusts or otherwise, or

conspiracy, in restraint of trade or commerce in this State is declared to be illegal."

152.    Based on the foregoing allegations, Plaintiffs allege that Verso's action in shutting down the Bucksport Mill, announced on October 1, 2014, was part of a cooperation agreement between Verso and NewPage designed (i) to assure that Verso's financial condition remained satisfactory until closing of the NewPage Acquisition (as apparently required by the Verso-NewPage merger agreement) and (ii) to increase future coated printing paper prices and thereby make the NewPage Acquisition more attractive to Verso economically than it otherwise would have been.  As such, it was an unreasonable restraint of trade that largely eliminated a competitive market for skilled printing paper factory workers in Hancock County, Maine.

### COUNT SEVEN:

### VIOLATION OF MAINE ANTITRUST LAW
### (10 M.R.S. § 1102)
### ATTEMPT TO MONOPOLIZE

153.    Plaintiffs reallege and incorporate herein paragraphs 1 though 146 of this Complaint.

154.    Verso has violated Maine Antitrust law, 10 M.R.S. § 1102, which makes illegal any attempt to monopolize.

### COUNT EIGHT:

### VIOLATION OF MAINE ANTITRUST LAW
### (10 M.R.S. § 1102)
### CONSPIRACY TO MONOPOLIZE

155.    Plaintiffs reallege and incorporate herein paragraphs 1 though 148 of this Complaint.

156.    Verso, in combination with AIM, has violated Maine Antitrust law, 10 M.R.S. § 1102, which makes illegal any conspiracy to monopolize with another person.

**COUNT NINE:  VIOLATION OF 26 M.R.S.A. §§ 625-B AND 626 –
DEDENDANTS' REFUSAL TO TIMELY PAY
SEVERANCE PAYMENTS AND FINAL WAGES,
INCLUDING ACCRUED 2015 VACATION TIME PAY,
WITHIN THE TIME PRESCRIBED BY MAINE LAW**

157.     Plaintiffs reallege the allegations contained in paragraphs 1 through 150 and incorporate them herein.

158.     As employees eligible for payment of severance pay as a result of the announced closure of the Bucksport Mill by the Verso Defendants, and the union that represents such eligible employees, Plaintiffs are entitled to commence a civil action for the timely payment of severance pay, on their own behalf, and on behalf of all similarly situated Bucksport Mill employees, pursuant to 26 M.R.S.A. § 625-B, sub-§ 4.

159.     Similarly, Plaintiffs are entitled to bring an action for unpaid wages, including accrued 2015 vacation time pay, and – in the event that Verso follows through with its stated intent not to pay accrued 2015 vacation time by January 8, 2015 -- recover interest, liquidated damages, and costs where an employer fails to pay final wages, including accrued vacation time, in a reasonable time, pursuant to 26 M.R.S.A. § 626.

160.     Pursuant to the express provisions of 26 M.R.S.A. § 625-B, sub-§ 2, each and every Plaintiff, and all similarly situated Bucksport employees, are entitled to payment of an amount of severance pay equal to his or her individual gross pay for the preceding 12 months, divided by the number of weeks he or she worked in the preceding 12 month period, times the number of years he or she worked.  This payment of severance "shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provision of law."

161.     On November 25 and December 10, 2014, Pamela Megathlin, Director of the Maine Bureau of Labor Standards, issued Determination Letters to Verso, expressly concluding that

December 31, 2014, will be the "last full day of work," within the meaning of 26 M.R.S.A. § 625-B, sub-§ 2, *for all terminated Bucksport employees*,.  Further Dir. Megathlin determined that Verso is obligated to pay severance pay, in an amount equal to or greater than required by 26 M.R.S.A. § 625-B, sub-§ 2, *on or by January 8, 2015* – the next regularly scheduled pay period (pay-day) after December 31, 2014.  (Exhibits 9 and 27).

162.    Verso has maintained in its communications with the Plaintiffs, other Bucksport employees and the union representatives, as well as with State officials, that Verso will *not* comply with the requirement to pay severance and accrued 2015 vacation time by January 8, 2015.  Rather, Verso has maintained that it will not pay severance or accrued 2015 vacation time for three (3) months  -- or until *April Fool's Day 2015*.  (See, e.g. Exhibits 2, 4, 8, 10, and 18)

163.    Verso cites a provision relating to the payment of severance in all of the collective bargaining agreements Verso has with its hourly wage employees at the Bucksport Mill as authority for its refusal to comply with the time requirements for paying severance in 26 M.R.S.A. § 625-B, sub-§ 2.  Specifically, Verso cites Section 12.2 of its CBA with the Plaintiffs as providing authority for its delay in paying severance until April Fool's Day, 2015.  (Exhibit 1 and 2, § 2).

164.    However, the three-month time delay contemplated for paying severance pay in Section 12 of the CBA between Defendants and Plaintiffs is in direct contravention of the time frame for paying severance under express the provisions in Maine law, in 26 M.R.S.A. § 625-B, sub-§ 2.

165.    Accordingly, pursuant to Section 29 of the CBA between Defendants and Plaintiffs, the provisions in Section 12, and specifically 12.2, of the CBA relating to the time for payment of severance pay *shall be superseded by the appropriate provisions of Maine law*, because the provisions of the CBA are in direct contravention of applicable, controlling State law.

166.    Thus, under both the requirements of Maine law *and the CBA*, Defendants are required to pay severance within the time mandated by Maine law, in 26 M.R.S.A. § 625-B, sub-§ 2 – on or by January 8, 2015 -- because any contrary provision for payment of severance in the CBA is superseded by the contravening provision in State law for making such payments.  Thus, under *both* State law and the Verso-IAMAW Local 1821 CBA, the date on which Defendants are required to pay severance to all employees terminated as of December 31, 2014 is January 8, 2015, as reflected in the Director's Determination Letters, since -- by operation of Section 29 -- Section 12.2 is superseded by the time requirements in 26 M.R.S.A § 625-B, sub-§ 2 and those time statutory time requirements are incorporated into the CBA(s) as an express and binding term of the parties' agreement.  *Id.*

167.    Despite Verso being repeatedly advised by Plaintiffs, union officials representing other hourly wage employees at the Bucksport Mill, Plaintiffs' counsel, and the highest ranking officials in the State of Maine that severance is owed, to all Bucksport employees who are being terminated as a result of the closure of the Bucksport Mill, within the *time* and *amount* requirements in 26 M.R.S.A. § 625-B, sub-§ 2, Verso continues to refuse to comply with the mandates in Maine law. (See Exhibits 2, 3, 4, 5, 8, 9, 10, 18 and 27).  Indeed, as late at Friday night, December 12, 2014, Verso's representatives confirmed that Verso still intended to violate the legal requirement to pay severance pay to the Bucksport employees by January 8, 2015.  (Exhibit 11).

168.    Verso has similarly refused to pay Plaintiffs and all similarly situated Bucksport employees their accrued 2015 vacation time pay within the time requirements in 26 M.R.S.A. § 626 – by January 8, 2015.

169.    Unlike the severance pay dispute, Verso cites no provision in the CBA to justify this 3-month delay in paying accrued 2015 vacation time pay.  However, initially, Verso claimed that there was no CBA provision requiring Verso to pay accrued 2015 vacation time pay.

170.    All of the CBAs between Verso and the hourly wage employees at the Bucksport Mill include provision for paid vacations.  Section 11 of the CBA between Verso and Plaintiff IAMAW Local Lodge 1821 entitles all members of Local Lodge 1821 to paid vacations.  Section 11.15(a) expressly addresses the right of employees "…who retire or resign giving proper notice of at least two weeks to the Company or die" to accrued vacation pay.  (See, Exhibit 1).

171.    In addition, in the MOAs entered by Verso and all of the hourly wage employees during effects bargaining, Verso agreed to pay all hourly wage employees their accrued 2015 vacation time pay.  See Exhibit 8, §§ 10 and 12, and Exhibit 10, §§ 10 and 12.

172.    Pursuant to the express provisions of 26 M.R.S.A. § 626, employees leaving employment must be paid all final wages in full within a "reasonable" time.  "[A] reasonable time means the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made."  Whenever the terms of employment include provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned.

173.    Pursuant to 26 M.R.S.A. § 626, Defendants are required to pay accrued 2015 vacation time pay by January 8, 2015, as a consequence of the Director's Determination Letters designating December 31, 2014 as "the last full day of work" for all Bucksport employees being terminated as a result of the closure of the Bucksport Mill, pursuant to 26 M.R.S.A. § 625-B, sub-§ 2.  *Id.*

174.

175.    Plaintiffs (and other unions' representatives) have asserted that this is and was required under Section 11.15(a) (or similar sections in the other CBAs).  However, this argument was eliminated as a justification for Verso's delay in paying employees for their accrued 2015 vacation time under the time requirements in 26 M.R.S.A. § 626 when Verso signed two Memoranda of Agreement, collectively covering all hourly wage employees, agreeing to pay accrued 2015 vacation time and then carving the issue of the timing of such payments out for separate resolution (to include resolution by litigation).  See, Exhibit 8 (November 25, 2014 MOA by other unions), §§ 10 and 12; and Exhibit 10 (December 3, 2014 MOA with Plaintiffs), §§ 10 and 12.

176.    Plaintiffs need not wait for a violation of 26 M.R.S.A. §§ 625-B and 626 to occur on January 8, 2015, before this matter is ripe for requesting declaratory and injunctive relief.  Verso has been adamant, consistent, and unequivocal in its refusal to comply with the requirements for payment of severance and accrued 2015 vacation time pay in 26 M.R.S.A. §§ 625-B and 626.

177.    Verso reiterated its intent to violate the time requirements in 26 M.R.S.A. § 625-B, sub-§ 2 and § 626, as recently as Friday, December 12, 2014 (Exhibit 18).

178.    Further, because of the added threat to payment of severance and other wages posed by the Verso-AIM MIPA transaction, scheduled to close on or before 12:01 a.m. on January 9, 2015, it is imperative that this matter be resolved now – prior to Verso actually violating 26 M.R.S.A. § 625-B and 626.

179.     On December 8, 2014, Verso filed an 8-K filing with the S.E.C. attached to which as exhibit 2.1 was a "Membership Interest Purchase Agreement" (MIPA), dated December 5, 2014, between Defendant Verso Paper Corp. and AIM Development (USA) LLC ("AIM"), detailing terms for the sale of the Bucksport Mill to AIM.[46]  On pages 24 and 42 of that MIPA, the

---

[46] http://www.sec.gov/Archives/edgar/data/1421182/000119312514436360/d834648dex21.htm

following statements and agreements between Verso and AIM appear regarding the payment of severance:

   3.10 <u>Employees</u>.

(b) Except for the obligations of Sellers and/or the Companies as set forth in the CBAs (which obligations VB is assuming as of the Closing Date with respect to the Facilities Employees) and except for the obligations to be assumed or retained at Closing by Sellers pursuant to Section 5.08(b) hereof, (i) neither Sellers nor the Companies is liable for any severance pay or other payments to any employee or former employee arising from the termination of employment at or relating to the Project, and (ii) *neither Sellers, the Companies, nor Buyer will have any liability under any benefit or severance policy, practice, agreement, plan, or program that exists or arises, or may be deemed to exist or arise, under any applicable Law (including, but not limited to, WARN and the Maine Revised Statutes regarding severance pay, 26 M.R.S. §625-B (" <u>Maine's Severance Pay Statute</u> ")) or otherwise, as a result of, or in connection with, the transactions contemplated by this Agreement or as a result of the termination on or prior to the Closing Date by Sellers or the Companies of any Persons employed by either Seller or either Company (or their respective Affiliates) at or relating to the Project*.

5.08 <u>Employment Matters</u>. The Parties agree and acknowledge as follows:

(b) Sellers shall be solely responsible for, and shall assume as of the Effective Time any and all liability for, severance payments and other payments that are or become payable under the CBAs, the Employee Plans, applicable Law (including Maine's Severance Pay Statute) to current or past employees of Sellers or their Affiliates who have been employed at the Project, other than the Facilities Employees (modified as contemplated by Section 5.08(a) hereof) that Buyer elects to employ or to cause VB to employ as of the Effective Time; provided that Sellers shall be solely responsible for and shall retain liability for all Employee Plans with respect to the Facilities Employees. VP caused to be delivered WARN notices to all employees employed at the Project on or about October 1, 2014, indicating the intent to cease operations at the Project effective November 30, 2014, which date may be extended at the option of VP to as late as December 31, 2014. VP shall engage in any bargaining required under the CBAs or applicable Law arising out of the planned termination of any employees employed at the Project who receive WARN notices as provided herein. Buyer agrees that VB shall be solely responsible for any payments or obligations to the Facilities Employees that Buyer elects to employ or to cause VB to employ as of the Effective Time, which payments or obligations arise following the Effective Time in connection with their employment by Buyer or VB or the termination of such employment, under the CBAs, applicable Law (including Maine's Severance Pay Statute). Any termination of the employment with Buyer or VB of any such Facilities Employee following the Effective Time shall be subject to (as applicable) the CBAs, the Employee

> Plans and applicable Law, and Buyer and VB shall be solely responsible for any costs or liabilities arising therefrom.

(emphasis supplied).

180.   The "closing date," "Effective Date" or "Effective Time" for this agreement are indicated as occurring on or before January 9, 2015.[47]

181.   The language of this MIPA between AIM and Verso, evinces an intent by Verso to evade the requirement to pay severance in the future, by attempting to contrive a contractual shift of Verso Paper Corp.'s statutory liability for severance, as the indirect employer to a subsidiary that will have been stripped of all assets at the time of the effective date of the described transfer.  This *ultra vires* attempt to evade Verso's liability for severance and accrued vacation time pay, demonstrates why it is imperative to compel timely payment of all severance and vacation time pay, within the time mandated under 26 M.R.S.A. §§ 625-B and 626, to prevent Verso from an effort to permanently mitigate its liability for such payments through an artifice designed to take advantage of the loop hole in 26 M.R.S.A. § 625-B, sub-§ 3.E.

182.   Accordingly, Plaintiffs are entitled to declaratory and injunctive relief to enforce the mandates relating to the time for payment of severance pay and final wages, including accrued 2015 vacation time pay, pursuant to 26 M.R.S.A. §§ 625-B and 626, as requested in this Complaint.

---

[47] *See, e.g.* MIPA, Article I (Definitions), p. 4; Article 6 (Conditions to the Closing), pp. 46-47; Article 7 (The Closing), pp. 48-49.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.        Adjudge and declare that Defendant Verso's agreement with NewPage to close down the Bucksport Mill is an illegal restraint of trade in violation of Section 1 of Sherman Act.

2.        Adjudge and declare that Defendant Verso's agreement with AIM to sell the Bucksport Mill to AIM, is an illegal conspiracy to monopolize the market for coated printing paper in violation of Section 2 of Sherman Act.

3.        Adjudge and declare that Defendant Verso's contemplated actions to (i) destroy the productive capability of the Bucksport Mill through affirmative acts and omissions, (ii) Verso's simultaneous refusal to offer it for sale as a going concern; and (iii) Verso's agreement to sell the Bucksport Mill to AIM for salvage constitutes illegal attempted monopolization in violation of Section 2 of the Sherman Act, and that Verso's sale of the Bucksport Mill to AIM also violates Section 7 of the Clayton Act and should be permanently enjoined.

4.        Prohibit Defendant Verso from taking any steps during the closure of the Bucksport Mill that would result in damage to this facility as a going concern for the production of coated printing paper or to in any way impede the sale of the Bucksport Mill at a reasonable price to a competitor willing and able to operate this facility as a paper mill, capable of continuing to produce coated printing paper for sale in the North American market.  Such prohibited acts to include:

> **A.** Wiping, damaging, altering, deleting or removing the hard drives or any portion thereof, including the data and "recipes" on those hard drives (including information that Verso asserts is "proprietary information" until such time an independent assessment of that designation can be made by a neutral third party appointed by the Court), of computer systems that operate the paper making machines and administrative support apparatus of the Bucksport Mill;

  **B.** Failing to release the tension on all belts and felts on the paper making machinery;

  **C.** Failing to maintain the temperature of the Bucksport Mill at 45°F or above at all times until a purchaser of this facility *as an operational mill* can be found for a reasonable price;

  **D.** Failing to maintain heated water in all tanks at the Bucksport Mill to ensure that the tile linings of these tanks are not damaged or destroyed;

  **E.** Failing to rotate and lubricate all metal rollers pursuant to "best practices" previously acknowledged by Verso;

  **F.** Selling essential components of the paper making machines, including the OMC attachment for the #1 Paper Machine; and

  **G.** Damaging, altering, deleting or removing any computer or hard paper files from the Bucksport Mill, or Verso Paper Corp.'s corporate files maintained outside Bucksport, including outside the State of Maine, including files maintained by Verso's parent and controlling shareholder Apollo Global Management or any of Verso's subsidiaries, agents, representatives, counsel, auditors, accountants, officers or employees, that would relate to the Bucksport Mill and its operations, "profitability," closure or the proposed Verso-NewPage Acquisition or Verso-AIM Acquisition.

5. Enter an injunction that:

(i)  Prohibits Verso and AIM from closing and/or consummating the sale of the Bucksport Mill to AIM  or any other similar entity that does not have the intent or experience  to operate the Bucksport Mill for the purpose of producing coated printing paper;

(ii)  Prohibits Verso and AIM from rejecting any offer to purchase the Bucksport Mill at a reasonable price from any bona fide buyer willing to continue to operate the Bucksport Mill as a printing paper mill;

(iii)  Requires Verso to work with and through the Maine Department of Economic and Community Development or a neutral designated by the Court to seek, solicit, evaluate and respond to offers from prospective buyers willing to continue to operate the Bucksport Mill as a printing paper mill;

(iv) Prohibits Verso and AIM from taking any actions that would render the Bucksport Mill inoperable on a cost basis, or otherwise financially impair the Bucksport Mill's capacity to product printing paper;

(v) Prohibits Verso from attributing costs associated with any other Verso facility, including the Jay Mill, to the Bucksport Mill; and

(vi) Prohibits Verso and AIM from selling or trying to sell the electric power plant associated with the Bucksport Mill except as part of a sale of the *whole* Mill as a going concern to a buyer that has agreed to resume production of coated printing paper at Bucksport.

Plaintiffs request that these injunctions remain in effect until June 1, 2015 or 60 days after consummation of the Verso-NewPage acquisition, whichever is later.

6.     Enter an affirmative injunction that:

(i) requires Verso to publicize the availability of the Bucksport Mill for sale at a reasonable price to any bona fide buyer willing to continue operate it as a printing paper mill; and

(ii) requires Verso to work through officials from the Maine Department of Economic and Community Development, including Rosaire Pelletier, or under the direction of a special master or trustee appointed by the Court, to find an appropriate buyer for a reasonable price (as determined by the Court or its designee).

7.     Adjudge and declare that all Bucksport Mill employees are entitled to payment of severance pay, in an amount that is equal to or greater than the amount mandated by 26 M.R.S.A. § 625-B, *on or by January 8, 2015* -- one regular pay period after complete of their last full day of work, pursuant to 26 M.R.S.A. § 625-B, sub-§ 2.

8.     Adjudge and declare that all Bucksport Mill employees are entitled to payment of final wages, including all accrued 2015 vacation time, *by January 8, 2015*, as mandated by 26 M.R.S.A. § 626.

9.     Award Plaintiffs their costs of this suit, including reasonable attorneys' fees.

      10.    Grant Plaintiffs such other and further relief as the Court deems just and

appropriate under the circumstances.

Dated this, <u>15</u>th Day of December, 2014.

                                              Respectfully submitted,
                                              */s/  Kimberly J. Ervin Tucker*
                                              Kimberly J. Ervin Tucker
                                              Maine Bar No. 6969
                                              48 Harbour Pointe Drive
                                              Lincolnville, Maine 04849
                                              202-841-5439
                                              k.ervintucker@gmail.com


                                              */s/ Dana F. Strout*
                                              Dana F. Strout, Esq.
                                              Dana F. Strout, P.A.
                                              Maine Bar No. 8239
                                              270 West Street, Ste. B
                                              Rockport, Maine 04856
                                              207-236-0200
                                              dfspcc@gmail.com


                                              Donald I. Baker
                                              Petitioner to Appear *Pro Hac Vice*
                                              District of Columbia Bar No. 944124
                                              Baker & Miller PLLC
                                              2401 Pennsylvania Ave., NW
                                              Suite 300
                                              Washington, D.C. 20037
                                              202-663-7820
                                              DBaker@bakerandmiller.com

I, Richard Gilley have read the foregoing Verified Complaint for Declaratory and Injunctive Relief and the facts contained therein are true and correct to the best of my knowledge and belief.

 _/s/ *Richard Gilley*_____
Richard Gilley, affiant, Plaintiff


STATE OF MAINE                    )
                    ) ss.
COUNTY OF Waldo                   )

        The above document was subscribed and sworn to before me by Dennis Gilley this12[th] Day of December 2014.

 (S E A L)      /s/ *Kimberly J. Ervin Tucker, Esq.*
Attorney at Law


Notary Public
My commission expires:_____

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2014, a true and correct copy of the foregoing was served upon the following individuals electronically by the CM/ECF system:

**David E. Barry**
Lead Litigation Counsel

Nolan L. Reichl
Litigation Counsel

PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
P:  207-791-1376
F:  207-791-1350
dbarry@PierceAtwood.com

nreichl@pierceatwood.com


David Strock, Esquire
Verso Labor Counsel

Fisher & Phillips LLP
One Monument Square
Suite 600
Portland, Maine 04101
O:  207-774-6001
C:  207-650-3393
dstrock@laborlawyers.com

Signed:          /s/  Kimberly J. Ervin Tucker


I further hereby certify that on the 15th day of December, 2014, a true and correct copy of the foregoing was served upon the following individuals on behalf of AIM Development (USA) LLC electronically by direct email at the emails listed for contact on the December 5, 2014 MIPA.

Kamila Wirpszo, Esq.
General Counsel
9100 Henri Bourassa
Montreal (Quebec) H1E 2S4
514-494-2000 (5666) (phone)
514-494-3008 (fax)
kwirpszo@aim-rg.com

Walter Greisselier
President
100 E. Sartell Street
Sartell, MN 56377-1947
walterg@aimrecyclinggroup.com


Signed:        /s/  *Kimberly J. Ervin Tucker*