UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| **THE INTERNATIONAL ASSOCIATION OF** | ) | |
| **MACHINISTS AND AEROSPACE WORKERS,** | ) | |
| **AFL-CIO, LOCAL LODGE NO. 1821**, et al., | ) | CIVIL ACTION NO. |
| | ) | 1:14-cv-00530-JAW |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| **VERSO PAPER CORP., VERSO PAPER LLC**, | ) | |
| and **AIM DEVELOPMENT (USA) LLC**, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFEDANTS VERSO PAPER CORP. AND VERSO PAPER LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Verso Paper Corp. (collectively with Verso Paper LLC, "Verso") recently closed its paper mill in Bucksport, Maine because of the rapid decline of demand for its principal product – the coated paper used to print magazines and catalogues – caused by the digital revolution. While the growth of digital technologies has spawned new industries, new products, and new jobs throughout the global economy, it has also challenged a number of existing industries—and the jobs of many employed in those industries. Perhaps nowhere is this more apparent than in the industry that manufactures paper for printed publications like magazines and catalogues. As an inevitable consequence of the proliferation of digital media and the means to access such media, such as tablet computers and e-readers, demand for publication paper (coated freesheet, coated groundwood and supercalendered paper used in magazines and catalogues) has declined rapidly over the last decade, resulting in substantial industry excess capacity. *See* Declaration of

George A. Hay ("Hay Decl.") ¶¶ 7-8.  This combination of excess capacity and a continued inexorable decline in demand has led to numerous paper mill or machine closures around the world over the last ten years, including frequent closures in North America.  Hay Decl. ¶¶ 9-10.  And additional publication paper capacity closures are inevitable.

The closure of Verso's Bucksport mill led to the unfortunate, yet unavoidable, loss of jobs that flows from the closing of any manufacturing facility.  Plaintiffs in this case are 58 individuals formerly employed at the mill (out of the more than 500 total mill employees) and the union that represents them.  The dispute between Plaintiffs and Verso over the timing of payment of severance and vacation benefits has been fully briefed and argued to this Court.  But these 58 employees also seek to turn this garden-variety labor dispute into something more:  they claim that Verso's decision to close the Bucksport mill is a violation of the antitrust laws and that this decision will cause them irreparable injury.  Amended Complaint ("Am. Compl.") ¶¶ 23-27; Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction (the "Motion") at 8 (ECF No. 4).

To remedy their loss of employment, Plaintiffs ask this Court to issue an extraordinary and unprecedented mandatory injunction ordering Verso, among other things, to 1) continue to invest in a money-losing manufacturing plant that makes product for which there is little demand; 2) hire a third party to be appointed by the Court to act as Verso's agent in offering the mill for sale; and 3) accept any offer to purchase the mill other than the one that Verso has already accepted, provided that it is an offer from a competing manufacturer of coated publication paper.  Plaintiffs stop short of asking this Court to order the U.S. economy to generate demand for the products that Verso made at the Bucksport mill, but absent that market demand the relief that Plaintiffs seek will be futile.  Indeed, Plaintiffs themselves admit in their

Amended Complaint that the decline in demand for coated publication paper means that opportunities for employment in this industry have also declined: "[a]lternative employment opportunities for such skilled workers are not available in the Bucksport area and appear limited in the State of Maine or New England, *as a result of the continuing decline in the coated printing paper markets*." Am. Compl. ¶ 139 (emphasis added). Given the acknowledged and inevitable decline of this industry, the only question is which mills will close—not whether more mills will close. According to Plaintiffs, it is for this Court, not the free market, to answer that question.

The Court should reject Plaintiffs' extraordinary and unprecedented request to have this Court engage in a form of industrial policymaking under the guise of providing relief under the antitrust laws. Plaintiffs fall far short of meeting their burden of establishing, by a clear showing, that they satisfy even one of the four elements required for entry of a preliminary injunction, much less all four as the Supreme Court has required in *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). They therefore fail by even a wider margin to meet the even higher burden needed to justify a mandatory injunction of the type they request here.

Plaintiffs cannot succeed on the merits because they lack standing to assert a violation of the antitrust laws. The harm they claim—their loss of employment from the closure of the Bucksport mill—is not a cognizable antitrust injury. Moreover, Plaintiffs fail to make any showing, much less the required *clear showing*, in support of any of the four federal and four Maine antitrust counts in the Complaint. Verso's decision to close the Bucksport mill was unilateral, not part of a contract, combination, or conspiracy with any other party as is required to establish a violation of Section 1 of the Sherman Act. Indeed, in a filing this week in the U.S. District Court for the District of Columbia relating to Verso's proposed acquisition of NewPage Holdings Inc. ("NewPage"), the Antitrust Division of the Department of Justice ("DOJ") wrote

3

that "Verso contemplated closing the [Bucksport] mill before it decided to merge with NewPage" and that the DOJ "does not allege that the closing of the Bucksport Mill is a result of the [Verso-NewPage] merger."[1]

Further, Verso's action in *reducing* its market share cannot be an act taken in furtherance of *gaining* market power as is required to establish either attempted monopolization or a conspiracy to monopolize in violation of Section 2 of the Sherman Act.  In any event, uncontroverted evidence makes clear that Verso could not succeed in obtaining monopoly power given the current state of competition in the coated publication paper industry.

Plaintiffs' claim that Verso's sale of the mill to AIM Development (USA) LLC ("AIM") violates Section 7 of the Clayton Act is equally misguided because, as Plaintiffs themselves concede, AIM is not a participant in the relevant market in any way.  Market power cannot be created in the relevant market by the sale of an operation to a company that is not a competitor, supplier, or distributor in the market.  Moreover, Section 7 addresses the concern that a *purchaser* could gain market power as result of an acquisition.  There is no instance in which a court found that a transaction gave a *seller* market power in violation of Section 7.  Verso's closure of the Bucksport mill and its sale of that mill to AIM cannot facilitate Verso's (or AIM's) ability to raise prices above a competitive level.  Finally, in addition to suffering the same flaws as their federal counterparts, the claims under the Maine statute suffer from an additional defect—there is no private right to seek injunctive relief under Maine's antitrust laws.

Although Plaintiffs' failure to establish that they are likely to succeed on the merits is itself a basis to deny Plaintiffs' Motion, Plaintiffs also fail to meet their burden of a clear showing in support of the other three elements needed to grant an injunction.  They cannot

---

[1] Competitive Impact Statement at 3 n.1, *United States v. Verso Paper Corp.*, Case No. 1:14-cv-2216 (D.D.C. filed Dec. 31, 2014) (ECF No. 3).

establish that they will suffer any irreparable harm that will be remedied by the grant of their requested relief; the grant of an injunction will harm Verso and AIM far more than denial will harm Plaintiffs; and the public interest argues strongly in favor of denying the request for an injunction.

The Bucksport mill, like so many other old and inefficient factories, has already stopped production.  It is tragic for those families that have been affected, but there is no indication that those jobs will return.  Because Plaintiffs have failed to establish their entitlement to the extraordinary relief that they seek, their request to this Court to alter outcomes driven by the market should be rejected and their request for a temporary restraining order and preliminary injunction should be denied.

## ARGUMENT

**I.     PLAINTIFFS HAVE NOT ESTABLISHED THE ELEMENTS NECESSARY TO IMPOSE A PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER.**

### A.     Legal Standard

Despite framing their request as one seeking "a limited injunction" that is designed to "preserve[] the status quo," Motion at 3, Plaintiffs actually ask this Court for an order that moves well beyond a prohibition against Verso's sale of the Bucksport mill to AIM.  In fact, Plaintiffs ask this Court to compel Verso to take several affirmative steps that would disturb (rather than preserve) the status quo, some of which are camouflaged with language that deceptively sounds prohibitory but is actually mandatory.  Specifically, Plaintiffs seek an order "prohibiting" Verso from engaging in, among others, the following acts:

- o     Failing to release the tension on all belts and felts on the paper-making machinery
- o     Failing to maintain a minimum temperature of 45°F at the Bucksport mill
- o     Failing to maintain heated water in all tanks at the Bucksport mill
- o     Failing to rotate and lubricate all metal rollers.

Clever drafting cannot obscure the reality that "prohibiting" a party from "failing" to do something is, in reality, compelling that party to take affirmative action. The requested relief also would require, in less cleverly disguised language, that Verso do the following:

- Publicize the sale of the Bucksport mill at an undetermined "reasonable price" to any buyer willing to continue printing paper operations;

- Work with either the Maine Department of Economic and Community Development or a trustee appointed by the Court to find an "appropriate buyer" for a "reasonable price"; and

- Accept any offer to purchase the Bucksport mill at a reasonable price (although it does not define what a "reasonable price" may be) from any bona fide buyer (again, Plaintiffs have not defined which buyer would be acceptable) willing to continue operating it as a printing paper mill, and to not in any way impede the sale of the Bucksport mill at a reasonable price to a competitor willing and able to operate this facility as a paper mill, and capable of continuing to produce coated paper for sale.

*See* Motion at 3-6. Accordingly, the appropriate legal standard is that applicable to mandatory injunctions.

### 1.      Requirements for All Injunctions, Prohibitory and Mandatory

A preliminary injunction, whether in the form of a preliminary injunction or temporary restraining order,[2] "is an extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004). In doing so, Plaintiffs cannot rest on the unsupported and conclusory

---

[2] Preliminary injunctions and temporary restraining orders are governed by the same legal standard. *See Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013); *Aftermarket Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc*., No. 12-00258, 2012 WL 4753407 (D. Me. Oct. 4, 2012).

allegations of their Amended Complaint. They must produce "substantial evidence" to support each of the elements of an application for a preliminary injunction or temporary restraining order. *Mazurek*, 520 U.S. at 972. Plaintiffs "must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuna*, 699 F.3d 1, 10 (1st Cir. 2012) (quoting *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

The First Circuit recognizes that "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted); *see also Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013).

### 2.    Requirements for Mandatory Injunctions

The standard for issuing a mandatory injunction is even higher. *See Braintree Labs., Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) ("Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'") (quoting *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)).

### B.    Plaintiffs' Claims Are Meritless and Are Not Likely to Succeed on the Merits

Plaintiffs assert four counts alleging violations of the federal antitrust laws and four alleging violations of Maine's antitrust laws. Specifically, Plaintiffs claim that 1) Verso violated Section 1 of the Sherman Act, which prohibits contracts, combinations or conspiracies in restraint of trade, by implementing its decision to shut down the Bucksport mill as part of an

alleged "cooperation agreement" between Verso and NewPage, Am. Compl. ¶ 170; 2) Verso attempted to monopolize the "North American market for 'coated printing paper'" in violation of Section 2 of the Sherman Act by intentionally closing the Bucksport mill and selling it to a noncompetitor, Am. Compl. ¶ 177; 3) AIM conspired with Verso to help Verso monopolize the alleged relevant market in violation of Section 2 of the Sherman Act "by destroying mills," Am. Compl. ¶ 182; and 4) Verso and AIM violated Section 7 of the Clayton Act through Verso's sale of the Bucksport mill to AIM, a noncompetitor, Am. Compl. ¶¶ 190-96.  Finally, Plaintiffs claim that each of these alleged violations of the federal antitrust laws also constitutes a violation of the analogous Maine antitrust statute.  Am. Compl. ¶¶ 197-207; Motion at 10.

Each of these claims arises—and Plaintiffs' alleged injury derives entirely from—Verso's decision to close the Bucksport mill.  But that injury fails to satisfy an essential requirement for standing to maintain an action under the antitrust laws—it is not an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts [allegedly] unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This fatal defect infects each of Plaintiffs' claims.  Moreover, each of the individual counts is independently flawed.  Plaintiffs' claim for violation of Section 1 (Count 1) is not likely to succeed because uncontroverted evidence establishes that Verso acted unilaterally and did not seek, nor did it obtain, NewPage's consent to close the Bucksport mill.  Their claims that Verso attempted to monopolize the alleged "North American" relevant market for "coated printing papers" (Count 2) and that it conspired with AIM to do so (Count 3) are not likely to succeed because 1) a company's decision to reduce its output and, therefore, its market share can never constitute an act in furtherance of obtaining a monopoly in the market in which it reduced its market share, and 2) the uncontroverted evidence demonstrates that Verso could not obtain

monopoly power as Plaintiffs suggest.  Finally, Plaintiffs cannot succeed on their claim that

Verso's sale of the Bucksport mill to AIM violates Section 7 of the Clayton Act because AIM is

not a participant in the alleged relevant market as a competitor, a supplier, or a distributor.

**1. Plaintiffs Cannot Show Antitrust Injury and, Therefore, Lack Standing.**

As the Supreme Court has recognized, an antitrust plaintiff "must prove antitrust injury,

which is to say injury of the type the antitrust laws were intended to prevent and that flows from

that which makes defendants' acts unlawful."  *Id.*  In *Brunswick*, the Court observed that the

plaintiffs' injury bore no relation to whether the challenged conduct was procompetitive or

anticompetitive and that the plaintiffs "would have suffered the identical 'loss'—but no

compensable injury—had the acquired [companies] instead obtained refinancing or been

purchased by [someone else]."  *Id.*  Thus, the alleged injury "was not of 'the type that the statute

was intended to forestall.'"  *Id.* at 487-88 (internal citations omitted).

The antitrust injury requirement is not limited to claims for damages.  In *Cargill v.

Monfort of Colorado, Inc.*, the Supreme Court recognized that plaintiffs seeking injunctive relief

must also demonstrate antitrust injury.  479 U.S. 104, 113 (1986).

*Brunswick*, *Cargill*, and their progeny make clear that IAM and its members fail to satisfy

the threshold requirement of antitrust injury.  The only irreparable injury that Plaintiffs claim—

and they do so repeatedly in their Complaint and Motion—is their loss of employment at the

Bucksport mill.  *See* Am. Compl. ¶¶ 23-27, 139-40; Motion at 8, 16, 19-20.  But Plaintiffs

"would have suffered the identical 'loss'" from Verso's decision to close the mill regardless of

whether 1) Verso was the largest or smallest competitor in the market or 2) Verso chose not to

sell the mill to AIM or any other buyer.  Plaintiffs' alleged injury flows from the closure of the

mill, not from any reduction in competition in any market.  Indeed, as their own Amended

Complaint admits, this market suffers from a "continuing decline" in demand for the products that the Bucksport mill used to make.  Am. Compl. ¶ 139.  Their injury flows from this "continuing decline."[3]

In applying the antitrust injury requirement, the First Circuit has concluded that "[i]n contrast [to customers or competitors], a commercial intermediary, such as a distributor or sales representative, generally lacks standing because its antitrust injury is too remote."  *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 11 (1st Cir. 1999).  Plaintiffs' alleged irreparable injury in this case is, like sales representatives or distributors, too remote to confer standing.  Courts have examined and consistently rejected, for lack of standing, similar antitrust claims by suppliers, distributors and other third parties that acquisitions violate Section 7 of the Clayton Act or the other antitrust laws—*even if the underlying merger or acquisition would allegedly violate the antitrust laws.* *See, e.g., id. at* 12 (dismissing antitrust claims for lack of antitrust standing by a distributor who lost its position as an exclusive sales representative as a result of a merger of two manufacturers); *Alberta Gas Chems. v. E.I. DuPont de Nemours & Co.*, 826 F.2d 1235, 1240-42 (3d Cir. 1987) (dismissing claims for loss of potential sales by a supplier of the acquired firm for lack of standing); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 500 (9th Cir. 1977) (holding that a terminated distributor did not have standing to sue to undo the merger of two beer manufacturers under Section 7 of the Clayton Act because it had not suffered an antitrust injury as a result of its termination because the distributor was neither a consumer nor a competitor of the manufacturers).

---

[3]Although the individual Plaintiffs also allege that they are consumers who have "purchased magazines and other products utilizing coated printing paper" (Am. Compl. ¶¶ 22-27), the Complaint and Motion are devoid of any claim that, as purchasers of these products, they could conceivably suffer irreparable harm from the challenged conduct (presumably because any such claim would be absurd on its face).  Thus, the Court need only consider Plaintiffs' standing to seek a preliminary injunction within the context of their status as former employees of the Bucksport mill.

Plaintiffs rely on two cases to justify their own standing, but in both cases the alleged restraint was directed at the labor market, not the employer.  Plaintiffs cite *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172 (5th Cir. 1976), to support their claim that "loss of employment may" be categorized as an antitrust injury.  Motion at 19-20.  In *Tugboat*, the plaintiffs (a tugboat company, the employees of the tugboat company, and the union representing those employees) alleged that another union and a rival tugboat company conspired to keep employee wages low so that the rival tugboat company could charge lower rates and drive the plaintiff, its competitor (and consequently its affiliated union and plaintiff employees), out of business.  The court explicitly refused to find that employees of a company that was the victim of an antitrust conspiracy could separately recover for antitrust claims due to reduced work opportunities.  Rather, the court recognized that the employees had standing "not because they suffered injuries as a result of their employer being victimized by violations of the antitrust laws, but because the conspiracy in this case was aimed at the employees as much as it was aimed at the employer."  *Id.* at 1177.  Plaintiffs here, in contrast, do not allege a conspiracy or other conduct designed to restrict competition in any labor markets for the purpose of reducing or suppressing wages.

Plaintiffs' reliance on *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001), is also misplaced.  Motion at 20.  In *Eichorn*, the court found that a "no-hire" promise, in which AT&T would not hire back any employees of an AT&T subsidiary being sold to a new employer for a certain period of time after the transaction, could cause antitrust injury to the affected employees.  But again, the antitrust injury flowed from the challenged restriction directly constraining the plaintiff's employment opportunities; it was not an indirect result of the sale of a facility.  *Eichorn,* 248 F.3d at 142.

11

**2. Uncontroverted Evidence Rebuts Plaintiffs' Claim Under Section 1 of the Sherman Act.**

A Section 1 claim requires that there be concerted action between or among two or more distinct entities. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). This element cannot be satisfied by conclusory allegation. As the Supreme Court articulated in *Bell Atlantic v. Twombly*, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 555 (2007) (internal quotations omitted). It must make factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* This means that "stating a [Section 1 claim] requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.

In addition, to support a motion for injunctive relief, Plaintiffs must present "'[e]vidence that goes beyond the unverified allegations of the pleadings." *Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 182 n.1 (D. Me. 2008) (citation omitted). Plaintiffs must show "evidence that tends to exclude the possibility of independent action by the [parties]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768.

Plaintiffs claim that "Verso's decision to shut down the Bucksport mill . . . was part of a cooperation agreement between Verso and NewPage." Am. Compl. ¶ 170. In support of this allegation, Plaintiffs cite to the Merger Agreement pursuant to which Verso agreed to acquire NewPage. *Id.* ¶ 169. But the lone provision in that agreement that could conceivably bear on the claims, and the provision Plaintiffs cite in their Amended Complaint, is Section 5.6(c). *See id.*; Motion at 14. In that provision, Verso and NewPage agreed to obtain written consent from each

other before selling any asset, *where such action was taken in order to gain DOJ approval.*  On

the strength of this provision alone, Plaintiffs allege that "Verso had to obtain the written consent

of NewPage" to sell the Bucksport mill.  Am. Compl. ¶ 169.

     Plaintiffs' Section 1 claim is likely to fail on the merits for two reasons.  First, to the

extent that Plaintiffs rely on the existence of Section 5.6(c) of the Merger Agreement to establish

the proposition that Verso must have sought and obtained the written consent of NewPage to sell

the Bucksport mill, the uncontroverted evidence establishes that this statement is flatly false.  As

the DOJ made clear in its Competitive Impact Statement supporting the Verso-NewPage

transaction and the divestiture of the Rumford and Biron mills, there is no evidence that Verso

closed the Bucksport mill for any reason other than for legitimate business reasons related to the

mill's profitability, and, in fact, Verso had contemplated closing the mill before deciding to

acquire NewPage.  *See* Competitive Impact Statement at 3 n.1, *United States v. Verso Paper*

*Corp.*, Case No. 1:14-cv-2216 (D.D.C. filed Dec. 31, 2014) (ECF No. 3).  Moreover, the

Competitive Impact Statement also makes clear that the DOJ did not require Verso to sell the

Bucksport mill as a condition to obtain approval for the Verso-NewPage transaction.  *Id.*  Rather,

Verso and NewPage agreed with the DOJ that NewPage will sell two other mills to complete the

DOJ antitrust review of the Verso acquisition of NewPage.[4]  Thus, as the declaration of Verso's

Chief Executive Officer attests, Verso never sought and never received the written consent of

NewPage to sell the Bucksport mill.  *See* Declaration of David J. Paterson ("Paterson Decl.")

¶ 22.  This is because no such obligation exists in the Merger Agreement.

     Second, once Section 5.6(c) is eliminated as evidence of an agreement to close the

Bucksport mill, what remains of the Complaint fails to satisfy the pleading standards of *Twombly*

---

[4] Competitive Impact Statement at 9-12, *United States v. Verso Paper Corp.*, Case No. 1:14-cv-2216
(D.D.C. filed Dec. 31, 2014) (ECF No. 3).

for pleading a conspiracy in violation of Section 1 because it does not allege the existence of any other agreement between Verso and NewPage with respect to the Bucksport mill. Plaintiffs have identified no evidence, either in the Complaint (as *Twombly* requires) or in support of their Motion, even to suggest plausibly, much less to prove, that Verso and NewPage reached an agreement to close the Bucksport mill. Plaintiffs have done nothing beyond allege the existence of a "cooperation agreement" between Verso and NewPage with the broad objective to reduce capacity ahead of their announced merger. Am. Compl. ¶ 47. But as Dr. Hay points out, the DOJ was aware of Verso's plan to close the Bucksport mill, and concluded that, with the proposed divestitures, the Verso-NewPage transaction was not anticompetitive. Hay Decl. ¶¶ 30-31. Because Plaintiffs have offered no evidence that such a "cooperation agreement" or "understanding" exists beyond pointing to Verso's public agreement to acquire NewPage (Am. Compl. ¶¶ 169-74), Plaintiffs' Section 1 claim is doomed to fail on the merits.

### 3.    Plaintiffs' Remaining Claims Are Unsupported and Meritless.

Plaintiffs' remaining antitrust claims all share a common core allegation, specifically that Verso's decision to close the Bucksport mill and to sell it to AIM rather than a competitor constitute an attempt to monopolize (Count 2), a conspiracy with AIM to monopolize (Count 3), and an acquisition that would somehow increase Verso's market power (Count 4), all in a North American coated printing paper market. As with Count 1, these claims will inevitably fail on the merits for the reason already discussed—Plaintiffs have not suffered an antitrust injury.

Plaintiffs' antitrust claims also are doomed to fail for additional reasons. The claims alleging attempted monopolization and conspiracy to monopolize under Section 2 of the Sherman Act are not likely to succeed on the merits because 1) Verso made a legitimate and unilateral business decision to close the Bucksport mill; 2) market conditions preclude Verso from being able to exercise market power now that the mill is closed and this will not change

when it acquires NewPage; and 3) the core challenged conduct (the closure of an unprofitable

paper mill) can never give rise to a claim of attempted or actual monopolization (or a conspiracy

to achieve same).  In order to prevail on an attempted monopolization claim, a plaintiff must

establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  And to carry its burden on its

conspiracy to monopolize claim, Plaintiffs must establish that both Verso and AIM

(1) participated in a conspiracy; (2) committed an overt act in furtherance of the conspiracy; and

(3) have the specific intent to monopolize.  *See United States v. Yellow Cab Co.*, 332 U.S. 218,

225 (1947); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 788, 809 (1946).

Courts have repeatedly cautioned that Section 2 should not be used as a tool to challenge

legitimate business decisions.  *See, e.g.*, *Spectrum Sports, Inc.*, 506 U.S. at 458-59 ("[T]his Court

and other courts have been careful to avoid constructions of § 2 which might chill competition,

rather than foster it.  It is sometimes difficult to distinguish robust competition from conduct with

long-term anticompetitive effects; moreover, single-firm activity is unlike concerted activity

covered by § 1, which 'inherently is fraught with anticompetitive risk.'") (quoting *Copperweld

Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)); *see also Barry White Corp. v. ITT

Grinnell Corp.*, 724 F.2d 227, 234 (1st Cir. 1983) (recognizing the need for caution when

applying the antitrust laws so as not to discourage legitimate business activity and stating that

"[w]e must be concerned lest a rule or precedent that authorizes a search for a particular type of

undesirable pricing behavior end up by discouraging legitimate price competition").  As the

uncontroverted evidence establishes, Verso closed the Bucksport mill because demand for coated

groundwood paper made at the mill has been declining sharply and the mill was consistently

losing money.  Paterson Decl. ¶ 9; Hay Decl. ¶¶ 12-14.  This decision was unilateral, Paterson

Decl. ¶¶ 10, 22, and it made sound economic sense, Hay Decl. ¶¶ 12-14, 18.  Plaintiffs offer no

evidence to permit any other conclusion.

In addition, uncontroverted evidence establishes that Verso could not possibly obtain

market power as Plaintiffs suggest.  Given the nature of competition in this industry and Verso's

position in it, Dr. Hay concludes that, contrary to the naked and unsupported allegations in the

Complaint, Verso's closure of the Bucksport mill "would not lead to a sustainable increase in

price."  Hay Decl. ¶ 33; s*ee also id.* ¶¶ 32-35, 38-39, 42.

A company cannot hope to gain monopoly power by *reducing* its own production

capacity.  If anything, Verso's decision to close the Bucksport mill should *increase* competition

in the market by creating additional opportunities for Verso's competitors to take business from

Verso.  *Id.* ¶ 33, 36-37.[5]

Plaintiffs' ability to succeed on the merits is blocked not only by these incontrovertible

facts, but also by adverse legal precedent.  Courts have refused to use the antitrust laws as a blunt

instrument to force companies to continue unprofitable operations.  For instance, in *International

Railways of Central America v. United Brands Co.*, the court concluded that the defendant did

not violate the antitrust laws when it decided to cease cultivation of its banana farms, as the

farms had become unprofitable, and did not sell the farms to another party who could

conceivably use the lands to harvest bananas and thereby supply business to the plaintiff railroad

that served banana farms in the area.

> [Defendant banana farmer] in fact had no reasonable business alternative but to
> abandon an unprofitable and uncomfortable operation.  This cannot possibly be

---

[5] We also note that Plaintiffs have not put forward any evidence in support of their market definition, an
issue on which they would bear the burden of proof.  But regardless of what relevant markets are defined,
Verso would not be able to obtain market power by closing the Bucksport mill and selling it to a third
party that is not a market participant.

> characterized as an act of monopolization, which is the exercise of a power to fix prices or to exclude competition.  Appellant's proposition boils down to the argument that a defendant which has a monopolistic position can never abandon an unprofitable operation but must continue to lose money because shutting down might involve a loss of profit for the supplier of a service.  No authority for this position has been advanced or discovered.

532 F.2d 231, 239-40 (2d Cir. 1976),

In response, Plaintiffs cite (at page 13 of their Motion) to the treatise, P. Areeda & H. Hovenkamp, Antitrust Law: *An Analysis of Antitrust Principles and Their Application* ¶ 782n (2014).  But Professors Areeda and Hovenkamp actually cite *International Railways* favorably in this section of their treatise and agree with its conclusion based on the facts of that case.  They then try to imagine a much different fact pattern that could give rise to a monopolization claim based on a manufacturing facility closing.  To do so, they hypothesize a market in which a competitor both competes upstream with others and controls a key supply route needed by its competitors downstream.  They then conclude (albeit without actual supporting precedent) that, as a policy matter, the antitrust laws could be used to challenge a company's decision to exit a line of business where doing so takes away from competitors their only means to get access to the market, thereby allowing the defendant ultimately to gain sales at the expense of the plaintiff.  However one views the wisdom of this policy conclusion, the hypothetical offered by Professors Areeda and Hovenkamp does not even remotely resemble the market conditions faced by Verso in the paper industry.  Plaintiffs' Section 2 claims are fatally flawed and are not likely to succeed on the merits.

Finally, Plaintiffs allege that the identical conduct underlying their conspiracy to monopolize claim—the decision to close the Bucksport mill and the agreement to sell the mill to AIM—constitutes a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, which governs mergers or acquisitions that may create or enhance market power or facilitate its exercise.

Market power can be created or enhanced by a horizontal acquisition of a direct competitor, *see, e.g.*, *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990), or by an acquisition of a supplier in the production chain or a distributor in the distribution chain (a vertical acquisition), *see, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 590-92 (1957).

By Plaintiffs' own admission, AIM is not a competitor of Verso.  It also is not a supplier of paper-making inputs or a distributor of paper.  In fact, AIM is not a participant in the relevant market in any way.  Market power cannot be created in the relevant market by the sale of an operation to a company that is not a competitor, supplier, or distributor in the market.  Moreover, as noted above, Verso's closure of the Bucksport mill and its sale of that mill to AIM will not facilitate Verso's ability to raise prices above a competitive level.  *See, e.g.*, Hay Decl. ¶¶ 31-36.

### 4.   Maine's Antitrust Statutes Section 1102 and Section 1102-A Do Not Provide for a Private Right of Action for Injunctive Relief

Maine courts have held that Sections 1101–1108 of Title 10 of the Maine Revised Statutes were modeled after federal law and are analogous to Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act and, hence, have held as a matter of state law that courts should look to those federal statutes when interpreting their Maine analogues.  *See, e.g.*, *The Envtl. Exch. v. Casella Waste Sys.*, No. 05-25, 2005 WL 3340068, at *3 (Me. Super. Ct. Oct. 24, 2005) ("Section 1102 is materially identical to section 2 of the federal Sherman Act"); *Karofsky v. Abbott Labs.*, No. 95-1009, 1997 WL 34504652, at *4 (Me. Super Ct. Oct. 16, 1997) ("The Maine Anti-Trust Statute parallels the Sherman Act.") (Saufley, J.); *Maine v. McCain Foods Ltd.*, No. 87-342, 1987 WL 119744, at *1 (Me. Super. Ct. Dec. 11, 1987) (referring to § 1101 as the "mini-Sherman Act") (Alexander, J.).  Consistent with the interpretations of Maine courts, federal courts uniformly have held that Maine antitrust laws are to be construed in accordance

18

with federal law.  *See, e.g., Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 42 n.1 (1st Cir.

2001); *Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000); *Tri-State Rubbish v.

Waste Mgmt.*, 875 F.Supp. 8, 14 (D. Me. 1994).  Plaintiffs fail under their Maine antitrust law

theories for the same reasons they fail under federal law.

Moreover, Maine's state laws do not provide for a private right of action for injunctive

relief under either 10 M.R.S. § 1102 or 10 M.R.S. § 1102-A.  Private rights of action for

violations of Maine's state antitrust laws are established under 10 M.R.S. § 1104, which provides

for treble damages for private plaintiffs to compensate for their injuries under section 1104(1),

but the right to seek injunctive relief is explicitly reserved for Maine's Attorney General under

section 1104(2).  *See* 10 M.R.S. § 1104.  At least one Maine court has analyzed whether indirect

purchasers may sue for injunctive relief under Maine's antitrust laws and concluded that

allowing this remedy would be "inconsistent with the legislative scheme" when "[t]he legislative

history does not reveal an intent to provide such a private right of action." *Melnick v. Microsoft*,

Nos. 99-709, 99-752, 2001 WL1012261, at *4 (Me. Super. Ct. Aug. 24, 2001).

### C.  Plaintiffs Will Not Suffer Any Irreparable Harm from the Sale of the Bucksport Mill to AIM.

Each Plaintiff claims that he "will be irreparably harmed if Verso is permitted to neglect,

sell, damage or destroy the paper making capability of the Bucksport Mill, rendering this facility

incapable of being sold to a competitor capable of operating it for further operations as a paper

mill, *which could provide [each Plaintiff] the ability to continue to work at this Mill*."  Am.

Compl. ¶¶ 23-27 (emphasis added).  But the Bucksport mill has already closed.  Granting the

relief Plaintiffs seek (blocking the sale of the Bucksport mill to AIM and requiring Verso to

continue to spend money on the mill for 6 months) will not cure their claimed irreparable harm.

19

And Plaintiffs have not even attempted to offer evidence – only a pure leap of faith – in support of the two propositions that they ask this Court to accept as the foundation for granting this extraordinary relief: 1) a competitor in the coated printing paper industry will emerge to buy the Bucksport mill despite existing and chronic over capacity and a continued free fall in demand for the mill's products; and 2) the 500+ employees of the Bucksport mill will sit around waiting for that buyer to materialize rather than pursue jobs elsewhere.  Simply stated, there is no evidence to support Plaintiffs' claim of irreparable injury and their claim defies both market realities and common sense.

> **D.    Verso, AIM, and the Unrepresented Majority of the Mill's Employees will Suffer Greater Harm if the Court Enjoins the Sale of the Bucksport Mill than Plaintiffs will if the Court Does Not Enjoin the Sale of the Bucksport Mill.**

The balance of equities in this case weighs heavily against granting Plaintiffs' Motion. Both Defendants, Verso and AIM, will suffer substantial harm if an injunction is granted. AIM's harm is addressed in its opposition brief.  Verso stands to lose the $60 million that AIM has committed to pay for the Bucksport site if AIM decides to abandon the transaction, as it has said that it might, rather than await the ultimate termination of this suit.  Memorandum of AIM Development (USA) LLC in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("AIM Opp.") at 8-9; Declaration of Jeff McGlin ("McGlin Decl.") ¶¶ 14-18.  Even if Verso can find another buyer for the site, it is impossible to estimate today what a now unknown purchaser would be willing to pay for the site.  Thus, even in an optimistic scenario, Verso will likely suffer some reduction in the purchase price.  It will also suffer the loss of liquidity associated with losing access to the capital infusion from the sale of the site within the next two to three weeks.

That loss of liquidity will, in fact, harm another group not before the court—the nearly 500 employees of the Bucksport mill who did not join this suit and whose severance payments are due within five business days following the sale of the Bucksport site pursuant to the recently entered Consent Order negotiated as part of a settlement between Verso and the Maine Department of Labor. If this Court enjoins the sale to AIM, those employees could have to wait another two months to receive the balance of their severance payments. The harm to these absent employees and their families alone would be good reason to deny Plaintiffs' requested relief.

In contrast and as noted above, Plaintiffs have not identified any harm to them that will be remedied by the requested relief. With or without an injunction precluding the sale to AIM, the IAM members' jobs are gone. They have made no showing at all that the requested relief would confer any tangible benefit on any of the IAM members. Instead, all they offer is pure speculation that an unidentified buyer will be willing to buy a closed paper mill that has no customers and, in the face of excess industry capacity and declining demand, will be interested in restarting production. Such speculation cannot begin to tip the balance of equities in Plaintiffs' favor in light of the certain and documented harm that Verso, AIM, and the unrepresented former employees of the Bucksport mill will suffer.

> **E.**     **An Injunction is not in the Public Interest.**

Granting the requested extraordinary relief will interfere with the efficient operation of the free market and, therefore, would not be in the public interest. Plant closures are a common occurrence in the American economy, especially in declining industries like publication paper. Hay Decl. ¶¶ 9-10, 52-53. Closures are an efficient response to declining demand or rising cost, and they reflect market forces at work efficiently directing assets to their highest-value use

(which may include scrap value).  It can be in a company's unilateral best interest to close

capacity, and this is consistent with Verso's decision to close Bucksport.  *Id.* ¶ 53.  Prohibiting

unilateral decisions to close high-cost plants would create substantial inefficiencies and weaken

the competitiveness of potentially *any* industry.  The efficient functioning of the U.S. economy

depends on companies being able to open and close manufacturing facilities freely.  A ruling that

limits this freedom would be devastating well beyond the publication paper industry alone.  *Id.*

¶¶ 55-57.

Additionally, enjoining the sale of Bucksport to AIM represents a significant lost

opportunity for the town of Bucksport and the surrounding community.  AIM intends to pursue

potential strategic uses for the mill, which would present a substantial economic opportunity for

the public.  McGlin Decl. ¶ 17.  If AIM abandons the transaction due to an injunction, the

potential development of Bucksport is lost and may not be recovered.

## CONCLUSION

For the reasons stated above, Defendants Verso Paper Corp. and Verso Paper LLC

respectfully request that the Court deny Plaintiffs' Motion for a Temporary Restraining Order

and a Preliminary Injunction.

Dated this 2nd day of January, 2015.

                                                             Respectfully submitted,

                                                             /s/David E. Barry
                                                             David E. Barry
                                                             Nolan L. Reichl
                                                             PIERCE ATWOOD LLP
                                                             Merrill's Wharf
                                                             254 Commercial Street
                                                             Portland, ME 04101
                                                             (207) 791-1100
                                                           dbarry@pierceatwood.com
                                                           nreichl@pierceatwood.com

                                            Scott A. Stempel (pro hac vice)
                                            Greta L. Burkholder (pro hac vice)
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            1111 Pennsylvania Avenue, NW
                                            Washington, DC  20004
                                            (202) 739-3000
                                            sstempel@morganlewis.com
                                            gburkholder@morganlewis.com

                                            *Attorneys for the Verso Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 2, 2015, I caused the foregoing document together with

any declarations and/or other exhibits to be electronically filed with the Clerk of Court using the

CM/ECF system which will distribute a copy of the document to all counsel of record except the

following, to whom I have emailed a copy:

GRETA LOUISE BURKHOLDER
MORGAN, LEWIS & BOCKIUS LLP
1111 PENNSYLVANIA AVE., N.W.
WASHINGTON, DC 20004
gburkholder@morganlewis.com

SCOTT ALAN STEMPEL
MORGAN, LEWIS & BOCKIUS LLP
1111 PENNSYLVANIA AVE., N.W.
WASHINGTON, DC 20004
sstempel@morganlewis.com

Dated:  January 2, 2015

/s/ David E. Barry
David E. Barry, Esq., ME Bar No. 3884
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
dbarry@pierceatwood.com

*Attorney for Defendants*
*Verso Paper Corp. and Verso Paper LLC*