UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, LOCAL LODGE NO. 1821, et al., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 1:14-cv-00530-JAW ) |
| VERSO PAPER CORP., et al. | ) ) |
| Defendants. | ) |

## ORDER DISMISSING PLAINTIFFS' MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF; AND DISMISSING PLAINTIFFS' MOTION FOR ATTACHMENT AND TRUSTEE PROCESS

No earlier than January 16, 2015, Verso Paper Corp. and Verso Paper LLC (Verso) anticipate selling the Bucksport, Maine Paper Mill to AIM Development USA, LLC and in anticipation of the sale, Verso ceased paper mill operations in Bucksport. In this lawsuit, former or soon to be former Verso employees of the Bucksport Paper Mill and their union seek a declaratory judgment and injunctive relief against Verso concerning their right to timely payment of severance pay and final wages, including accrued 2015 vacation pay, in accordance with time frames they say are established under state law. The Court dismisses Plaintiffs' claims for severance pay because Maine law precludes them from proceeding once the state of Maine Director of Bureau of Labor Standards brought suit in state court against the Defendants, and the Court dismisses Plaintiffs' claims for vacation pay because state rather than federal court,

is a better venue for adjudicating that claim.[1]  The Court also dismisses Plaintiffs'

motion for attachment and trustee process because the motion is related to

enforcement of their severance and vacation pay claims only, and dismisses the

United Steelworkers' motion for joinder as it relates to Plaintiffs' severance and

vacation pay claims because its motion is now moot.

## I.    BACKGROUND

### A.    Procedural Background

On December 15, 2014, the International Association of Machinists and

Aerospace Workers, AFL-CIO, Local Lodge No. 1821 (IAM or IAMAW), Richard

Gilley, Corey Darveau, Brian Simpson, Brian Abbott, and Harold Porter (Plaintiffs)

filed a complaint against Verso Paper Corp. and Verso Paper LLC (Verso) and against

AIM Development USA LLC (AIM).[2]  *Compl. for Declaratory and Injunctive Relief*

(ECF No. 1) (*Compl.*).  In the Complaint,[3] Plaintiffs allege that Verso refuses "to

comply with the laws of the State of Maine governing the timely payment of severance

pay and final wages, including accrued 2015 vacation time," in violation of 26 M.R.S.

---

[1]     The parties placed difficult time constraints on the Court.  Although the parties had been involved in these issues during the weeks, perhaps months, leading up to the lawsuit, the Court first became aware of the controversy on December 15, 2014 when Plaintiffs filed the Complaint.  Amid intervening holidays and weekends, the parties set about filing multiple memoranda on a wide range of issues and the Court held oral argument on December 29, 2014.  At the argument, the parties agreed that, if possible, the Court should issue a decision before January 8, 2015.  The Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored" in arriving at this decision.  *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004); *Nw. Bypass Grp. v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 337 n.5 (D.N.H. 2006).  At the same time, the Court commends counsel for their diligent and able presentations, both in writing and orally.  The Court's task has been made simultaneously easier and more difficult by the excellence of counsel.

[2]     The Court refers to the individual Plaintiffs and the IAM/IAMAW collectively as "Plaintiffs" and differentiates among them only as required.

[3]     In their Complaint and Amended Complaint, Plaintiffs also alleged antitrust violations.  Those allegations will be separately briefed and argued; they are not the subject of this Order.

§§ 625-B and 626. *Id.* ¶ 6.[4]  Also on December 15, 2014, Plaintiffs filed a motion for expedited declaratory judgment and a request for a preliminary and permanent injunction, as well as a motion for attachment and trustee process. *Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* (ECF No. 6) (*Pls.' Mot.*); *Pls.' Mot. for Attach. and Trustee's Process* (ECF No. 5) (*Pls.' Attach. Mot.*).[5]

At the request of Plaintiffs, the Court held a telephone conference on December 19, 2014 and set initial scheduling deadlines. *Minute Entry* (ECF No. 26).  On December 22, 2014, Plaintiffs filed an amended complaint, which added 53 Local No. 1821 Members as plaintiffs and included additional allegations. *First Am. Compl. for Declaratory and Injunctive Relief* (ECF No. 29) (*Am. Compl.*).  Also on December 22, 2014, Verso submitted a joint stipulation of facts, *Joint Stipulations Relating to Count 9 of the Compl.: Timely Payment of Severance and Vacation Pay* (ECF No. 31) (*Stipulation of Facts*), and proposed statements of fact. *Proposed Statements Relating to Count 9 of the Compl.: Timely Payment of Severance and Vacation Pay* (ECF No. 32) (*Defs.' Proposed Statements of Fact*).  Again on December 22, 2014, Verso filed its response in opposition to Plaintiffs' motion. *Defs. Verso Paper Corp. and Verso Paper LLC's Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* (ECF No. 34) (*Defs.' Opp'n*).

---

[4]   Plaintiffs brought the alleged violations of 26 M.R.S. §§ 625-B and 626 against Verso only, not against AIM.

[5]   Plaintiffs refer to this remedy as "trustee's process." *Pls.' Mot. for Attach. and Trustee's Process* (ECF No. 5).  The Court uses the more commonly accepted term, "trustee process."  ME. R. CIV. P. 4B, "Trustee Process"; *Smith v. Davis*, 131 Me. 9, 12, 158 A. 359, 361 (1932) ("Trustee process is simply a form of attachment"); ANDREW M. HORTON & PEGGY L. MCGEHEE, MAINE CIVIL REMEDIES §§ 27.1-27.8 (1991 ed.) (Chapter 27: Trustee Process); CHARLES HARVEY, 2 MAINE CIVIL PRACTICE §§ 4B:1-29 (3d ed. 2013-2014).

3

On December 22, 2014, the parties and the state of Maine Attorney General participated in a settlement conference before Magistrate Judge John C. Nivison. *Minute Entry* (ECF No. 36). On December 23, 2014, Plaintiffs filed their reply to Verso's response in opposition. *Pls.' Reply Regarding Severance and Accrued 2015 Vacation Time Payments* (ECF No. 39) (*Pls.' Reply*). Also on December 23, 2014, the state of Maine and the Director of Bureau of Labor Standards filed a complaint against Verso in Kennebec County Superior Court, and a proposed consent order; Superior Court Justice Robert Mullen signed and dated the Consent Order the same day it was filed. *Def. Verso Paper Corp. and Verso Paper LLC's Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* Attach. 2 *Compl.* (ECF No. 40) (*Director Compl.*); *id.* Attach. 3 *Consent Order* (*Consent Order*). Verso also filed a supplemental response in opposition to Plaintiffs' motion on December 24, 2014. *Def. Verso Paper Corp. and Verso Paper LLC's Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* (*Defs.' Supplemental Opp'n*). On December 26, 2014, Plaintiffs filed a reply to Verso's supplemental response. *Pls.' Reply to the Verso Defs.' Dec. 24, 2014 Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj. Regarding Severance and 2015 Vacation Time Pay* (ECF No. 44) (*Pls.' Supplemental Reply*).

On December 27, 2014, the parties filed a number of documents. First, Plaintiffs filed a request for judicial notice, and a sworn attorney declaration relating to the accuracy of the documents attached to the First Amended Complaint. *Pls.' Req.*

*for Judicial Notice* (ECF No. 45) (*Req. for Judicial Notice*); *Decl. of Kimberly J. Ervin Tucker* (ECF No. 46) (*Tucker Decl.*). Next, the parties filed a joint stipulation concerning exhibits. *Joint Stipulation Regarding Authenticity and Admissibility of Exs.* (ECF No. 47) (*Joint Stipulation*). Third, Verso filed another supplemental memorandum. *Def. Verso Paper Corp. and Verso Paper LLC's Second Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Decl. J. and Req. for Prelim. and Permanent Inj.* (ECF No. 48) (*Defs.' Second Supplemental Opp'n*). Fourth, Plaintiffs filed another supplemental memorandum. *Pls.' Mem. on Why Abstention is not Appropriate in this Case* (ECF No. 49) (*Pls.' Mem. on Abstention*). Plaintiffs also filed proposed verified statements of fact. *Pls.' Proposed Verified Statements of Fact Relating to Count 9 of the Compl.: Timely Payment of Severance and Accrued 2015 Vacation Pay* (ECF No. 50) (*Pls.' Proposed Verified Statements of Fact*). Finally, Verso filed another proposed statements of fact. *Proposed Statements Relating to Count 9 of the Compl.: Timely Payment of Severance and Vacation Pay* (ECF No. 51) (*Defs.' Second Proposed Statements of Fact*).

On December 28, 2014, Plaintiffs filed a second supplemental reply. *Pls.' Reply to the Verso Defs.' Second Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* (ECF No. 53) (*Pls.' Second Supplemental Reply*). On December 29, 2014, the Court heard oral argument. *Minute Entry* (ECF No. 56). Also on December 29, 2014, the United Steelworkers, on behalf of USW Local Union 4-01188 and 4-261 (USW) filed a motion for joinder. *Mot. for Joinder as Pl. Filed by United Steelworkers* (ECF No. 54) (*USW's Mot.*). That

same day, Plaintiffs filed their response in opposition to the USW's motion, and on December 31, 2014, Plaintiffs filed a supplemental response in opposition. *Pls.' Objection and Mot. in Opp'n to Permissive Joinder or Intervention of the USW* (ECF No. 55) (*Pls.' Objection and Mot. in Opp'n to the USW's Mot.*); *Supplemental Mem. of Law in Support of Pls.' Objection and Mot. in Opp'n to Permissive Joinder of the United Steelworkers Pursuant to Rule 20, Fed. R. Civ. P.* (ECF No. 59) (*Pls.' Supplemental Objection and Mot. in Opp'n to the USW's Mot.*). Also on December 31, 2014, Verso filed a third supplemental memorandum. *Def. Verso Paper Corp. and Verso Paper LLC's Third Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* (ECF No. 60) (*Defs.' Third Supplemental Opp'n*). That same day, Plaintiffs filed a third supplemental reply. *Pls.' Reply to the Verso Defs.' Third Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* (ECF No. 61) (*Pls.' Third Supplemental Reply*).

### B.   Factual Background

#### 1.   The Parties

The Bucksport Mill is a paper mill located in Bucksport, Maine owned by subsidiaries of Verso Paper Corp. *Stipulation of Facts* ¶ 1. Verso Paper Corp. is a publicly-held Delaware corporation headquartered in Memphis, Tennessee. *Id.* ¶ 2. Verso Paper LLC is a Delaware limited liability company, a subsidiary of Verso Paper Corp., and the employer of the employees at the Bucksport Mill. *Id.* ¶ 3. The IAM or

IAMAW is a labor union representing 59 hourly-wage persons employed as mechanics at the Bucksport Mill. *Id.* ¶ 4.

### 2. Verso Agrees to Sell the Bucksport Mill

On October 1, 2014, Verso announced its plans to shut down the Bucksport Mill, and on December 4, 2014, Verso ceased paper production there. *Id.* ¶¶ 5-6. Verso agreed to pay all hourly-wage employees at the Bucksport Mill, including IAM members, through December 31, 2014. *Id.* ¶ 7. January 8, 2015 is the pay day for the next regularly scheduled pay period ending after December 31, 2014. *Id.* ¶ 11.

On December 5, 2014, Verso Paper LLC and Verso Maine Power Holdings LLC, another subsidiary of Verso Paper Corp., entered into a Membership Interest Purchase Agreement (MIPA) to sell the entities owning the Bucksport Mill to AIM. *Id.* ¶ 24. Verso's counsel has confirmed that the closing is scheduled to take place no earlier than January 16, 2015. *Minute Entry* (ECF No. 41).[6] For some employees, their last full day of work was on December 17, 2014, whereas all other employees' last full day of work was on or before December 31, 2014 except for "approximately 44 employees that have been slated to remain working to maintain the power plant at the Mill and other duties." *Pls.' Mot.* at 19.

### 3. Verso's Original Stance on Severance and Vacation Pay; Effects Bargaining of October and November 2014; Determination Letters Issued by the Maine Bureau of Labor Standards

<hr>

[6] The parties originally stipulated that, in accordance with Section 7.01 of the MIPA, Verso Paper LLC and Verso Maine Power Holdings LLC and AIM agreed to use their commercially reasonable efforts to consummate the AIM Transaction on or before January 9, 2015. *Stipulation of Facts* ¶ 25. However, on December 24, 2014, Verso's counsel informed the Court during a telephone conference that the closing has been rescheduled to take place no earlier than January 16, 2015. *Minute Entry* (ECF No. 41).

The Bucksport Mill is a "Covered Establishment" as defined in 26 M.R.S. § 625-B(1)(A) and the closure of the Bucksport Mill is a "Termination" as defined in 26 M.R.S. § 625-B(1)(G). *Stipulation of Facts* ¶¶ 8-9. Verso has a contractual obligation to pay the IAM members whose employment will be terminated as a result of the closure of the Bucksport Mill severance in an amount equal to or greater than the amount required under the formula in 26 M.R.S. § 625-B(2). *Id.* ¶ 10.

On October 28, 2014, Verso began effects bargaining with the unions as required by Section 12.5 of the CBA with the IAM and identical provisions of the CBAs with the other unions.[7] *Id.* ¶ 14; *see also* Section I.B.4, *infra*. During the process, representatives from all the unions representing the hourly-wage employees at the Bucksport Mill were present and participated. *Stipulation of Facts* ¶ 15. Also on October 28, 2014, Verso offered two written drafts of a Memorandum of Agreement (MOA) between Verso and the unions, which the unions rejected. *Id.* ¶ 16.

On November 19, 2014, Verso resumed effects bargaining with the IAM and on November 24, 2014, Verso resumed effects bargaining with the other unions. *Id.* ¶¶ 17-18. The next day, Verso and the other unions entered into a MOA.[8] *Id.* ¶ 19. Also on November 25, 2014, and again on December 1, 2014, Verso resumed effects bargaining with the IAM. *Id.* ¶¶ 20-21.

---

[7] "Effect or effects bargaining" is a term of art within the field of labor law. Section 12.5 of the CBA between the IAMAW and Verso provided that "[i]n situations involving permanent reductions due to complete or partial closures, employees will be laid-off in accordance with the current labor agreement and effect bargaining will take place." *Compl.* Attach. 1 *Labor Agreement Between Verso Paper Bucksport Mill Bucksport, Maine and Int'l Ass'n of Machinists and Aerospace Workers Lodge No. 1821* at 11-12.

[8] The November 25, 2014 MOA is attached as Exhibit 8 to Plaintiffs' Complaint. *Compl.* Attach. 8 *Mem. of Agreement*.

On December 3, 2014, Verso and the IAM entered into a MOA.[9]  *Id.* ¶ 22.  The MOA between Verso and the IAM resolved many issues, but not the timing for payment of (a) severance benefits and (b) the equivalent of the vacation time the union members would have received in 2015.  *Id.* ¶ 23.[10]  Verso estimates that the equivalent of the 2015 vacation time allotted to the IAM's members is approximately $390,000.  *Id.* ¶ 26.

The dispute revolves around the timing of payments.  Verso has maintained since at least November 2014 that it will not pay severance or accrued 2015 vacation time to its employees before April 1, 2015.  *See, e.g., Compl.* Attach. 3 *Nov. 19, 2014 Letter from United States Senator Susan Collins to Verso* ("We have been told that Verso management does not intend to issue severance pay until 90 days after the mill is closed.  The Commissioner of the Maine Department of Labor and the Governor have stated that doing so would be a violation of Maine State law.  What is Verso's plan for paying the legally required severance pay on time?"); *id.* Attach. 4 *Nov. 19, 2014 Resp. Letter from Verso to Senator Collins* (explaining that Verso presented a proposal to the unions, including the IAMAW, for "enhanced severance benefits that go well beyond those agreed to in our labor agreements or required by Maine law," but would not be paid until "three months after their last day of employment – just as it is written in the labor agreements"); *id.* Attach. 10 *Mem. of Agreement* ¶ 10

---

[9]      The December 3, 2014 MOA is attached as Exhibit 10 to Plaintiffs' Complaint.  *Compl.* Attach. 10 *Mem. of Agreement*.

[10]      Verso also entered into the MOA with all other unions representing hourly wage employees at the Bucksport Mill, which includes Verso's agreement to pay former employees their accrued 2015 vacation time even though "[p]ayment of 2015 vacation is not required under the current Labor Agreements."  *Compl.* Attach. 8 *Mem. of Agreement* ¶ 10.

("[T]he Company will pay terminated employees (voluntarily or involuntarily) 2015 vacation time.  Payment will be made three (3) months following their termination date or as ultimately resolved").

Verso's position on the timing of severance payments has been met with unified opposition from the highest-ranking Maine officials, including Governor Paul LePage, United States Senators Susan Collins and Angus King, Maine Attorney General Janet Mills, the Commissioner of the Maine Department of Labor Jeanne Paquette, the Director of the Bureau of Labor Standards Pamela Megathlin, and legislative leadership.  *Am. Compl.* ¶ 116.

Contrary to its position, Verso received two Determination Letters from Director Pamela Megathlin regarding timing for severance pay.  *Pls.' Mot.* at 3.  On November 25, 2014, Director Megathlin wrote the First Determination Letter to Charles Welch, Manager of Human Resources for Verso, stating in part:

> It is our understanding that the workers will be paid in full, along with all benefits until December 31, 2014.  If this understanding is correct, and the employment relationship ceases on December 31, 2014 for all other purposes, then we interpret the law [26 M.R.S. § 625-B(2)] to conclude that the "last full day of work" will be December 31, 2014 for all applicable employees.  Based upon the information we have, severance payments will then be due within one regular pay period after this date, which we understand to be January 8, 2015.
>
> Any further delay of severance payment by Verso will be viewed as a violation of the law and will subject Verso and its parent company to an enforcement action for full legal remedies authorized by law.

*Compl.* Attach. 9 at 1-2 (*First Determination Letter*).  On December 9, 2014, Director Megathlin wrote a follow-up letter to Mr. Welch.  *Id.* Attach. 27 (*Second

*Determination Letter*).  She reiterated the Bureau of Labor's position that severance

payments are due on January 8, 2015, and added:

> [T]he determining factor for the "last full day of work" is the continued
> payment of wages.  If an employee is not paid through December 31,
> 2014, that employee's last "full day of work" pursuant to 26 M.R.S. §
> 625-B(2) would be the date in which the worker is last paid for a "full
> day of work."
>
> . . .
>
> As we have previously explained, based on the current collective
> bargaining agreement, Verso may not mitigate its liability for severance
> pursuant to 26 M.R.S. § 625-B(3)(B) unless the severance pay has
> actually been paid.  Verso may not mitigate its liability for severance
> pursuant to 26 M.R.S. § 625-B(3)(B) by agreeing to pay the amount of
> severance due under the law, but paying it at a date later than one
> regular pay period after the last full day of work.

*Id.* at 1-2.

Following issuance of the Second Determination Letter, Plaintiffs inquired

whether Verso had changed its position with respect to the time for payment of

severance.  *Pls.' Mot.* at 3.  On December 12, 2014, Mr. Welch responded: "Verso's

position on timing of severance pay and the payment required by Section 10 (2015

Vacation) of the MOA has not changed, but we continue to evaluate circumstances as

they arise."  *Compl.* Attach. 18 *Subject: RE: Confirmation of Verso's Position*.

### 4.    Collective Bargaining Agreement Provisions

Verso is a party to a collective bargaining agreement (CBA) with the IAM that

contains provisions regarding the payment of severance and vacation benefits.[11]

---

[11]    Plaintiffs attached a copy of the CBA between Verso and the IAM to the Complaint as Exhibit
1.  *Compl.* Attach. 1 *Labor Agreement Between Verso Paper Bucksport Mill Bucksport, Maine and Int'l
Ass'n of Machinists and Aerospace Workers Lodge No. 1821* (*CBA*).

*Stipulation of Facts* ¶ 12.  Verso is a party to collective bargaining agreements with four other unions that represent other hourly-wage employees at the Bucksport Mill: USW Locals 1188 and 261, IBEW Local 1777, and OPEIU Local 555.  *Id.* ¶ 13.

According to Plaintiffs, the relevant provisions of the CBA are Sections 7, 11.15(a), 12 and 29.  *Am. Compl.* ¶ 110.  The applicable CBA is effective from May 1, 2011 through April 30, 2015.  *CBA* § 2.1.

The relevant provisions of the CBA state:

SECTION 7.  SENIORITY

7.5  In the event of a layoff, the employees with the least department seniority shall be the first laid off in each department and shall be returned to work in reverse order.  This section also applies to vacations.

7.6  Seniority referenced in this section shall refer to Mill Seniority as defined in Section 7.2.  If an employee with one (1) year seniority or less is laid off for less than twelve (12) months due to lack of work, their seniority remains unbroken.  If an employee with more than one (1) year seniority is laid off for less than eighteen (18) months due to lack of work, their seniority remains unbroken.  If more than twelve (12) months or eighteen (18) months respectively, their seniority starts anew.  If an employee is recalled and offered employment at their regular kind of work within the twelve (12) month or eighteen (18) month period respectively, and does not report, their seniority will be broken.

7.7  In the event of a temporary curtailment of operations which does not exceed twenty-one (21) continuous days, the following guidelines are established IAM members Mechanical Maintenance Department.

  1. Every reasonable effort will be made to give people time off during the curtailment if they request it.  Scheduled vacations will be honored first.

  2. Positions will be filled by department seniority. Seniority means most senior qualified.

  3. The parties may mutually agree to change the schedule.

    4. Unanticipated openings will be offered to the most senior qualified person not scheduled by department seniority.

## SECTION 11. VACATIONS

11.15  The following provisions will govern the administration of the vacation clause relating to (a) retiring and terminated employees, (b) employees who have otherwise met the eligibility requirements but have failed to meet the required 1,200 work hour qualification because of absence due to sickness and (c) employees who are absent from work due to an occupational injury.

(a) Retiring and Terminated Employees
Employees who retire or resign giving proper notice of at least two weeks to the Company or die will be granted accrued vacation pay on the following basis:

Employees who retire or resign from the Company or die will be granted vacation pay for the current vacation year prorated on the basis of one-twelfth (1/12) normal vacation pay for each full month completed on the active payroll by the employee during the vacation year in which they retire, resign or die.

## SECTION 12. SEVERANCE PAY

12.1  In instances of addition, elimination or modification of equipment which results in employment of fewer employees, the company will provide a severance payment equal to 40 hours x the employee's current card rate for each year of service.

12.2  Such severance pay shall only apply to employees permanently laid off for three (3) months or more and payment will not be made until three (3) months following the date of layoff.

12.5  The Company agrees that when exercising its rights under the current labor agreement, it will undertake any reductions in force through voluntary severance and/or attrition except in situations involving temporary lay-offs or permanent reductions due to complete or partial closure.  In situations involving temporary lay-offs, current labor agreement provisions will apply.  In situations involving permanent reductions due to complete or partial closures, employees will be laid-off in accordance with the current labor agreement and effect bargaining will take place.

12.6  It is understood that should the State or Federal law provide a greater severance allowance those affected employees would receive the higher amount.  In order to qualify for these higher benefits, such employees would have to be terminated per the conditions of the applicable law.

SECTION 29.  CONTRAVENTION OF LAW

29.1  If any provision or section of this Agreement is in contravention of the laws or regulations of the United States or of the State in which the mill covered by this Agreement is located, such provisions shall be superseded by the appropriate provisions of such law or regulations, so long as same is in force and effect, but all other provisions of the Agreement shall continue in full force and effect.

## 5.   The Consent Order

Having reached an agreement with Verso regarding the payment of severance and vacation pay, the State through the Director of the Bureau of Labor Standards (Director) filed a complaint against Verso and proposed consent order in Kennebec County Superior Court on December 23, 2014.  *Director Compl.*; *Consent Order*. Superior Court Justice Mullen signed and dated the Consent Order on December 23, 2014. *Consent Order* at 6.  In the Consent Order, the Director and Verso agree:

10.   Defendants agree to pay one-half of the severance pay as set forth on Attachments A-D to each of the affected hourly employees on or before January 8, 2015.  Payments shall be made directly by the Defendants by direct deposit or other usual payroll method to the affected employees.

11.   Defendants agree to pay the remaining severance pay due to the affected hourly employees on the earlier of
a.     the 5th business day after the completion of the sale of the Verso Bucksport Mill or any portion thereof; or
b.     March 19, 2015.

12.   Defendants agree to pay all benefits due to the affected hourly employees under Section 10, Vacation, of the applicable Memorandum of Agreement on the earlier of

a.     the 5th business day after the completion of the sale of the Verso Bucksport Mill or any portion thereof, or

b.     March 19, 2015.

13.     If the sale takes place before March 19, 2015, Defendants will notify the Office of the Attorney General within 24 hours of the completion of the sale.

. . .

15.     Plaintiffs [Director] assert that Defendants will be in violation of 26 M.R.S. § 625-B for the portion of the severance not paid by January 8, 2015. Plaintiffs agree to forego penalties or other enforcement action against Defendants for such alleged violation if timely payments are made in full compliance with paragraphs 10, 11, and 12 of this Consent Order. Notwithstanding Plaintiff's assertion, Defendants do not admit they will be in violation of 26 M.R.S. § 625-B for the portion of the severance not paid by January 8, 2015.

. . .

22.     The [Superior] Court shall retain jurisdiction over this matter for the purpose of allowing the parties to apply to the Court at any time for such further orders or proceedings as may be necessary for the construction or enforcement of any provision of this Consent Order, including, in the event of noncompliance with the Consent Order's obligation provisions, contempt proceedings under M.R. Civ. P. 66.

*Id.* ¶¶ 10-13, 15, 22. During a telephone conference on December 24, 2014, counsel for both parties confirmed that the Consent Order covers all Plaintiffs, including IAMAW members. *Minute Entry* (ECF No. 41).

## II.     POSITION OF THE PARTIES

### A.     Plaintiffs' Motion

Plaintiffs seek "***timely*** payment of severance pay and final wages, including accrued 2015 vacation time pay from Verso . . . ***by January 8, 2015***, pursuant to the time frames for such payments established in and mandated by 26 M.R.S.A. §§ 625-

B and 626." *Pls.' Mot.* at 2 (emphasis in original). To ensure payment by January 8, 2015, Plaintiffs argue that declaratory and injunctive relief are appropriate because the case presents (1) an actual controversy; (2) within the jurisdiction of the Court; and (3) they have standing to bring this action on behalf of themselves and all similarly-situated employees. *Id.*

Citing 26 M.R.S. §§ 625-B and 626, and the First and Second Determination Letters, Plaintiffs contend that both the legal obligation to pay severance and the time frame by which the legal obligation must be fulfilled by Verso is unambiguous—severance pay is due the Bucksport Mill employees no later than January 8, 2015. *Id.* at 3. However, because Verso stated that it does not intend to pay severance and vacation pay by this date, Plaintiffs claim that

- The threat that these rights will be violated by Verso is real, imminent and undebatable;

- The harm that Bucksport employees will suffer is substantial, irreparable and unquestionable;[12]

- The risk that Verso will declare bankruptcy of its Bucksport Mill subsidiary after a merger with NewPage is complete—denying Bucksport employees the ability to recover their severance under Maine law is significant and irrefutable; and

- The need for immediate court action, through a declaration and injunction to prevent this violation of law is indisputable and in the interest of justice.

*Id.* at 3-4.

---

[12]    According to Plaintiffs, such "significant and irreparable harm" would include insufficient resources to (1) pay for living expenses such as heat and food, (2) enroll in the Affordable Care Act before the February 15, 2015 open enrollment deadline, and (3) pay for COBRA benefits for at least the next several months. *Pls.' Mot.* at 10.

Anticipating Verso will assert that it is exempt under section 625-B(3)(B) from complying with the time requirement under section 625-B(2), Plaintiffs counter that the legislative history indicates that section 625-B(3)(B) was amended in 2003 to "clarify" legislative intent regarding mitigation of liability under a collective bargaining agreement; specifically, an employer's liability under "'*state law is mitigated as a result of a contract providing for severance pay **only if the contractual severance pay has actually been paid** pursuant to the terms of the contract*.'" *Id.* at 4-5 (quoting Comm. Amend. A to L.D. 1733 (HP 1255) (121st Legis. 2003)) (emphasis in Plaintiffs' original). Thus, although Verso claims that if it complies with Section 12.2 of the CBA—providing that severance shall be paid within three months of the date of layoff—it has properly mitigated its liability under the severance pay statute, Plaintiffs argue that "[t]his ignores the plain meaning of the words of the statute . . . as well as the clear statements of legislative intent and context of the enactment of the 2003 amendment." *Id.* at 5.

Next, Plaintiffs contend that even under the CBA, Verso owes severance pay to its former employees by January 8, 2015. *Id.* at 6. Citing Section 29 of the CBA, which provides that any provision that "is in contravention of the laws" of Maine "shall be superseded" by Maine law, Plaintiffs argue that Section 12.2 is superseded by the timing requirements under section 625-B(2). *Id.* Thus, Plaintiffs state that "Verso has both a statutory and contractual obligation to pay severance and accrued 2015 vacation time by January 8, 2015." *Id.* at 7.

Plaintiffs next address the suitability of a declaratory judgment in this case. Citing 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Plaintiffs explain that declaratory relief is authorized where there is "(1) an 'actual controversy;' (2) 'within its jurisdiction' (subject-matter jurisdiction in the federal court); and (3) an 'interested party' (parties with standing)." *Id.* at 10. Plaintiffs also cite a case from the District of Massachusetts for the proposition that the Court should treat a motion for declaratory judgment just as it would a motion for summary judgment; in other words, Plaintiffs have the burden of showing there is no genuine dispute as to any material fact and are entitled to judgment as a matter of law. *Id.* at 11 (citing *Delaware Cnty. Emps. Retirement Fund v. Portnoy*, Civil Action No. 13-10405-DJC, 2014 WL 1271528, at *4, 2014 U.S. Dist. LEXIS 40107, at *11-12 (D. Mass. Mar. 26, 2014)). Moreover, Plaintiffs point out that "a litigant does not have to await consummation of threatened injury to obtain preventive relief; if an injury is certainly impending, that is enough." *Id.* (citing *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994)).

Here, according to Plaintiffs, "there is no genuine issue of fact in dispute." *Id.* at 7. Although the parties dispute the timing of severance pay, Plaintiffs assert that "*this is an issue of law NOT fact.*" *Id.* (emphasis in original). In addition, based on the language of section 625-B(2) and the Second Determination Letter, and based on Section 29 of the CBA, Plaintiffs argue they "have a substantial likelihood of success on the merits for all severance pay claims." *Id.* at 12-13. Furthermore, regarding accrued 2015 vacation time, "Verso has agreed to pay 2015 vacation time in the MOAs

entered with all Bucksport hourly wage employees and 26 M.R.S.A. § 626 mandates such sums be paid, under the circumstances of this case on January 8, 2015," and therefore, according to Plaintiffs, they "have a substantial likelihood of success on all claims" related to accrued 2015 vacation time.  *Id.* at 13.

Next, Plaintiffs argue that they "do not have an adequate remedy at law."  *Id.* They claim that, based on the language in Section 3.10 of the MIPA between AIM and Verso for the sale and transfer of the Mill,

> Verso has revealed that it also intends to get paid $58 million by scrapper AIM to *eat the Bucksport Mill employees' $30 to $35 million slice of severance cake* – structuring a deal with scrapper AIM Development that will both further Verso's scheme of *permanently* eliminating the Bucksport Mill's paper-making capacity, while simultaneously attempting to shift Verso Paper Corp.'s statutory obligation to pay Bucksport's employees $30-$35 million in severance payments to Verso's Bucksport subsidiary as a part of the $58 million sale transaction with AIM.

*Id.* at 14 (emphasis in original).

In other words, Plaintiffs assert that Section 3.10 attempts to relieve Verso of all liability to make severance payments "by contractually transferring this obligation to a subsidiary that will have no assets remaining to pay this obligation."  *Id.* According to Plaintiffs, the subsidiary could then file a Chapter 11 bankruptcy petition, and invoke one of the mitigation provisions under 26 M.R.S. § 625-B(3)(E) to avoid the liability completely.  *Id.*  Citing *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) and *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970), Plaintiffs contend that they have no adequate remedy at law because "just as in those cases, monetary damages received

later, if recovered or recoverable, will not be adequate to compensate the Plaintiffs for the irreparable harms that they will endure in the interim if they are denied the ***timely*** payment of severance and accrued 2015 vacation time required by Maine law." *Id.* at 15-16 (emphasis in original).

Addressing the likelihood of irreparable harm, Plaintiffs note that not only will the former employees and their families suffer, but the legislative intent behind sections 625-B and 626 will be defeated and be "contrary to the public's interest." *Id.* at 17. Finally, addressing the balance of harms, Plaintiffs contend that Verso can assert no harm by making timely severance and accrued vacation payments in accordance with Maine law, whereas "Plaintiffs and the public will suffer significant and potentially irreparable harm if Verso is allowed to evade, delay or deny the payment of severance and accrued 2015 vacation time." *Id.* at 18.

In conclusion, Plaintiffs seek the following from the Court: (1) a judgment declaring that each employee of the Bucksport Mill is entitled to receive severance and vacation pay no later than January 8, 2015 (except for those approximately 44 employees who will remain working at the Bucksport Mill); (2) in the event that Verso fails to timely pay severance and vacation pay in accordance with Maine law and a declaratory judgment, interest at the rate of 6.13%; (3) an order directing Verso to deposit funds in the Court's registry should Verso decide to appeal a judgment against it; and (4) recovery of all reasonable costs and attorneys' fees. *Id.* at 19-20.

### B. Verso's Opposition

Verso begins by referring to Section 12 of the CBA, and asserting that, under the terms of the agreement,

> [d]uring the 3-month [layoff] period . . . employees are not terminated, but remain employees of the Company. Not only do laid-off employees retain employee status, they retain their seniority and remain eligible for recall. . . . Thus, not only did the IAM negotiate a time certain for payment, it succeeded in retaining recall rights for permanently laid off employees—even *after* they receive severance payments. The IAM now claims that it wants all the benefits of that deal, but none of the burdens.

*Defs.' Opp'n* at 3 (emphasis in original). Verso also contends that Plaintiffs are simply unhappy that their demands regarding timing of payment were not met during the effects bargaining process, and now, "the IAM turn[s] to the courts in an effort to set aside those provisions of the CBA to which the IAM no longer wished to be bound (while leaving intact those provisions of the CBA it still found beneficial)." *Id.* at 5. According to Verso, the Court should dismiss Plaintiffs' motion on the grounds that the state severance pay statute is preempted by federal law; "Plaintiffs have failed to exhaust the remedies available to them under the CBA"; and the state severance pay statute exempts it from severance liability because the CBA controls and expressly provides for severance payments. *Id.* at 5-6. In addition, Verso seeks dismissal of Plaintiffs' motion regarding vacation pay, "because Plaintiffs have no contractual rights to any such pay." *Id.* at 6. Finally, Verso claims the Court has no subject-matter jurisdiction over either claim. *Id.*

First, addressing its contention that the Court lacks subject-matter jurisdiction via diversity jurisdiction over Plaintiffs' claims, Verso argues that Plaintiffs "have not alleged that the claims of any IAM member, including the

individual plaintiffs themselves, meet the jurisdictional threshold of $75,000 set forth in 28 U.S.C. § 1332." *Id.* To the extent Plaintiffs seek to aggregate their claims to meet the $75,000 threshold, Verso counters that "courts of this District and the First Circuit have made clear that such aggregation is impermissible." *Id.* (citing *Craig v. Congress Sportswear, Inc.*, 645 F. Supp. 162 (D. Me. 1986); *CE Design Ltd. v. Am. Econ. Ins. Co.*, 755 F.3d 39, 43 (1st Cir. 2014)). In addition, Verso argues that because the jurisdictional threshold has not been properly pled in Plaintiffs' Complaint, "it is Plaintiffs' burden going forward to demonstrate that each and every person whom they seek to represent has a claim that meets the jurisdictional threshold." *Id.* at 7 (citing *Abdel-Aleem v. OPK Biotech LLC*, 665 F.3d 38, 41-42 (1st Cir. 2012)).

Next, turning to its argument that federal law preempts the Maine severance pay statute, Verso claims that the "federal Labor Management Relations Act ('LMRA') preempts Plaintiffs' claims under the [Maine severance pay statute] because Plaintiffs' claims turn on the Court's analysis of the Verso-IAM CBA." *Id.* Citing 29 U.S.C. § 185(a), *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 135 (D. Me. 2010), *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985), and *Warner v. Atkinson Freight Lines Corp.*, No. 04-123-P-S, 2005 WL 1926641, at *6, 2005 U.S. Dist. LEXIS 16911, at *19-20 (D. Me. Aug. 11, 2005), Verso contends that "[f]ederal courts, including courts of this District, have made clear that state law claims are preempted when they require the interpretation of a collective bargaining agreement." *Id.* at 7-8. Thus, according to Verso, the severance claims are preempted

under 29 U.S.C. § 185(a) because the Court is required to interpret the terms of the CBA to reach a resolution. *Id.* at 8.

In addition, Verso states that 26 M.R.S. § 625-B(3)(B) exempts employers from severance liability if otherwise-eligible employees are "'covered by, and [have] been paid under the terms of, *an express contract providing for severance pay* that is equal to or greater than the severance pay required by [the Act].'" *Id.* (emphasis in Verso's original). Therefore, Verso instructs the Court to review the CBA and determine if Plaintiffs are "covered by . . . the terms of" the CBA regarding severance and whether it allots severance pay to covered employees "that is 'equal to or greater than' the statutory formula." *Id.* at 8-9. According to Verso, this exercise may also require the Court's analysis regarding the interplay between Sections 12 and 29 of the CBA. *Id.* at 9 n.6. Verso assumes the Court will find these factors in its favor, and based on this assumption, instructs the Court to then "determine whether each of the employees, as required by the exemption, has been paid 'under the terms of' Section 12 of the CBA." *Id.* at 9.

Next, addressing its assertion that Plaintiffs have not exhausted their contractual remedies, Verso argues that "[e]ven if Plaintiffs' claims are not preempted by the LMRA, the Court should dismiss the severance claim because Plaintiffs failed to exhaust the grievance and arbitration procedures contained in the CBA." *Id.* at 10 (citing *United Paperworkers Int'l Union, Local 14, AFL-CIO-CLC v. Int'l Paper Co.*, 777 F. Supp. 1010, 1023 (D. Me. 1991)). According to Verso, "[c]ourts consistently dismiss claims in these circumstances." *Id.* (citing *DeGrandis v. Children's Hosp.*

*Boston*, Civil No. 14-10416-FDS, 2014 WL 4656612, at *7, 2014 U.S. Dist. LEXIS 127354, at *17 (D. Mass. Sept. 11, 2014)). Because no Plaintiff has followed the "grievance and dispute resolution procedures" in the CBA, Verso concludes that their claims should be dismissed. *Id.* at 11.

Turning back to its argument that it is exempt under section 625-B(3)(B), Verso contends that even if the Court does not find in its favor that federal law preempts Plaintiffs' state law claims or that Plaintiffs have not exhausted their remedies under the CBA, it "is [still] exempt from severance liability under the Act by virtue of the [severance pay statute's] express contract exemption." *Id.* (citing 26 M.R.S. § 625-B(3)(B)). Citing an array of cases regarding statutory interpretation, *id.* at 11-12, Verso argues that "Plaintiffs' interpretation of the express contract exemption does not comport with the statute's plain language." *Id.* at 13. According to Verso, "[t]he plain language of the [statute] makes clear that [it] is exempt from any severance liability by virtue of the CBA." *Id.* Looking to the words of the statute that require Plaintiffs to have "been paid under the terms of" the CBA, Verso counters that the words "'has been paid' is the present perfect tense of the verb 'to pay,'" and thus, "Plaintiffs are incorrect to argue that the [statute's] use of the phrase 'has been paid' necessarily requires Verso already to have paid them." *Id.* at 13-14. In addition, Verso contends that the phrase of the statutory exemption requiring an employee to have "been paid under the terms of, an express contract" means that the terms of the CBA—not the statute—control when Plaintiffs get paid. *Id.* at 14. In other words, because the CBA time requirements for severance payments have not yet arisen (i.e.,

April 1, 2015), Verso remains exempt as long as it makes payment by that date. *Id.*
at 15. According to Verso, the Maine Department of Labor Regulations support its
interpretation of section 625-B(3)(B). *Id.* (citing 12-170 C.M.R. ch. 15, § III(A)).

In addition to arguing that the plain language of section 625-B(3)(B) supports
its position, Verso claims that "[t]he legislative history of subsection 3(B)
demonstrates that the 'paid under' phrase was meant to require actual payment of
severance." *Id.* Verso summarizes the history of the subsection, beginning with its
original language in 1979 and amendments in 1999 and 2003. *Id.* at 16-18. According
to Verso, the purpose of the 2003 amendment "was to allow employers to rely on the
'express contract' exception under subsection 3(B) 'only if the contractual severance
pay has actually been paid pursuant to the terms of the contract.'" *Id.* at 18. Verso
summarizes its argument:

> The legislative history contains no suggestion . . . that the Legislature
> intended to dictate the exact terms of the payment schedule or require
> a particular timing for the payment of severance. In other words, the
> legislative history contains no suggestion that an employer must
> actually pay the severance prior to the payment deadline set forth in
> Subsection 2 of the Act. Instead, the legislative history demonstrates
> that payment was to be made only "pursuant to the terms of the
> contract."

*Id.* Furthermore, Verso argues that if the Court were to adopt Plaintiffs'
interpretation of section 625-B(3)(B), it "would lead to absurd results that frustrate
the purpose of the exemption, and is in derogation of common law principles and
would create a constitutional issue by negating a CBA." *Id.* at 19. In other words,
the "absurd results" would be that any express contract providing for severance must
require full payment on or before the statutory deadline under section 625-B(2) no

matter what. *Id.* Thus, "it would not afford any freedom to the parties to the 'express contract' contemplated by the statutory exemption to negotiate an outcome meaningfully different from what the statute already dictates." *Id.*

Finally, turning to Plaintiffs' right to accrued 2015 vacation pay, Verso contends that Plaintiffs do not have any contractual right to vacation pay, and the issue must be brought through the grievance and arbitration process. *Id.* at 21. Addressing Plaintiffs' contention that 26 M.R.S. § 626 dictates that vacation pay be paid by January 8, 2015, Verso counters that "both the Law Court and courts of this District have made clear that vacation pay constitutes 'wages' under Section 626 only if an employee has an explicit contractual right to receive that vacation payment." *Id.* (citing *Richardson v. Winthrop Sch. Dep't*, 2009 ME 109, ¶ 7, 983 A.2d 400; *Rowell v. Jones & Vining, Inc.*, 524 A.2d 1208 (Me. 1987); *Gibson v. Power Maint. Int'l, Inc.*, No. 02-37-P-C, 2002 WL 31399791, at *6, 2002 U.S. Dist. LEXIS 20731, at *17 (D. Me. Oct. 24, 2002)). According to Verso, neither the CBA nor the MOA gives them that necessary contractual right. *Id.* at 21-22. In addition, the MOA dictates when it will be paid. *Id.* at 23.

### C. Plaintiffs' Reply

Beginning with Verso's claim that the Court lacks subject-matter jurisdiction, Plaintiffs counter that "[t]here are three bases for this Court to assert jurisdiction over Count Nine." *Pls.' Reply* at 3. First, because the Court has jurisdiction regarding the federal antitrust claims, "it may and should exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367." *Id.* at 3-4 (citing *Exxon Mobil*

*Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 559 (2005)). In addition, "the state law claim does not predominate over the antitrust claims over which the Court has original jurisdiction." *Id.* at 4 (citing 28 U.S.C. § 1367(c)). Second, because at least one of the Plaintiffs (Nathaniel Gray) is owed more than $75,000, Plaintiffs contend "there is no reason that the Court should refuse to exercise jurisdiction because he is joined by other IAM members who worked at the Bucksport Mill and seek essentially the same declaratory judgment." *Id.* Third, the IAMAW has authority under 26 M.R.S. § 625-B(4)[13] to bring this action on behalf of all its members for recovery of severance pay, "and the combined total of the losses incurred by the union's members far exceeds the $75,000 jurisdictional threshold for diversity jurisdiction." *Id.*

Addressing Verso's argument that the individual Plaintiffs may not aggregate their claims to satisfy the amount in controversy requirement for diversity jurisdiction, Plaintiffs distinguish *Craig* (cited by Verso) on the basis that unlike that case, which involved a class action for damages under the same state severance pay statute, this case seeks declaratory and injunctive relief rather than damages, and is also being brought by the employees' union. *Id.* at 4-5. In addition, citing Stipulation of Facts ¶ 26 ("Verso estimates that the equivalent of the 2015 vacation time allotted to IAM's members is approximately $390,000") and Defendants' Proposed Statements of Fact ¶ 9 (acknowledging it owes "approximately $2 million" in severance payments), Plaintiffs argue that this "more than satisf[ies]" the amount in

---

[13]    Plaintiffs cited 26 M.R.S. § 4 in their reply to support the assertion that the IAMAW has authority to bring this suit on behalf of its employees, but the Court assumes they meant 26 M.R.S. § 625-B(4). *See Pls.' Reply* at 4.

controversy requirement. *Id.* at 5. Citing an array of caselaw and secondary authority, Plaintiffs observe that some courts have held that "where the value of the declaratory judgment is different for plaintiffs and defendants, the 'defendants' viewpoint' should govern." *Id.* at 6. Once again citing Stipulation of Facts ¶ 26 and Defendants' Proposed Statements of Fact ¶ 9, Plaintiffs conclude that "the declaratory judgment is therefore greater than $75,000 from defendants' viewpoint." *Id.*

Plaintiffs also contend that when parties bring an action for declaratory judgment, aggregation may be permitted if the parties have a "common and undivided interest" and "the value of plaintiffs' claim is based on the value of the object of the litigation." *Id.* at 5-6 (citing *Snyder v. Harris*, 394 U.S. 332, 335 (1969); *Local Div. No. 714, Amalgamated Transit Union, AFL-CIO v. Greater Portland Transit Dist. of Portland, Maine*, 589 F.2d 1, 10 (1st Cir. 1978); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977)).

Next, addressing Verso's contention that the federal LMRA preempts Plaintiffs' claims under the state severance pay statute, Plaintiffs argue that Verso's position has already been rejected by this Court in *Faloon v. W.S. Libby Co.*, No. 91-124-P-H, 1992 WL 358790, 1992 U.S. Dist. LEXIS 9337 (D. Me. Apr. 27, 1992). *Id.* at 7-8. According to Plaintiffs, although *Faloon* was decided before the 2003 amendment to section 625-B(3)(B), its application here results in the same conclusion: that their claims under the state statute are not preempted. *Id.* at 8-9.

Turning to Verso's argument that Plaintiffs need to exhaust their contractual remedies before filing a court action, Plaintiffs counter that they "are not suing to enforce a right under the CBA," and therefore, "they need not exhaust their administrative remedies." *Id.* at 9. Citing *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 80 (1998) and *O'Brien v. Town of Agawam*, 350 F.3d 279, 285-86 (1st Cir. 2003) for the proposition that a "union-negotiated waiver of employees' statutory rights to a judicial forum must be 'clear and unmistakable' from the language of the contract," Plaintiffs contend that no such waiver exists under the CBA. *Id.*

Next, addressing Verso's contention that it is exempt from severance liability because there is an express contract between the parties that provides for severance payments, Plaintiffs reassert the argument they made in their motion that section 625-B(3)(B) cannot be satisfied unless the Bucksport Mill employees are actually paid, and because Verso has stated that employees will not be paid by January 8, 2015, Verso will be in violation of section 625-B(2). *Id.* at 9-11. Furthermore, in response to Verso's inquiry as to why Plaintiffs would have agreed to the three month pay period under Section 12.2 of the CBA if it was aware of the statutory time frame, Plaintiffs claim that they "*did not agree* to the application of the 3-month time frame contemplated in Section 12.2 in situations like the closure of the Bucksport Mill. Section 12.2 has no application to the Bucksport Mill's closure under either or both Section 12.5 and Section 29.1." *Id.* at 11-12 (emphasis in original).

Finally, in response to Verso's claim that it has no contractual obligation to pay Plaintiffs their accrued 2015 vacation time and within the time frame established under 26 M.R.S. § 626, Plaintiffs argue to the contrary—they are contractually entitled under both the CBA (Section 11.15(a)) and MOA. *Id.* at 12-14.

### D.  Verso's Supplemental Opposition

Verso begins by reaffirming the arguments it made in its original opposition, except observes that the Court has subject-matter jurisdiction only over two Plaintiffs (Plaintiffs Kendal Dunbar and Nathaniel Gray) whose individual claims meet the amount in controversy requirement. *Defs.' Supplemental Opp'n* at 1; *see also id.* at 3-5 (explaining how it calculates the amount in controversy alleged for each employee). In addition, in light of the Director's filing of the Director Complaint and Consent Order in Kennebec County Superior Court, Verso contends that Plaintiffs no longer have a cause of action for severance under section 625-B because that suit is "on behalf of all current and former hourly employees at the Bucksport Mill who may be eligible to receive severance pay from Verso, including each Plaintiff." *Id.* at 2. According to Verso, "the State's action terminates Plaintiffs' right to bring their severance claims and the Motion should be denied to the extent it concerns those claims." *Id.* Verso also noted that while the other four unions have agreed to the terms of the Consent Order, "Plaintiffs . . . have parted ways from the State and the other four locals at the Bucksport Mill and refuse to drop their claims concerning the timing of severance pay and vacation benefits brought in this action." *Id.* at 2-3.

Citing section 625-B(5), Verso argues that it "specifically provides that the right of any employee to maintain an independent private cause of action 'shall terminate upon the filing of a complaint by the director.'" *Id.* at 6. In addition, contrary to Plaintiffs' argument that it matters who files an action first, Verso contends that the "statute does not draw any distinction between actions that already have been filed and those that have not yet been filed. And neither the United States Supreme Court nor the Maine Supreme Judicial Court has recognized any such distinction." *Id.* at 6-7 (citing *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 5 (1987); *Director of Bureau of Labor Standards v. Fort Halifax Packing Co.*, 510 A.2d 1054, 1057 (Me. 1986); *Viking Freight, Inc. v. Moberg*, 1998 WL 35155724, at *12 (Me. Super. July 27, 1998)).

Although Verso believes that the plain language of the statute reads in its favor, Verso also observes that the legislative history of section 625-B(5) supports its position that Plaintiffs' suit should be dismissed. *Id.* at 7. Quoting the Maine Legislature's Committee on Labor (Committee on Labor), Verso points out that "one of the purposes of the amendment was to make clear that 'the director's suit may *take the place of the individual suits* of a large number of employees.'" *Id.* at 7-8 (quoting Comm. Amend. A to H.P. 1082, L.D. 1362, No. H-674 (107th Legis. 1975)) (emphasis in Verso's original). Thus, in Verso's view, "one lawsuit cannot 'take the place of' another if the other lawsuit does not exist in the first place." *Id.* at 8. Anticipating that Plaintiffs may argue that dismissal of their case on the basis of section 625-B(5) would be "inequitable," Verso argues to the contrary:

Indeed, the potential inequities flow in the opposite direction, as the instant situation makes clear. The Consent Order applies to, and confers benefits upon, all hourly wage employees at the Bucksport Mill, including all of the Plaintiffs. By asserting that they nevertheless should remain free to prosecute their action against Verso, Plaintiffs seek to reap the benefits of both the State's enforcement efforts and of Verso's decision to forgo its asserted legal rights in favor of a negotiated agreement—all without having to give anything in return. The Court should not permit that result.

*Id.* at 8-9.

### E. Plaintiffs' Supplemental Reply

Addressing Verso's claim that only two individual Plaintiffs meet the amount in controversy requirement, Plaintiffs respond "that there are four bases of jurisdiction that this Court has over the severance and 2015 vacation pay issues raised in Count 9 of the First Amended Complaint." *Pls.' Supplemental Reply* at 2. First, Plaintiffs contend that the Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because "at least two of the named Plaintiffs individually meet the $75,000 jurisdictional threshold," and therefore, the Court has supplemental or pendent jurisdiction over all claims of the individual Plaintiffs. *Id.* at 3. In other words, each individual Plaintiff's claims "derive from a common nucleus of operative facts." *Id.* at 3-4 (citing *Corporate Res., Inc. v. Se. Suburban Ambulatory Surgical Ctr., Inc.*, 774 F. Supp. 503, 506 (N.D. Ill. 1991)). In addition, citing the Supreme Court's ruling in *Exxon Mobil Corp.*, Plaintiffs assert that § 1367 "permits a federal court to exercise diversity jurisdiction over additional plaintiffs who fail to satisfy the minimum amount-in-controversy requirement, as long as other elements of diversity jurisdiction under 28 U.S.C. § 1332 are present and at least one named

plaintiff satisfies the amount-in-controversy requirement." *Id.* at 4. As for the other three bases of jurisdiction asserted by Plaintiffs, they repeat the arguments in their reply, and add that this Court's ruling in *Craig* came two years before the enactment of 28 U.S.C. § 1367 "and almost two decades before the Supreme Court's" ruling in *Exxon Mobil Corp. Id.* at 5-7.

Turning to the Director filing an action in Kennebec County Superior Court against Verso, Plaintiffs first discuss their severance pay claims, and contend that "while the filing of [the Director's] action terminates the ability of employees of the Bucksport Mill to bring any new action, or to *become a party plaintiff to this action*, the filing of the Director's action does not terminate this pending action for the recovery of severance pursuant to 26 M.R.S.A. § 625-B." *Id.* at 7 (emphasis in original). According to Plaintiffs, this is so because "the Director's action failed to recover the relief that Plaintiffs are seeking in this declaratory and injunctive relief action – or that is mandated by Maine law." *Id.*

Plaintiffs contend they "have a property interest in their cause of action pending in this Court," and looking at the legislative history relied on by Verso, further assert that "nowhere in these Legislative History papers is there any indication that the Legislature intended that the filing of a Director's suit would terminate a *pending* action, maintained by employees or a labor organization." *Id.* at 13 (emphasis in original). Plaintiffs further argue that their interpretation is correct especially because of language contained in 26 M.R.S. § 625-B(5) (i.e., "The right provided by subsection 4 . . . of any employee to become a party plaintiff to any action

under this subsection, shall terminate upon the filing of a complaint by the director in an action under this subsection"). *Id.* They conclude that "[t]he plain meaning of this phrase logically indicates there could be an action for an employee to become a party plaintiff in – *after the filing of a Director's suit*." *Id.* (emphasis in original).

Plaintiffs also argue that their right to proceed has not been terminated because the relief they seek "was not achieved by the settlement reached by the Director's action and Consent Decree." *Id.* at 14. In essence, Plaintiffs contend that if the Court dismisses their suit, they will not receive the "full relief" they allege they are entitled to (i.e., payment of all severance pay within the time frame provided by 26 M.R.S. § 625-B(2)) and suggest that this result would be a violation of due process. *Id.* at 14-15 (citing *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 316 (D. Mass. 1999)).

In addition, Plaintiffs claim that, under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b)-(c), and Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626(b), the language of those federal statutes "mirrors the language in the [Maine severance pay statute] relating to the right of employees to bring an action and when that right of action is terminated." *Id.* at 15. Plaintiffs explain:

> [T]he filing of an action by the Secretary of Labor does not terminate pending actions – only the right to bring new actions or to "become a party plaintiff" to a pending action terminates with the filing of an action by the Secretary. Both Congress and prior court decisions firmly have stated that when the U.S. Secretary of Labor brings an action under the FLSA or ADEA, that has no affect on pending actions, which are allowed to continue. *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 695 n.1 (2003); *Burns v. Equitable Life Assur. Soc. of U.S.*, 696 F.2d 21 (2d Cir. 1982). Therefore, since the Maine Legislature has

> essentially copied the same provisions from the FLSA and ADEA into the Maine Severance Pay Statute, the same interpretation should apply.

*Id.* Quoting the House-Senate Conference Report that accompanied the amendments to 29 U.S.C. § 216(b), Plaintiffs argue that pending private actions are not terminated when the Secretary of Labor brings suit. *Id.* at 17; *see also* H.R. Conf. Report No. 327, 87th Cong., 1st Sess., 20 (1961) ("The filing of the Secretary's complaint against an employer would not, however, operate to terminate any employee's right to maintain such a private suit to which he had become a party plaintiff before the Secretary's action"). Plaintiffs also cite and discuss *Breuer* and *Burns*, especially to contend that the word "bring" under 26 M.R.S. § 625-B(5) means to terminate those cases not previously pending (as opposed to use of the word "maintained," which appears under subsection 4), as Justice Souter discussed in *Breuer* in the context of the FLSA. *Pls.' Supplemental Reply* at 17-19; *see also Breuer*, 538 U.S. at 695-96 & n.1.

Next, turning to the cases cited by Verso, Plaintiffs counter that "Defendants have cited no case in which a prior pending action has in fact been dismissed by court order after the filing of a Director's action." *Pls.' Supplemental Reply* at 19. First, regarding *Viking Freight, Inc.*, they argue that Superior Justice Calkins, who concluded that "the right of any employee to *maintain* an action terminates 'unless the action is dismissed without prejudice by the director,'" made an improper conclusion because she incorrectly used the word "maintain" rather than "bring." *Id.* at 20-21 (emphasis added); *Viking Freight, Inc.*, 1998 Me. Super. LEXIS 191, at *16. In addition, Plaintiffs argue that *Viking Freight, Inc.* is "inapposite" because those

employees entered the case after the Director initiated a counterclaim. *Pls.'*
*Supplemental Reply* at 21. Finally, regarding Verso's citations to the Maine Supreme
Judicial Court and United States Supreme Court decisions in *Fort Halifax Packing*
*Co.*, Plaintiffs concede that dicta from the United States Supreme Court suggests that
a pending suit by employees would terminate after the Director files an action, but
nevertheless contends that "there was no judicial determination" on that point, and
further argues that those "decisions are not binding on this Court" because they were
issued before Justice Souter's "clarifying holding" in *Breuer* as to the meaning of
"maintain." *Id.* at 21-22.

Plaintiffs turn to public policy. *Id.* at 23 ("To allow the Verso Defendants to
defeat this court's jurisdiction as a consequence of a deal they negotiated with the
State for less than the amount owed, in the time it is due by law, will encourage other
employers to do the same in the future").

Discussing their vacation pay claims, Plaintiffs observe that while the Consent
Order addresses the timing of vacation pay, the Director's action has no impact on
their right to maintain their suit pursuant to 26 M.R.S. § 626. *Id.* at 12. Therefore,
according to Plaintiffs,

> **if Verso fails to pay vacation time to any Bucksport employees on**
> **or by no later than January 8, 2015, (as contemplated by the**
> **consent decree between Verso and the Director), Verso will owe**
> **all Bucksport employees that bring suit to recover these unpaid**
> **wages, a reasonable rate of interest, an additional amount equal**
> **to twice the amount of those wages as liquidated damages and**
> **costs of suit, including a reasonable attorney's fee**.

*Id.* at 25-26 (emphasis in original).

**F. Verso's Second Supplemental Opposition**

At the Court's suggestion, Verso submitted a second supplemental opposition to address abstention principles as they relate to Plaintiffs' claims. *Defs.' Second Supplemental Opp'n* at 1. Verso argues that the Court should abstain from ruling on any of Plaintiffs' claims because they have not alleged "Verso has violated or will violate any provision of the [United States] Constitution, any federal law, or even any regulation promulgated by a federal authority. Plaintiffs' claims are instead pure creatures of state law that turn on disputed, complex, and even obscure elements of Maine statutory and common law." *Id.* at 2-3. Verso also points out that these state law issues are now before Superior Court Justice Mullen. *Id.* at 3. Furthermore, Verso notes that jurisdiction over Plaintiffs' claims may only arise "out of supplemental jurisdiction under 28 U.S.C. § 1367," and even if the Court finds that it has diversity jurisdiction, it "still would have the discretion to refuse to hear their request for declaratory relief because federal courts are not obligated by statute to hear such claims." *Id.*

Verso also argues that "[e]ven if each Plaintiff were able to firmly establish mandatory subject matter jurisdiction . . . the Court still could refuse to hear their request for declaratory judgment because the 'Declaratory Judgment Act, 28 U.S.C. § 2201, is discretionary.'" *Id.* at 4-5 (quoting *Canal Ins. Co. v. W.M. Jr. Trucking Co.*, Civ. No. 8-76-B-W, 2008 WL 2690361, at *2, 2008 U.S. Dist. LEXIS 50529, at *4 (D. Me. July 1, 2008); *Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306, 310 (1st Cir. 1986)). Thus, according to Verso, "the Court is free to decline to hear all of Plaintiffs' claims

*even before* the Court reaches the question of abstention." *Id.* at 5 (emphasis in original).

Turning to specific abstention doctrines, Verso contends that this case falls within the doctrine articulated by the Supreme Court in *Younger v. Harris*, 401 U.S. 37 (1971) ("*Younger* abstention"). *Id.* According to Verso, under *Younger* abstention and as refined by the First Circuit, a federal court

> *must* abstain from reaching the merits of a case over which it has jurisdiction so long as there is (1) an ongoing state judicial proceeding instituted prior to the federal proceeding (or, at least, instituted prior to any substantial progress in the federal proceeding), that (2) implicates an important state interest, and (3) provides an adequate opportunity for the plaintiff to raise the claims advanced in this federal lawsuit.

*Id.* at 5-6 (quoting *Brooks v. N.H. Supreme Court*, 80 F.3d 633, 638 (1st Cir. 1996)) (emphasis in Verso's original). Verso also cites the recent Supreme Court case of *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013) for the proposition that *Younger* abstention "applies specifically where the competing state lawsuit at issue is a civil enforcement proceeding brought by a state authority – precisely what is at issue here." *Id.* at 6.

Verso asserts that each *Brooks* element has been met here. *Id.* at 6-7. First, Verso notes that although this action was filed first, the action filed by the Director in Kennebec County Superior Court remains "ongoing," was instituted "only 8 days later," and occurred "before any 'proceeding[s] of substance on the merits' have taken place before this Court." *Id.* at 6 (citing *Mallinckrodt LLC v. Littell*, 616 F. Supp. 2d 128, 135-37 (D. Me. 2009)). Second, Verso argues that interpretation of section 625-B(5) "'implicate[s] an important 'sovereign prerogative' in which the state's law is

unclear.'" *Id.* at 6-7 (quoting *Coors Brewing Co. v. Mendez-Torres*, 678 F.3d 15, 23 (1st Cir. 2012) (quoting *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959))). Third, Verso contends "there is no impediment to Plaintiffs seeking the relief they desire from the Maine Superior Court." *Id.* at 7.

Addressing additional abstention doctrines, Verso claims that this case also falls within the doctrine articulated by the Supreme Court in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) ("*Burford* abstention"). *Id.* According to Verso, under *Burford* abstention,

> a federal court should abstain from consideration of matters where (1) there is available "time[] and adequate state court review"; (2) there is the potential that federal court jurisdiction "will interfere with state administrative policymaking"; and (3) the federal court cannot avoid conflict with the state proceedings "by careful management of the federal case."

*Id.* at 8 (quoting *Klane ex rel. Klane v. Mayhew*, Civil no. 1:12-cv-00203-NT, 2013 WL 1245677, at *2, 2013 U.S. Dist. LEXIS 42053, at *6 (D. Me. Mar. 26, 2013) (quoting *Chico Serv. Station, Inc. v. Sol P.R. Ltd.*, 633 F.3d 20, 32 (1st Cir. 2011))). Here, Verso asserts that "Plaintiffs' action implicates both the letter and the spirit of this test." *Id.* In addition to similar arguments noted in its discussion of *Younger* abstention, Verso also argues that this case calls into question the Director's power to enforce the statute in the first place, and thus, should be left to a state court. *Id.*

Finally, Verso argues that this case falls within the doctrine articulated by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) ("*Colorado River* abstention"). *Id.* at 9. Verso explains that this doctrine focuses on "the value of 'wise judicial administration.'" *Id.* (quoting *Currie*

*v. Grp. Ins. Comm'n*, 290 F.3d 1, 9 (1st Cir. 2002)). According to Verso, the *Currie*

Court explained the factors that apply:

> (1) whether either court has assumed jurisdiction over a res; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law controls; and (6) whether the state forum will adequately protect the interests of the parties.

*Id.* (quoting *Currie*, 290 F.3d at 10). Although Verso observes that the first two *Currie*

factors do not apply in this case, it argues that "the remaining four cut decisively in

favor of abstention." *Id.* at 9-10 (applying each factor).

### G. Plaintiffs' Memorandum on Abstention; Plaintiffs' Second Supplemental Reply

In their memorandum on abstention, Plaintiffs argue that none of the

abstention doctrines discussed by Verso apply to this case, nor does the doctrine

articulated by the Supreme Court in *Railroad Commission of Texas v. Pullman Co.*,

312 U.S. 496 (1941) ("*Pullman* abstention"). *Pls.' Mem. on Abstention* at 2-5. First,

Plaintiffs argue that *Pullman* abstention does not apply because their claim "does not

seek or require any federal constitutional ruling." *Id.* Second, they contend that

*Younger* abstention does not apply because, among other reasons, the state court

action is not "ongoing" and their request for declaratory relief does not require this

Court to "interpret or overrule anything contained in the Consent Decree." *Id.* at 2-

3. Third, Plaintiffs argue that *Colorado River* abstention does not apply "because

there is no action currently pending in state court that seeks a declaratory judgment

relating as to plaintiffs' right to seek severance and vacation pay," nor were they

parties to the state court action. *Id.* at 4. Fourth, they assert that *Burford* abstention does not apply because a ruling by this Court as to the timing of payment "under Maine law will not interfere with any state administrative proceedings or order." *Id.* at 4-5. Finally, Plaintiffs argue that the Court should not abstain in the interest of public policy, namely, "[i]f Verso succeeds in this evasion of State law now, it will encourage every other employer subject to the [Maine severance pay statute] to attempt the same evasion in the future. That is contrary to the interests of the public and Maine workers in every industry covered by the [statute]." *Id.* at 6-7.

Plaintiffs also replied to Verso's memorandum on abstention. Beginning with Verso's citation to *Sprint Communications, Inc.* for the proposition that *Younger* abstention applies in a case such as this, Plaintiffs counter that "the Supreme Court's holding . . . makes clear that *Younger* abstention is not warranted and would, in fact, be inappropriate under the circumstances presented in this case." *Pls.' Second Supplemental Reply* at 2. According to Plaintiffs, *Sprint Communications, Inc.* "simply held that where a case does not fall within any of the three classes of exceptional cases for which *Younger* abstention is appropriate, **abstention must be denied**." *Id.* (emphasis in original). In addition, Plaintiffs note that the *Sprint Communications, Inc.* Court explained that it has applied *Younger* abstention to specific state civil proceedings that resemble criminal prosecutions, "or that implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* at 2-3 (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987)).

However, Plaintiffs argue that it is only in "exceptional circumstances" where a federal court should refuse to decide a case and defer to the States. *Id.* at 3. Relying on the Supreme Court's ruling in *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989), they contend that there are three instances in which "exceptional circumstances" arise: (1) "*Younger* precludes federal intrusion into ongoing state criminal prosecutions"; (2) "certain 'civil enforcement proceedings' warrant *Younger* abstention"; and (3) "federal courts should refrain from interfering with pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id.* (quoting and citing *New Orleans Pub. Serv., Inc.*, 491 U.S. at 368). Furthermore, Plaintiffs note that the *Sprint Communications, Inc.* Court concluded that *Younger* abstention applies in the three "exceptional circumstances" articulated above, but not beyond. *Id.* at 4 (citing *Sprint Commc'ns, Inc.*, 134 S. Ct. at 591-94).

In addition, Plaintiffs argue that in *Sprint Communications, Inc.*, the Supreme Court "noted that the Eighth Circuit misinterpreted [its] decision in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982), to mean that *Younger* abstention is warranted whenever there is (1) 'an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges.'" *Id.* at 3-4. They assert that this case does not fall under any of the three "exceptional circumstances," nor does it meet the three elements described by Verso in its second supplemental opposition. *Id.* at 5-6. Most notably, Plaintiffs observe that they "have no right to

intervene in the Director's action as a party plaintiff, as a consequence of the termination provision in" 26 M.R.S. § 625-B(5), and therefore, "if this Court abstains, and sends the Plaintiffs to State Court, Plaintiffs' ability to obtain timely payment of all of the severance due them will be lost forever, because of the termination language" under the statute. *Id.* Plaintiffs summarize their argument:

> Here, denying review of this matter in federal court based on *Younger* abstention, coupled with the "termination" of new actions provision in 26 M.R.S.A. § 625-B, sub-§ 5 after initiation of a Director's action, will provide the Plaintiffs *NO opportunity to vindicate their cause of action in ANY court* and will effect a complete denial of Plaintiffs' property in their cause of action and access to courts without due process of law – since Plaintiffs will be denied any opportunity to seek judicial review or action on their claim for <u>*timely*</u> payment of <u>*all*</u> severance payments due them under [statute].

*Id.* at 7 (emphasis in original). Furthermore, as a matter of public policy, Plaintiffs contend that a ruling by this Court regarding timing of severance pay "will assist the State in prior enforcement actions against future employers who refuse to comply with the [Maine severance pay statute] and all the Bucksport Mill's employees all have the benefits of at least the compromise payments that the Director obtained through the consent decree to tide them over." *Id.* at 10.

Next, addressing their claims for vacation pay under 26 M.R.S. § 626, Plaintiffs argue that the Court should not abstain from deciding this issue either. *Id.* at 11. Citing several provisions from the CBA and reiterating that neither the action nor Consent Order filed in Kennebec County Superior Court impacts their vacation pay claims, *id.* at 11-14, Plaintiffs conclude that "under no circumstances can Verso pay this sum after January 8, 201[5]." *Id.* at 15.

## H.    Verso's Third Supplemental Opposition

At the invitation of the Court, Verso filed a third supplemental response "to address the applicability of federal court interpretations of both the [FLSA] and the [ADEA] to the termination provision of . . . 26 M.R.S. § 625-B."  *Defs.' Third Supplemental Opp'n* at 1.  Verso argues that (1) the legislative history regarding section 625-B is unambiguous and should not be "trump[ed]" by federal legislative history or caselaw interpreting the FLSA and ADEA; (2) even if the Court consulted federal legislative history or caselaw regarding these statutory schemes, "those interpretations are abstruse and far from definitive"; and (3) the enforcement provisions under the FLSA and ADEA "substantially differ from" section 625-B and should therefore lead to the conclusion that they should be interpreted differently. *Id.* at 1-2.

First, Verso asserts that "Plaintiffs' argument neglects to consider that Maine law requires that any ambiguity in a *Maine state statute* be resolved first by looking to the intent of the *Maine legislature*, as manifested in the statute's legislative history."  *Id.* at 3 (emphasis in original).  According to Verso, under Maine law,

> the court first determines whether the statute is clear on its face.  If so, the inquiry ends.  If the statute is ambiguous, however, the court proceeds to extrinsic aids that may elucidate the intent of the Maine legislature, chief among those aids being the relevant legislative history.

*Id.* at 3-4 (citing *Strout v. Cent. Me. Med. Ctr.*, 2014 ME 77, ¶ 10, 94 A.3d 786; *Damon v. S.D. Warren Co.*, 2010 ME 24, ¶ 10, 990 A.2d 1028; *McNally v. Douglas Bros., Inc.*, 2003 ME 155, ¶ 9, 838 A.2d 1176).  In addition, Verso observes that "Maine courts have looked to analogous federal statutes precisely *because* the legislative history of

a Maine statute suggested that they do so." *Id.* at 4-5 (citing *Percy v. Allen*, 449 A.2d 337, 342 (Me. 1982)) (emphasis in original). Furthermore, Verso instructs the Court to "not simply adopt wholesale federal interpretations of similar federal statutes," especially where there are "differences between existing Maine law and interpretations of that federal statute." *Id.* at 5 (citing *Affo v. Granite Bay Care, Inc.*, Civil Nos. 2:11-CV-482-DBH, 2:12-CV-115-DBH, 2013 WL 2383627, 2013 U.S. Dist. LEXIS 76019 (D. Me. May 30, 2013); *Jackson v. State*, 544 A.2d 291, 296 n.7 (Me. 1988); *Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, ¶ 27, 58 A.3d 1083).

Based on these principles, Verso concludes that "Plaintiffs have lost their right to sue Verso." *Id.* Once again, Verso points to the observations made by the Maine Supreme Judicial Court and United States Supreme Court in *Fort Halifax Packing Co.* based on the plain language of the statute that "suits filed by the [Director] displace existing private actions." *Id.* at 6. Verso also asserts that even if this Court found the plain language ambiguous, Maine "legislative history eliminates any doubt about what the Maine Legislature intended when it drafted the termination provision." *Id.* at 6-7. Specifically countering Plaintiffs' claim that the legislative history does not address pending actions, Verso says "that is precisely what the phrase 'take the place of' means. Again, the [Director]'s suit cannot 'take the place of the individual suits' if the individual suits are not already pending." *Id.* at 7.

Next, addressing Plaintiffs' citation to *Breuer* and Justice Souter's discussion of the words "bring" and "maintain," Verso contends that that case "did not aim to

resolve, nor did it resolve, any issue that bears on the interpretation" of subsection 5 of the Maine severance pay statute. *Id.* at 3, 9. First, Verso counters that "*Breuer* was at best ambivalent about the difference between the words 'bring' and 'maintain.'" *Id.* at 9. Second, according to Verso, *Breuer* concerned whether a FLSA case could be removed, and thus, "did not decide, nor did it purport to decide, whether the termination provision of § 216(c), which is similar to that of [section] 625-B(5), applied to previously-filed private actions." *Id.* at 9-10. Third, Verso argues that while it does not dispute the legislative history cited in footnote 1 of Justice Souter's opinion in *Breuer*, "federal courts have not consistently held that pending private actions under § 216 survive suits by the Secretary." *Id.* at 11.

Lastly, Verso argues that there are "significant differences between" the FLSA and ADEA compared to 26 M.R.S. § 625-B, and thus, "there are clear reasons why the termination provision of those statutes would be interpreted differently." *Id.* at 3. For example, Verso points out that while the "FLSA requires that private litigants who wish to represent the rights of other similarly situated employees first obtain the explicit written consent of those employees," section 625-B contains no similar requirement. *Id.* at 12. Verso explains:

> Plaintiffs claim for themselves the power to control the severance claims owned by each and every single worker at the Bucksport Mill, even over the objection of a great majority of those workers, who have made clear that they oppose the very existence of Plaintiffs' action. It therefore makes perfect sense for the Maine Legislature to have vested authority in the [Director] to step in, displace such private actions, and effectively take over the representation of the workers at issue. . . . [T]he [Director] is clearly better situated to advocate for and defend the rights of both non-party employees and the general public than is the random private plaintiff who happened to get to the courthouse first.

*Id.* at 12-13.  In contrast, Verso contends, because the FLSA permits persons to be bound only if they affirmatively consent, there is "no risk . . . that those without the means to opt in will have their rights determined by others and, therefore, less of a reason why the statute would be interpreted as authorizing the Secretary to displace existing private actions." *Id.* at 13.

## I.  Plaintiffs' Third Supplemental Reply

In response to Verso's third supplemental opposition, Plaintiffs first argue that if the Court were to adopt the construction advocated for by Verso, it "would arguably violate the Plaintiffs' constitutional rights to the property interest they already have in their cause of action to recover severance pay" under Maine law.  *Pls.' Third Supplemental Reply* at 2.  In addition, Plaintiffs advocate the Court to avoid delving into the legislative history of subsection 5 "to create an ambiguity w[h]ere none exists on the face of the statute and . . . [instead] apply the logical construction of this plainly worded statute." *Id.* at 3.

Second, Plaintiffs contend that while 26 M.R.S. § 625-B is unambiguous, "the legislative history on which Defendants rely is." *Id.* at 4.  According to them, the addition of subsection 5 to the severance pay statute "was taken against the clear backdrop of years of FLSA and ADEA cases that concluded use of this language would not terminate pending actions and the Legislature chose to use this language with that knowledge." *Id.*  Moreover, Plaintiffs argue that "nothing in the legislative history evidences an express intent to terminate pending actions." *Id.* at 5.

Plaintiffs also argue that "public policy favors allowing pending lawsuits to proceed." *Id.* at 9. For a summary of Plaintiffs' public policy arguments, *see* Section III.C.8.d.i, *infra*.

## J. Plaintiffs' Objection and Motion in Opposition to the USW's Motion; Plaintiffs' Supplemental Objection and Motion in Opposition to the USW's Motion[14]

The USW filed a motion for joinder because it believes "this litigation has the potential to result in factual and legal determinations which, while technically not binding on USW, might profoundly affect USW's rights." *USW's Mot.* at 2-3. Plaintiffs object "to the continued participation of Attorney Jonathan Beal, Esq., and permissive joinder of the" USW. *Pls.' Supplemental Objection and Mot. in Opp'n to the USW's Mot.* at 2. Plaintiffs argue that "Mr. Beal's effort to use Rule 20 as a mechanism for the USW to become a party plaintiff in this action is procedurally improper." *Id.* In summary, Plaintiffs contend that (1) section 625-B(5) terminated the USW's right to enter this action because it is attempting to enter subsequent to the Director's filing in Kennebec County Superior Court, and (2) the USW has not properly complied with the intervention requirements under Federal Rule of Civil Procedure 24. *Id.*

In Plaintiffs' view, the USW's "primary purpose" appears to be concerned with interfering and obstructing Plaintiffs' "efforts to preserve the Bucksport Mill as a going concern in the prosecution of" its antitrust claims, which the USW lacks

---

[14] Plaintiffs filed (1) an objection and motion in opposition to the USW's joinder motion; and (2) a supplemental objection and motion in opposition to the USW's joinder motion. *See* Section I.A, *supra*. As both pleadings are substantially similar, the Court summarizes only Plaintiffs' supplemental pleading.

standing to do in this matter. *Id.* Plaintiffs say that the settlement reached between the Director and the other unions regarding severance and vacation pay has nothing to do with the sale of the Bucksport Mill, "so the underlying justification for the USW's participation as a party is fundamentally flawed and jurisdictionally lacking." *Id.* at 3. Furthermore, they argue that the "USW's stated purpose of entering this litigation to oppose Plaintiffs' efforts to prevent the sale of the Bucksport Mill . . . is not only contrary to the interests of Plaintiffs, it is contrary to the interests of the USW's own members." *Id.* at 5.

Even if the USW had standing to enter this action to pursue its "primary purpose," Plaintiffs contend that it no longer has standing to become a plaintiff in light of the Director's suit in state court, which occurred prior to the USW's attempt to enter this action. *Id.* (citing 26 M.R.S. § 625-B(5)). In addition, notwithstanding their argument that subsection 5 strips the USW of standing, Plaintiffs also argue that under 26 M.R.S. § 625-B(4), a labor organization has standing to pursue severance pay on behalf of its members, but not to oppose its members or members of another union (such as the IAMAW) from receiving severance pay under the statute. *Id.* at 6. Furthermore, Plaintiffs assert that the USW has no standing to enter this matter regarding vacation pay because 26 M.R.S. § 626 "provides no standing to a labor organization." *Id.* at 7. Thus, according to Plaintiffs, whether the USW attempted to enter this action via Rule 20 or Rule 24, it still lacks standing under section 625-B(5). *Id.* at 7-8 (citing *Usery v. Bd. of Pub. Educ.*, 418 F. Supp. 1037 (W.D. Pa. 1976)).

Finally, Plaintiffs also contend that the USW improperly attempted to enter this case via Rule 20 because only a party can request joinder. *Id.* at 8. In addition, Plaintiffs repeat their contention that section 625-B(5) prevents it from entering this case, and further assert that because the USW is not a party, and "'is seeking to enter the suit of [its] own accord, [then] the court should apply the intervention provisions set forth in Rule 24.'" *Id.* at 9 (quoting *Hubner v. Schoonmaker*, 1990 WL 149207, at *4, 1990 U.S. Dist. LEXIS 13035, at *13 (E.D. Pa. Oct. 2, 1990)).

## III. DISCUSSION

### A. Diversity Jurisdiction

Because there is no dispute that the parties are citizens of different States, whether diversity jurisdiction exists turns on whether "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a). "The party invoking federal jurisdiction . . . bears the burden of establishing jurisdiction." *Thomas v. Adecco USA, Inc.*, 1:13-cv-00070-JAW, 2013 U.S. Dist. LEXIS 165421, at *10 (D. Me. Nov. 21, 2013) (citing *Milford-Bennington R.R. Co. v. Pan Am Rys., Inc.*, 695 F.3d 175, 178 (1st Cir. 2012); *Satterfield v. F.W. Webb., Inc.*, 334 F. Supp. 2d 1, 2 (D. Me. 2004)); *see also CE Design Ltd.*, 755 F.3d at 43 ("The burden is on the federal plaintiff to establish that the minimum amount in controversy has been met").

As Plaintiffs initiated the case in this Court, "the amount specified by the plaintiff controls, as long as that amount is asserted in good faith." *Barrett v. Lombardi*, 239 F.3d 23, 30 (1st Cir. 2001); *see also CE Design Ltd.*, 755 F.3d at 43

("Amount in controversy is usually assessed from the viewpoint of the plaintiff"); *Richard C. Young & Co., Ltd. v. Leventhal*, 389 F.3d 1, 3 (1st Cir. 2004) (viewing the value of the object of the litigation from plaintiff's perspective where plaintiff sought both declaratory and injunctive relief). Furthermore, "[t]he amount in controversy in actions seeking declaratory relief 'is the value of the right or the viability of the legal claim to be declared, such as a right to indemnification or a duty to defend.'" *CE Design Ltd.*, 755 F.3d at 43 (quoting 14AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3708 (4th ed. 2011)).

"Once the damages allegation is challenged, however, the 'party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount.'" *Spielman v. Genzyme Corp.*, 251 F.3d 1, 5 (1st Cir. 2001) (quoting *Dep't of Recreation & Sports v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir. 1991)); *see also Abdel-Aleem*, 665 F.3d at 42 (same). In addition, "'[a] party may meet this burden by amending the pleadings or by submitting affidavits.'" *Spielman*, 251 F.3d at 5 (quoting *Dep't of Recreation & Sports*, 942 F.2d at 88).

Here, there is no dispute that Plaintiffs Kendal Dunbar and Nathaniel Gray meet the amount in controversy requirements based on their individual claims. According to Plaintiffs' Spreadsheet, Mr. Dunbar claims severance pay, either under Maine law or the MOA, in the amount of $74,520.00, and vacation pay under Section 10 of the MOA in the amount of $7,237.44 (equaling $81,757.44). *Am. Compl.* Attach.

1 (*Spreadsheet*). Similarly, the Spreadsheet also indicates that Nathaniel Gray claims severance pay, either under Maine law or the MOA, in the amount of $66,610.00, and vacation pay under Section 10 of the MOA in the amount of $10,800.07 (equaling $77,410.07). *Id.* The Spreadsheet reveals that no other individual employee meets the amount in controversy requirement based solely on his or her own claims. *See id.* Therefore, as the parties recognize, the question turns on whether the remaining Plaintiffs may proceed on the basis of diversity jurisdiction by (1) aggregating their individual claims; or in the alternative, by (2) the IAMAW having standing to assert its members' claims as their representative union.

"As a general rule, multiple plaintiffs cannot aggregate their separate individual claims to meet the jurisdictional amount threshold." *CE Design Ltd.*, 755 F.3d at 43. However, "[a] limited exception to this rule exists where 'several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest.'" *Id.* (quoting *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 294 (1973) (quoting *Troy Bank of Troy, Indiana v. G.A. Whitehead & Co.*, 222 U.S. 39, 40-41 (1911))). In such a situation, "'it is enough if their interests collectively equal the jurisdictional amount.'" *Id.* at 43-44 (quoting *Zahn*, 414 U.S. at 294 (quoting *Troy Bank*, 222 U.S. at 41)). The First Circuit has emphasized the importance of the collective interest being not only common, but also undivided. *Id.* at 44 (citing and quoting *Everett v. Verizon Wireless, Inc.*, 460 F.3d 818, 824 (6th Cir. 2006), which explained that "[a] common interest in a litigation recovery thus represents a necessary, but by itself insufficient, ground to qualify claims for aggregation").

In the context of declaratory or injunctive relief, the Court finds two cases instructive. First, in *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court held that a state agency could bring suit on behalf of apple growers and dealers to prevent enforcement of a state law, and therefore, "it may also rely on them to meet the requisite amount in controversy." 432 U.S. at 346. To reach that determination, the *Hunt* Court explained that it was "unnecessary to reach the aggregation question posed by the appellants for it does not appear to us 'to a legal certainty' that the claims of at least some of the individual growers and dealers will not amount to the required" statutory figure. *Id.* (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)). The *Hunt* Court ruled that the "amount in controversy is measured by the value of the object of the litigation," which in this case "is measured by the losses that will follow from the statute's enforcement," which it found to be approximately $2 million. *Id.* at 347-48.

Second, in *Local Division No. 714, Amalgamated Transit Union, AFL-CIO v. Greater Portland Transit District of Portland, Maine*, a First Circuit case, a union brought suit on behalf of its members to enforce "binding arbitration of the disputed terms of the parties' collective bargaining agreement." 589 F.2d at 10. Relying on *Hunt*, the *Local Division No. 714* Court explained that "[t]he Union . . . can rely upon the actual or threatened injury to individual employees in establishing the jurisdictional amount." *Id.* at 9. It explained:

> The Supreme Court held in *Hunt* that a representative plaintiff such as the Union can establish the requisite amount in controversy if the claims of of at least some of the individuals represented exceed that amount. Thus, the jurisdictional amount in controversy is met in this case unless

it is clear "to a legal certainty" that the rights to interest arbitration of not even some of the employees is worth [the amount in controversy required]. It is hard to say this is so. But we do not rest on that premise. We would also venture that the Union is entitled to aggregate the value of its members' claims to satisfy the jurisdictional amount requirement. To be sure, the Supreme Court in *Hunt* reserved the question of whether a representative plaintiff could aggregate individual claims in establishing the jurisdictional amount. But while the issue is thus as yet undecided, there are convincing reasons to aggregate in these circumstances.

*Id.* According to the First Circuit, the reasons in favor of aggregation included that "[t]he value of the arbitration is impossible to determine precisely . . . [t]his is especially so, because of the reasonableness of the claim that the aggregate interest of the 107 employees exceeds" the statutory requirement. *Id.* at 10.

Verso relies on this Court's ruling in *Craig* for the proposition that "aggregation is impermissible" in a case such as this. *Defs.' Opp'n* at 6. In *Craig*, individual employees filed a class action against their former employer to obtain severance pay under the same Maine statute, 26 M.R.S. § 625-B. 645 F. Supp. at 163-64. The Court denied the right of the employees to aggregate their claims to meet the jurisdictional threshold because they "each [sought] the severance pay due them individually, as calculated on the basis of the number of years worked and the weekly wages earned. This is not an assertion of a common or undivided interest in a single right or title, such as would permit aggregation of their claims." *Id.* at 164.

The Court concludes that the case at hand is more like *Hunt* and *Local Division No. 714* than *Craig*. First, as in *Hunt* and *Local Division No. 714*, the IAMAW has standing to bring this action on behalf of its members for severance pay. *See* 26 M.R.S. § 625-B(4) ("Any labor organization may also maintain an action on behalf of

its members"). By contrast, *Craig* was a class action consisting of 58 employees and the union was not a party. *Craig*, 645 F. Supp. at 165. Therefore, the *Craig* Court did not reach whether individual claims may be aggregated through the union's representative capacity. Second, *Local Division No. 714* addressed whether a labor union could be a "representative plaintiff" described in *Hunt* and concluded not only that it may, but that the claims of its individual members may be aggregated to establish the amount in controversy requirement. *Local Division No. 714*, 589 F.2d at 9 ("The Supreme Court held in *Hunt* that a representative plaintiff such as the Union can establish the requisite amount in controversy . . . . We would also venture that the Union is entitled to aggregate the value of its members' claims to satisfy the jurisdictional amount requirement").

A significant caveat to the right of a union to aggregate the claims of its members is the requirement under *Zahn* that the plaintiffs "have a common and undivided interest." *Zahn*, 414 U.S. at 294. As just noted, the district court in *Craig* observed that the "plaintiffs each seek the severance pay due them individually, as calculated on the basis of the number of years worked and the weekly wages earned." 645 F. Supp. at 164. The *Craig* Court concluded that these individual claims were "not an assertion of a common or undivided interest in a single right or title, such as would permit aggregation of their claims." *Id.* Here, however, Plaintiffs have not asked the Court to determine the specific amount of their individual severance or vacation payments from Verso, a demand that may have jeopardized their claim of a common and undivided interest; instead, they have only asked the Court to rule on

the timing of those payments. The difference between "a common and undivided interest" and "separate and distinct" is clearer in theory than in practice. *Local Division No. 714*, 589 F.2d at 10 ("The distinction between 'a common and undivided interest' and 'separate and distinct' claims is not entirely clear"). Nevertheless, by restricting their claims and requested relief, Plaintiffs have fit themselves well within the "common and undivided interest" rubric for purposes of the jurisdictional amount under 28 U.S.C. § 1332.

At oral argument, Verso asserted that because all IAMAW members are now Plaintiffs, the Union no longer has the right to proceed as a plaintiff. Verso cited no authority for this proposition and the statute allows for no such interpretation. Section 625-B(4) plainly grants unions the authority to maintain an action for their members and does not condition that authority on the number of members who individually elect to join the lawsuit. 26 M.R.S. § 625-B(4) ("Any labor organization may also maintain an action on behalf of its members"). As a practical matter, issues arising under section 625-B invariably involve larger employers because the statute applies only to facilities employing 100 or more persons. *Id.* § 625-B(1)(A). As this case demonstrates, labor unions and their counsel typically bring to a lawsuit broader perspectives and greater resources than individual employees, even acting en masse, are likely to muster, and may serve to counterbalance the resource depth and legal firepower often available to a larger employer. The Court rejects Verso's contentions on the continued vitality of the IAMAW as a party Plaintiff.

The Court finds it has diversity jurisdiction over all claims.

## B. Standard for Statutory Interpretation

When a federal court makes a statutory interpretation, it must first determine "whether the statutory language is plain and unambiguous." *U.S. v. Commonwealth Energy Sys. and Subsidiary Cos.*, 235 F.3d 11, 15 (1st Cir. 2000). "'A statute is ambiguous only if it admits of more than one reasonable interpretation.'" *U.S. v. Godin*, 534 F.3d 51, 56 (1st Cir. 2008) (quoting *Gen. Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2006)). Thus, "[i]n the absence of ambiguity, [a court] generally do[es] not look beyond the statutory language." *Commonwealth Energy Sys.*, 235 F.3d at 15. At the same time, if the statute at hand is ambiguous, a court "may seek evidence of [legislative] intent in the legislative history."[15] *Id.* The Supreme Judicial Court of Maine follows a similar standard when interpreting statutes. *See Fuhrmann*, 2012 ME 135, ¶ 23, 58 A.3d 1083 ("We interpret the language of a statute de novo by first examining its plain meaning. Only when we determine that a statute is ambiguous do we look beyond the plain language of the statute and the context of the whole statutory scheme to indicia of legislative intent such as the statute's history and its underlying policy") (internal citations and punctuation omitted).

## C. Severance Pay under 26 M.R.S. § 625-B

Maine law sets forth the requirements for when an employer must pay its employee(s) severance pay:

---

[15]     "'Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue to the state's highest court, or undertake its prediction, 'when the [route] [the] state courts would take is reasonably clear.'"' *Lyons v. Nat'l Car Rental Sys., Inc. (of Delaware)*, 30 F.3d 240, 245 (1st Cir. 1994) (quoting *Vanhaaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 3 (1st Cir. 1993) (citation omitted)). However, here, the timeframe for a judicial decision is so narrow that certification is unrealistic.

> Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

26 M.R.S. § 625-B(2). There is no dispute that (1) the Bucksport Mill is a "covered establishment" under 26 M.R.S. § 625-B(1)(A); (2) the closure of the Bucksport Mill is a "termination" under 26 M.R.S. § 625-B(1)(G); and (3) severance is owed to the Bucksport Mill employees in an amount equal to or greater than the statutory formula set forth under 26 M.R.S. § 625-B(2). *See Stipulation of Facts* ¶¶ 8-10.

### 1.    The Employees/Union Lawsuit

Subsection 4 of section 625-B, entitled "Suits by employees," expressly allows the Verso employees and the IAMAW to bring suit in this Court to enforce the statutory right to severance pay:

> Any employer who violates the provisions of this section shall be liable to the employee or employees affected in the amount of their unpaid severance pay. Action to recover the liability may be maintained against any employer in any state or federal court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and any other employees similarly situated. Any labor organization may also maintain an action on behalf of its members.

26 M.R.S. § 625-B(4). Verso does not claim otherwise.

### 2.    The Director's Lawsuit

Subsection 5 of section 625-B also allows the Director to bring a similar enforcement action in "any court of competent jurisdiction" against an employer to enforce the provisions of the severance pay statute:

> The director is authorized to supervise the payment of the unpaid severance pay owing to any employee under this section. The director may bring an action in any court of competent jurisdiction to recover the amount of any unpaid severance pay.

*Id.* § 625-B(5). By filing a lawsuit in Kennebec County Superior Court, the Director acted within her statutory authority. Neither party has claimed otherwise. In fact, Verso and Plaintiffs agree that the Plaintiff employees are entitled to benefit from the terms of the Consent Order issued by the Superior Court Justice. This much is clear.

### 3. The Impact of the Director's Lawsuit on the Plaintiffs' Lawsuit

Where the parties draw swords is over the difficult question of what happens to an employee/labor union lawsuit previously filed under subsection 4 when the Director files a lawsuit under subsection 5. This question appears to be a matter of first impression within the state of Maine. The critical statutory language reads:

> The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under this subsection, unless the action is dismissed without prejudice by the director.

*Id.*

To place a point on this dispute, Plaintiffs concede that if the Director had filed her subsection 5 lawsuit before they filed their subsection 4 lawsuit, they would have been barred from filing this action. Their contention is a narrow one: that the subsection 5 termination provision does not apply to pending lawsuits.

### 4. The Organization of the Statute

Section 625-B is found within title 26 of the Maine Statutes. In general, title 26 addresses Labor and Industry within the state of Maine. *See* 26 M.R.S. §§ 1 *et seq.* It establishes the Bureau of Labor Standards and provides for the appointment of the Director. *Id.* § 41. The statute directs the Director of the Bureau of Labor Standards to "cause to be enforced . . . all laws regulating the payment of wages; and all laws enacted for the protection of the working classes." *Id.* § 42. To this end, the statute authorizes the Director to collect employment information and to investigate alleged violations of the employment laws, including the right to enter onto a place of business. *Id.* §§ 42, 44. It authorizes the Director to adopt regulations regarding "all such laws" pursuant to the Maine Administrative Procedure Act, to establish and supervise education and training programs, and to take and preserve testimony of witnesses. *Id.* §§ 42-42-A, 43. In short, the statute contemplates an active role for the Director of the Bureau of Labor Standards in enforcing the employment laws of the state of Maine.

Within title 26, chapter seven addresses employment practices. *Id.* §§ 591 *et seq.* In general, this chapter not only establishes laws that regulate employment practices within the state of Maine, but also sometimes directs the Director of the Bureau of Labor Standards to enforce those laws. *See, e.g.*, *id.* §§ 592, 594 (forbidding employers from (1) requiring an employee to bear the expense of a medical examination required or ordered by an employer, and (2) charging an application fee to a prospective employee and directing the Director "to enforce this section"). Section 625-B is found within chapter seven.

### 5.      The Organization of Section 625-B

Section 625-B describes the definitional and circumstantial preconditions for triggering an obligation to make a severance payment and the way that the severance pay calculation must be made.   *Id.* § 625-B(1)(A-H) ("Definitions"), *id.* § 625-B(2) ("Severance Pay"), *id.* § 625-B(3) ("Mitigation of severance pay liability").   Once those preconditions are met, the employer must "notify the director in writing not less than 60 days prior to the relocation."   *Id.* § 625-B(6).   In "any investigation or proceeding under this section," the statute allows the Director "in addition to all other powers granted by law, the authority to examine books and records of any employer affected by this section. . . ."   *Id.* § 625-B(7).   Under these provisions, the statute envisions an active role on the part of the Director in investigating whether the employer owes severance pay and in "supervis[ing] the payment of the unpaid severance pay owing to any employee under this section."   *Id.* § 625-B(5).

### 6.      The Right to Maintain an Action

Section 625-B(4) allows employees and labor unions to file suit against the employer to enforce the severance obligation:

> **SUITS BY EMPLOYEES.**   Any employer who violates the provisions of this section shall be liable to the employee or employees affected in the amount of their unpaid severance pay.   Action to recover the liability may be maintained against any employer in any state or federal court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and any other employees similarly situated. Any labor organization may also maintain an action on behalf of its members.   The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant and costs of the action.

*Id.* § 625-B(4).

Section 625-B(5) accords a similar right to the Director:

**SUITS BY THE DIRECTOR.** The director is authorized to supervise the payment of the unpaid severance pay owing to any employee under this section. The director may bring an action in any court of competent jurisdiction to recover the amount of any unpaid severance pay. The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under this subsection, unless the action is dismissed without prejudice by the director. Any sums recovered by the director on behalf of an employee pursuant to this subsection shall be held in a special deposit account and shall be paid, on order of the director, directly to the employee affected. Any sums thus recovered not paid to an employee because of inability to do so within a period of 3 years shall be paid over to the State of Maine.

*Id.* § 625-B(5).

The critical sentence is "The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director . . . ." Plaintiffs read this language closely. They point out that it says the right "to bring" an action and the right "to become" a plaintiff, which they say must mean a new lawsuit. As they had already brought an action and had already become plaintiffs, they contend that the termination provision does not apply. They argue that the use of the verb "maintain" in subsection 4 is consistent with this interpretation because this subsection gives the employee the right to "maintain" or continue with their lawsuit, even after the Director has filed one.

### 7. *Breuer v. Jim's Concrete of Brevard, Inc.*

Plaintiffs draw powerful support for their interpretation of these provisions from an opinion by former Justice David Souter of the United States Supreme Court in *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691 (2003). In *Breuer*, the Supreme Court addressed a different question, but interpreted similar language, this time from the FLSA. *Id.* at 693. In *Breuer*, the employee sued his former employer in state court under the FLSA and the employer removed the lawsuit to federal court. *Id.* The employee objected to the removal on the ground that the FLSA allowed him to maintain the action in state court, and the case found its way to the Supreme Court. *Id.* at 694.

Surprisingly, the language of 26 M.R.S. § 625-B echoes the language in 29 U.S.C. § 216 of the FLSA. Concerning the employee's right to bring an action, § 216(b) reads:

> Any employer who violates the provisions . . . of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages. . . . An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

29 U.S.C. § 216(b). The FLSA also contains a provision that allows for the Secretary to file suit:

> The Secretary is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under [29 U.S.C. §§ 206 or 207]. . . . The Secretary may bring an action in any court of competent jurisdiction to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages. The right

provided by subsection (b) of this section to bring an action by or on behalf of any employee to recover the liability specified in the first sentence of such subsection and of any employee to become a party plaintiff to any such action shall terminate upon the filing of a complaint by the Secretary in an action under this subsection in which a recovery is sought of unpaid minimum wages or unpaid overtime compensation under [29 U.S.C. §§ 206 and 207] of this title or liquidated or other damages provided by this subsection owing to such employee by an employer liable under the provisions of subsection (b) of this section, unless such action is dismissed without prejudice on motion of the Secretary.

*Id.* § 216(c).   With minor adjustments,[16] the language in the corresponding subsections of the Maine severance pay statute is identical to the language in the FLSA.

In *Breuer*, Justice Souter discussed the distinction between two meanings of "maintain": "to continue" or "to commence."   538 U.S. at 694-95 (" 'To maintain an action' may mean 'to continue' to litigate, as opposed to 'commence' an action.   But 'maintain' in reference to a legal action is often read as 'bring' or 'file' ") (internal citation omitted).   After an extended discussion, the *Breuer* Court concluded that the term "maintain" in § 216(b) means "to commence," not "to continue," and thus, the Supreme Court allowed the employer to remove the case to federal court.   *Id.* at 700.

If the Court applies the Souter analysis of this same language to section 625-B(4), the critical language of the statute would read:

Action to recover the liability may be [brought] against any employer in any state or federal court of competent jurisdiction by any one or more

---

[16]   The adjustments relate to statutory references within each section to other sections within either the FLSA or the Maine severance pay statute.

Section 216(c) of the FLSA contains a waiver provision, which says that if an employee agrees to accept payment of minimum wages or overtime and is paid, the employee waives the right to proceed against the employer under § 216(b).   The Maine statute contains no similar provision.   However, there has been no assertion that the employees in this case have accepted and been paid severance payments, and therefore, the provision is not applicable.

employees for and on behalf of himself or themselves and any other employees similarly situated. Any labor organization may also [bring] an action on behalf of its members.

26 M.R.S. § 625-B(4) (alteration by the Court). Used in this sense, subsection 4 dovetails with subsection 5:

The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under this subsection . . . .

*Id.* § 625-B(5). Buttressed by *Breuer*, Plaintiffs urge the Court to conclude that section 625-B(5)'s termination language is applicable only to lawsuits commenced after the Director filed her action.

This argument, based as it is on the United States Supreme Court's interpretation of identical statutory language, would be convincing enough. But for purposes of this lawsuit, Plaintiffs draw more from *Breuer*. In footnote 1, Justice Souter addresses a situation very similar to the one at hand:

Actually, there is reason to think that this sense of "maintain" was intended. Under the FLSA, the Secretary of Labor may file a suit on behalf of an employee to recover unpaid wages or overtime compensation, and when the Secretary files such a suit, an employee's right to bring a comparable action terminates, *see, e.g.*, 29 U.S.C. § 216(c). Congressional reports suggest that although an employee may no longer initiate a new action once the Secretary has sued, an employee may continue to litigate, *i.e.*, "maintain," an action already pending. *See* H.R. Conf. Rep. No. 327, 87th Cong., 1st Sess., 20 (1961) (filing of the Secretary's complaint would "not, however, operate to terminate any employee's right to maintain such a private suit to which he had become a party plaintiff before the Secretary's action"); S. Rep. No. 145, 87th Cong., 1st Sess., 39 (1961) (Secretary's filing of complaint "terminates the rights of individuals to later file suit"); *cf. Smallwood v. Gallardo*, 275 U.S. 56, 61 (1927) ("To maintain a suit is to uphold, continue on foot and keep from collapse a suit already begun"). Seen in this light,

Congress's use of the term "maintain" is easy to understand, carrying no implication for removal.

538 U.S. at 695 n.1. Justice Souter's language is clear. If the Court applies Justice Souter's footnote to the language of section 625-B(4) and (5), the Court would be compelled to conclude that the Director's filing of the lawsuit has no effect on Plaintiffs' right to continue with their own lawsuit against Verso.[17]

### 8. Countervailing Interpretations

#### a. Plain Language

Faced with an authoritative interpretation of precisely the same statutory language from the Supreme Court, the Court is able to draw a different conclusion only if justified by meaningful distinctions between the two statutes, the legislative history, and potential policy implications.

Turning first to the plain language of section 625-B, subsection 5 contains an inherent ambiguity:

> The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director . . . .

26 M.R.S. § 625-B(5). The phrase "right provided by subsection 4" refers back to subsection 4, which describes that right as the right to "maintain" a lawsuit. As Justice Souter noted, the term, "maintain," has at least two meanings. *Breuer*, 538

---

[17] Section 626(b) of the ADEA suggests that Justice Souter's analysis in footnote 1 of *Breuer* would apply to the ADEA as well. "The ADEA expressly incorporates the procedures originally fashioned by the 87th Congress to govern enforcement of the Fair Labor Standards Act (FLSA). Section 7(b) of the ADEA, 29 U.S.C. § 626(b), specifies that the Act 'shall be enforced in accordance with the powers, remedies, and procedures' established by the FLSA, specifically including those set forth in section 16(b) of the FLSA, 29 U.S.C. § 216(b)." *Burns*, 696 F.2d at 23.

U.S. at 694-95. If the Maine Legislature intended "maintain" to mean "continue with," the reference in subsection 5 to "[t]he right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate" would capture all employee or labor union actions, regardless of when they were filed because the statute expressly terminates "[t]he right provided by subsection 4." Yet, if the word "maintain" is interpreted to mean "bring," then the language in subsection 5 would terminate only the right to bring a new lawsuit and would not affect pending actions.

The rest of the statute does not resolve this ambiguity. The statute does not differentiate between suits under subsection 4 not yet filed as opposed to pending when the Director initiated suit. If the Maine Legislature had intended to distinguish between pending and non-pending suits, it could have easily stated so explicitly. *See, e.g.*, *Fuhrmann*, 2012 ME 135, ¶ 34, 58 A.3d 1083 (explaining the Maine Human Rights Act does not provide for individual supervisor liability for employment discrimination, and "[i]f the Legislature had intended to create individual supervisor liability it would have done so explicitly in much clearer terms").

Furthermore, the Maine severance pay statute expressly empowers the Director to oversee the payment of severance pay to the affected employees:

> The director is authorized to supervise the payment of the unpaid severance pay owing to any employee under this section.

26 M.R.S. § 625-B(5). The phrase, "any employee," must include employees who previously filed suit, and if those employees and their labor union are allowed to proceed separately with their litigation, it is difficult to see how the Director will be

able to carry out this statutory mandate. To be clear, the FLSA contains almost identical language, *see* 29 U.S.C. § 216(c), but Justice Souter did not address this language in *Breuer*.

## b. Other Courts

Two court decisions directly addressing section 625-B support Verso's interpretation of subsection 5. In *Director of Bureau of Labor Standards v. Fort Halifax Packing Co.*, the Maine Law Court recited the relevant procedural history:

> [E]leven employees of the plant filed suit against Halifax in Superior Court seeking severance pay pursuant to 26 M.R.S.A. § 625-B. A few days later the Director of the Bureau of Labor Standards also commenced an action to enforce the provisions of Maine's severance pay law as to all Halifax employees pursuant to 26 M.R.S.A. § 625-B(5).

510 A.2d at 1057. At the time of this case, subsection 5 contained identical language to its current version. *See id.* at 1057 n.4. The situation in *Fort Halifax Packing Co.* is the same as here regarding the order of lawsuits—the employees filed suit first, and the Director then filed suit "[a] few days later." The case was appealed to the United States Supreme Court, which granted certiorari. In its recitation of the procedural history, the Supreme Court stated:

> Under authority granted by the statute, the Maine Director of the Bureau of Labor Standards also commenced an action to enforce the provisions of the state law, *which action superseded the suit filed by the employees*.

*Fort Halifax Packing Co., Inc.*, 482 U.S. at 5 (emphasis added). The Supreme Court cited subsection 5 to support its assertion that the employees' action had been "superseded" once the Director filed suit. *See id.* at 5 n.2.

Another case in the Cumberland County Superior Court supports the conclusion that subsection 5 terminates Plaintiffs' action for severance under the Maine severance pay statute. *Viking Freight, Inc.*, 1998 Me. Super. LEXIS 191. The *Viking Freight* situation was slightly different from this one: the Director filed a counterclaim against the employer to determine whether the Maine severance pay statute applied to it, and subsequently, the Director sought to dismiss the counterclaim. *Id.* at *1-2, 16. However, the superior court discussed the operation of subsection 5:

> The severance pay statute allows employees to bring an action to enforce the provisions of the statute. Hinsey [Director] may bring an action to enforce the statute, but once he files an action, the right of any employee to maintain an action terminates "unless the action is dismissed without prejudice by the director." 26 M.R.S.A. § 625-B(4), (5). In other words, if Hinsey stays in the case as a counterclaimant, the employees must be taken out of the action. Because the statute is clear that both the State and employees should not be prosecuting the same claim for severance pay, dismissal of Hinsey's counterclaim without prejudice is required.

*Id.* at *16-17.

Juxtaposing the *Breuer* interpretation of similar language in the FLSA against these judicial opinions, the legislative intent behind section 625-B remains ambiguous. In light of this ambiguity, Justice Souter turned to legislative history and the Court does the same.

### c.    Legislative History

The legislative history behind subsection 5 suggests that the Maine Legislature intended the Director's lawsuit to terminate all employee lawsuits, both pending and contemplated. In 1975, the Maine Legislature's Committee on Labor

clarified the purpose of certain amendments to 26 M.R.S. § 625-B, including subsection 5.[18]  *Defs.' Supplemental Opp'n* Attach. 5 *Legislative History* (Comm. Amend. A to H.P. 1082, L.D. 1362, No. H-674 (107th Legis. 1975)) (*Leg. History*). Representative Farley of Biddeford introduced Legislative Document No. 1362 to amend the severance pay statute to grant employees a private right of action.  *Leg. History* at 2.  With respect to subsection 5, the purpose was to:

> Allow suits by the Director of the Bureau of Labor to obtain judgments (in particular, the director's suit may take the place of the individual suits of a large number of employees) and to enforce the judgments.

*Id.* at 6.  The language "take the place of the individual suits" strongly suggests that the Legislature intended that the Director's lawsuit would replace pending litigation because the Director's lawsuit would not take the place of a lawsuit that had not yet been filed.

### d.  Policy Considerations

The Court turns to policy issues.

### i.  Reasons in Favor of Exempting Pending Litigation

---

[18]  At that time, subsection 5 was subsection 12.

Also, the first statement of fact for the bill states that the intent of the bill "is to clarify and make more explicit the provisions of law regarding severance pay enacted by the 105th Legislature and modified by the 106th Legislature, in the light of the decision of the Supreme Judicial Court in **Shapiro Brothers Shoe Co., Inc. v. Lewiston-Auburn Shop Workers Protective Association**, 320 A.2d 247 (Me. 1974)."  *Leg. History* at 2 (emphasis in original).  On May 28, 1974, the Maine Supreme Judicial Court handed down the *Shapiro* case and in that opinion, the Maine Law Court commented that the labor union did not have "standing to bring any action to recover money on its own behalf or on behalf of the employees."  320 A.2d at 251.  The 1975 amendment of the Maine severance pay law included a provision that explicitly allowed the union to maintain an action on behalf of affected employees.  *Leg. History* at 2.  This portion of the rationale for the 1975 amendments does not appear relevant to the issues before the Court in this lawsuit.  The same is true of the amendments relating to mitigating the employer's liability for employees who accept a job from the same employer at a different location and for employees who had been employed at the employer for less than three years.  *Id.* at 6.

It is difficult to understand why the Maine Legislature would exempt pending employee or labor union litigation from the statute's termination provision. If the Director is acting on behalf of all affected employees when she files a lawsuit under subsection 5, to allow individual employees or unions to persist in their lawsuits is justifiable only if the Maine Legislature perceived that the employees and labor unions would have such a different set of interests on the amount or timing of the severance payout that separate individual lawsuits should be allowed to proceed in tandem with the Director's lawsuit. Such a conflict between the Director and the affected employees/unions is easily theorized because the Director is charged with a broader, state-wide perspective and the employees/labor unions are pressing a local, individualized case. However, when pressed at oral argument, Plaintiffs' counsel disavowed any claim that the mission of the Director in her lawsuit differed from the goals of Plaintiffs in the pending action.[19] Furthermore, even if a potential conflict between the Director and the individual employees and their unions could be postulated, it is unknown why the Legislature would exempt only pending lawsuits from the termination provision.

In their reply to Verso's third supplemental memorandum, Plaintiffs propose three policy reasons in favor of their interpretation. First, Plaintiffs say that the statute "allows and encourages both private parties and the [Director] to bring

---

[19] Plaintiffs' counsel expressed the regret that the state Attorney General had not included Plaintiffs in the negotiations with Verso. But counsel did not assert that their position on the termination clause would have forced the Attorney General to invite her clients to the negotiating table. In fact, to the extent the Attorney General did not include Plaintiffs, she did so despite the pendency of Plaintiffs' lawsuit in this Court, and at least during the attempted mediation in this Court, the Attorney General, Verso, the Steelworkers, and Plaintiffs all participated.

enforcement actions because it recognizes that the [Director] cannot possibly prosecute all violations of the statute, and that there will be situations where private parties will be better situated to enforce their rights than the [Director]. Otherwise, the statute would have only granted the right of enforcement to the [Director]." *Pls.' Third Supplemental Reply* at 9-10.

Second, "unions and employees who file suit under the [Maine severance pay statute] can never know in advance for certain whether [the Director] will file its own enforcement action. Thus, it would be completely contrary to the statute's purpose to allow and encourage private actions, but then strip that right away if the [Director] later decides to file a case against the same party. Such a result would *disincentivize* any private parties and their counsel from researching, developing and bringing cases, because they would lose any right to damages and fees if the [Director] filed a suit at a later date." *Id.* at 10 (emphasis in original).

Third, "the filing of private suits by private parties can bring violations of the [Maine severance pay statute] to the attention of the [Director], and can encourage the [Director] and the violating party to reach agreements, which might not have been the case in the absence of a private enforcement action." *Id.*

Plaintiffs correctly note that the Maine severance pay statute allows the filing of lawsuits by employees and labor unions against employers. 26 M.R.S. § 625-B(4). The statute also encourages employees and labor unions to file such suits because it allows for "a reasonable attorney's fee to be paid by the defendant and costs of the action." *Id.* No doubt, Plaintiffs are correct that there will be severance pay disputes

where the Director does not file suit and the statute properly grants the employees and labor unions access to the courts to resolve their dispute. *Id.* Also, there may be instances where the filing of a lawsuit by the employees and labor unions stirs the Director to action, and in doing so, the employees and labor unions would have accomplished a presumably desirable goal: the intervention of the state government on their behalf.

But none of these policy arguments addresses why the employees and labor unions, who file suit before the Director files suit, should be allowed to persist with their lawsuit while the employees and labor unions, who wait until after the Director has filed suit, have their right to sue terminated. If the underlying reason for allowing the employees and labor unions to persist with a lawsuit after the Director has filed suit is to force the employer to pay their attorney's fees, it would be unusual for the law to exalt attorney's fees over the ability of the Director to supervise the dispute. Even assuming the validity of some of these points, the Court views the public policy reasons against Plaintiffs' position to substantially overwhelm any public benefit in favor of their position.

### ii. The FLSA and the Maine Severance Pay Law

It is true that the FLSA has a provision that allows a private individual who has filed suit to persist with a lawsuit even after the Secretary has filed an action, but the FLSA is a very different statute than the Maine severance pay law because the circumstances often surrounding the invocation of section 625-B are so distinct from the typical FLSA claim. Although FLSA lawsuits have a facial similarity to

Maine severance claims because they involve claims by employees against employers, severance claims under Maine law are often more serious, complex and dire than claims for overtime and minimum wages under the FLSA. Where an employee elects to sue an employer for failure to pay proper overtime under 29 U.S.C. § 207(a)(1), for example, she may wish to proceed on her own, even though the Secretary of Labor elects to file suit and her goals are not likely to conflict with the Secretary of Labor's position in the lawsuit.

Without diminishing the significance of an FLSA claim, the situation is markedly different for a Maine severance pay claim. To trigger the severance pay provisions of the Maine statute, the employer must be shutting down a facility with at least 100 employees. 26 M.R.S. § 625-B(1)(A), (G). Here, for example, the Amended Complaint alleges that Verso ceased papermaking operations in a mill that employed about 570 workers. *Am. Compl.* ¶ 162. Plaintiffs allege that 53 members of the IAMAW had worked for Verso or its predecessors at the Bucksport Mill from a few years to over forty years. *Id.* ¶ 27. A clear majority of these members had worked for decades at the Bucksport Mill and they face the hard prospect of fashioning a new financial future without the Mill. *Id.* Although the total amount of the severance Verso would owe all of its Bucksport Mill employees is not a matter of agreement, Plaintiffs allege that Verso estimated the total to equal about $30,000,000 to $35,000,000, a substantial sum of money, far larger than most FLSA claims, and the individual payments are especially critical in the Maine severance pay context since they are being made to people whose employment has been terminated and must set

about looking for a new job. *See id.* ¶ 129. Although Verso's finances are not a matter of clear record here, the ability to collect from a business is at least as important as the right to collect. The stakes, in short, are often unusually high in the Maine severance pay situations, circumstances not often seen in FLSA lawsuits. In short, the Maine severance pay law, by its terms, deals with a markedly different set of circumstances than most FLSA claims.[20] *See also Affo*, 2013 U.S. Dist. LEXIS 76019, at *27-28 (explaining that "the First Circuit has consistently recognized the extraordinarily broad scope of FLSA coverage" and the Maine Legislature has not incorporated all FLSA definitions into Maine law).

### iii.     The Role of the Director

The Maine statute contemplates that the Director may play a central role in resolving disputes about the timing and amount of severance pay under section 625-B. It grants the Director reporting requirements, investigative authority, the right to file suit for affected employees, and overall supervisory authority. Here, consistent with that statutory authority, the Director entered into negotiations with Verso, arrived at an agreement (an agreement apparently supported by a majority of the millworkers), filed a proposed consent order in state court, and received a judicial imprimatur on the terms of that decree.

---

[20] Verso is correct in pointing out that, under the FLSA, when an employee(s) brings an action on behalf of "other employees similarly situated," an employee need not become a party plaintiff to that action "unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Verso is also correct that no such provision exists under the Maine severance pay law. Even so, this distinction does not assist to illuminate the issues in this case.

The impact on the Director's ability to exercise her statutory authority by allowing employees or labor unions to persist with a severance pay lawsuit would be considerable. In dealing with an exiting employer, the Director would be unable to provide the employer the assurance that she has the actual authority to negotiate a resolution on behalf of all affected workers, thereby making a global resolution less likely. Instead, the employer would face the prospect of defending multiple lawsuits, in both state and federal court, filed by unions, individual employees, and groups of employees, both in Maine and potentially in other jurisdictions. The resources and attention of the parties, particularly the employer, which ideally should be directed to resolving whatever issues have arisen from the closure, could be compromised by the employees and labor unions' quick resort to litigation. If the employer is experiencing financial stress, which occasionally is true when a large plant is being entirely shut down, the limited resources of the employer would be better put in the pockets of the affected employees than the employer's lawyers.

### iv.       A Race to the Courthouse

There are three categories of interested parties authorized to bring suit under the Maine statute: the employees, the unions, and the Director. If the employees and labor unions' lawsuits remained unaffected by a consent decree filed by the Director only if the lawsuits were pending, they would have a strong incentive to race to the courthouse, file suit, and thereby secure their right to persist in their objections to whatever comprehensive resolution the Director and the employer enter into. The Director would have the same incentive to file immediate suit to bar potentially

dissident claims. Given the sometimes tense and compressed atmosphere that occasionally surrounds such negotiations, it is difficult to understand why the Maine Legislature would encourage an immediate resort to litigation.

### v. A Fight Among Friends

Nor is there any guarantee that different employees and unions will see the issues the same way. What satisfies one employee, group of employees, or labor union may not satisfy the others. Here, for example, the Steelworkers are well satisfied with the result of the negotiations between the Director and Verso resulting in the Consent Order. The IAMAW is not. What ideally should be a tough, but fair global resolution might well devolve into a bitter, protracted fight among the employees themselves, the very people most affected by the shutdown and least able to sustain the expense and commitment of multi-layered legal battles.

### vi. Rewarding the Litigious

Also, if the employer is having difficulty producing the cash to pay all the severance amounts, there would be an inherent unfairness in granting a preference to those employees who engaged in litigation early over those who waited for the Director and the employer to negotiate. The law rarely so rewards litigation over negotiation, especially where the state government itself is authorized to act on behalf of the private parties.

### vii. The Bankruptcy Escape Clause

The Maine severance pay law provides a complete escape clause from severance payments for employers who file in bankruptcy:

> There is no liability under this section for severance pay to an eligible employee if: A covered establishment files for protection under 11 United States Code, Chapter 11 unless the filing is later converted to a filing under 11 United States Code, Chapter 7.

26 M.R.S. § 625-B(3)(E).[21]  Negotiations for severance pay sometimes take place in the shadow of a potential bankruptcy filing, an event that could effectively stymie efforts to obtain any severance pay from the employer.  Here, in fact, Plaintiffs are worried that Verso will transfer its liability for severance payments to a Verso subsidiary that would proceed to file a Chapter 11 petition in bankruptcy court.  Negotiations for delayed payments or reduced payments may well have to be based on a cold-eyed assessment of the risk that the employer will avoid its severance pay obligations in its entirety, an assessment that may be at least complicated by the presence in the negotiating room of persons other than the Director and the employer.  Moreover, access to accurate financial information from the employer is essential to evaluate whether the threat of a bankruptcy filing is real.  However, gaining access to such proprietary information is sometimes difficult for a private party.  Under the statute, the Director has been granted investigative authority to "examine books and records of any employer" affected by this law, and therefore, the Director is in a better

---

[21]  The language of the Maine statute seems to absolve an employer that declares bankruptcy under Chapter 11 of any liability to pay severance pay.  26 M.R.S. § 625-B(3)(E) ("There is no liability under this section for severance pay to an eligible employee if: A covered establishment files for protection under 11 United States Code, Chapter 11 . . . .").  Intentionally or not, the statute gives the employer a certain leverage in discussion with the Director or the employees/labor unions, because a Chapter 11 filing bars their severance pay claims.  This is different than the situation where the severance pay claim still exists under the law but is subject to the distribution authority of the bankruptcy court.  This complete escape hatch clause may cause the Director and the employees/unions to negotiate terms of payment, including timing, that are more generous to the employer than a strict application of the payment and timing terms the statute would otherwise contemplate.

position to demand and obtain sensitive financial information from the employer. *See id.* § 625-B(7).

### viii. The Missing Director and Attorney General

As this lawsuit demonstrates, the Director is often the key figure in the resolution of severance pay disputes. Here, the Director and the Attorney General negotiated a comprehensive resolution with Verso and filed suit in state court to obtain a consent decree. Again, as this lawsuit demonstrates, the Director and Attorney General are not necessarily parties to the employees and labor unions' separate litigation. In this case, although the Attorney General participated in a settlement session, she did not appear at the oral argument and has filed nothing in this Court. Thus, Plaintiffs are presenting an interpretation of a Maine statute with a significant practical effect on the Director and the Director is not a party to the litigation.

The same principle applies to all employee and labor union lawsuits, once the Director has filed a lawsuit. While the Director and the employer are addressing a comprehensive resolution, the private litigants will be separately proceeding with their claims without any requirement of coordination with the Director's action. The courts will be attempting to address issues in the private lawsuits that may affect other parties, including the Director, without the benefit of their participation.

### ix. Other Lawsuits and Other Courts

Finally, Plaintiffs' interpretation virtually guarantees simultaneous litigation over the same issue in multiple forums. The Maine severance pay law explicitly

allows the employees and labor unions to bring suit "in any state or federal court of competent jurisdiction." *Id.* § 625-B(4). Some employees and unions, as in this case, will elect to proceed in federal court; others in state court. In this case, the federal district court is being asked to rule on issues that are the subject of an existing state superior court order. In a future case, there may be a plethora of quickly-filed lawsuits in different courts and different jurisdictions, each in different stages, some resulting in conflicting court orders. Plaintiffs' proposed interpretation of the statute would lead to inconsistent rulings, the creation of difficult federal-state, state-state, and internal state court comity issues, and the prospect of tangled enforcement puzzles.

### x. Summary

By this Court's reckoning, the balance of policy considerations in favor of interpreting the Maine severance pay law to include pending employee/union lawsuits in the termination provision of subsection 5 weighs strongly in favor of Verso's view. This does not mean that the policy considerations necessarily carry the day. The Maine Legislature in its wisdom is free to enact laws on behalf of the people of Maine that seem to this Court in its best judgment to be markedly ill-advised. Nevertheless, where the benefits of Plaintiffs' interpretation of a law are so elusive, the drawbacks are so obvious, and the advantages of the Verso interpretation so apparent, the Court factors these policy considerations into its statutory analysis in substantial support of Verso's position.

### 9. Conclusion

Based on its analysis of the language of the statute, the available caselaw, the legislative history, and policy considerations, the Court concludes that the Director's filing of "an action" in state of Maine Superior Court under 26 M.R.S. § 625-B(5) "to recover the amount of any unpaid severance pay" terminated Plaintiffs' suit for severance under Maine statute. The Court therefore dismisses Plaintiffs' motion for declaratory and injunctive relief with respect to that claim.

### D.     Vacation Pay under 26 M.R.S. § 626

Maine law sets forth the requirements for when an employer must pay its employee(s) vacation pay:

> An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid . . . . Whenever the terms of employment include provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned.
>
> . . .
>
> For purposes of this subchapter, a reasonable time means the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made.
>
> . . .
>
> An action for unpaid wages under this section may be brought by the affected employee or employees or by the Department of Labor on behalf of the employee or employees.
>
> . . .
>
> If the terms of employment include provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned. The seller of a business may comply with the provisions of this paragraph through a specific agreement with the buyer in which the buyer agrees to pay any wages earned by employees through

> employment with the seller and to honor any paid vacation earned under
> the seller's vacation policy.

26 M.R.S. § 626. Unlike 26 M.R.S. § 625-B(5), there is no express language under section 626 indicating that Plaintiffs' claims for vacation pay under the statute are terminated upon the filing of a complaint by the Director.

The Maine Law Court has stated explicitly that "the conditions for earning vacation and the amount of vacation earned are governed by the terms of employment, not by the statute. The statute refers to 'the terms of employment' because an employee has no right to a paid vacation except as provided by the terms of his employment." *Rowell*, 524 A.2d at 1210-11. Thus, the *Rowell* Court concluded that "the plaintiffs' only rights to vacation pay must derive from the [employer's] vacation plan set forth in their Employment Policy and Procedural Manual as a term of their employment." *Id.* at 1211; *see also Richardson*, 2009 ME 109, ¶ 7, 983 A.2d 400 (citing *Rowell* and explaining that "[a]lthough section 626 creates a statutory right for former employees to *seek* payment, *entitlement* to payment is governed solely by the terms of the employment agreement. . . . Therefore, pursuant to section 626, a former employee may only claim what is owed according to the terms of the employment agreement; section 626 does not modify or supercede [sic] its terms" (emphasis in original)); *Gibson*, 2002 U.S. Dist. LEXIS 20731, at *17 (citing *Rowell* and ruling that pursuant to section 626, "an employee has no right to a paid vacation except as provided by the terms of his employment," and, "[i]f the defendant's vacation policy applied to the plaintiff, it was enforceable under Maine law").

Similarly, in terms of timing of vacation payment, "[u]nder Maine law, 'the employment agreement, not section 626, governs how wages are earned and, if specified, when wages are to be paid.'" *Warner v. Atkinson Freight Lines Corp.*, 350 F. Supp. 2d 108, 119 (D. Me. 2004) (quoting *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 9, 770 A.2d 97); *see also Burke v. Port Resort Realty Grp.*, 1998 ME 193, ¶ 5, 714 A.2d 837. Because section 626 specifies that "vacation pay on cessation of employment has the same status as wages earned," an employer may dictate the timing of vacation payments as well. 26 M.R.S. § 626.

Here, Verso argues that neither the CBA nor the MOA gives Plaintiffs a right to vacation pay as contemplated by section 626 (i.e., the "terms of employment" do not grant Plaintiffs vacation pay), and therefore, it need not comply with the statutory time requirements. *Defs.' Opp'n* at 21-23. Plaintiffs make exactly the opposite argument—Section 11.15(a) of the CBA and the MOA grant them the right contemplated by section 626, and therefore, they are entitled to payment within the statutory time frame. *Pls.' Reply* at 12-14.

Rather than address these diametrically opposed arguments, the Court concludes that it should abstain from ruling on vacation pay. First, the Consent Order in Kennebec County Superior Court addresses the timing of vacation pay: "Defendants agree to pay all benefits due to the affected hourly employees under Section 10, Vacation, of the applicable Memorandum of Agreement on the earlier of the 5th business day after the completion of the sale of the Verso Bucksport Mill or any portion thereof, or March 19, 2015." *Consent Order* ¶ 12. In light of the December

23, 2014 Consent Order, it makes more sense for the Superior Court Justice to interpret his own Consent Order rather than for this Court to do so. *See also id.* ¶ 22 ("The [Superior] Court shall retain jurisdiction over this matter for the purpose of allowing the parties to apply to the Court at any time for such further orders or proceedings as may be necessary for the construction or enforcement of any provision of this Consent Order, including, in the event of noncompliance with the Consent Order's obligation provisions, contempt proceedings under M.R. Civ. P. 66").

Second, there are matters of state law more properly resolved in state than federal court. A couple examples suffice. The relevant portion of the MOA entered into between Verso and Plaintiffs states that "the Company will pay terminated employees (voluntarily or involuntarily) 2015 vacation time. Payment will be made three (3) months following their termination date or as ultimately resolved." *Compl.* Attach. 10 *Mem. of Agreement* ¶ 10. The Court is unclear whether Maine law would recognize an MOA as an "employment agreement" for purposes of section 626. If it does, the Court is unclear whether the ambiguous time frame of "three (3) months following their termination date or as ultimately resolved" would supersede the statutory time frame in section 626. In addition, the Consent Order sets forth another time frame for payment under paragraph 12 ("the 5th business day after the completion of the sale of the Verso Bucksport Mill or any portion thereof, or March 19, 2015"). Once again, the Superior Court Justice who executed the Consent Order is in a better position to interpret his own Order and to determine its relationship to section 626 and its timing provisions.

Because the Court concludes that the timing of vacation pay is an issue of state law more properly adjudicated in state court and that the proper interpretation of that law in this case may require an analysis of a duly entered state court Consent Decree, the Court dismisses Plaintiffs' motion for declaratory and injunctive relief with respect to that claim to allow the parties, if they elect to do so, to obtain a definitive ruling of state law from a state judge.[22]

## IV. CONCLUSION

The Court DISMISSES Plaintiffs' Motion for *Expedited* Declaratory Judgment and Request for Preliminary and Permanent Injunction (ECF No. 6) to the extent Plaintiffs demand relief under the Maine severance pay law and Maine vacation pay statute. This Order has no effect on the pending claims in the Amended Complaint relating to any antitrust issues.

The Court DISMISSES Plaintiffs' Motion for Attachment and Trustee's Process (ECF No. 5).[23]

The Court DISMISSES the Motion for Joinder as Plaintiff Filed by United Steelworkers (ECF No. 54) to the extent it sought joinder in Plaintiffs' severance and

---

[22]     A strong argument could be made that the Court should have abstained from deciding the Maine severance pay law claim on precisely the same basis. In fact, the implications of Plaintiffs' arguments affect the authority of the Director and the Attorney General to act under a state statute, so there is even more of a compelling argument for abstention than in the vacation pay matter. However, Plaintiffs initiated this case in federal court and it was not brought to this Court by removal. Accordingly, if the Court abstained on the Maine severance pay law issue, its only option would have been to dismiss the claim and require Plaintiffs to file suit, if they chose, in state court. If that occurred, Plaintiffs properly made the point that they would be filing their state lawsuit after the Director had filed her lawsuit and under their own interpretation of subsection 5, they would have been precluded from filing suit. Accordingly, because in fairness to Plaintiffs, they deserved a decision on the merits, the Court has declined to abstain on the Maine severance pay law issue.

[23]     The reason for the dismissal of the motion for attachment and trustee process is that the motion is directed to the severance and vacation pay claims only. *Pls.' Attach. Mot.* at 1-2.

vacation pay case because the Motion for Joinder is now moot.[24]  This Order has no effect on the Motion for Joinder relating to Plaintiffs' antitrust claims.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of January, 2015

---

[24]  It may well be that the USW's Rule 20 motion is moot in its entirety because it seems directed only to the severance and vacation pay issues.  However, the Court is not certain so it has dismissed the motion to the extent it relates to the severance and vacation pay claims only.