UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| **THE INTERNATIONAL ASSOCIATION OF** )<br>**MACHINISTS AND AEROSPACE WORKERS,**)<br>**AFL-CIO, LOCAL LODGE NO. 1821**, on behalf )<br>of its individual members employed at the )<br>Bucksport Paper Mill; **RICHARD GILLEY,** **)**<br>individually and as IAMAW District 4 Business )<br>Representative for Local Lodge No.1821; )<br>**COREY DARVEAU,** individually and as )<br>President of Local Lodge No. 1821; )<br>**BRIAN SIMPSON,** individually and as Vice )<br>President of Local Lodge No. 1821; )<br>**BRIAN ABBOTT,** individually and as Recording )<br>Secretary of Local Lodge No. 1821; )<br>**HAROLD PORTER,** individually and as Financial )<br>Secretary for Local Lodge 1821, and )<br>**FIFTY-THREE LOCAL NO. 1821 MEMBERS,** )<br>Individually and for all other similarly situated )<br>Salaried and hourly wage employees, )<br>            Plaintiffs, )<br>v. )<br>   )<br>**VERSO PAPER CORP.,** a Delaware Corporation; )<br>**VERSO PAPER LLC**, a Delaware Limited )<br>Liability Company (LLC) and a wholly owned )<br>subsidiary of Verso Paper Corp., )<br>   )<br>   )<br>**AIM DEVELOPMENT (USA) LLC**, a )<br>Delaware Limited Liability Company and indirect )<br>wholly-owned subsidiary of American Iron & )<br>Metal Company, Inc., )<br>_____Defendants._____ \_\_\_\_) | CIVIL ACTION NO.<br>1:14-CV-00530-JAW |

**PLAINTIFFS' CORRECTED REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION UNDER THE ANTIRUST LAWS**

1

I. **Introduction**

This case challenges the Defendants' attempt to permanently eliminate about 10% of the North American production capacity for coated groundwood printing paper (and 4.5% of all North American coated paper capacity) in the context of a merger that makes Verso the largest seller of coated printing papers in North America. The shutdown is the consequence of ongoing acts among Defendants Verso and AIM, as well as Verso's larger competitor NewPage, to downsize industry capacity in order to obtain higher prices for coated printing papers. Those who organized the Verso/NewPage merger transaction in January 2014, and the lenders who agreed to finance it, explicitly understood that taking an irreversible step to reduce productive capacity was what was necessary for Verso and its rivals to obtain higher prices for coated printing papers in the future. As a result, prices for coated groundwood paper have *already begin to go up*, contrary to Verso's argument that there is no future in the industry.

Throughout this case, Verso has claimed that the closure of the Bucksport Mill was "inevitable", and that plaintiffs' job losses were "unavoidable". (Verso Opp. at 2.) But the closure was not inevitable, and the job losses were (*are*) not unavoidable. There were other offers to buy the Bucksport Mill besides from AIM, but Verso never responded to them. As Governor Paul R. LePage has said, "[w]hat disturbs me...is that more than one firm had expressed genuine interest in acquiring the asset in Bucksport to continue papermaking activities."[1] *See also* Declaration of Whitfield Russell, ¶ 9 (stating that on November 18, 2014, he sent Verso an inquiry on behalf of a client interested in purchasing the Mill, but Verso never responded). Instead, Verso made the intentional decision to sell the Mill to a scrapper and reject any bids from companies that wanted to keep the Bucksport Mill running.

---

[1] http://content.govdelivery.com/accounts/MEGOV/bulletins/e83784

Furthermore, even though such parties have been constantly rebuffed, Gov. LePage reports that "there are still interested parties out there."[2]  They just need to have the chance to make their bid, with the knowledge that it will be taken seriously, and they will have the opportunity to conduct due diligence.  But the only way that will happen is if the Court requires Verso to accept any bid for the plant above $58 million from a paper manufacturer.  This will insure that the free market can operate efficiently, and that the Bucksport Mill will go to the user who places the highest economic value on the property.

Verso claims that the sale to AIM reflected "market forces at work efficiently directing assets to their highest-value use (which may include scrap value)."  (Verso Opp. at 21-22).  But that statement is a complete fabrication.  Market forces have *not* had the chance to work properly in this case because Verso refused to even hear bids from any of its competitors or parties that wanted to keep the Bucksport Mill open.  And it is clear that the $58 million that AIM agreed to pay is far below the Mill's actual value.  *See* Declaration of Jef Fitzgerald (showing the value of Bucksport Mill real estate alone is $92 million, and the value of the machinery/equipment is over $200 million).

Verso incorrectly argues that Plaintiffs are seeking to force Verso to own or operate the Bucksport mill.  But that is false.  The antitrust issue is not that Verso elects not to run this plant.  Instead the antitrust problem is that Verso insists on selling the plant for scrap rather than at a presumably higher value that would be paid by a rival for the mill as a productive asset.  For Verso to forego a presumably more profitable sale (the potential for which it did not even attempt to explore when it retained an energy industry agent to find a buyer) makes abundantly

---

[2] http://content.govdelivery.com/accounts/MEGOV/bulletins/e83784

clear that Verso expects to profit by *not having to compete and by removing this capacity from the market*.  Mergers for the purpose of eliminating capacity are not a novel strategy, and have been condemned under antitrust law for decades.  *See, e.g. FTC v. Cardinal Health*, 12 F.Supp.2d 34 (D.D.C. 1998)(blocking hospital merger where parties planned to remove excess capacity from the market, because the merger would ultimately hurt consumers).

A recent decision from the Southern District of New York explains the law quite clearly:

> "While the mere possession of monopoly power is not unlawful, monopolists cannot run their businesses in an anticompetitive manner....A monopolist's decision to withdraw a product from customers may violate antitrust laws if done for the sole purpose of harming competition, i.e., if it constitutes exclusionary conduct."

*New York v. Actavis, PLC*, No. 14-CV-7473, 2014 U.S. Dist. LEXIS 172918 (S.D.N.Y., Dec. 11, 2014)("*Actavis*")(granting injunction to prevent drug company from removing a patent-expiring drug from the market in order to force patients to switch to a newly patented drug).

And, in a remarkably similar case from the Sixth Circuit, the Court reversed a District Court's denial of an injunction where U.S. Steel refused to consider any bids from the Steelworkers Union that was interested in purchasing the factory where they worked. *United Steel Workers v. United States Steel Corp.*, 631 F.2d 1264, 1282-1283 (6th Cir. 1980).

There, U.S. Steel refused to consider the USW's bid for the factory on the pretextual objection that USW had received loan assistance from the Federal Government.  And in response, the Sixth Circuit stated:

> "United States Steel's implied claim that it can, consistent with federal antitrust laws, refuse to do business with a corporation...is unique in this court's experience. Nor has our research served to date to disclose any legal precedent for such a position. The ramifications of this refusal would be far-reaching."

*Id.*

The Sixth Circuit ultimately remanded the antitrust claims to the District Court, saying "[t]he antitrust issue which we perceive as arguable should be the subject of briefing, argument and trial court decision before consideration by this court." *Id.* But the matter was later settled out of court and there are no further reported decisions.

## A.  ANTITRUST OVERVIEW

The decisions that this Court is called on to make in this case rest on two broad political and legal landmarks adopted by Congress over a century ago—the Sherman Act of 1890 and the Clayton Act of 1914.  These historically-important mandates are broad, flexible, and remain the central pillars of modern antitrust law.   They essentially call on Federal Judges to decide very diverse cases, and thereby create a body of Federal common law concerned with competitive infringements and abuses.   The fundamental goal of this law (which the Supreme Court has called "the Magna Carta of free enterprise"[3]) is to protect the public interest in the integrity of the competitive process and especially the interests of consumers in lower prices, innovation and efficiency.

The Supreme Court has famously emphasized that,

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.  It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, . . . the policy unequivocally laid down by the Act is competition."[4]

---

[3] *U.S. v. Topco Associates, Inc.*, 405 US 596, 610 (1972).
[4] Northern Pacific Ry. v. United States, 356 US 1, 4 (1958)

The statute prohibits and criminalizes (i) agreements, understandings, or a conspiracies that unreasonably restrain trade, especially agreements among competitors (in Section 1); and (ii) monopolization, attempted monopoly, and conspiracies to monopolize (in Section 2).[5]

The Clayton Act was enacted 24 years later, after the ferocious 1912 election in which antitrust law and enforcement were a central issue.[6] Sponsored by the victorious President Woodrow Wilson and his illustrious adviser Louis Brandeis, the Clayton Act was intended to add specificity to some broad prohibitions in Sherman Act.  It thus included more detailed provisions on price discriminations, tie-ins exclusive dealing, and corporate acquisitions.

On acquisitions, Section 7 of the Act *lightened* the normal burden of proof for the Government or a private plaintiff so that an acquisition becomes illegal when "the effect of such acquisition...*may be* substantially to lessen competition or tend to create a monopoly" in any relevant market.[7] Plaintiffs' Complaint alleges that AIM's acquisition of the Bucksport Mill for the purposes of permanently eliminating its paper-producing capability has the necessary adverse effect on the relevant markets for both coated printing paper and groundwood coated printing paper and therefore is an illegal acquisition under Clayton Act Section 7 and its Maine law counterpart.

Antitrust cases tend to be involved with how a market is *actually affected* (or, in the case of a merger, *may be affected*) by what market participants do.  Thus antitrust law governing mergers is all about predictions about what may happen in future.  It is also notorious for being highly fact-intensive.

---

[5] 15 U.S.C. §§ 1-2.

[6] *See* Doris Kearns Goodwin, *The Bully Pulpit: Theodore Roosevelt, William Howard Taft, and the Golden Age of Journalism* (Nov. 5, 2013).

[7] 15 USC ¶ 7 (emphasis added).

But, in this case, there has been neither the time or opportunity for traditional discovery, so the Court will have to make its *probability of success* determination based on largely on the basis of legal rules and factual assertions contained in the Complaint and in affidavits.   This is normal practice, and Courts have granted injunctions in such situations.  *See, e.g. Allied Signal, Inc. v. B.F. Goodrich Co.,* 183 F.3d 568, 573-75 (7th Cir. 1999)(affirming preliminary injunction to block acquisition and stating that "federal regulators will not necessarily challenge every potentially troublesome merger, which is why Congress made private enforcement an integral part of the congressional plan for protecting competition"). *See also Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1166 (W.D. Ark. 1995) *aff'd sub nom., Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998)(blocking acquisition of newspapers because it would harm competition).

In this case seeking preliminary relief, the grim reality is that AIM's contemplated actions vis-a-vis the Bucksport Mill are irreversible in reducing industry capacity.  This should be important to how the Court deals with the factual disputes necessarily before it.  Letting AIM's mission proceed on the basis of erroneous factual assertions by the Defendants or erroneous factual assumptions by the Court would render the Plaintiffs' case moot.  The plant would be gone and coated paper consumers would be left to suffer the adverse economic consequences that the Defendants planned for them, as would the Bucksport workforce.

This Court is being presented with essentially four separate questions.  In view of the circumstances just described, if the Court finds a reasonable probability that the answer to any of these questions will be  "yes", then the Court should at least grant a temporary restraining order to allow such further development of the record as the Court may determine to be necessary in

order to enter a preliminary injunction and implement an appropriate remedy.  The four questions are:

1) May the sale of the Bucksport Mill from Verso to AIM, for the admitted intention of destroying it, tend to reduce actual or potential competition in the market for coated printing paper?[8]

2) In the context of a corporate merger that makes the acquirer the dominant competitor in an industry, can the acquirer shutdown and destroy a substantial part of its productive capacity in order to prevent the plant's continued commitment to the market via a sale to a competitor?

3) Have Plaintiffs presented sufficient evidence at this juncture to show a reasonable likelihood that Verso and NewPage (which were separate legal entities until January 7, 2015) reached an understanding or agreement to reduce capacity in the market for coated printing paper?

4) Have Plaintiffs presented sufficient evidence at this juncture to show a reasonable likelihood that Verso and AIM engaged in ongoing coordinated activity to reduce capacity in the market for coated printing paper?

**B. FACTUAL CHRONOLOGY**

<u>Mid-January 2011</u> – Verso and NewPage begin their first merger discussions.[9]

---

[8] Stated alternatively: Is the acquisition of the Bucksport Mill a corporate asset acquisition subject to Section 7 of the Clayton Act?  And, if so, may its effect be to substantially lessen actual and potential competition in a relevant printing paper market?

[9] Stepanie Botelho, *No NewPage-Verso merger After All?,* Folio (Feb. 10, 2011), *available at* http://www.foliomag.com/2011/no-newpage-verso-merger-after-all#.VK2LZCe7k6o ("NewPage's owner, Cerberus, and Apollo Management, which has a controlling interest in #2 maker Verso Paper, are discussing what to do about NewPage's high levels of debt, *PPI Pulp & Paper Week* reported recently. Apollo is also the largest holder of #1 NewPage's $800 million second-lien bonds, the publication said."); *See also <u>NewPage, Verso Owners Reportedly</u>*

June, 2011 - NewPage sells Kimberly, WI Mill property to AIM Demolition USA, LLC.[10]

September, 2011 – Verso claims to have abandoned its plans to merge with NewPage.

Sept-Dec, 2011 – AIM starts demolishing the former NewPage-owned Kimberly Mill.

September 4, 2012 — Verso Paper Corp., owned by private equity firm Apollo Global Management LLC, ends merger discussions with bankrupt rival NewPage Corp. [11]

January, 2013 – Verso sells its Sartell, MN Mill to AIM, which subsequently demolishes it.[12]

January 6, 2014 –Verso and NewPage announced their acquisition agreement.

January 14, 2014 – Verso signs deal with lenders to finance the acquisition, based on representations and commitments by it and NewPage regarding future capacity reductions.

April 3, 2014 --Verso and NewPage announced that they had received Second Requests for more facts from the Department of Justice ("DOJ").

May 2014 – Verso reportedly engages Concentric Energy Advisors to start shopping the Electric Power plant at Bucksport.[13]

---

*Discussing a Deal*, Dead Tree Edition (Jan. 18, 2011), *available at* http://deadtreeedition.blogspot.com/2011/01/newpage-verso-owners-reportedly.html

[10] Eric W. Fowle & David Kress, Former NewPage Mill Property Redevelopment Strategy: Public Workshop Summaries, Results, and Recommendations (Nov. 1, 2012), *available at* http://www.vokimberly.org/media/146836/new%20page%20mill%20site%20nov%202012.pdf

[11] Jamie Santo, *Verso Paper publicly ended talks to acquire NewPage*, Law 360 (Sept. 5, 2012), *avaialble at* http://www.law360.com/articles/375444/verso-paper-ends-talks-to-acquire-newpage

[12] Twincities.com, "*Minnesota Verso Paper Mill demolition permit approved,*" Associated Press (August 23, 2013). http://www.twincities.com/localnews/ci_23926214/minnesota-verso-paper-mill-demolition-permit-approved

[13] *See* http://www.thedeal.com/first_word/2014/07/verso_shops_maine_energy_facility_as_debt_exchange_vrs.html

October 1, 2014 --Verso announced, without any prior hint or warning, that it was shutting down the Bucksport Mill effective in December.

October 2, 2014 --In an employee meeting, Verso management made very clear that the company would not sell the Mill to a competitor.  Exhibits 28-31 to Pls.' Complaint.

October 3, 2014 – A Moody's analyst identified news of the Mill's closure as a "credit positive" step, because of the resulting reduction in production capacity in the coated printing paper market.[14]

October 13, 2014 – The Portland Press Herald reported in a news story on the printing paper industry:  "[A] company that is selling one of its mills is loath to do so to a competitor, said Mark Wilde, a senior analyst of the pulp, paper and forest product sectors for the Bank of Montreal.  If the competitor buys the plant on the cheap, it could be in a position to undercut the previous owner.  That leaves selling the mill for scrap as the only alternative, said Wilde."[15]

October 17, 2014 – At a State-sponsored job fair, Verso posted guards to prevent competing printing paper companies from interviewing Bucksport Mill employees.

October 30, 2014 – Verso announced that NewPage was selling two of its mills in Wisconsin and Maine to Catalyst, a Canadian paper company,  "in order to address antitrust considerations related to the NewPage Acquisition".  (DOJ has since confirmed that it required these divestitures).

November 12, 2014 – State officials (including Rosaire Pelletier, Senior Forest Products Industries Advisor to the Governor) informed the Plaintiffs that there were two potential buyers

---

[14] https://www.moodys.com/research/Moodys-views-the-closure-of-Versos-Bucksport-mill-as-credit--PR_309892

[15] Edward D. Murphy, *Buyers for paper mills don't grow on trees*, Portland Press Herald (Oct. 13, 2014), *available at* http://www.pressherald.com/2014/10/12/buyers-for-paper-mills-dont-grow-on-trees/

interested in buying the Bucksport Mill as a going concern producing paper, who had approached Verso but been rebuffed by Verso management and refused access to the mill to assess the equipment to make an offer.

November 17, 2014 – At a meeting with union representatives, Verso refused to take any affirmative steps to preserve the paper making equipment in operational condition.[16]

November 18, 2014 – Energy consultant Whitfield Russell communicates to Verso a client's interest in bidding on the electricity generation plant at Bucksport to operate as a cogeneration operation in conjunction with an operational mill, but Verso has never replied. (Whitfield Russell Decl.)

November 19, 2014 (approximately) – Verso managers instructed the Mill's IT staff that, as soon as paper production at the Mill had ceased, they were to pull the hard drives from the computers that run the paper making machines at the Mill and either "wipe" programming off them or dispose of them entirely.

November 25, 2014 – Verso again refuses to take any affirmative steps to preserve the equipment in operational condition.

November 30, 2014 – AIM Development states that it first learned of opportunity to purchase the Bucksport Mill. (AIM-McGlin Declaration).

December 2, 2014 – AIM Development allegedly makes its initial bid for the Bucksport Mill (Verso-Paterson Declaration).

December 4, 2014 – All paper making operations at the Bucksport Mill ceased.

---

[16] The requested actions releasing tension on the felts and belt, maintaining the rollers, lubricating the rollers and periodically turning the rollers in the same manner that the "best practices" manual used at the Mill now follows to prevent warping, pitting and other damage that will damage the integrity of this expensive and essential hardware, etc).

December 5, 2014 – AIM signs agreement to purchase Bucksport Mill for approximately $58 million.

December 8, 2014 – Verso advises the Plaintiffs and press of the AIM purchase agreement (MIPA) and files an 8-K with the S.E.C. with regards to the agreement.

December 15, 2014 – Plaintiffs filed this lawsuit against Verso and AIM for violation of federal and state antitrust laws.

## II. The Plaintiffs Have Standing to Bring This Case and Seek this Equitable Relief

In Plaintiffs' Initial Motion filed on December 15, 2014, Plaintiffs explained why they had standing to pursue injunctive relief as both indirect purchasers of products containing coated paper, and as suppliers of labor to the Bucksport Mill. Verso's Opposition only challenges Plaintiffs' standing as suppliers of labor – it does not challenge Plaintiffs' standing as consumers, because the case law is clear on that point.

Verso's Opposition ignores all of the case law on standing that Plaintiffs cited. First, the Supreme Court has recognized that the Clayton Act (15 U.S.C. § 15) "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . [and it] protect[s] all who are made victims of the forbidden practices...." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982). Verso does not address why plaintiffs should not be considered "victims" of the forbidden practices alleged in the Complaint.

Second, claims for injunctive relief can be sought by a "broader range of plaintiffs" than actions for damages because the "standards to be met are less exacting [when injunctive relief is sought]..." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407-08 (1st Cir. 1985). However, Verso has failed to distinguish its standing analysis between claims for

12

damages and injunctive relief.  "[U]nder § 16, a plaintiff need show only a threat of injury rather than an accrued injury." *Id.*

Third, defendants do not dispute that plaintiffs are indirect purchasers of coated paper because they have purchased magazines containing such paper.  Thus, plaintiffs allege that they will have to pay higher prices for products containing coated paper as a result of Defendants' illegal acts which have reduced competition in the market and *have already raised prices* according to industry reports.[17]  This constitutes a clear example of antitrust injury, and the vast majority of Courts have stated that indirect purchasers do have standing to seek injunctive relief under 15 U.S.C. § 26.  *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 274 (D. Mass. 2004); *U.S. Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 627 (7th Cir. 2003); *In re Warfarin Sodium Antitrust Litigation,* 214 F.3d, 399 (3d Cir. 2000); *In re Chicken Antitrust Litigation American Poultry,* 669 F.2d 228, 238 (5th Cir. 1982); *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 594 (3d Cir. 1979). Verso has not addressed these cases.

Verso claims that "Plaintiffs' alleged injury flows from the closure of the mill, not from any reduction in competition in any market." (Opp. at 9).  But that is a complete misrepresentation of Plaintiffs' injuries, which do result from a reduction in competition. Plaintiffs' injuries result from multiple acts including (i) the closure of the Mill, which has led to Plaintiffs losing their jobs; (ii) the permanent destruction of the Mill, which prevents Plaintiffs from ever working at the Mill again; (iii) Verso's refusal to sell the Mill to any of its competitors, which also prevents Plaintiffs from ever working at the Mill again; and (iv) the reduction of competition that has already occurred, and will continue to occur, in the market for

---

[17] See RISI, "Publication paper price hikes start gaining traction as capacity cuts bite…", Nov. 21, 2014 (Ex. 1).

coated paper as a result of the Mill's destruction and Verso's refusal to consider offers from its competitors; and (v) the increase in prices for groundwood paper, and consequential rise in products containing such paper *that has already occurred*.[18]  Additionally, reduction in competition has also resulted from other conspiratorial acts between Verso, NewPage and AIM aimed at reducing capacity.

The cases cited by Verso are distinguishable.  Verso cites *Serpa Corp. v. McWane, Inc*., 199 F.3d 6 (1st Cir. 1999), but there the Court held there that "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Id.* at 10.  Second, in that case, the plaintiff was not a consumer (like Plaintiffs here), but a sales representative.   Specifically, the *Serpa* court noted that the "[plaintiff] does not bring its claim as either a competitor *or a consumer* but as a distributor whose injuries resulted from the loss of its position as Anaco's exclusive sales representative in the New England market." *Id.* at 12 (emphasis supplied). Thirdly, that case was an action for damages, not injunctive relief, and thus applied a somewhat different standard for standing.

In addition, Plaintiffs' interest as suppliers of labor to the Bucksport Mill coincides precisely with the consumer interest in keeping the Bucksport Mill as a producer in the coated paper market. Here, the employees are the direct victims of Verso's refusal to sell the Mill to any of its competitors, and thus Defendants' acts have limited competition in the labor market for Plaintiffs, which has been directly affected.

In *Serpa*, the relationship between the plaintiff and defendant was far more attenuated than it is here, because the plaintiff was a third-party who did not work directly for the defendant, and the plaintiff did not lose the capability to work as a sales representative for other

---

[18]  See RISI, "Publication paper price hikes start gaining traction as capacity cuts bite…", Nov. 21, 2014 (Ex. 1).

companies.  *Id.*  But here, Plaintiffs are specialized workers in the field of paper production, and they have limited opportunities to work in their field given the limited number of paper plants in Maine and New England generally. Thus, in addition to their standing as indirect purchasers, Plaintiffs also have standing as employees of the Mill.

## III.     The DOJ has not analyzed whether the sale of the Bucksport Mill to AIM anti-competitive

It is very important for the Court to understand that the DOJ has not analyzed whether the sale of the Bucksport Mill to AIM would lessen competition or tend to create a monopoly, because that transaction was not submitted to them for review.  The only transaction that was submitted to the DOJ for review was the acquisition of NewPage by Verso.

Only certain types of acquisitions, usually deals valued at $75 million or more, require "pre-approval" from the DOJ Antitrust Division.  Since the sale of Bucksport from Verso to AIM was below this amount, this deal was not required to be submitted to the DOJ for pre-approval, as opposed to the Verso-NewPage deal which was valued at over a billion dollars.

But just because a deal is not required to be submitted to the DOJ for pre-approval does not mean it cannot be enjoined or undone.  In fact, private parties retain authority to both enjoin mergers that have yet to take place, and seek divestiture and "undoing" of already completed mergers, regardless of their transactional value, under Section 7 of the Clayton Act.  *California v. American Stores Co.*, 495 U.S. 271 (1990).

As the DOJ makes clear in its Competitive Impact Statement, "the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants." (DOJ CIS, p. 7-8).[19]

Moreover, DOJ's analysis failed to consider the type of potential competition just described, because it failed to explore whether the Bucksport Mill, in the hands of a new owner would offer a competitive threat to the newly-expanded Verso in the three markets that it employed in its Complaint.  Instead DOJ simply accepted Verso's self-serving assertion that it had intended to close the Mill; and on this basis treated Bucksport as if it simply did not exist. DOJ CIS n. 1.

As noted, DOJ has alleged three product markets--Coated Freesheet Web Paper, Coated Groundwood Paper, and Label Paper (U.S. Complaint Paras. 16-19) and a geographic market labeled "North America" that "is no larger than the United States and Canada" (Paras. 22-25). The Government then alleges increases in concentration and anticompetitive effects in (i) "coated publication papers" (covering both coated freesheet web paper and coated groundwood paper) (Paras. 26-34) and (ii) label paper (Paras. 35-37).[20]

The Government's proposed relief involved divestiture of two NewPage Mills (in Rumford, ME and Biron, WI), now largely engaged in producing coated groundwood paper.  But DOJ seems to think that these divestitures will solve all the problems that they allege all three of their chosen markets.  The Government explains:

> The divestiture provisions of the proposed Final Judgment preserve the
> competition that would be lost if the proposed acquisition occurred without the

---

[19] http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/31/verso_cis_0.pdf.
[20] See DOJ Complaint v. Verso, http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/31/verso_complaint_0.pdf.

divestiture.  The divestiture will largely maintain the existing structure of the relevant markets.  The mills to be divested produced 940,000 tons of coated publication papers, label paper, and other papers which is approximately the same amount of production as Verso *currently operates*.  *(CIS p. 11, emphasis added).*

 What the "currently operates" language conveniently ignores is the Bucksport Mill.  The "competition that would be lost" by the set of transactions involving Verso, NewPage and AIM is the 405,000 tons of production represented by Bucksport.  In other words, between January 1, 2014 and January 8, 2015, Verso has closed one transaction with NewPage and is seeking to close a second one with AIM--that will tend to permanently reduce industry capacity during a time frame when the prices for the industry's products have increased.  The resulting adverse competitive effects could be mitigated if some competent operator were allowed to revive Bucksport, while it still appears to be operational, as a source of potential competition for Verso and its DOJ-anointed rival, Catalyst.

IV. **DOJ's Analysis Supports a Finding that the Defendants Have Generated Anticompetitive Effects in Plaintiffs' Relevant Market:  Coated Printing Paper in North America**

    A. **Product Market Definition**

Paragraph 77 of Plaintiffs' Amended Complaint asserted that "coated printing paper" in North America is a market in which the destruction of the Bucksport Mill would have a clear anticompetitive effect.

"This specialized and high quality paper is purchased and used by publishers of magazines, newspaper inserts and catalogs. According to Verso's website, "coated paper" is described as "freesheet and groundwood papers for publishers, catalogers, advertisers and commercial print producers."[21]  This market may also include some "SC paper" (i.e., supercalendared uncoated groundwood paper)

---

[21] See, https://www.versopaper.com/OurProducts/CoatedPapers/

which some, but not all, publishers may use as a substitute for coated printing paper." (Amed. Compl. ¶ 77)(ECF No. 29).

Meanwhile, the DOJ (whose Complaint and Competitive Impact Statement were not yet available when we filed the Amended Complaint) alleged three different product markets of printing papers that fell within our "coated printing paper" definition:  coated freesheet web paper, label paper, and coated groundwood paper.   As the Government explains:

> The Complaint alleges that the proposed acquisition will likely substantially lessen competition in all three relevant markets. In each market, the Complaint alleges that the acquisition will likely increase concentration substantially and eliminate significant head-to-head competition, leading to higher prices and reduced output. In the coated freesheet web and coated groundwood markets, the Complaint further alleges that the acquisition will likely cause the remaining competitors to accommodate one another's price increases and output reductions.
>
> The proposed acquisition is presumptively unlawful because it will increase concentration significantly in the highly concentrated coated freesheet web and label paper markets. Market concentration is a useful indicator of the level of competitive vigor in a market and the likely competitive effects of a proposed acquisition.[22]

Then the Government negotiated a remedy in only one of those three markets-- groundwood paper--leaving the post merger effects to continue unabated in the other two segments.

The major difference between the Plaintiffs' market and the three DOJ selected markets is that DOJ has apparently not thought it necessary to explore how flexible these large paper making machines actually are.  Thus, for example, the machines at Bucksport were primarily being used to make coated groundwood paper when the Mill closed, but in past years they had been used to make other coated printing papers.  *See* Declaration of Brian Abbott.

---

[22] DOJ CIS, p. 6: http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/31/verso_cis_0.pdf

Thus, measuring the anticompetitive effects of the AIM acquisition only in the coated groundwood paper would give a quite incomplete picture.  Rather, it is important to look at the other coated printing papers that Bucksport could efficiently produce, and this is what we have attempted to do by employing the broader "coated printing paper" market alleged in the complaint.   The DOJ explanation of the barriers to entry is important because it does support a broader market that includes all three coated printing papers:

> Entry or expansion into each of the relevant markets is costly and time-consuming. A competitive entrant would need a cost-effective mill. Building such a mill would cost billions of dollars, take two or more years to build, and require extensive environmental permits to construct. New competitors also would need to secure major customers, which often involves lengthy and expensive qualification processes.[23]

## B.  The Geographic Market is North America

The DOJ has also asserted that North America (the United States and Canada) is the relevant geographic market for purposes of antitrust analysis, stating:

> The relevant geographic market for analyzing the likely effects of the proposed acquisition on the sale of each relevant product is no larger than the United States and Canada (referred to here as "North America," consistent with usage in the paper industry).[24]

The Court should therefore not give credence to Verso's economist's conclusion that "Plaintiffs' putative geographic market—North America—is implausible." (Hay Decl. ¶ 26).  Instead, Dr. Hay alleges that the relevant market is the global market, and includes imports into North America.  But the DOJ considered this argument and rejected it noting that:

---

[23] DOJ CIS, p. 8. http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/31/verso_cis_0.pdf

[24] Complaint, ¶ 22, http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/31/verso_complaint_0.pdf

"Overseas producers tend to focus on markets that are closer to them where they can earn higher margins, rather than selling in the more distant North American markets where they pay higher shipping costs. In addition, customers require timely delivery, as coated paper is an essential input into their final products. Procuring coated paper from overseas adds significant lead time, increases the risk of delivery delays, and makes more difficult quick correction of quality problems. Also, fluctuations in foreign exchange rates pose a challenge to overseas producers competitively selling to customers in North America because they add substantial risk to long-term relationships." DOJ CIS, p. 8-9. (*See also* DOJ Complaint against Verso, ¶ 39).[25]

Because Verso's geographic market definition is clearly contrary to the DOJ's geographic market definition and erroneous, the Court should accept and adopt the DOJ's geographic market definition of North America and not include imports in its calculation of the relevant market share.

## C.  Market Share

Assuming a North American georgraphic market, and a product market including coated groundwood, coated freesheet, and supercalendered paper, then the combined Verso-NewPage company has at least 38.2% of North America capacity before the Bucksport closure, not including imports.  (See George Hay Ex. 6b, recalculated to exclude imports).   And after the Bucksport closure, Verso-NewPage will still control 35.8% of North American capacity, not including imports. (See Hay Ex. 6b, recalculated to exclude imports).  But prior to acquiring NewPage, Verso only had about 13% of the total coated paper capacity in North America.[26]  So from Jan. 2014 to Jan. 2015, Verso's share of the market has jumped from 13% to 35.8%.

---

[25] The DOJ's Complaint states:
> "Supply responses from overseas manufacturers are unlikely to prevent a substantial lessening of competition. Prices are generally higher for imports than for domestic products. Furthermore, foreign producers are limited by commitments to more profitable local markets; by significant transportation costs and logistical issues; by customers' exacting product specifications and preferences for short lead times; and by fluctuations in currency exchange rates, which disrupt consumer preferences for stable supply relationships."

(DOJ Compl. ¶ 39).
[26] http://www.fisheri.com/images/features/North%20American%20Coated%20Papers.pdf

Such a market share is enough to exercise monopoly power. *See United States v. Visa USA, Inc.*, 344 F.3d 229, 240 (2d Cir. 2003)(MasterCard found to have market power with 26% market share); *Broadway Delivery Corp. v. United Parcel Serv. of Am.*, Inc., 651 F.2d 122, 129 (2d Cir. 1981)("the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share"); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008) (a finding of market share less than 30% would not foreclose the possibility of proving monopoly power); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 671 (7th Cir. 1987)("the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%").

C.  **Anticompetitive Effects of Permanently Eliminating the Bucksport Mill from the Market for Coated Printing Papers**

Bucksport (with its 350,000 tons of coated paper capacity, and 55,000 tons of specialty paper capacity) represented almost a third of Verso's pre-merger printing capacity; and thus it represented about 4.5% of the total North American capacity for making coated printing papers.[27]  In other words, before it closed, it was a source of *actual competition* in coated groundwood paper and a source of *potential competition* in other various other types of coated printing papers (if the machines were adapted to produce other types of paper).  The coated printing paper market is quite highly concentrated, and so are the segments that make it up, as the DOJ has alleged in its Complaint and Competitive Impact Statement.

A merger that creates a substantial loss of *potential* competition has long been recognized by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.  The starting

---

[27] See George Hay Ex. 6b, alleging that North America had 9,282,000 tons of Coated Groundwood, Coated Freesheet and SuperCalendered capacity before Bucksport closed (excluding imports).   425,000 tons divided by 9,282,000 tons = 4.5%.

point was *United States v. El Paso Natural Gas Co.,* 376 U.S. 651 (1964), where the dominant

supplier of natural gas in Southern California (El Paso) had acquired another company

(Northwest) that had a pipeline that could serve the market.  The *El Paso* decision and its

importance was well explained by the Eleventh Circuit in *Polypore Int'l, Inc. v. F.T.C.,* 686 F.3d

1208, 1214 (11th Cir. 2012):

> The Court held that the acquired company was shown to have been a substantial
> factor in the California market: "Though young, it was prospering and appeared
> strong enough to warrant a 'treaty' with El Paso that protected El Paso's
> California markets." The acquired company had not actually sold gas in the
> market but the Court noted that *§ 7 of the Clayton Act was concerned with*
> *probabilities, not certainties. "Unsuccessful bidders are no less competitors than*
> *the successful one."* As the Court noted, "[w]e would have to wear blinders not to
> see that the mere efforts of Pacific Northwest to get into the California market,
> though unsuccessful, had a powerful influence on El Paso's business attitudes." *It*
> *then emphasized again that § 7 was intended to "arrest the trend toward*
> *concentration, the tendency to monopoly, before the consumer's alternatives*
> *disappeared."* In a healthy, growing market, the fact that the acquired company
> did not win a contract or had never sold in the market was not conclusive.[28]

(italics added).

The Supreme Court reemphasized the message too when it held the loss of potential

competition constituted a Section 7 violation in *F.T.C. v. Procter & Gamble Co.,* 386 U.S. 568,

585-86 (1967).  This time the Court explained very clearly:

> [A] reasonably probable entrant has been excluded from the market and a measure
> of horizontal competition has been lost. Certainly the exclusion of what would
> promise to be an important independent competitor from the market may be
> sufficient, in itself, to support a finding of illegality under § 7, *United States v. El*
> *Paso Natural Gas Co*., 376 U.S. 651 (1964), when the market has few
> competitors.[29]

---

[28] *Polypore Int'l, Inc. v. F.T.C.,* 686 F.3d 1208, 1214 (11th Cir. 2012).

[29] 386 U.S. at 585-86.

The importance of preserving potential competition as an antitrust was particularly clearly articulated by *Paschall v. Kansas City Star Co.*, 695 F.2d 322, 329 (8th Cir. 1982) *rev'd on other grounds on reh'g en banc*, 727 F.2d 692 (8th Cir. 1984), imposing liability on a locally dominant newspaper:

> The preservation of *potential competition* in concentrated markets is an important goal of antitrust policy. The potential competition doctrine's rationale is that the threat of entry by a firm standing at the threshold of a market will likely exercise a restraining influence on pricing and other behavior of existing firms in the market, and that the removal of the threat will adversely affect competition. *See Von Kalinowski,* 4 *Antitrust Laws and Trade Regulations, supra,* § 19.02[2], at 19–50.9 -- 19–55. *Id.* (italics added).

The intent of sale of the Bucksport Mill to AIM is intended to destroy the Mill as a threatened source of potential competition in the hands of a new owner.  Thus, these circumstances offer a uniquely strong "potential competition" merger case.

There are two key parts of the "potential competition" doctrine.  First, the potential entrant that is being removed or excluded must be a firm that would likely to enter the market. Normally, there is a question of whether the potential entrant would enter the market in a timely and effective manner; but in the assumed situation, the new owner of Bucksport--having purchased this substantial production facility--would be virtually certain to enter the coated printing paper market, because this would be the most (and maybe only effective) use that the new owner could make of this capital intensive equipment.  This of course is what Verso knows and fears--which is why it is so determined to have Bucksport promptly destroyed.

The second part of the "potential competition" doctrine, as developed by the Supreme Court in the merger area, is that the acquired entity that is being removed from competition be *one of only a few* potential entrants.  *U.S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973); *FTC v. Proctor Gamble Co.*, 386 U.S. 568, 580-81 (1976); *Merchantile Tex. Corp. v. Bd.*

*of Governors*, 638 F.2d 1255, 1267 (5th Cir. 1981).  Obviously, if the potential entrants are numerous, then the elimination of one by merger would be of no particular consequence (i.e. pizza stores in Boston).[30]   In our case, this condition should be easy to satisfy.   Since building a new plant would cost billions of dollars and take a long time (according to the DOJ CIS), the only potential entrants to the coated paper market would be the owner of another shutdown mill which (i) had been mothballed in operational condition and (ii) could be restarted reasonably promptly without great capital expense.  That is the only hope for new mill entrants in the current environment.  But we believe there are only a few  (and maybe none) of these hypothetical mothballed mills that could easily be restarted--in large part because the market leaders (NewPage and Verso) have been so intent in disabling the potential future capability of their mills once they have been shut down.

Thus we believe that this Court should be able to conclude, even based on the limited record, that the effect of AIM acquisition of the Bucksport Mill may be to lessen the potential competition that Bucksport would represent to the new leader in an even more concentrated market for coated printing papers--Verso--which has only Sappi and Catalyst Paper Corporation left as meaningful competitors.   And, if so, this represents a probable Section 7 violation and justifies at least a TRO against the AIM acquisition going forward.

---

[30] Where a monopolist takes to eliminate *all* potential competitors it matters not that they are numerous. *See also Fishman v. Estate of Wirtz*, 807 F.2d 520, 536-37 (7th Cir. 1986) ("The potential competition...was much broader and consisted of all those who might have bid for the Bulls had they not faced the insuperable obstacle of the defendants' stadium monopoly. That the survivor of the aborted competition would quite fortuitously find itself alone in the consumer basketball market in Chicago—at least for a while—*does not make the destruction of competition to enter that market any less an antitrust violation.*")(italics added).

**V. It Is Undisputed That Verso Never Intended To Sell The Bucksport Mill To Someone Who Might Use It To Make Paper**

Attached to Plaintiffs' Complaint and Motion, Plaintiffs provided witness declarations testifying that on October 2, 2014, Dennis Castonguay, Verso's Manager of the Bucksport Mill, publically stated that Verso would not sell the Bucksport Mill to any of its competitors. This statement has gone unchallenged by Verso.  Verso has not denied that this statement was made, nor has it submitted any affidavits stating that statement was not made.

It is therefore undisputed that this statement was made.  Furthermore, in a recent telephone conference before The Honorable Magistrate Judge Nivison, Verso counsel, David Barry, asserted that plaintiffs could have filed their Complaint earlier than December 15 because they knew as of October 2 that Verso "would never sell to a competitor" due to Mr. Castonguay's statement.  In essence, Verso has admitted that this statement was made, but has pretended that it didn't happen.

Mr. Castonguay's statement was not some off-the-cuff statement: it reflected Verso's actual policy.  This is supported by several other facts that are undisputed or admitted.  First, Verso employed a broker named "Concentric Energy Broker" ("Concentric") to sell the power-plant portion of the Bucksport Mill sometime in May 2014.[31] Concentric has no expertise in selling paper mills and is only utilized to broker deals for energy plants.  This is strong evidence that Verso only wanted to sell Bucksport to an energy provider – not to a paper producer.

Here again, Verso does not dispute that it did not solicit any offers from the Bucksport Mill from any paper manufacturers, or that it failed to negotiate or consider any such offers from

---

[31] http://www.thedeal.com/first_word/2014/07/verso_shops_maine_energy_facility_as_debt_exchange_vrs.html

paper producers.  Therefore, it is clear that Verso never had any intention of selling the mill to a paper producer because they did not want to have to compete with any potential buyer.

If Verso had not been actively trying to stifle competition in the paper industry, the economically rational thing for it to do would have been to widely publicize the availability of the Mill to all potential purchasers, and not preemptively reject any offers from paper producers, who may have been willing to offer more than $58 million for the Mill.

AIM claims in its declaration that AIM did not learn of the possibility of purchasing Bucksport Mill until Sunday, November 30, 2014 (from Concentric), two days after Plaintiffs first filed (but pulled before docketing) its lawsuit to compel preservation of the mill's assets and almost two months after Mr. Castonguay said that Verso would not sell the Mill to any competitors. (McGlin Dec. ¶ 5).  By Friday, December 5, 2014 (five days after AIM allegedly first learned that Bucksport was for sale), AIM had signed an agreement to purchase the Mill. The quick sale of the Mill suggests that the negotiations were put on a fast-track and that Verso was not interested in considering other buyers who may have been willing to pay more than $58 million for the Mill.

However, AIM had a long-running relationship with Verso and it was Dennis Castonguay, the current Mill Manager in Bucksport, who oversaw and coordinated the destruction of the Sartell Mill with AIM and was the point of contact for transfer of the Sartell Mills power assets to AIM in the FERC proceedings in January of 2013 regarding the Sartell Mill.  Thus, for more than a year before the Verso-NewPage merger was announced, the Bucksport Mill's Manager was overseeing the identical scrapping and power plant asset transfer transaction that is now happening at the Bucksport Mill.

Verso's extensive argument that the paper industry is in decline and that the Bucksport Mill in particular is unable to make a profit is refuted by its refusal to sell to a rival paper producer.  If the industry were in sufficient decline to make operation of Bucksport uneconomical, it would be irrational for paper producers to express interest in buying it, *as they have done*.

It also does not make economic sense that Verso would have announced the closing of the Mill before seeing if there were any paper producers interested in buying it.  Once Bucksport was closed, and all of its employees discharged, such acts severely lowered the value of the Mill to any potential paper producers, who would now have to spend considerable time and expense to rehire workers, and get the machines back up and running.  In other words, a seller would normally be able to get a higher sale price for an ongoing business (with employees and ongoing customer relationships), than for a business that has already been closed, lost its customers, and needs considerable investment to be restarted.

Indeed, if Verso had been willing to consider bids from a paper manufacturer before closing the Bucksport Mill, Verso would have avoided the payment of any severance or other closing costs – costs they estimate to be between $30 and $35 million in severance and up to $45 million total for closing the Bucksport Mill.

But Verso didn't want any paper purchasers to operate the Bucksport Mill after Verso left – so it closed the plant first and signed a contract to sell it some two months later, negotiating solely with AIM.  Indeed, Verso either rejected offers or rebuffed any inquiries from power asset purchasers interested in running the power plant as a cogeneration facility with a paper mill operation.  Running the power plant in conjunction with an operating paper mill would have

taken advantage of reduced costs and increased efficiencies as compared to a stand-alone power

plant with no paper mill.  (Declaration of Whitfield Russell).

**VI. The Sale of the Bucksport Mill to AIM is Indisputably Intended to Permanently Eliminate the Bucksport Mill as a Producer of Coated Groundwood Paper**

AIM does not intend to continue producing paper at the Bucksport Mill.  AIM's counsel,

Clifford Ruprecht, conceded during a conference with Magistrate Judge Nivison that AIM's

intent in purchasing the Bucksport Mill is to destroy and salvage any paper-producing facilities.

AIM's declaration states that "AIM is not a seller or producer in the market for coated paper."

(McGlin Decl. ¶ 7).  Thus, AIM has no intent to manufacture paper at the Bucksport Mill, and

intends to salvage it.

Additional facts support the conclusion that AIM does not intend to continue to produce

from Bucksport Mill.  AIM is a leading North American salvage company that has previously

scrapped paper plants for Verso and NewPage.  (McGlin Decl.)  AIM has never operated a

production plant, let alone a specialized paper-making plant.  (*Id*)  Lastly, the contract between

Verso-AIM clearly contemplates that AIM would only continue to operate the electric power

plant at Bucksport.  (See Pls.' Motion).  The MIPA only allows AIM to assign its right to

purchase with Verso's approval.  Verso has made clear it will never sell the mill to a competitor,

so Verso will not allow AIM to assign its right to purchase to a competitor.

Further, AIM has a significant incentive to not sell to a Verso competitor after the sale

from Verso is competed because AIM needs to preserve relationships with other manufacturers

that scrap facilities to reduce capacity.  AIM would not want to alienate future customers by

selling the Bucksport Mill to a competitor of the merged Verso-NewPage entity.  Then they

would never be hired again to scrap a productive facility.

By accepting a lesser offer from AIM than it could have gotten from a paper producer, Verso is making an investment in reduced industry capacity. Verso has calculated that it would extract more profits in the long-term through increases in the price for coated groundwood paper than it would gain from a sale of the Mill to a paper producer.

## VII. The Decision to Shut Down the Bucksport Mill was Closely Tied to the NewPage Acquisition

There is clear and uncontroverted evidence that Verso's decision to shut down the Bucksport Mill and sell it for scrap is directly connected to Verso's acquisition of NewPage – an acquisition that has been in the works since at least January of 2011. Prior to the acquisition of NewPage, Verso only owned three paper plants nationwide: Bucksport, and one plant each in Jay, Maine and Quinnesec, Michigan.[32] If Verso were not acquiring NewPage, the shutdown of Bucksport would have been economically irrational – it would have reduced Verso's market share, left them with only two plants, and made Verso a much weaker company.

NewPage was actually a far larger producer of paper than Verso. NewPage owned eight plants nationwide prior to the acquisition, compared to Verso's three plants.[33] NewPage owns three plants in Wisconsin, plus one each in Minnesota, Michigan, Kentucky, Maryland, and Maine. As a part of its review of the deal, the DOJ has required NewPage to sell the plant in Rumsford, Maine, and another plant in Biron, Wisconsin, to a third-party paper producer named Catalyst, leaving NewPage with six plants. In short, as a result of the NewPage acquisition, Verso is going from a 3-plant company to an 8-plant company.

---

[32] Verso Paper Corp., Annual Report (Form 10k) (Mar. 6, 2014), *available at* http://www.sec.gov/Archives/edgar/data/1395864/000142118214000024/vrs12312013-10k.htm

[33] NewPage Holdings Inc., Annual Report (Form 10k), at 6 (Feb. 26, 2014), *available at*: http://www.sec.gov/Archives/edgar/data/1578086/000157808614000005/a201310-knewpage.htm

It is clear from public documents filed with the SEC that one of the main goals for Verso's acquisition of NewPage was to reduce production capacity, and therefore increase prices for coated paper.

First, in an SEC filing by Verso on January 14, 2014, Verso made clear it planned to close mills as a direct result of the NewPage Acquisition.  In addition Verso set aside funds for reorganization or closures of facilities.

> "We expect to incur approximately $65 million of transaction fees and other costs related to the consummation of the Merger [with NewPage]. In addition, we expect to incur one-time costs of approximately $80 million in connection with integrating the operations, products and personnel of Verso and NewPage into a combined company, in addition to costs related directly to completing the Merger described below. **These costs may include costs of . . . reorganization or closures of facilities"**.[34]

(emphasis supplied).

Second, on January 15, 2015, executives at Verso and NewPage's (including Verso CEO David Paterson) made a presentation to various bondholders and lenders in order to convince them to support the acquisition.  In this presentation, Verso and NewPage asserted that **one of the goals of the acquisition was the "[r]eduction of redundant product and supply inventory"** (emphasis supplied).[35]

This Presentation also stated that "A Combination [between Verso and NewPage] Will Result in the Largest Coated Paper Producer in N. America"[36], and that "The Combined

---

[34] Verso Paper Corp. & NewPage Holdings Inc., Unaudited Pro Forma Condensed Combined Financial Information (Exhibit 99.2) at 5 (Jan. 14, 2014), *available at* http://www.sec.gov/Archives/edgar/data/1395864/000119312514010953/d658330dex992.htm

[35] NewPage Holdings Inc., Lenders Presentation – Public, at 9 (Jan. 15, 2014), *available at* http://www.sec.gov/Archives/edgar/data/1578086/000119312514011410/d659471dex991.htm

[36] *Id.* at 10.

Company [Verso and NewPage] Would Become the Cost Leader in the North American Coated Paper Industry".[37]

Elsewhere, the Presentation states that the "[NewPage] Combination with Verso will Maintain Focus on Coated Paper Products…", showing that the combined entity still intends to compete in the market for coated paper.[38] It also states "NewPage and Verso Mills have Lower Cash Costs Relative to Competitors, Driven by their Pulp-Integration and Structural Characteristics".[39]

Verso and NewPage also presented a graph that showed that the Bucksport Mill has average operating costs in comparison to other unidentified coated groundwood paper mills within the industry, and that it is cheaper on a cost-basis to deliver paper to Chicago from Bucksport than the average European Mill.[40] Later, Verso and NewPage stated that the combined company would "Operate[] many of the lowest cost mills in both CFS [Coated Freesheet] and CGW [Coated Groundwood]".[41]

Thirdly, in order to obtain financial support for the acquisition, Verso had to obtain approval from various banks. To those ends, Verso signed a deal with several banks on January 3, 2014 that shows that if either Verso or NewPage decided to reduce capacity after the merger was completed, then one entity would make a payment to the other, so that lenders for both

---

[37] *Id.* at 25.

[38] *Id.,* at 18.

[39] *Id.* at 22.

[40] *Id. at* 22.

[41] *Id at 25.*

Verso and NewPage would reap the benefits of any future capacity reduction and subsequent price increase.[42]

If plaintiffs were permitted to take discovery, it is likely that other internal documents would show that Verso anticipated closing factories as a result of the NewPage acquisition.

The timing of the Bucksport closure is also important.  Verso announced that Bucksport would close on October 1, 2014.  This is approximately nine months after the deal with NewPage was announced, and about six months after the DOJ had issued a "second request" to Verso asking for more information in order to evaluate the merger.  By October 1, 2014, Verso knew or should have known that DOJ would approve their acquisition, and therefore it could safely proceed with the closure of Bucksport without worrying about losing any of its customers.

Verso's Opposition claims that "…Verso had contemplated closing the mill before deciding to acquire NewPage." (Opp. at 13).  And Verso CEO David Patterson asserts that "Verso has considered closing the mill for several years." (Paterson Aff., ¶ 9).  But more relevant than when Verso "contemplated" or "considered" closing Bucksport Mill is when the actual decision was made.  The above evidence clearly shows the Verso only planned to close Bucksport in connection with the NewPage Acquisition.  Indeed, Plaintiffs assert that the closures of the Kimberly, WI mill by NewPage and the Sartell, MN mill by Verso – both done with AIM's help in scrapping the mill assets so that these mills could not be operated by competitors – were all part of a common and coordinated pattern of conduct by Verso and NewPage. This conduct began in January 2011 to reduce market capacity in advance of the formal announcement of their merger intentions in January 2014.

---

[42] Verso Paper Corp., Consent and First Amendment to Credit Agreement, at Annex I (Jan. 3, 2014), *available at* http://www.sec.gov/Archives/edgar/data/1421182/000119312514002327/d647650dex101.htm

It is only because Verso knows that it was acquiring NewPage that Verso decided it would make sense to close Bucksport and attempt to shift all of its customers to its other plant in Jay, ME, as asserted by Verso CEO Dave Paterson.[43]  The merger is the only reason that Verso decided to close Bucksport.

There are additional reasons why Verso and NewPage may have found it easy to coordinate their activity.  Apollo Global Management, the private equity group that owns Verso, is also one of the largest holders of NewPage's debt, and has used such holding to gain leverage over NewPage.[44]

Verso's Opposition also claims that "A company cannot hope to gain monopoly power by *reducing* its own production capacity. If anything, Verso's decision to close the Bucksport mill should *increase* competition in the market by creating additional opportunities for Verso's competitors to take business from Verso."  (Opp. at 16).  This is not the case when Verso and NewPage, with the help of AIM, have set about shuttering mills in an industry with high entry costs, to reduce capacity.

Again, Plaintiffs are not challenging Verso's decision to unilaterally decide how much paper it produces – that is Verso's prerogative.  Nor are plaintiffs attempting to *force* Verso to continue operating the Bucksport Mill – again, that is their decision to make.

Instead, plaintiffs are only challenging Verso's documented refusal to consider bids for the Bucksport Mill from any competitors and public statement that it would not sell the Mill to its competitors under any circumstances.  Such acts are clearly anti-competitive, and there is no

---

[43] Paterson Declaration.

[44] http://www.risiinfo.com/blogs/Did-Verso-Come-To-Purchase-NewPage-Or-To-Bury-It.html

legitimate business justification to refuse bids for the Bucksport Mill only from buyers that wanted to continue paper production at the Mill.  Such acts are clearly anti-competitive.

**VIII. Verso's Agreement With AIM to Close Down and Scrap a Productive Facility, In Conjunction with Verso's Merger With NewPage, Violates the Antitrust Laws, Regardless of Whether the Merger Itself Would Otherwise be Found to be Illegal**

The antitrust issue is whether Verso may engage in a scheme, unilaterally and in concert with others, to reduce market capacity as part of its expansion of market power by merging with its largest rival.  A significant part of Verso's purpose in its merger with NewPage, a merger contemplated since January 2011, and the only purpose of its agreement with AIM, is to eliminate the Bucksport mill from the marketplace so that no other paper company can maintain it.   Verso's is unable to divorce the shuttering of the plant from its expansion via the NewPage merger.

Verso not only does not want to operate Bucksport, but wants to be sure that no other paper producer runs it.  As explained above, this objective is woven inherently into the AIM agreement and also has been literally incorporated into the financing documents behind the NewPage merger.  Indeed, the reduction of capacity through AIM as the instrument of destruction, began for both of Verso and NewPage in 2011 – long before the merger was publicly acknowledged and DOJ scrutiny was on them.

The issue before the court is whether a company may acquire a group of plants for the purpose of, among other things, to remove at least one of the plants from the marketplace and prevent any other competitor from running them.  While a company may normally decide what plants it wants to operate, it may not do so to engage in an anticompetitive scheme to reduce market capacity and increase prices in connection with acquisition activity.

34

Verso could not lawfully *acquire* a NewPage mill for the purpose of shutting it down and depriving consumers of its output - and the effect of its acquiring NewPage's plants for the purpose of being able to shut Bucksport is essentially no different.  For example, when the leading daily newspaper in Hawaii sought to acquire its evening newspaper rival for the sole purpose of shutting it down, the United States District Court for the District of Hawaii entered injunctive relief to block the scheme.  *See generally Hawaii v. Gannett Pacific Corp.,* 99 F.Supp.2d 1241 (D. Haw. 1999).

In *Gannett Pacific,* the court observed "that the State has presented a strong argument that the intent of the agreement is for GPC to buy out Liberty so that Liberty may then shut down the Star-Bulletin…" *Id*. at 1250.  The Court found violations of the Sherman Act Section 1 prohibition of conspiracy as well as Section 2 prohibitions against attempted monopolization and conspiracy to monopolize.  Although *Gannett Pacific* is set against the backdrop of the Newspaper Preservation Act, it is nearly axiomatic that a dominant market participant may not acquire assets for no other reason than to shut them down and ensure that no rival may use them to compete in the market.  Removing productive resources from the market and away from rivals is not a legitimate business activity and is activity that the antitrust laws are intended to prohibit.

This case is fundamentally no different than *Gannett Pacific* because of the nexus between Verso's plan to scrap the Bucksport plant and its acquisition of *other plants* via the NewPage merger.  If a dominant firm owning plant A may not acquire plant B for the sole purpose of shutting it down, then it equally may not acquire plant B for the purpose of shutting down plant A.  From an economics standpoint the result is the same: the acquisition is consummated for the impermissible purpose of depriving the market of productive capacity.

35

Since Verso is acquiring NewPage's plants as part of a plan to shut down Bucksport, its conduct is essentially subject to the same analysis as the court applied in *Gannett Pacific.*

By preventing another paper company from acquiring and running the mill, Verso will harm competition in at least three ways. First, the destruction of this plant will immediately deprive the market of 350,000 tons of coated groundwood paper and 55,000 tons of specialty paper.[45] This marks a substantial reduction in market capacity; it is widely believed that the reduction will result in higher prices. *And prices have already begun to go up.*[46] Verso, its lenders, and the rating services all expect Verso and its rivals to achieve higher prices by closing Bucksport. Second, the closure will also eliminate one mill from an already concentrated market, thus increasing the likelihood of coordination among the few remaining mill owners.

Merger law "rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *FTC v. PPG Indus.*, 255 U.S. App. D.C. 69, 798 F.2d 1500, 1503, n. 8 (D.C. Cir. 1986). By reducing the number of plants its rivals need to monitor, Verso will facilitate coordinated activity, tacit or otherwise, among producers. Finally, Verso will prevent a new entrant from gaining a foothold in the coated paper business. Verso will acquire an existing plant and avoid the prohibitive costs of greenfield entry, while simultaneously preventing an existing rival from competing using the Bucksport plant.

---

[45] *See,* Verso Paper Corp., (Form 8-K) (Oct. 1, 2014), *available at* http://investor.versopaper.com/secfiling.cfm?filingID=1421182-14-56&CIK=1421182

[46] See RISI, "Publication paper price hikes start gaining traction as capacity cuts bite…", Nov. 21, 2014 (Ex. 1).

And the DOJ has calculated it costs "billions" to build a new plant from scratch - something no competitor can likely afford at present.[47]  Thus, the removal of Bucksport will truly be permanent for the foreseeable future.

In *FTC v. Cardinal Health*, 12 F.Supp.2d 34 (D.D.C. 1998) the defendant argued that its proposed mergers would eliminate "excess capacity" which the court found was an anticompetitive objective: "If the mergers were to be approved and excess capacity removed from the market, this Court finds that pricing pressure would ease and prices would not likely continue to go down. In the end, this would inevitably affect competition to the detriment of the American consumer."  *Id.,* at 63 *et seq.*

In 2009, the FTC again faced a similar situation in the hospital industry.  Two hospitals planned to merge in Texas, and the FTC investigated the merger.  The acquiring party wanted to turn one of the hospitals from a general acute hospital into a children's hospital.  But there had been no opportunity for purchasers who wanted to maintain the hospital as a general acute facility to make a bid. So the FTC required the parties to see if any party in the market would be willing to keep the hospital as service to the whole population, rather than just to children.

The FTC wrote:

"The evidence suggested that another hospital system, the Seton Family of Hospitals, was seriously interested in acquiring King's Daughters but that its opportunity to complete due diligence and potentially acquire the hospital was unnecessarily cut short by the agreement between King's Daughters and Scott & White. **Thus, Commission staff was concerned that an interested alternative purchaser had been deprived of the opportunity to acquire King's Daughters and maintain competition for general acute care services in the marketplace."**[48]

---

[47] DOJ CIS, p. 8, http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/31/verso_cis_0.pdf

[48] http://www.ftc.gov/sites/default/files/documents/closing_letters/scott-white-healthcare/kings-daughters-hospital/091223scottwhitestmt.pdf

(emphasis supplied).

Ultimately the bidder decided not to go forward, but the FTC's principle still stands: "interested alternative purchaser[s]" should not be "deprived of the opportunity" to acquire a facility and "maintain competition...in the marketplace."[49]

Verso's argument that the paper industry is in decline is also unavailing.  The antitrust laws apply equally in declining and vibrant markets, and indeed it is often in weakened markets that anticompetitive schemes become more prevalent for obvious reasons.  In any event, the dire straits of the industry are irrelevant to whether Verso may lawfully acquire NewPage's plants for the purpose of scrapping the Bucksport plant and preventing any rival from taking it over.  If the market for paper is as sickly as Verso claims, it defies logic that Verso's rivals might want to expand their output by buying the Bucksport plant - which the evidence shows is the case.

Since there are buyers interested in purchasing the Mill, that means that the "free market" has determined the Mill still has economic value, and other parties believe it can be operated as a profitable enterprise, regardless of Verso's assertions that it could not make a profit at the Mill. Even assuming that Verso cannot operate the Bucksport Mill efficiently at a profit, *Verso's position is basically that "if we can't make a profit here then no one can, and we won't let anybody else try"*. Verso does not have the right to make that determination.

A highly analogous case is *New York v. Actavis*, in which the Southern District of New York granted a mandatory injunction that *prohibited* a pharmaceutical company from removing one of its drugs from the market.  *New York v. Actavis, PLC*, No. 14-CV-7473, 2014 U.S. Dist. LEXIS 172918 (S.D.N.Y., Dec. 11, 2014)("*Actavis*").  In that case, the Court found that Actavis, a drug company, had committed an attempted monopolization (among other violations) by

---

[49] *Id.*

planning to remove a drug from the market whose patent was expiring, and replacing it was very similar patented drug, in order to avoid competition with generic drug manufacturers. *Id.* at *5-6.

That case is remarkably similar to this one. In *Actavis*, the defendant stopped distributing a drug, and immediately tried to convert all of its customers to a newly patented drug to maintain its market share. There, defendant wrote to its customers as follows: "Dear all: ...[Actavis] has made the decision to discontinue sales of Namenda IR [the patent-expiring drug] and transition all patients to Namenda XR [the new drug]." *Id.* The Court concluded that "[b]y doing the hard switch, [Actavis] hoped to hold on to a large share of its base instead of losing them to competition." *Id.*

Here, Verso is attempting to do the same thing. It has shut down Bucksport, refused to sell it a competitor, and immediately began shifting all of its customers to its facility in Jay, Maine. As Verso CEO Mr. Paterson explains:

> Verso has already taken the necessary steps to cease operations at the Bucksport mill and to transfer orders to its other mills, including: shifting orders to Verso's other mills; notifying suppliers to cease deliveries to the Bucksport mill; notifying and renegotiating contracts with transportation companies; and assisting customers of the Bucksport mill in transferring their orders to other Verso mills, including working to make sure that other Verso mills can meet qualification specifications for these orders. Patterson Aff., ¶12.

The overall effect of Verso's activity is thus anticompetitive, and violate Sections 1 and 2 of the Sherman Act, as well as Section 7 of the Clayton Act. *See generally Declaration of Rick Warren-Boulton* in support.

**IX.  Plaintiffs Meet the Requirements for A Temporary Restraining Order and Preliminary Injunction**

*(A) Applicable Standards*

A TRO is available under Fed. R. Civ. P. 65 to a litigant facing a threat of irreparable harm before a preliminary injunction hearing can be held.  When the opposing party has notice and an opportunity to respond and an adversarial hearing is held, the standards for issuing a TRO are substantively similar to those for a preliminary injunction.  See 11A Charles A. Wright, et al., *Federal Practice and Procedure* § 2951 (1996 & Supp. 2008) (*Wright & Miller*).   The moving party bears the burden of persuasion to show: (1) a substantial likelihood of success on the merits; (2) a significant risk that it will suffer irreparable harm if the TRO is denied; (3) the harm it will suffer outweighs any harm that the TRO will cause to 3D; and (4) the TRO "will promote (or, at least, not denigrate) the public interest."  See *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001) (stating the four-factor test for issuance of a preliminary injunction).

Balancing the relative harms to the respective parties along with the public interest, the court should conclude that a preliminary injunction is warranted.

*(1) Likelihood of Success on the Merits*

A movant's burden to show likely success on the merits is tempered at early stages of litigation. *Fairchild Semiconductor corp. v. Third dimension (3D) Semiconductor, Inc.*, 564 F.Supp.2d 63, 66-70 (D. Me. 2008) ("For this early stage in the litigation, Fairchild has made a convincing demonstration….").

IAMAW's complaint asserts that Verso is engaged in a scheme, acting in concert with NewPage and AIM, with the dual objectives of achieving market power and then reducing capacity sufficiently to affect prices of the relevant coated paper products. At the insistence of

the defendants, no discovery has taken place, and so plaintiffs' required showing must be viewed in this light.

Even in the absence of discovery, there is uncontested evidence from publicly available sources that Verso is merging with its largest domestic rival; that concomitantly with that merger, Verso contracted to transfer the Bucksport Mill to AIM; that AIM concedes that it intends to scrap the paper production facilities at the Mill; and that Verso is selling the Mill for scrap as part of its management's determination that Verso did not want a competitor to acquire the Mill even if at a higher price than what is to be paid by AIM. The connection between the NewPage merger and the mill closure is reasonably clear even on this truncated record. Thus it is evident that Verso is essentially engaging in acquisition activity for the purpose and with the effect of shutting down part of the productive capacity of the industry. On the present record, therefore, IAMAW has demonstrated a sufficient likelihood of success on the merits.[50]

### Section 7 Claim under the Clayton Act

To prevail under a claim for Section 7, Plaintiffs must demonstrate (1) that the effect of the merger had some likelihood of substantially lessening competition or tending to create a monopoly, 15 U.S.C. § 18; and (2) that Plaintiffs had some likelihood of being within the class

---

[50] Nothing in Maine state law indicates injunctive relief is not a viable remedy under state law. Maine law states:
> Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, **may sue for the injury in a civil action.**

10 M.R.S. § 1104. The language "may sue for the injury in a civil action" does not preclude seeking injunctive relief. If the Maine legislature had wanted to preclude private parties from seeking injunctive relief, it could have done so, but did not. Since § 1102-A forbids any acquisitions that lessen competition, it would be anomalous for Maine law to allow private parties to seek damages for an anti-competitive acquisition, but not allow them to seek injunctive relief for those very same violations. Furthermore, Courts have treated Maine antitrust law as equivalent to its federal counterpart. *See, e.g. Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 42 n.1 (1st Cir. 2001). Therefore, in order to interpret Maine antitrust law consistent with federal law, the Court should also permit plaintiffs to seek injunctive relief under the Maine Antitrust laws as well.

of plaintiffs with standing to assert the likely antitrust injuries. *AlliedSignal, Inc. v. B.F. Goodrich Co.,* 183 F.3d 568, 573-75 (7th Cir. 1999). Here, the sale of Bucksport to AIM, for the purpose of destroying it, clearly has some likelihood of substantially lessening competition or tending to create a monopoly in the market for coated groundwood paper. And second, plaintiffs have shown that, as consumers of products containing coated paper and as suppliers of labor to Bucksport, they have standing to bring this challenge.

**Attempt to Monopolize Claim**

To prove an attempt to monopolize, plaintiffs must show that: "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 448 (1993).

The refusal to sell the Bucksport Mill to any competitor was clearly predatory and anti-competitive, and Verso has not proffered any justifications for its refusal to consider bids from competitors. Second, Verso clearly has specific intent to monopolize as demonstrated by its refusal to consider bids from competitors. And third, Verso has a dangerous probability of achieving monopoly power because coated groundwood prices have gone up and Verso's market share in both coated paper and coated groundwood paper has gone up from January 2014 to January 2015 through the NewPage Acquisition and keeping Bucksport out of the hands of its competitors.

**Section 1 Claim**

Section 1 of the Sherman Act bars every "contract, combination . . . or conspiracy, in restraint of trade . . . ." 15 U.S.C. §1. "An agreement may be found when the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful

arrangement." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013)(internal citation omitted).  As Verso points out, an "antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)(internal citations omitted).

Here, plaintiffs have satisfied this standard for the purposes of a TRO and preliminary injunction.  Both NewPage and Verso have been in merger discussions since January 2011. Apollo Management owned Verso, while also being a substantial holder of debt in NewPage (its supposed chief competitor).  Both Verso and NewPage have shut down and scrapped perfectly capable paper mills by selling them to AIM, and never even considered selling them to any other paper companies.

### Conspiracy to Monopolize Claim

A claim for conspiracy to monopolize requires a showing of: "(1) concerted action; (2) overt acts in furtherance of the conspiracy; and (3) specific intent to monopolize." *Bos. Sci. Corp. v. Schneider (Eur.) AG*, 983 F. Supp. 245, 268 (D. Mass. 1997).  Plaintiffs have shown the likelihood of such a conspiracy between Verso and AIM to reduce capacity in the market for coated paper, as described throughout this brief.

### *(2) Irreparable Harm*

Irreparable harm is an injury "not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir. 1996).  Verso mischaracterizes the irreparable harm that would follow from a failure to maintain the status quo at the mill.  According to Verso, the irreparable harm is that employees will lose their jobs and become unemployable.  However, the irreparable harm that is connected with

plaintiffs' antitrust claims is the imminent danger of the mill permanently and irreversibly exiting the market.  Verso has deliberately chosen to preclude even basic maintenance so that in a matter of a short period of time the mill would not be economically revivable.  More directly, the scheme alleged involves the deliberate destruction of a substantial part of the industry's capacity - one-third of Verso's existing mills - to the detriment of consumers.  That the mill cannot be revived once scrapped as planned is uncontested.  The extinguishing of so much industry capacity does create irreparable harm in depriving consumers, including plaintiffs as indirect purchasers of magazines, of a vital source of upstream competition.

Further one need only look as the consequences to Kimberly, WI and Sartell, MN of the impacts of this scheme on whole communities for years if not forever, to understand just how irreparable the harm from this scheme can be and is.

### (3) Balance of Harms

The TRO should not cause substantial harm to Verso or AIM.   Its effect is merely to prevent Verso and AIM from effectively destroying the mill for a matter of a few days.  Conversely, if the mill is allowed to be irreversibly shut down, the harm to antitrust Plaintiffs would be appreciable.  Furthermore, the Plaintiffs' objective involves imposing an obligation on Verso to attempt to sell the mill for *more* money than it obtains in the AIM transaction.  The balance of harms thus plainly weighs in favor of issuing the relief requested.

### (4) Public Interest

The public interest also weighs heavily in favor of entering the injunctive relief requested.  As a matter of direct concern under antitrust law, consumers of the relevant products would be irrevocably denied the full benefit of marketplace competition unless Verso and AIM are prevented from destroying the mill. It is also notable that the town of Bucksport, although not

a plaintiff here, would be potentially devastated by the mill's closure.  Thus, this factor also weighs in favor of the relief sought by plaintiffs.

X.  **The Court should Implement an Appropriate Remedy to Restore Competition**

Here, the injunctive relief that the Plaintiffs seek is divestiture of the Bucksport Mill and sale of the Mill to a buyer capable and willing to operate it as a going concern in the continued production of coated groundwood paper products (including food grade paper products), *for a price greater than the $58 million price* AIM has agreed to pay.

Neither Verso nor AIM will suffer irreparable harm as a consequence of granting this relief and any losses either may sustain are of speculative gains they would receive as a consequence of the violation of antitrust laws – and thus for which they have no right or entitlement.

The conduct of the merged Verso enterprise and AIM, in scrapping this operational mill – for which there are buyers willing to pay more for than AIM has agreed to pay -- threatens economic harm to Plaintiffs and all consumers of coated paper products.

The Supreme Court, in unequivocally endorsing divestiture as an appropriate remedy in a private action under the Clayton Act reasoned that:

> [T]he purpose of giving private parties treble-damages and injunctive relief was not merely to provide private relief but was to serve as well the high purpose of enforcing the antitrust laws.... Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords [injunctive relief], like other equitable remedies, is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." ... Its availability should be "conditioned by the necessities of the public interest which Congress sought to protect."

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130–31 (1969).

In *California v. American Stores Co.*, 495 U.S. 271 (1990), the Supreme Court held that:

> "Divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control, and it is reasonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved. Of the very few litigated § 7 cases which have been reported, most decreed divestiture as a matter of course. Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found."
>
> If divestiture is an appropriate means of preventing that harm, the statutory reference to "threatened loss or damage" surely does not negate the court's power to grant such relief. (FN8)
>
> FN 8.  Indeed, the evident import of Congress' reference to "*threatened* loss or damage" is not to constrict the availability of injunctive remedies against violations that have already begun or occurred, but rather to expand their availability against harms that are as yet unrealized.
>
> *California v. American Stores Co.*, 495 U.S. at 282-285.

Based on the foregoing authorities, an order directing divestiture of the Bucksport Mill for a price that is above $58 million, and that compensates AIM for the alleged $200,000 out of pocket expenses it claims to have incurred (assuming that AIM can provide proof to the Court of such expenditures) would impose no loss on either Verso or AIM.  Accordingly, such injunction relief should be mandated to prevent the violation of antitrust laws that transfer of the Bucksport Mill to AIM and scrapping of the Mill by AIM would result in.  An injunction should be directed to prevent the AIM transaction.

Although AIM says that it is free to accept offers or to transfer its right to acquire the Mill to another buyer, or to sell to another buyer after transfer – this is not a credible claim nor is any public purpose served by allowing the transfer to AIM to occur.  The reason why AIM would still not sell the Mill at a higher price than it paid for it is that, if it did so, it knows it would never get another big plant-scrapping project from Verso or a similarly-situated plant owner.

46

Further, the reason why Verso has refused to sell the Bucksport Mill as a going concern at a higher price than AIM is paying for its electric power plant plus scrap and landfill is absolutely clear:  Verso is counting on being able to earn much more through higher prices for printing paper in its much-expanded, post-merger mode.  There is no legitimate reason for refusing to accept a higher offer from a competitor for the mill.  For the same reasons that DOJ directed the sale of Rumford and Biron, the sale of Bucksport must be ordered where there is a buyer willing to continue to operate the mill.  Competition is not served and free enterprise is disserved by allowing an asset like a paper mill – that produces large numbers of high paying jobs – to be laid waste when there is a buyer available and consumers' interests are best served by preserving the mill as a mill.

Verso's commercial goal is squarely at odds with the basic *consumer welfare* goals of modern antitrust law, and cannot be accepted as an appropriate justification for denying an antitrust injunction, at least since *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) in 1977.  An injunction requiring that a bidder pay more money than AIM is willing to pay, with reimbursement to AIM of any legitimate and demonstrable expenses incurred since November 30, 2014, serves the public's interests, upholds the goals of applicable antitrust law, and is in the public interest to protect free enterprise and competition and to produce jobs and revenue for the State of Maine and its taxpayers.

Dated:  January 12, 2015                                    Respectfully submitted,
                                                            /s/  *Kimberly J. Ervin Tucker*
                                                            Kimberly J. Ervin Tucker
                                                            Maine Bar No. 6969
                                                            48 Harbour Pointe Drive
                                                            Lincolnville, Maine 04849
                                                            202-841-5439

k.ervintucker@gmail.com

*/s/ Dana F. Strout*
Dana F. Strout, Esq.
Dana F. Strout, P.A.

Maine Bar No. 8239
270 West Street, Ste. B
Rockport, Maine 04856
207-236-0200
dfspcc@gmail.com

Donald I. Baker
Petitioner to Appear *Pro Hac Vice*
Ishai Mooreville
Petitioner to Appear *Pro Hac Vice*
Baker & Miller PLLC
2401 Pennsylvania Ave., NW, Suite 300
Washington, D.C. 20037
Phone: 202-663-7820
DBaker@bakerandmiller.com
IMooreville@bakerandmiller.com

Jesse Markham
Petitioner to Appear *Pro Hac Vice*
Baker & Miller PLLC
One Embarcadero Center, 5th Floor
San Francisco, CA 94111
JMarkhamlaw@gmail.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January, 2015, a true and correct copy of the

foregoing was served upon the following individuals electronically by the CM/ECF system:


**David E. Barry**
Lead Litigation Counsel
Nolan L. Reichl
Litigation Counsel
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
P:  207-791-1376
F:  207-791-1350
dbarry@PierceAtwood.com

nreichl@pierceatwood.com


David Strock, Esquire
Verso Labor Counsel
Fisher & Phillips LLP
One Monument Square
Suite 600
Portland, Maine 04101
O:  207-774-6001
C:  207-650-3393
dstrock@laborlawyers.com


Clifford Ruprecht, Esquire
Lead Counsel for AIM Development (USA) LLC
Roach Hewitt Ruprecht Sanchez & Bischoff PC
66 Pearl Street
Portland, Maine  04101
O:  207-747-4870
cruprecht@rhrsb.com


Signed:        /s/  *Kimberly J. Ervin Tucker*