UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, LOCAL LODGE NO. 1821, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:14-cv-00530-JAW |
| VERSO PAPER CORP., et al. | ) ) | |
| Defendants. | ) | |

## ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND ADDENDUM

As early as January 19, 2015, Verso Paper Corp. and Verso Paper LLC (Verso) anticipated selling the Bucksport, Maine Paper Mill to AIM Development (USA), LLC (AIM) and in anticipation of the sale, Verso ceased paper mill operations in Bucksport. In this lawsuit, former Verso employees of the Bucksport Paper Mill, their union, and former Verso employees in their capacity as consumers of coated paper goods allege various federal and state antitrust law violations, and seek an order enjoining and restraining Verso and AIM from closing on the sale. The Court denies Plaintiffs' motion.

## I. BACKGROUND

### A. Procedural Background

On December 15, 2014, the International Association of Machinists and Aerospace Workers, AFL-CIO, Local Lodge No. 1821 (IAM or IAMAW), Richard Gilley, Corey Darveau, Brian Simpson, Brian Abbott, and Harold Porter (Plaintiffs) filed a complaint against Verso Paper Corp. and Verso Paper LLC (Verso) and against AIM Development (USA) LLC (AIM).[1] *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*). Also on December 15, 2014, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction. *Mot. for a TRO and a Prelim. Inj. Pursuant to F.R.C.P. 65* (ECF No. 4) (*Pls.' Mot.*). On December 22, 2014, Plaintiffs filed an amended complaint, which added 53 Local No. 1821 Members as plaintiffs and included additional allegations. *First Am. Compl. for Declaratory and Injunctive Relief* (ECF No. 29) (*Am. Compl.*). In the Amended Complaint,[2] Plaintiffs allege that: (1) Verso publicly refuses "to consider any offers to purchase [the] Bucksport [Mill] from other" competitors, and deliberately selected AIM as the buyer, which has "a prior history of scrapping paper making mills" and plans on doing the same in Bucksport, all in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2; and (2) AIM's acquisition of a Verso subsidiary "will substantially lessen competition, and tend to create a monopoly, in the relevant national market for coated printing paper," in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Maine antitrust law, 10 M.R.S. §§ 1101-1102-A. *Id.* ¶¶ 2, 4.

---

[1] The Court refers to the individual Plaintiffs and the IAM/IAMAW collectively as "Plaintiffs" and differentiates among them only as required.

[2] In their Complaint and Amended Complaint, Plaintiffs also alleged violations of Maine law regarding the timing of severance and vacation payments owed to Verso employees. *Compl.* ¶ 6. On January 6, 2015, the Court ruled on these issues in a separate order. *Order Dismissing Pls.' Mot. for Declaratory and Injunctive Relief; and Dismissing Pls.' Mot. for Attach. and Trustee Process* (ECF No. 73).

At the request of Plaintiffs, the Court held a telephone conference on December 19, 2014 and set initial scheduling deadlines. *Minute Entry* (ECF No. 26). On December 27, 2014, Plaintiffs filed a request for judicial notice, and a sworn attorney declaration relating to the accuracy of the documents attached to the First Amended Complaint. *Pls.' Req. for Judicial Notice* (ECF No. 45) (*Req. for Judicial Notice*); *Decl. of Kimberly J. Ervin Tucker* (ECF No. 46) (*First Tucker Decl.*).[3]

On January 2, 2015, AIM filed its response in opposition to Plaintiffs' motion. *Mem. of AIM Dev. (USA) LLC in Opp'n to Pls.' Mot. for TRO and Prelim. Inj.* (ECF No. 64) (*AIM's Opp'n*). Also on January 2, 2015, Verso filed its response in opposition to Plaintiffs' motion. *Defs. Verso Paper Corp. and Verso Paper LLC's Opp'n to Pls.' Mot. for a TRO and a Prelim. Inj.* (ECF No. 67) (*Verso's Opp'n*). On January 5, 2015, Magistrate Judge John C. Nivison held a telephone conference regarding discovery. *Minute Entry* (ECF No. 71). On January 6, 2015, the Magistrate Judge issued an order on discovery. *Order on Disc.* (ECF No. 74). On January 8, 2015, Plaintiffs filed their reply to AIM and Verso's oppositions, and on January 12, 2015, they filed a corrected reply. *Pls.' Reply Mem. in Support of Mot. for TRO and Prelim. Inj. Under the Antitrust Laws* (ECF No. 79) (*Pls.' Reply*); *Pls.' Corrected Reply Mem. in Support*

---

[3]     On December 29, 2014, the United Steelworkers, on behalf of USW Local Union 4-01188 and 4-261 (USW) filed a motion for joinder. *Mot. for Joinder as Pl. Filed by United Steelworkers* (ECF No. 54). That same day, Plaintiffs filed their response in opposition to the USW's motion, and on December 31, 2014, Plaintiffs filed a supplemental response in opposition. *Pls.' Objection and Mot. in Opp'n to Permissive Joinder or Intervention of the USW* (ECF No. 55); *Supplemental Mem. of Law in Support of Pls.' Objection and Mot. in Opp'n to Permissive Joinder of the United Steelworkers Pursuant to Rule 20, Fed. R. Civ. P.* (ECF No. 59). On January 6, 2015, the USW filed its reply to Plaintiffs' response in opposition, and on that same day, withdrew its motion for joinder. *Reply of United Steelworkers to IAM's Opp'ns to USW's Mot. for Joinder as Pl.* (ECF No. 72); *United Steelworkers Withdrawal of Mot. for Joinder as Pl.* (ECF No. 75).

*of Mot. for TRO and Prelim. Inj. Under the Antitrust Laws* (ECF No. 82) (*Pls.'*
*Corrected Reply*).  Also on January 12, 2015, Verso filed a surreply.  *Defs. Verso Paper*
*Corp. and Verso Paper LLC's Surreply in Further Opp'n to Pls.' Mot. for a TRO and a*
*Prelim. Inj.* (ECF No. 84) (*Verso's Surreply*).  On January 13, 2015, the Court heard
oral argument.  *Minute Entry* (ECF No. 86).

### B.     Factual Background[4]

### 1.     The Parties

AIM is an affiliate of American Iron & Metal Company, Inc.  *AIM'S Opp'n*
Attach. 1 *Membership Interest Purchase Agreement among AIM and Verso* § 1.01
(*MIPA*).  It is "one of the leading firms in the world in the metal recovery and recycling
industry."  *Decl. of Jeff McGlin in Support of AIM Dev. (USA) LLC's Opp'n to Mot. for*
*TRO and Prelim. Inj.* ¶ 4 (ECF No. 65) (*McGlin Decl.*).  In addition, much of its
business "involves sourcing scrap metal through the purchase of discontinued
manufacturing facilities, salvage of the recoverable metal, and preparation of the site
for further disposition."  *Id.* ¶ 5.

---

[4]      Although the parties submitted joint stipulations regarding certain facts and the authenticity
and admissibility of certain exhibits, those stipulations only applied to the severance and vacation pay
claims.  *See Joint Stipulations Relating to Count 9 of the Compl.: Timely Payment of Severance and
Vacation Pay* (ECF No. 31); *Joint Stipulation Regarding Authenticity and Admissibility of Exs.* (ECF
No. 47).
         Thus, in developing the factual background of this antitrust dispute, the Court relied on
affidavits and pleadings.  *Int'l Paper Co. v. Inhabitants of the Town of Jay*, 672 F. Supp. 29, 33 (D. Me.
1987) ("Federal Rule of Civil Procedure 65(a) does not require the Court to hold an evidentiary hearing
before issuing a preliminary injunction.  While an evidentiary hearing may be required where facts
are controverted, a court may rely on affidavits and pleadings alone where basic facts are not
disputed") (citations omitted); *see also* 7 JAMES WILLIAM MOORE, J. LUCAS & K. SINCLAIR, MOORE'S
FEDERAL PRACTICE § 65.04 (2d ed. 1986) ("A district court may, in the exercise of sound discretion,
grant a preliminary injunction on the basis of affidavits") (quoted by *Int'l Paper Co.*, 672 F. Supp. at
33).

Verso Paper Corporation is a Delaware corporation and indirect parent of the sellers of the Bucksport Mill, Verso Paper LLC, a Delaware limited liability company, and Verso Maine Power Holdings LLC, also a Delaware limited liability company. *MIPA* at 2, § 1.01.

Plaintiffs are a labor union and its 59 hourly-wage members employed as mechanics at the Bucksport Mill, as well as "purchasers of magazines and other products that contain coated paper." *Pls.' Mot.* at 1.[5]

### 2. The Merger Between Verso and NewPage; The DOJ's Approval of the Merger

On January 3, 2014, Verso agreed to acquire NewPage Holdings, Inc. (NewPage) for approximately $1.4 billion. *United States v. Verso Paper Corp.*, Case No. 1:14-cv-2216 at 2 (D.D.C. Dec. 31, 2014), http://www.justice.gov/atr/cases/f310800/310833.pdf (*Competitive Impact Statement*). The NewPage Acquisition was submitted to the United States Department of Justice (DOJ) for antitrust review and clearance, which remained pending at the time of Plaintiffs' lawsuit on December 15, 2014. *Pls.' Mot.* at 5. In a letter to Verso employees dated October 30, 2014, Verso President and CEO David Paterson provided an update to employees:

> Today, in order to address potential antitrust considerations related to the acquisition, NewPage Corporation and two of its subsidiaries signed an agreement to sell NewPage's paper mills in Biron, Wisconsin, and Rumford, Maine, to a subsidiary of Catalyst Paper Corporation.

*Compl.* Attach. 28 *Statement of Pl. Harold Porter* at 3 (*Porter Decl.*).

---

[5]     The ECF and Plaintiffs' pagination in this motion differ. To maintain consistency, the Court has used the page number labeled by Plaintiffs.

On December 31, 2014, as part of the settlement process with Verso, the DOJ filed a civil antitrust action in the United States District Court for the District of Columbia alleging that the pending merger would violate antitrust laws. *Competitive Impact Statement* at 1. However, the DOJ also submitted a "Hold Separate Stipulation and Order" and proposed Final Judgment, "which are designed to eliminate the anticompetitive effects of the acquisition," and thus, allow the merger to proceed. *Id.* at 2, 9-12. Under the terms of the proposed Final Judgment, the NewPage paper mills in Biron, Wisconsin and Rumford, Maine must be sold to Catalyst Paper Corporation, or an alternate buyer approved by the DOJ. *Id.* at 2, 9-10. The purpose of the divestiture is to "provide the purchaser of the divested assets with a market presence comparable to Verso's current market presence in the relevant markets." *Id.* at 11. With this caveat, the DOJ states that it "is satisfied . . . that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of coated freesheet web paper, coated groundwood paper, and label paper in the relevant market identified by the [DOJ]." *Id.* at 14. Furthermore, "[t]he [DOJ] does not allege that the closing of the Bucksport Mill is a result of the merger." *Id.* at 3 n.1.

The district court will rule on whether the proposed Final Judgment "is in the public interest" after the 60-day comment period passes, as required by 15 U.S.C. § 16(e)(1). *Id.* at 15. However, Verso's counsel indicated to the Court during oral argument on January 13, 2015 that the Verso-NewPage merger is complete. *Tr. of Proceedings* 31:12-14 (ECF No. 90).

### 3. The Bucksport Mill and Its Closure

The Bucksport Mill employed over 500 people (including Plaintiffs). *Pls.' Mot.* at 2; *Verso's Opp'n* at 2. It was capable of producing "approximately 350,000 tons of coated groundwood paper and 55,000 tons of specialty paper per year." *Verso's Opp'n* Attach. 2 *Decl. of George A. Hay in Support of the Verso Defs.' Opp'n to Pls.' Mot. for Entry of a TRO and a Prelim. Inj.* ¶ 6 (*Hay Decl.*). On October 1, 2014, Verso announced its plans to shut down the Bucksport Mill. *Compl.* Attach. 31 *Statement of Pl. Brian Simpson* at 2 (*Simpson Decl.*); *id.* Attach. 30 *Statement of IAMAW 1821 Member Alfred George* at 2 (*George Decl.*). The following day, Verso Vice President Dennis Castonguay told employees that the Mill "may be offered on the market, but not to a competitor." *George Decl.* at 2; *Porter Decl.* at 2. On December 4, 2014, the Bucksport Mill's printing facilities shut down. *Pls.' Mot.* at 6.

### 4. Verso's Reasons for Shutting Down the Bucksport Mill

Mr. Paterson stated that "Verso had unilateral, legitimate business reasons for closing the Bucksport Mill." *Verso's Opp'n* Attach. 1 *Decl. of David J. Paterson in Support of the Verso Defs.' Opp'n to Pls.' Mot. for Entry of a TRO and a Prelim. Inj.* ¶ 5 (*Paterson Decl.*). He asserted that the Mill was "unprofitable for the past several years, despite Verso's attempts to increase its profitability," and its "cash flow and EBITDA (earnings before interest, taxes, depreciation and amortization), both of which are common measures of profitability, were significantly negative for the past several years." *Id.* ¶ 6. Mr. Paterson also explained that the Mill was "highly dependent on natural gas as an energy source," but because the cost of natural gas is

so high, especially during the winter season, it "played a significant role in Verso's decision to close the Bucksport mill before the winter of 2014-2015." *Id.* ¶ 17. Furthermore, according to Dr. George A. Hay, a Verso-hired economist, "North American demand for publication papers is declining rapidly primarily due to the proliferation of tablet computers, e-readers, internet-based publications and advertising, and electronic mail," and there is and will continue to be a trend of paper mill closures across North America. *Hay Decl.* ¶¶ 7, 9-10.

In addition, Mr. Paterson stated that "Verso has considered closing the mill for several years," even before the NewPage merger was negotiated. *Paterson Decl.* ¶ 9. According to him, it did not close before now because it had insufficient "cash on hand to pay the costs associated with closing," approximately $35-40 million. *Paterson Decl.* ¶ 18; *Hay Decl.* ¶ 17. Dr. Hay noted that Verso has overall debt of approximately $1.3 billion, and in his opinion, it could eventually file for bankruptcy as a stand-alone company. *Hay Decl.* ¶ 12. Mr. Paterson affirmed that the proceeds of the pending sale with AIM will be used to pay closing costs, "including the payment of severance and other benefits to the former employees of the mill." *Paterson Decl.* ¶ 20. According to Dr. Hay, the sale will also put Verso "in a position to be a more vigorous competitor in the publication papers market." *Hay Decl.* ¶ 18.

Despite Mr. Paterson's explanations for why the Mill is closing now, Frederick R. Warren-Boulton, an economist hired by Plaintiffs, opined that the timing of the merger and sale may not be coincidental because "the acquisition will increase the profitability to Verso of closing Bucksport, and can make the closure of Bucksport

profitable even though it would not be profitable to close the mill, at least at this time, absent the merger." *Pls.' Reply* Attach. 7 *Decl. of Frederick R. Warren-Boulton* at 3 (*Warren-Boulton Decl.*).

### 5.    Verso Agrees to Sell the Bucksport Mill to AIM

According to AIM Vice President Jeff McGlin, AIM first became aware that the Bucksport Mill was for sale "on or about November 30, 2014," by which time Verso had announced its plans to shut down the Mill. *McGlin Decl.* ¶¶ 10-11. He stated that the Mill "was being actively marketed by a broker, Concentric Energy Advisors." *Id.* ¶ 10. Mr. McGlin confirmed that before the transaction at issue in this case, AIM had bought a Verso paper mill in Minnesota in 2013, "which had been destroyed by an explosion, to salvage the mill for scrap." *Id.*

On December 2, 2014, AIM submitted its initial bid. *Paterson Decl.* ¶ 11. On December 8, 2014, Verso announced an agreement to sell the Bucksport Mill to AIM for $58 million. *Pls.' Mot.* at 1, 6; *MIPA* § 2.03(a)(i); *see also Paterson Decl.* ¶ 19 ("Verso sold the Bucksport mill to AIM for approximately $60 million"). AIM paid a $10 million deposit as part of the transaction. *McGlin Decl.* ¶ 14. The closing is scheduled to occur at a date in the near future, as soon as January 19, 2015.[6] *Tr. of Proceedings* 3:1-22.

---

[6]    Plaintiffs asserted in their motion that the closing was scheduled to occur no later than January 9, 2015. *Pls.' Mot.* at 1, 6. However, on December 24, 2014, Verso's counsel informed the Court during a telephone conference that the closing had been rescheduled to take place no earlier than January 16, 2015. *Minute Entry* (ECF No. 41). Subsequently, on January 13, 2015, Verso's counsel informed the Court during oral argument that it was his understanding that Verso was waiting for approval from the Federal Energy Regulatory Commission (FERC) before closing with AIM. *Tr. of Proceedings* 3:12-22. Although counsel indicated that he could not predict when FERC would issue a decision, he expected a decision to be issued soon, and requested the Court, if able, to issue a ruling on Plaintiffs' motion before January 19, 2015 so that Verso could close then. *Id.* 3:20-

Mr. Paterson maintained that "Verso neither sought nor received the written consent of NewPage for the sale of the Bucksport mill. NewPage's consent was not necessary . . . because the sale of the Bucksport mill was not undertaken at the request of the [DOJ] in order to obtain regulatory clearance" of the merger. *Paterson Decl.* ¶ 22.

### 6.    Alternate Potential Purchasers of the Bucksport Mill

According to Mr. Paterson, "[a]ny purchaser of the Bucksport mill would not purchase an ongoing business, but instead a non-functioning mill without orders, inventory, raw materials or a sales force to generate those orders." *Id.* ¶ 13. To his knowledge, no coated groundwood paper manufacturer "expressed an interest in buying the Bucksport mill and operating its papermaking facilities." *Id.* ¶ 14. In addition, even if such a purchaser existed, Mr. Paterson "would not expect" it to buy the Mill "at any price above $60 million." *Id.* ¶ 15.

Notwithstanding Mr. Paterson's statements, an expert for Plaintiffs, Whitfield Russell, a public utility consultant and principal of Whitfield Russell Associates, stated that he emailed the person he thought was the assistant to the Verso CEO on November 18, 2014 to inform Verso that he had two clients that sought anonymity but also had "[c]onsiderable interest" in making a potential bid on the electricity generation plant at the Bucksport Mill and requested review of company documents

---

4:7. On January 15, 2015, Verso's counsel informed the Court that FERC issued its ruling authorizing the proposed deal between AIM and Verso. *Letter from Attorney David E. Barry* (ECF No. 89); *id.* Attach. 1 *Order Authorizing Disposition of Jurisdictional Facilities* (*FERC Order*). Based on counsel's comments during oral argument and the recent decision by FERC, this timetable explains Verso's urgency.

as part of a due diligence analysis.  *Pls.' Reply* Attach. 1 *Aff. of Whitfield A. Russell* ¶¶ 1, 9(a) (*Russell Decl.*).  However, Mr. Russell represented that he never received a response from Verso regarding his email.  *Id.* ¶ 9(b).  In addition, regarding the $58 million sale price, Mr. Russell believed it "is a relatively low price typical of older, condensing power plants divested by electric utilities."  *Id.*  In his view, had one of his anonymous clients been permitted "to bid on the Bucksport co-generation facility, it would have necessarily undertaken to explore carefully whether there was any paper making company willing to continue operation of the paper making capacity at Bucksport," and had such a company emerged, would have potentially led to a higher bid for the Mill.  *Id.* ¶ 9(c).

Mr. Warren-Boulton stated that "it may well be profitable for a buyer other than AIM to continue operating Bucksport even if it is not profitable for Verso to operate Bucksport after the merger.  Specifically a new [owner] could find it profitable to operate Bucksport and would be willing to pay more for Bucksport than AIM is willing to pay."  *Warren-Boulton Decl.* at 4.  However, he did not provide insight on whether there were or are any specific buyers to buy the Bucksport Mill, or to buy it for more than $58 million.  *See id.* at 2-5.

Upon information from officials with the state of Maine, Plaintiffs' counsel attempted to learn the identity of an alleged potential buyer willing to pay more than $58 million for the Mill, one who had emerged before Verso accepted the AIM contract.  *Pls.' Reply* Attach. 6 *Decl. of Kim Ervin Tucker* at 2 (*Second Tucker Decl.*).  However, Attorney Tucker explained "it is impossible for the State or Plaintiffs to

confirm this since Verso had required the buyer to sign a confidentiality agreement regarding any offers made to Verso." *Id.* On January 8, 2015, Maine Governor Paul LePage's office issued a public statement regarding closure of the Bucksport Mill, noting that "Administration officials are aware [a] firm was able to communicate with Verso and express its interest in pursuing due diligence to continue papermaking activities. Before that due diligence could even take place, Verso chose to sell the asset to AIM." *Id.* at 5. According to the Governor's Office, "more than one firm had expressed genuine interest in acquiring the asset in Bucksport to continue papermaking activities." *Id.* at 4. In addition, the public statement claimed that another potential firm "made several attempts to contact Verso" before the sale to AIM, but Verso never responded. *Id.* at 5. Finally, the Governor's Office stated that "there are still interested parties out there." *Id.*

### 7. AIM's Intended Use of the Bucksport Mill

On its face, the MIPA entered into between AIM and Verso suggests that AIM intends to use the Bucksport Mill for its power-generating facility, its scrap value, and for use as a landfill, but does not mention paper production. *MIPA* § 1.01 ("Buyer's Intended Use"). In addition, AIM does not sell or produce coated paper. *McGlin Decl.* ¶ 7. Since 2011, AIM has acquired three paper mills in total (not including the Bucksport Mill) from NewPage and Verso. *Id.* ¶ 8; *Supplemental Decl. of Jeff McGlin* ¶ 4 (ECF No. 88) (*McGlin Supplemental Decl.*).

Despite section 1.01 of the MIPA, Mr. McGlin explained that AIM will not necessarily scrap the Bucksport Mill, at least not right away:

> AIM has not agreed with Verso that it will dismantle the mill. AIM is at liberty to resell the mill at any time after closing, and would sell to a buyer intending to operate the mill to make paper, if the offer represented a better economic opportunity than salvage of the mill. Since it will take some time to commence and complete salvage operations, there will be a period of opportunity after closing for a buyer to purchase the mill from AIM before the mill is dismantled.

*McGlin Decl.* ¶ 13. Furthermore, during oral argument, AIM's counsel indicated that the definition from section 1.01 is

> used in all of the seller's representations and warranties and covenants, and the reason is quite simple. Verso is promising AIM that in the interim period between the [MIPA] and the closing of the transaction, Verso's not going to do anything with that facility that's going to impair what AIM is planning to do with that – with that property.

*Tr. of Proceedings* 59:16-22. The Court later inquired: "But you're saying that that [provision] doesn't apply to postsale activities on the part of AIM?" *Id.* 60:8-9. AIM's counsel replied: "Correct. There's not a single promise by AIM in that agreement anywhere regarding how AIM is going to use that facility. That's just not a covenant or a representation that AIM makes to Verso." *Id.* 60:10-13.

In addition, Mr. McGlin stated that while "AIM has not finalized its strategy for the use of the site . . . the site represents a potentially very good strategic fit with a number of recycling facilities AIM has developed throughout Maine, and AIM intends to explore the beneficial use it might develop for the deep water port associated with the Mill site." *McGlin Decl.* ¶ 17.

## II. POSITION OF THE PARTIES

### A. Plaintiffs' Motion

Plaintiffs assert that, through this lawsuit, they hope "to protect and preserve the capacity of the Bucksport Mill to operate as a paper mill," and continue their employment at the Mill "under the employ of a successor employer." *Pls.' Mot.* at 1 & n.1. In addition, they contend that Verso plans on "violating its prior commitment to Plaintiffs" regarding when it will remove hard drives and data on the hard drives from the Bucksport Mill computers; Plaintiffs claim that Verso promised not to remove hard drives and data until after the sale, but now plan on doing so "a few days before the transaction is completed." *Id.* at 1-2. They further argue that an injunction is necessary under the circumstances of this case:

> Once AIM takes control of the Bucksport Mill, it will be nearly impossible for Plaintiffs to obtain the relief they seek in their lawsuit, which is a limited injunction against the destruction or sale of the Bucksport Mill to any entity which does not intend to continue to use it for the production of paper until at least June 1, 2015, so that a paper-manufacturer has adequate time to make a bona fide offer for the Bucksport Mill.

*Id.* at 3. In summary, Plaintiffs contend that closure of the Bucksport Mill and its pending sale to AIM "is anticompetitive and violates federal [and state] antitrust laws," specifically, 15 U.S.C. §§ 1-2, 18, and 10 M.R.S. §§ 1101-1102-A. *Id.* at 2.

Quoting *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 430 (1st Cir. 1985) for the proposition that "'the key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition,'" Plaintiffs seek a temporary restraining order (TRO) and preliminary injunction: (1) blocking the sale between Verso and AIM or any other entity that does not intend to continue operating the Bucksport Mill as a paper mill; (2) prohibiting "Verso and AIM

from taking any actions that would render the Bucksport Mill inoperable on a cost basis, or otherwise financially impair the Bucksport Mill"; (3) forcing Verso to coordinate with the Maine Department of Economic and Community Development or another neutral party appointed by the Court "to seek, solicit, evaluate and respond to offers from prospective buyers willing to continue to operate the Bucksport Mill as a printing paper mill"; (4) ensuring that Verso and AIM not damage "the Bucksport Mill as a going concern for the production of coated paper"; (5) forbidding Verso from selling or attempting to sell the "electric power plant associated with the Bucksport Mill" unless sold to a buyer that agrees to continue running the Mill as a paper mill; and (6) preventing Verso "from rejecting any offer to purchase the Bucksport Mill at a reasonable price from any bona fide buyer [including any competitor] willing to continue operating it" as a paper mill. *Id.* at 3-5.

In Plaintiffs' view, "Verso's sole purpose in shutting down the Bucksport Mill and selling it for scrap is to reduce competition in the North American market for coated paper, and increase its chances for obtaining monopoly power." *Id.* at 7. Furthermore, referencing prior deals between AIM and Verso, which Plaintiffs characterize as "scrapping endeavors," they argue that those deals and the pending Bucksport Mill sale "are all part of a Verso-NewPage-AIM scheme to reduce capacity and supply in the coated paper market . . . [t]he antitrust laws do not permit a dominant firm to conspire to reduce output, as Verso plainly is poised to do." *Id.* Thus, according to Plaintiffs, if this deal goes through, the following laws will be violated:

1. 15 U.S.C. § 18 and 10 M.R.S. § 1102-A: By Verso's attempt to shut down the Bucksport Mill and pending deal with AIM, it "tend[s] to create a monopoly, in both the market for coated paper in North America, and the labor market for specialized Mill workers in the state of Maine";

2. 15 U.S.C. § 2 and 10 M.R.S. § 1102: By Verso's attempt to shut down the Bucksport Mill and pending deal with AIM, it "creates a dangerous probability that Verso will achieve monopoly power and raise market prices," and constitutes conspiracy to monopolize; and

3. 15 U.S.C. § 1 and 10 M.R.S. § 1101: "Verso's agreement with NewPage to shut down the Bucksport Mill and reduce output constitutes concerted action in restraint of trade."

*Id.* at 7-8.

Addressing the suitability of a preliminary injunction, Plaintiffs recite the four required elements:

(i)     [T]he movant's likelihood of success on the merits of its claims;

(ii)     whether and to what extent the movant will suffer irreparable harm if the injunction is withheld;

(iii)    the balance of hardships as between the parties; and

(iv)    the effect, if any, that an injunction (or the withholding of one) may have on the public interest.

*Id.* at 9 (quoting *Corporate Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013)). In Plaintiffs' view, "all four factors favor granting a TRO and preliminary injunction." *Id.* at 10.

## 1.     Likelihood of Success on the Merits

Plaintiffs contend that they have shown a likelihood of success on the merits based on their claims that Verso has violated federal and state antitrust laws. *Id.* First, quoting Section 7 of the Clayton Act, 15 U.S.C. § 18,[7] they assert that the MIPA

---

[7]     Plaintiffs note that because 10 M.R.S. § 1102-A is "worded similarly," their analysis is the same for both section 1102-A and Section 7 of the Clayton Act. *Pls.' Mot.* at 10 n.10.

between Verso and AIM and prior dealings demonstrate an intent to "'substantially . . . lessen competition, or to tend to create a monopoly.'" *Id.* Specifically, the deal

> will lead to the immediate removal of 350,000 tons of production capacity from the market for coated paper and will "substantially lessen competition" in the same market. Additionally, it will also lessen competition in the market for the specialized labor provided by plaintiffs that have been trained to work in paper production.

*Id.* at 11. According to Plaintiffs, if the acquisition were completed, Verso-NewPage will control "more than fifty percent (50%) of the North American coated paper market." *Id.* at 11-12.

Second, Plaintiffs argue that they "have established that Verso has attempted to monopolize the market for North American coated paper," in violation of 15 U.S.C. § 2.[8] *Id.* at 12. To prove an "attempt to monopolize," Plaintiffs say they must show "'(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 448 (1993)). They assert that (1) the first *Spectrum Sports* element has been met because they "have demonstrated that Verso has engaged in anticompetitive conduct by intentionally shutting down and selling the Bucksport Mill at below market value for salvage, as well as stating publically that it would not sell the Bucksport Mill to any competitor," *id.*; (2) the second *Spectrum Sports* element has been met based on "Verso's statements that it will not sell the Mill to any competitor, and the suspicious timing of its actions to shut down the Bucksport Mill while a DOJ investigation [was]

---

[8] Plaintiffs note that because 10 M.R.S. § 1102 is "worded similarly," their analysis is the same for both section 1102 and 15 U.S.C. § 2. *Pls.' Mot.* at 12 n.15, 15 n.21.

pending," *id.* at 13; and (3) the third *Spectrum Sports* element has been met because "Verso will have greater tha[n] 50% of the market for coated paper in . . . North America" if the NewPage Acquisition is approved.  *Id.* at 13-14 (citing *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987)).

Third, Plaintiffs assert that "an agreement to shut down the Bucksport Mill constitutes a restraint of trade," in violation of 15 U.S.C. § 1.[9]  *Id.* at 14.  This is so, according to Plaintiffs, because (1) Verso and NewPage are competitors that reached an agreement "to reduce output," (2) Verso could not shut down the Bucksport Mill without the written approval of NewPage (i.e., to gain DOJ approval and indicates that Verso and NewPage communicated about the Bucksport Mill sale), and (3) "both parties understand that reducing their market share in the market for North American coated paper would improve the chances for the acquisition gaining approval," as demonstrated by Verso and NewPage agreeing that upon DOJ approval, NewPage "should sell two of its paper mills to a third party if the acquisition is approved." *Id.* at 14-15.

Fourth, Plaintiffs claim they have "demonstrated a conspiracy to monopolize between Verso and AIM," in violation of 15 U.S.C. § 2.[10]  *Id.* at 15.  To prove a "conspiracy to monopolize," Plaintiffs say their burden of proof must only reasonably tend to show "'(1) concerted action; (2) overt acts in furtherance of the conspiracy; and

---

[9]    Plaintiffs note that because 10 M.R.S. § 1101 is "worded similarly," their analysis is the same for section 1101 and 15 U.S.C. § 1.  *Pls.' Mot.* at 14 n.17.
[10]   *See supra* note 8.

(3) specific intent to monopolize.'" *Id.* (quoting *Boston Scientific Corp. v. Schneider (Eur.) AG*, 983 F. Supp. 245, 268 (D. Mass. 1997); citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). They argue that (1) the first *Boston Scientific Corp.* element has been met because the sale agreement between AIM and Verso states that "AIM will only use the Mill as a power plant, as a landfill, and for salvage," *id.*; (2) the second *Boston Scientific Corp.* element has been met based on AIM and Verso's prior dealings and the sale at hand, *id.* at 15-16; and (3) the third *Boston Scientific Corp.* element has been met based on Verso's public statement that it will not sell the Mill to one of its competitors, and the sale of the Mill "at far below market value." *Id.* at 16.

### 2. Irreparable Harm Caused to Plaintiffs if the Preliminary Injunction was Denied

Plaintiffs argue they will suffer irreparable harm if the preliminary injunction and TRO were denied because they "have demonstrated that they will lose their ability to work for the Bucksport Mill if the Mill is sold to AIM and it is destroyed. Once the key facilities and machines of the Bucksport Mill are gone, it would require enormously large investments of money and capital to reopen the Bucksport Mill and restart paper production." *Id.*

### 3. The Balance of Hardships

In Plaintiffs' view, there would be "no great hardship imposed on Verso" if it was prevented from selling the Bucksport Mill to AIM temporarily and required to keep the Mill in reasonable working condition "until a new buyer can be found." *Id.* In contrast, according to them, Plaintiffs will suffer "great and irreparable hardship"

19

if the Mill is sold and destroyed because a new buyer could no longer acquire and continue operating it as a paper mill, leaving Plaintiffs unemployed. *Id.* at 16-17.

### 4. The Effect on Public Interest

Plaintiffs also assert that the effect on public interest is great, as the "Bucksport Mill is vital not only to those it employs, but also the entire community of Bucksport and the surrounding area. The Mill employs more than 500 persons and provides about 44% of the town's tax revenue." *Id.* at 17.

### 5. Standing

Finally, Plaintiffs argue they have standing under the Clayton Act, 15 U.S.C. § 26, to pursue their claims, and because they are seeking injunctive relief, "they need only show 'significant threat of injury from an impending violation of the antitrust laws.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969)). Plaintiffs also argue they have standing not only as terminated employees of the Bucksport Mill, but also as "purchasers of magazines containing coated paper, [as] both interests coincide." *Id.* at 17-18 (citing an array of caselaw). They explain:

> The consumers' interest is obvious: incrementally more capacity supplying the market is likely to lead to somewhat lower prices. The employees' complementary interest in maintaining the Bucksport Mill as a viable long term producer of coated paper is equally obvious: they are suppliers of specialized, skilled paper mill labor in an isolated geographic market, and thus are dependent on the Mill being productively operated to create the demand for their skilled services.

*Id.* at 18.

Furthermore, Plaintiffs assert that standing in antitrust cases is evaluated on a case-by-case basis, based on the following factors:

> (1)    [T]he causal connection between the alleged antitrust violation and harm to the plaintiff;
>
> (2)    an improper motive [by Defendant];
>
> (3)    the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ('antitrust injury');
>
> (4)    the directness with which the alleged market restraint caused the asserted injury;
>
> (5)    the speculative nature of the damages; and
>
> (6)    the risk of duplicative recovery or complex apportionment of damages.

*Id.* (quoting *Sullivan v. Tagliabue*, 25 F.3d 43, 46 (1st Cir. 1994)).  Here, Plaintiffs argue that all relevant *Sullivan* factors have been met, based in large part on arguments previously discussed (including that "'loss of employment' may constitute an antitrust injury" and "consumers of magazines and other products containing coated paper" have standing "because they will likely pay higher prices as a result of the destruction of the Bucksport Mill").  *Id.* at 19-20 (citing *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir. 1976); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 142 (3d Cir. 2001)).

## B.    AIM's Opposition

AIM counters Plaintiffs' motion by first adopting the arguments made by Verso that Plaintiffs have not demonstrated a likelihood of success on the merits.  *AIM's Opp'n* at 3; *see* Section II.C.1, *infra*.  It adds that, despite Plaintiffs' contention, it has "no restriction whatsoever regarding its disposition of the Mill, has not promised Verso that AIM will dismantle the Mill, and in fact if AIM were offered a better economic opportunity than salvage from a manufacturer seeking to make paper at

the Mill, AIM would sell to that manufacturer." *AIM's Opp'n* at 3 (citing *McGlin Decl.* ¶ 13).

Although AIM argues that the Court should deny Plaintiffs' motion based solely on the Plaintiffs' failure to demonstrate a likelihood of success on the merits, it argues that the other three elements have not been met either. *Id.* at 4. First, addressing possible irreparable harm to Plaintiffs if the Court denied their motion, AIM asserts that Plaintiffs' claim that the employees will not be able to work for the Mill if it is sold and subsequently destroyed "shows neither that Plaintiffs will suffer harm that is irreparable nor that the injunction they seek would prevent that harm." *Id.* According to AIM, Plaintiffs may pursue a damages remedy but not injunctive relief, and the loss of jobs is not caused by the sale of the Bucksport Mill, but rather, "by the Mill's unprofitability as a paper-making operation." *Id.* at 4-5. In addition, AIM contends that it did not know of the possibility to purchase the Bucksport Mill until after Verso had announced the shutdown and informed its employees that they were being laid off. *Id.* at 5 (citing *McGlin Decl.* ¶ 10). Furthermore, AIM points out that Plaintiffs have not demonstrated a likelihood that a buyer of their preference will make an offer for the Bucksport Mill before their proposed June 2015 cutoff date, or that these employees will be available for work by that date. *Id.* In short, AIM believes "[a] brokered sale at arms' length has produced presumably the best terms the market is willing to offer on the Bucksport Mill." *Id.* at 6-7.

Turning to the balance of hardships, AIM contends that Plaintiffs' assertions are merely conclusory. *Id.* at 7. In contrast, AIM contends there is evidence "of

substantial countervailing harm to AIM." *Id.* First, if there is a buyer willing to pay more for the Mill than AIM, "that opportunity for profit belongs to AIM by virtue of its purchase agreement, and the injunction would serve only to steal that opportunity from AIM." *Id.* at 7-8. Second, if the injunction delays the closing until June 2015, AIM asserts it will be harmed by, among other things, loss of profits and substantial costs. *Id.* at 8 (citing *McGlin Decl.* ¶¶ 15(a)-(b), 18(a)-(d)). Third, "there is a significant chance that the injunction will kill this transaction, even if no other buyer can be found," because the MIPA would allow Verso or AIM to terminate the deal. *Id.* (citing *MIPA* §§ 8.01, 6.01(e)). Plus, if the deal does not close, AIM argues it "will obviously lose any profit it expects to make," and notes it has already invested $200,000 in costs associated with the sale, "which will be unrecoverable if the deal does not close." *Id.* at 9.

Finally, addressing the effect on public interest, AIM observes that, as a result of the Consent Order filed by the Director of Bureau of Labor Standards in Kennebec County Superior Court on December 23, 2014, "all Bucksport Mill workers will receive all of their negotiated severance and vacation benefits within five days of AIM's closing" or by March 19, 2015. *Id.* at 11; *Def. Verso Paper Corp. and Verso Paper LLC's Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* Attach. 3 *Consent Order* ¶ 11 (ECF No. 40). Thus, if the sale is blocked, AIM asserts that workers will be unable to get "their money during the heating season, and in the earliest part of their search for new employment, [which] is a significant harm to those workers, to their

dependents, and to local businesses that benefit from those workers' ability to spend."

*AIM's Opp'n* at 11.  In addition, AIM argues that if the Mill is not going to continue on as a paper mill, it should be put "to some other productive use," and finally, "enjoining AIM's purchase of the Mill is destructive, not promotive, of competition." *Id.*

### C.    Verso's Opposition

In response to Plaintiffs' motion, Verso counters that "Plaintiffs stop short of asking this Court to order the U.S. economy to generate demand for the products that Verso made at the Bucksport mill, but absent that market demand the relief that Plaintiffs seek will be futile."  *Verso's Opp'n* at 2.  Verso observes that even Plaintiffs observe that the coated paper markets are declining rapidly, and "[g]iven the acknowledged and inevitable decline of this industry, the only question is which mills will close—not whether more mills will close."  *Id.* at 3 (citing *Am. Compl.* ¶ 139).  In summary, Verso argues that

> Plaintiffs fall far short of meeting their burden of establishing, by a clear showing, that they satisfy even one of the four elements required for entry of a preliminary injunction, much less all four as the Supreme Court has required in *Winter v. Natural Res[ources] Def[ense] Council*, 555 U.S. 7, 24 (2008).  They therefore fail by even a wider margin to meet the even higher burden needed to justify a mandatory injunction of the type they request here.

*Id.*

In addition, Verso argues that Plaintiffs lack standing because their alleged injury (i.e., loss of employment) "is not a cognizable antitrust injury," and that they have not made a "clear showing" to support the alleged antitrust violations under

24

state or federal law.  *Id.*  Verso contends there was no conspiracy to monopolize as required to support a violation of 15 U.S.C. § 1, and this is further evidenced by the DOJ's assertion that "Verso contemplated closing the [Bucksport] mill before it decided to merge with NewPage," and the DOJ "does not allege that the closing of the Bucksport Mill is a result of the . . . merger."  *Id.* at 3-4 (citing *Competitive Impact Statement* at 3 n.1).  Regarding Plaintiffs' contention as to 15 U.S.C. § 2, Verso questions how it could gain "market power" in the industry by shutting down the Mill and "given the current state of competition in the" industry.  *Id.* at 4.  Regarding Plaintiffs' contention as to Section 7 of the Clayton Act, Verso responds that because AIM is not a competitor and "[m]arket power cannot be created in the relevant market by the sale of an operation to a company that is not a competitor, supplier, or distributor in the market," their claim must fail.  *Id.*  Verso also asserts that "Section 7 addresses the concern that a *purchaser* could gain market power as result of an acquisition.  There is no instance in which a court found that a transaction gave a *seller* market power in violation of Section 7."  *Id.* (emphasis in original).  As for the alleged violations under Maine law, Verso argues "there is no private right to seek injunctive relief."  *Id.*

### 1.    Likelihood of Success on the Merits[11]

#### a.    Standing

---

[11]    Verso also argues that the Court should apply the heightened standard for a mandatory preliminary injunction because Plaintiffs' requests go beyond preserving the status quo; instead, they seek "affirmative action" on the part of Verso.  *Verso's Opp'n* at 5-7.

First, Verso argues that Plaintiffs' claims must fail because they lack standing because they have not shown an antitrust injury (i.e., loss of employment is not an antitrust injury). *Id.* at 9. According to Verso, because "Plaintiffs' alleged injury derives entirely from [] Verso's decision to close the Bucksport mill . . . that injury . . . is not an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts [allegedly] unlawful.'" *Id.* at 8 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Verso relies on the Supreme Court's observation in *Brunswick Corp.* that "the plaintiffs 'would have suffered the identical 'loss'—but no compensable injury—had the acquired [companies] instead obtained refinancing or been purchased by [someone else],'" and therefore, there was no antitrust injury. *Id.* at 9 (quoting and citing *Brunswick Corp.*, 429 U.S. at 487-88). Verso also asserts that a requisite showing of antitrust injury is required when a plaintiff(s) seeks injunctive relief, and therefore, applies to Plaintiffs. *Id.* (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986)). Here, Verso contends that, as was the case in *Brunswick Corp.*, Plaintiffs "would have suffered the identical loss" from Verso's decision to close the Bucksport Mill, regardless of Verso's competitive size, or if Verso had chosen not to sell the Mill at all. *Id.* In other words, "Plaintiffs' alleged injury flows from the closure of the mill, not from any reduction in competition in any market." *Id.*

Next, citing *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 11 (1st Cir. 1999), Verso argues that "Plaintiffs' alleged irreparable injury in this case is, like sales representatives or distributors, too remote to confer standing." *Verso's Opp'n* at 10.

According to Verso, courts have rejected "similar antitrust claims by suppliers, distributors and other third parties that acquisitions violate Section 7 of the Clayton Act or the other antitrust laws—*even if the underlying merger or acquisition would allegedly violate the antitrust laws.*" *Id.* (citing *Serpa Corp.*, 199 F.3d at 12; *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1240-42 (3d Cir. 1987); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 500 (9th Cir. 1977)) (emphasis in original).

Furthermore, Verso distinguishes the two cases relied on by Plaintiffs for the proposition that loss of employment is a suitable antitrust injury, arguing that "in both cases the alleged restraint was directed at the labor market, not the employer." *Id.* at 11. It argues that in *Tugboat, Inc.*,

> [t]he court explicitly refused to find that employees of a company that was the victim of an antitrust conspiracy could separately recover for antitrust claims due to reduced work opportunities. Rather, the court recognized that the employees had standing "not because they suffered injuries as a result of their employer being victimized by violations of the antitrust laws, but because the conspiracy in this case was aimed at the employees as much as it was aimed at the employer."

*Id.* (quoting *Tugboat, Inc.*, 534 F.2d at 1177). Similarly, Verso asserts that in *Eichorn*, "the antitrust injury flowed from the challenged restriction directly constraining the plaintiff's employment opportunities; it was not an indirect result of the sale of a facility." *Id.* (citing *Eichorn*, 248 F.3d at 142).

### b. 15 U.S.C. § 1

In response to Plaintiffs' contention that Verso's decision to shut down the Mill was done as a part of the merger agreement (i.e., "Verso had to obtain the written

consent of NewPage . . ."), Verso points out that section 5.6(c) of the merger agreement provides that "Verso and NewPage agreed to obtain written consent from each other before selling any asset, *where such action was taken in order to gain DOJ approval*." *Id.* at 12-13 (emphasis in original). Thus, in Verso's view, because the sale of the Bucksport Mill was not done to gain DOJ approval, the DOJ knew of Verso's plans to shut down the Mill, and section 5.6(c) is the sole basis upon which Plaintiffs must be relying, they "have identified no evidence, either in the Complaint . . . or in support of their Motion, even to suggest plausibly, much less prove, that Verso and NewPage reached an agreement to close the Bucksport mill." *Id.* at 13-14.

c.    **Remaining Antitrust Claims**

Verso also contends that Counts 2, 3 and 4 in Plaintiffs' Complaint must fail. *Id.* at 14. First, regarding Plaintiffs' claims under 15 U.S.C. § 2, Verso argues that

> 1) [it] made a legitimate and unilateral business decision to close the Bucksport mill; 2) market conditions preclude Verso from being able to exercise market power now that the mill is closed and this will not change when it acquires NewPage; and 3) the core challenged conduct (the closure of an unprofitable paper mill) can never give rise to a claim of attempted or actual monopolization (or a conspiracy to achieve [the] same).

*Id.* at 14-15. Among other arguments, Verso asserts that "[a] company cannot hope to gain monopoly power by *reducing* its own production capacity. If anything, Verso's decision to close the Bucksport mill should *increase* competition in the market by creating additional opportunities for Verso's competitors to take business from Verso." *Id.* at 16 (emphasis in original). Furthermore, Verso cites *International Railways of Central America v. United Brands Co.*, 532 F.2d 231, 239-40 (2d Cir.

1976) for the proposition that "[c]ourts have refused to use the antitrust laws as a blunt instrument to force companies to continue unprofitable operations," even one that is in a position of monopolization. *Verso's Opp'n* at 16-17.

Second, regarding Plaintiffs' claims under 15 U.S.C. § 18, Verso argues that those claims must fail as well because "AIM is not a competitor of Verso. It also is not a supplier of paper-making inputs or a distributor of paper. . . . Market power cannot be created in the relevant market by the sale of an operation to a company that is not a competitor, supplier, or distributor in the market." *Id.* at 17-18. In other words, there has been no "horizontal acquisition of a director competitor" or "a vertical acquisition" of a supplier in the distribution or production chains. *Id.* at 18.

Finally, Verso agrees that construction of Maine antitrust laws should be done by comparing to the federal counterparts, and therefore, concludes that "Plaintiffs fail under their Maine antitrust law theories for the same reasons they fail under federal law." *Id.* at 18-19. Furthermore, it contends that "Maine's state laws do not provide for a private right of action for injunctive relief under either 10 M.R.S. § 1102 or 10 M.R.S. § 1102-A" because that form of relief is left solely to the Maine Attorney General under 10 M.R.S. § 1104(2). *Id.* at 19 (citing *Melnick v. Microsoft Corp.*, Nos. CV-99-709, CV-99-752, 2001 WL 1012261, at *4 (Me. Super. Aug. 24, 2001)).

### 2. Irreparable Harm Caused to Plaintiffs if the Preliminary Injunction was Denied

Verso argues that no irreparable harm will result by denying the preliminary injunction because "the Bucksport mill has already closed. Granting the relief Plaintiffs seek (blocking the sale of the Bucksport mill to AIM and requiring Verso to

continue to spend money on the mill for 6 months) will not cure their claimed irreparable harm." *Id.* In addition, Verso contends that Plaintiffs have not presented any evidence that a buyer would emerge during that time period that would want to continue operating it as a paper mill, nor that the workers would be willing to and capable of coming back to work after six months. *Id.* at 20. Verso concludes that "their claim defies both market realities and common sense." *Id.*

### 3. The Balance of Hardships

Verso asserts that "[t]he balance of equities in this case weighs heavily against granting Plaintiffs' Motion." *Id.* For example, Verso points out that it may potentially lose the $60 million committed by AIM to purchase the Bucksport Mill (as noted in AIM's Opposition), and "[e]ven if Verso can find another buyer for the site, it is impossible to estimate today what a now unknown purchaser would be willing to pay for the site." *Id.* As a result, Verso argues that it will suffer "loss of liquidity," which will harm the former Bucksport Mill employees entitled to their remaining severance payments due under the Consent Order. *Id.* at 20-21. In other words, the employees would have to wait until March 2015 before they receive those payments. *Id.* at 21.

### 4. The Effect on Public Interest

Lastly, Verso argues that granting the relief sought by Plaintiffs would not benefit the public interest because it "will interfere with the efficient operation of the free market." *Id.* In addition, the town of Bucksport could be adversely impacted because "AIM intends to pursue potential strategic uses for the mill, which would

present a substantial economic opportunity for the public. . . . If AIM abandons the transaction due to an injunction, the potential development of Bucksport is lost and may not be recovered." *Id.* at 22 (citing *McGlin Decl.* ¶ 17).

### D.    Plaintiffs' Corrected Reply

Plaintiffs begin by asserting that "Verso made the intentional decision to sell the Mill to a scrapper and reject any bids from companies that wanted to keep the Bucksport Mill running." *Pls.' Corrected Reply* at 2 (citing *Second Tucker Decl.* at 4; *Russell Decl.* ¶ 9). In Plaintiffs' view, these companies "need to have the chance to make their bid, with the knowledge that it will be taken seriously, and they will have the opportunity to conduct due diligence." *Id.* at 3. They argue this will not happen, however, unless the Court orders "Verso to accept any bid for the plant above $58 million from a paper manufacturer." *Id.* Citing *Local 1330, United Steel Workers of Am. v. United States Steel Corp.*, 631 F.2d 1264, 1282-83 (6th Cir. 1980), Plaintiffs contend this was a "remarkably similar case," in which the Sixth Circuit reversed the district court's denial of an injunction "where U.S. Steel refused to consider any bids from the Steelworkers Union that was interested in purchasing the factory where they worked." *Pls.' Corrected Reply* at 4.

Returning to standing, Plaintiffs contend that Verso only challenges their standing as "suppliers of labor" but not as "consumers, because the case law is clear on that point." *Id.* at 12. Citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) for the proposition that 15 U.S.C. § 15 protects "all who are made victims of . . . forbidden practices," Plaintiffs contend that "Verso does not address why [they]

should not be considered 'victims' of the forbidden practices alleged in the Complaint." *Pls.' Corrected Reply* at 12. In response to Verso's contention that "Plaintiffs' alleged injury flows from the closure of the mill, not from a reduction in competition in any market," Plaintiffs counter that their injuries come from "multiple acts," including (1) the Mill's closure, leading to employees being laid off; (2) the threat of the Mill being torn down, which will lead to employees being unable to return; (3) Verso's refusal to sell to one of its competitors, which will lead to employees being unable to return; (4) the reduction in competition that has already occurred; and (5) price increases for groundwood paper that have already occurred. *Id.* at 13-14. Therefore, in Plaintiffs' view, they have standing both as "indirect purchasers" and as employees. *Id.* at 15.

Plaintiffs turn to recent developments regarding the DOJ's findings. *Id.* Plaintiffs opine "that the DOJ has not analyzed whether the sale of the Bucksport Mill to AIM would lessen competition or tend to create a monopoly, because that transaction was not submitted to them for review. The only transaction that was submitted . . . was the acquisition of NewPage by Verso." *Id.* According to Plaintiffs, this is because "deals valued at $75 million or more" are the ones that require pre-approval from the DOJ, and because the Bucksport Mill sale was less, no approval was required. *Id.* However, they quote the Competitive Impact Statement to support their argument that "'the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.'" *Id.* at 16. Plaintiffs also submit that the "DOJ simply accepted Verso's self-serving assertion

that it had intended to close the Mill; and on this basis treated Bucksport as if it simply did not exist." *Id.* (citing *Competitive Impact Statement* at 3 n.1).

Plaintiffs assert that there are "anticompetitive effects of permanently eliminating the Bucksport Mill from the market for coated printing papers." *Id.* at 21. According to them, before the Mill closed, "it was a source of *actual competition* in coated groundwood paper and a source of *potential competition* in other various . . . types of coated printing papers (if the machines were adapted to produce other types of paper)." *Id.* (emphasis in original). Plaintiffs cite an array of caselaw for the proposition that preservation of "potential competition" is an antitrust issue. *Id.* at 22-23.

They also appear to change their argument regarding the percentage of control Verso will have following the completion of its merger with NewPage. *Compare Pls.' Mot.* at 11-12 (arguing that completion of the merger will mean that Verso controls "more than fifty percent (50%) of the North American coated paper market") *with Pls.' Corrected Reply* at 20 (explaining that "the combined Verso-NewPage company has at least 38.2% of North America[n] capacity before the Bucksport closure," and "35.8% of North American capacity" after its closure, not including imports for either figure). According to them, "from Jan. 2014 to Jan. 2015, Verso's share of the market has jumped from 13% to 35.8%." *Pls.' Corrected Reply* at 20.

Next, Plaintiffs point out that it is undisputed that Mr. Castonguay stated publicly that Verso would not sell the Bucksport Mill to one of its competitors, and Verso has not refuted it. *Id.* at 25. In addition, Plaintiffs argue that because Verso

employed a broker that "has no expertise in selling paper mills and is only utilized to broker deals for energy plants," this represents "strong evidence" that Verso had no intention of selling the Mill to a competitor. *Id.* at 25-26. Furthermore, Plaintiffs believe that the "quick sale" between Verso and AIM suggests that Verso had no interest in hearing bids from other potential bidders. *Id.* at 26. Despite Mr. McGlin's declaration, explaining that AIM has the right to sell the Mill to whomever it wants once the deal is completed, Plaintiffs opine that "AIM would not want to alienate future customers by selling the Bucksport Mill to a competitor of the merged Verso-NewPage entity. Then they would never be hired again to scrap a productive facility." *Id.* at 28.

Plaintiffs assert that Verso's merger with NewPage was "the only reason that Verso decided to close Bucksport," notwithstanding contrary Verso declarations. *Id.* at 33. To support their argument, Plaintiffs point to the timing of the Bucksport Mill closure in relation to the DOJ review. *Id.* at 32-33. In summary, Plaintiffs assert that "Verso[] is unable to divorce the shuttering of the plant from its expansion via the NewPage merger." *Id.* at 34. Citing *Hawaii ex rel. v. Gannett Pacific Corp.*, 99 F. Supp. 2d 1241 (D. Haw. 1999) (involving application of the Newspaper Preservation Act), Plaintiffs also claim that this case supports their argument that "it is nearly axiomatic that a dominant market participant may not acquire assets for no other reason than to shut them down and ensure that no rival may use them to compete in the market." *Pls.' Corrected Reply* at 35.

Moreover, Plaintiffs contend that "Verso's argument that the paper industry is in decline is . . . unavailing. The antitrust laws apply equally in declining and vibrant markets, and indeed it is often in weakened markets that anticompetitive schemes become more prevalent for obvious reasons." *Id.* at 38. They further argue that Verso "does not have the right" to determine whether some other company would be capable of running the Mill at a profit, but that is essentially what it is doing by "preventing any rival from taking it over." *Id.* (citing *New York v. Actavis, PLC*, 14 Civ. 7473, 2014 U.S. Dist. LEXIS 172918 (S.D.N.Y. Dec. 11, 2014) as a "highly analogous case").

In addition, regarding Verso's contention that Maine antitrust law precludes private actions for injunctive relief, Plaintiffs counter that the statute does not prohibit them from proceeding under section 1104(1), and because "[c]ourts have treated Maine antitrust law as equivalent to its federal counterpart," it logically follows that there must be a private right of action for injunctive relief under Maine antitrust law just as there is under federal antitrust law. *Id.* at 41 n.50.

In conclusion, Plaintiffs summarize their request for injunctive relief:

> Plaintiffs seek . . . divestiture of the Bucksport Mill and sale of the Mill to a buyer capable and willing to operate it as a going concern in the continued production of coated groundwood paper products (including food grade paper products), *for a price greater than the $58 million price* AIM has agreed to pay.

*Id.* at 45 (emphasis in original). Plaintiffs suggest that the Court should require Verso to pay AIM its "legitimate and demonstrable expenses incurred since November 30, 2014." *Id.* at 47.

### E.    Verso's Surreply

In response, Verso argues that "Plaintiffs' decision to withhold the presentation of arguments and evidence until its reply memorandum is prejudicial to Verso and unfair." *Verso's Surreply* at 1. However, Verso chose "not [to] rebut in writing each and every new argument or new piece of evidence put forth in support of Plaintiffs' reply" because "of the burden that these proceedings have imposed on both the Court and the litigants." *Id.*

However, in Verso's view, "[o]ne aspect of Plaintiffs' reply . . . merit[s] specific attention." *Id.* at 2. In response to Plaintiffs' citation to *Local 1330, United Steel Workers of America v. U.S. Steel Corp.*, 631 F.2d 1264 (6th Cir. 1980), Verso counters that, among other points, this Court should not be dictated by a Sixth Circuit case from 1980, but rather, should follow the lead of a 2004 United States Supreme Court case, *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). *Verso's Surreply* at 3. According to Verso, *Trinko* stands for the proposition that the general rule is that "a firm—even one that is a monopolist—generally cannot be held liable under Section 2 of the Sherman Act for refusing to deal with a competitor." *Id.* In other words, Verso contends that Plaintiffs' reliance "on a pre-*Trinko* case whose holding depends on the very proposition that *Trinko* rejected" is misguided. *Id.* at 4.

## III.    DISCUSSION

### A.    Standing

The Court must first determine whether Plaintiffs have standing to bring these antitrust claims under federal and/or state law. The Court addresses whether

Plaintiffs have standing: (1) as consumers (or "indirect purchasers"); (2) as former employees and in connection with their status as consumers and suppliers of labor; and (3) to maintain this action for injunctive relief under Maine antitrust law.

### 1. Standing as Consumers or "Indirect Purchasers"

Although Plaintiffs argued that neither Verso nor AIM challenged their right to pursue their claims "as consumers of end products incorporating coated paper," *Am. Compl.* ¶ 1, Verso's counsel stated during oral argument that they do challenge their standing as consumers on the basis that "there are not sufficient allegations in the complaint that would confer standing." *Tr. of Proceedings* 33:22-34:2. Plaintiffs contend that consumers will "likely pay higher prices as a result of the destruction of the Bucksport Mill," and thus, they have properly alleged an antitrust injury. *Pls.' Mot.* at 19-20. Verso's counsel admitted during oral argument that "generally speaking, customers that purchase products affected by an acquisition would have standing because they face the risk of higher prices." *Tr. of Proceedings* 34:2-5.

Verso's counsel is correct. The Clayton Act provides that "[a]ny person . . . or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The language of § 26 is broad enough to potentially cover Plaintiffs as "consumers of" coated paper goods, and caselaw supports their right to proceed on this basis. *See, e.g.*, *Cia. Petrolera Caribe, Inc.*, 754 F.2d at 407-08 ("Plainly, Congress empowered a broader range of plaintiffs to bring [injunctive relief] actions because the standards to be met are less exacting than those under [15 U.S.C. § 15 for damages] . . . a

plaintiff need show only a threat of injury rather than an accrued injury); *Zenith Radio Corp.*, 395 U.S. at 131 (explaining that 15 U.S.C. § 26 "should be construed and applied . . . with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims") (internal citations and quotation marks omitted); *Serpa Corp.*, 199 F.3d at 10 ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury").

Instead, Verso argues that Plaintiffs lack standing because the allegations in the Amended Complaint are inadequate: (1) "the four or five employees who say they buy magazines did not allege that they will face higher prices for magazines"; (2) those employees "did not allege that the magazines they have purchased use the type of paper that is made at Bucksport"; and (3) "prices go up and down for paper," and any increase in prices would not be attributable to the closure of the Mill. *Tr. of Proceedings* 34:7-11, 35:3-5. In summary, Verso argues that Plaintiffs "are purchasers, but they need to allege that they would be, in fact, affected by the transaction here, and the transaction here relates to the products made at Bucksport." *Id.* 35:6-9.

In response, Plaintiffs argued that the allegations in the Amended Complaint are sufficient because they allege "that the result of this destruction of the Bucksport mill will increase the price of coated printing paper generally and that there have been some increases since the – the NewPage merger was announced." *Id.* 35:12-17.

Furthermore, according to Plaintiffs, Verso applies caselaw related to damage claims, not an injunctive relief claim, and "virtually every court that has faced the question of standing to bring an injunction case has – by an indirect purchaser has sustained it." *Id.* 35:20-36:5

The Supreme Court interpreted 15 U.S.C. § 15 to prohibit indirect purchasers from seeking antitrust damages except in particular limited situations. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726-29 (1977). However, in *Zenith Radio Corp.*, the Supreme Court declared that 15 U.S.C. § 26 does not require a showing of actual injury, and instead, is satisfied by demonstrating a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." 395 U.S. at 130. Sufficient allegations may include those actions that could "fairly be anticipated from the defendant's conduct in the past." *Id.* at 132 (internal citations and quotation marks omitted).

As summarized by the Supreme Court in *Cargill, Inc.*, "[s]tanding analysis under [15 U.S.C. § 26] will not always be identical to standing analysis under [15 U.S.C. § 15]." 479 U.S. at 111 n.6. When a plaintiff seeks damages, "courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under [15 U.S.C. § 15]." *Id.* In contrast, when a plaintiff seeks injunctive relief, "some of the factors other than antitrust injury that are appropriate to a determination of standing" for damages are not relevant because a claim for

injunctive relief "raises no threat of multiple lawsuits or duplicative recoveries." *Id.* This makes sense, especially because "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 261 (1972). In other words, *Cargill* stands for the proposition that "a party who lacks standing under [the damages provision] may still have standing to seek injunctive relief under [15 U.S.C. § 26]." *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998); *see also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 273 (D. Mass. 2004) ("[T]he lower courts that have addressed the issue have held that claims for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, do not undermine *Illinois Brick*, but rather fall properly outside its scope"); *Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 594 (3d Cir. 1979) (same).

For example, in *Campos*, the Eighth Circuit held that the plaintiffs' antitrust claims for damages must be dismissed because they lacked standing, but they had standing to pursue injunctive relief. 140 F.3d at 1171-72. In *Campos*, the plaintiffs alleged "that they are direct purchasers of 'ticket distribution services' from Ticketmaster, primarily because they pay directly to Ticketmaster distinct service and convenience fees." *Id.* at 1171. The *Campos* Court ruled that this was an insufficient allegation for a damages claim as it constituted "derivative dealing [which] is the essence of indirect purchaser status," but also held "the pleadings establish anti-trust standing to seek injunctive relief. All of the plaintiffs claim to have purchased tickets from Ticketmaster and claim to have paid the monopolistic

service fees. The payment of those fees establishes standing to pursue a claim for injunctive relief." *Id.* at 1171-72.

Because Plaintiffs seek injunctive relief as indirect purchasers, they need not show actual injury to have standing; rather, they must show a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp.*, 395 U.S. at 130. They allege that as a result of Verso's merger with NewPage and its sale of the Mill to AIM, these acts will "injure buyers of coated printing paper and consumers of books, magazines, and other products printed on or containing such paper by causing them to pay higher prices as a result of reducing the productive capacity committed to their market." *Am. Compl.* ¶ 3. Mr. Gilley alleges that he is "a consumer who has purchased products containing Verso paper, including various magazine publications utilizing coated printing paper." *Id.* ¶ 22. Although Verso's counsel seemed to suggest during oral argument that someone like Mr. Gilley has not made an adequate allegation because he did not allege that he purchased "Bucksport Mill paper," the Court concludes that alleging the purchase of "Verso paper" is sufficient.

Messrs. Darveau, Simpson, Abbott, and Porter, as well as the other 53 Local No. 1821 Members make identical allegations as Mr. Gilley, except without noting that these products contained "Verso paper." *Id.* ¶¶ 23-27. In addition, Plaintiffs summarize in their Amended Complaint that "all of the individual named plaintiffs have also purchased magazines printed on coated printing paper and other products using coated printing paper, and therefore . . . have standing as consumers." *Id.* ¶

139. The fact that only Mr. Gilley states he purchased products that used "Verso paper" is not detrimental to all other Plaintiffs' claims as indirect purchasers, because they have properly alleged that a significant threat of injury exists if the merger were completed and the Bucksport Mill was sold to AIM (i.e., the price of coated paper would rise as a result). Furthermore, "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one." *Standard Oil Co. of Cal.*, 405 U.S. at 261.

The Court concludes that Plaintiffs have standing as indirect purchasers.

### 2. Standing as Former Employees

In Verso's view, Plaintiffs' alleged injury (loss of employment) derives entirely from the closure of the Mill (as opposed to a reduction in competition), and thus, is not an injury the antitrust laws were intended to protect. Plaintiffs counter that their injuries derive from "multiple acts" taken by Verso and AIM, not just the act of closing the Mill, and their loss of employment includes being "participants in the competitive local market to provide a specialized input (i.e., skilled printing labor)." *Am. Compl.* ¶ 139.

Plaintiffs allege in their Amended Complaint that they have standing "under 15 U.S.C. § 26 because they have been employees at Bucksport, and are potential suppliers of labor to the Bucksport Mill, and Bucksport's destruction can be avoided by a determination that the AIM Acquisition is illegal and its performance is enjoined." *Id.* ¶ 196; *see also id.* ¶¶ 23-27, 139-40.

42

The Supreme Court has provided the framework of what kind of an injury is an "antitrust injury" for a plaintiff(s) to confer standing:

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Brunswick Corp.*, 429 U.S. at 489 (quoting *Zenith Radio Corp.*, 395 U.S. at 125). Although many cases discuss an antitrust injury in the context of 15 U.S.C. § 15, which permits damages recovery, an antitrust injury must also be shown when a plaintiff(s) seeks injunctive relief under 15 U.S.C. § 26. *Cargill, Inc.*, 479 U.S. at 113.

As the First Circuit pointed out, "the [Supreme] Court has created a comprehensive antitrust standing doctrine to determine which persons are entitled to bring suit under the federal antitrust statutes." *Serpa Corp.*, 199 F.3d at 10. Those six factors include:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*Id.*; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537-45 (1983). In applying these factors, Verso's counsel confirmed during oral argument that Verso purposely chose to only challenge Plaintiffs' claims that they have made out a valid antitrust injury on the basis of their loss of employment because "it was dispositive." *Tr. of Proceedings* 43:13-22. Thus,

the Court turns its attention to the cases cited by the parties regarding an antitrust injury.

In *Brunswick Corp.*, three bowling centers (respondents) brought an antitrust action against "one of the two largest bowling manufacturers of bowling equipment in the United States" and the largest bowling center operator, alleging violations under Section 7 of the Clayton Act. 429 U.S. at 479-80. Respondents alleged that the "petitioner has acquired and operated a large number of bowling centers, including six in the markets in which respondents operate," and thus, violated antitrust laws. *Id.* at 479. "These acquisitions [of defaulting bowling centers] made petitioner by far the largest operator of bowling centers." *Id.* at 480. Respondents sought, among other things, injunctive relief under 15 U.S.C. § 26. *Id.* at 481. The Supreme Court concluded that respondents had not properly alleged an antitrust injury under 15 U.S.C. § 15 for damages because

> respondents' injury the loss of income that would have accrued had the
> acquired centers gone bankrupt bears no relationship to the size of
> either the acquiring company or its competitors. Respondents would
> have suffered the identical "loss" but no compensable injury had the
> acquired centers instead obtained refinancing or been purchased by
> "shallow pocket" parents . . . .

*Id.* at 487 (citations omitted). Verso contends that, as in *Brunswick Corp.*, Plaintiffs "would have suffered the identical loss" based on Verso's decision to close the Mill, regardless of its size, or if it had chosen not to sell the Mill at all.

The Court finds *Brunswick Corp.* distinguishable from the case at hand. First, the language relied upon by Verso (i.e., "would have suffered the identical loss") was in support of the Supreme Court's conclusion that the Court of Appeals erred in its

analysis of 15 U.S.C. § 15. *Id.* ("This holding [by the Court of Appeals] would make [15 U.S.C. § 15] recovery entirely fortuitous, and would authorize damages for losses which are of no concern to the antitrust laws"). Plaintiffs have not alleged that they seek damages under 15 U.S.C. § 15, and as discussed above, the standard for antitrust standing is different depending on the remedy sought. Second, respondents sought injunctive relief under 15 U.S.C. § 26, and because petitioner did not challenge the Court of Appeals' holding as to injunctive relief, the Supreme Court concluded that "respondents remain free, on remand, to seek such a decree." *Id.* at 491. Therefore, the Supreme Court did not dispose of respondents' request for injunctive relief. *See also* LAWRENCE A. SULLIVAN & WARREN S. GRIMES, THE LAW OF ANTITRUST: AN INTEGRATED HANDBOOK § 17.2a (2d ed. 2006) ("Note, however, that this was not a suit to enjoin a merger. The Court correctly focused its attention on plaintiff's claims for treble damage relief"). Third, unlike the Supreme Court's conclusion that respondents would have suffered "the identical loss" if the defaulting bowling centers had been refinanced or been purchased by one with "shallow pockets," the same cannot be said for Plaintiffs. They allege in their Amended Complaint that if the Mill were sold to a purchaser in the papermaking industry rather than AIM, they would potentially preserve their jobs. *Am. Compl.* ¶ 139.

Verso also directs the Court's attention to the First Circuit's statement that "a commercial intermediary, such as a distributor or sales representative, generally lacks standing because its antitrust injury is too remote." *Serpa Corp.*, 199 F.3d at

11. In Verso's view, Plaintiffs' alleged injuries are also "too remote." This comparison does not illuminate the issue at hand.

Plaintiffs direct the Court's attention to *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172 (5th Cir. 1976) and *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001) for the proposition that "loss of employment" is an antitrust injury. In *Tugboat, Inc.*, the Fifth Circuit explained that, to make out an antitrust injury, a union and its members "must prove both that they suffered injury to their 'commercial interests or enterprises' and that they were in the target area of the conspiracy." 534 F.2d at 1176. Addressing the "commercial interests or enterprises" element, the Fifth Circuit held "[t]here can be little doubt that an employee who is deprived of a work opportunity has been injured in his 'commercial interests or enterprise,' because the selling of one's labor is a commercial interest. If this were not the case, courts would have to adopt an across the board rule against employees bringing antitrust actions in any context." *Id.* Likewise, the *Tugboat* Court concluded that a union could meet this element as well. *Id.* The issue turned on the second element—whether they were in the target area of the conspiracy—meaning, "within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Id.* (internal citations and quotation marks omitted). Although the court concluded that the employees and representative union were in the target area, it also noted that "[i]f, in the case at hand, the complaints were based merely upon loss of employment opportunity . . . the [union] and their members would lack standing." *Id.* The *Tugboat* Court determined that, in this case, the plaintiffs pled

more than just loss of employment, including that they were the "intended victims of the alleged illegal acts" (i.e., the employer was alleged to have conspired with others "to keep plaintiff union employees off of Tugboat, Inc. job sites, necessarily depriving the union member plaintiffs of job opportunities"). *Id.* at 1177-78.

In *Eichorn*, the plaintiffs alleged that they were unduly restricted from providing their services elsewhere under the terms of a "no-hire agreement," which they claimed "interfered with their ability to attain pension benefits." 248 F.3d at 142. The *Eichorn* Court held that "[b]ecause the no-hire agreement directly impeded plaintiffs' ability to sell their labor to at least three companies within the competitive market and effectively cancelled their AT&T pension benefits, we believe they have standing to litigate their [antitrust] claims." *Id.* During oral argument, Plaintiffs argued that *Eichorn* applies to their case because all employees were required to sign an agreement following their termination stating they "will have no right to employment or reemployment with Verso." *Tr. of Proceedings* 41:17-42:6. This, however, is not the type of restriction contemplated in *Eichorn*. Plaintiffs have not otherwise alleged that Verso or AIM attempted to restrict their ability to work elsewhere for any other employer besides Verso (e.g., there is no allegation of an unduly restrictive non-compete agreement). The Court finds *Eichorn* inapposite.

The rule annunciated by the *Tugboat* Court—that loss of employment alone is insufficient for an antitrust injury—has been adopted by many other courts. *See Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992) ("[T]o the extent the *Adams [v. Pan Am. World Airways, Inc.*, 828 F.2d 24 (D.C. Cir. 1987)] court's dicta

stands for the bold proposition that employees of an airline allegedly driven into bankruptcy by competitors who violated the antitrust laws automatically have established an antitrust injury because of their loss of employment, we reject it as contrary to Supreme Court and Tenth Circuit precedent"); *Orr v. BHR, Inc.*, 4 Fed. Appx. 647, 650-51 (10th Cir. 2001) (citing *Sharp* and finding that a doctor's "loss of employment was not the result of an absence of competition. It was, at most, minimally related to an alleged harm in the medical billing market," and "plaintiff has not demonstrated why it was necessary to discharge him"); *Trepel v. Pontiac Osteopathic Hosp.*, 599 F. Supp. 1484, 1493 (E.D. Mich. 1984) ("The injury claimed by plaintiffs is loss of employment as hospital-based radiologists. But this is not an antitrust injury as it is not the type of injury the antitrust statute was designed to remedy"); *Bichan v. Chemetron Corp.*, No. 80 C 3349, 1981 U.S. Dist. LEXIS 15015, at *6 (N.D. Ill. Aug. 31, 1981) ("Plaintiff's injury was his loss of employment. But plaintiff's loss of employment did not result from the lessening of competition in the industrial gas industry" and therefore, he did not properly allege an antitrust injury).

In contrast, the Seventh Circuit held that loss of employment is sufficient to proceed under 15 U.S.C. § 15 because it is an injury to one's business or property. *See Nichols v. Spencer Intern. Press, Inc.*, 371 F.2d 332, 334 (7th Cir. 1967) ("[W]e readily conclude that one who has been damaged by loss of employment as a result of a violation of the antitrust laws is 'injured in his business or property' and thus entitled to recovery under 15 U.S.C.[] § 15"); *Quinonez v. Nat'l Ass'n of Secs. Dealers, Inc.*, 540

F.2d 824, 830 (5th Cir. 1976) (same).  However, the Court does not find these cases persuasive as they were decided pre-*Brunswick Corp.*

There is a string of cases holding that loss of employment alone is insufficient to constitute an antitrust injury within the meaning of *Brunswick Corp.*  The Court characterized the requirement as "an allegation of loss of employment plus."  *Tr. of Proceedings* 38:3-12.  Plaintiffs agreed with this general proposition.  *Id.* 38:20-39:3.  The "plus" is lacking here.  Plaintiffs allege that absent the merger, "it is highly unlikely that Verso would have decided to close down and disable one of its own mills, representing roughly 26% of its 2014 production capacity."  *Am. Compl.* ¶ 10.  They further allege that the merger "would cause Verso to become the dominant supplier of coated printing paper in North America with a market share estimated to be almost 50%."  *Id.* ¶ 11.  This does not meet the judicially required "plus."  As previously noted, *Eichorn* involved a no-hire agreement, which has not been alleged in this case.  Throughout their filings and during oral argument, Plaintiffs also argued that their loss of employment is interrelated to their being consumers and "suppliers of a specialized input to the mill," and that meets the necessary "plus," but "employees [are] always suppliers[.]"  *Tr. of Proceedings* 38:13-19, 39:12-17.  The Court has not found any caselaw to support Plaintiffs' theory, nor could Plaintiffs' counsel do so when pressed during oral argument.[12]  *Id.* 40:17-41:5.  Also, unlike *Tugboat, Inc.*, the

---

[12]     On January 16, 2015, Plaintiffs' counsel filed a letter to address questions he thought he had not adequately answered during oral argument.  *Additional Citations to Authorities by IAMAW* (ECF No. 91) (*Attorney Baker Letter*).  As regards "antitrust standing for sellers of services," Attorney Baker cited *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012) and *Addamax Corp. v. Open Software Foundation, Inc.*, 888 F. Supp. 274, 280 (D. Mass. 1995) to support Plaintiffs' position.  *Attorney Baker Letter* at 2.  Plaintiffs direct the Court's attention to language in *In re High-Tech Employee Antitrust Litigation* where that court noted that "it is not the status as a

Court does not conclude that Plaintiffs sufficiently alleged that Verso has attempted to "chill . . . employees' ability to get other employment with other papermakers." *Id.* 41:10-15.

The Court concludes that Plaintiffs do not have standing to pursue injunctive relief on the basis of loss of employment under federal antitrust law.

### 3.     Standing under Maine Law

Verso contends that, pursuant to 10 M.R.S. § 1104(2), Plaintiffs may not institute a private right of action for injunctive relief under sections 1101, 1102, and 1102-A because only the Attorney General may seek such relief. Plaintiffs counter that there is nothing under the statute that explicitly prevents them from proceeding, as their right to seek injunctive relief derives from section 1104(1), and "[c]ourts have treated Maine antitrust law as equivalent to its federal counterpart," so it logically follows that there must be a private right of action for injunctive relief under Maine antitrust law just as there is under federal antitrust law. *Pls.' Corrected Reply* at 41 n.50.

The statute provides:

---

consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." 856 F. Supp. 2d at 1123.

This language does not support Plaintiffs' position. The district court also stated that "where . . . an employee is the direct and intended object of an employer's anticompetitive conduct, that employee has standing to sue for antitrust injury," *Id.* It cited several cases in support of this statement, including *Eichorn*. *Id.* For the reasons previously discussed, Plaintiffs have not demonstrated that they were "the direct and intended object of" Verso's alleged anticompetitive conduct.

Plaintiffs also point to language in *Addamax Corp.* where that court stated that "a seller to a collusive monopsony, has alleged sufficient antitrust injury, and has the standing necessary to bring this suit." 888 F. Supp. at 280. *Addamax Corp.* is distinguishable, however, because Addamax was an "independent developer[]" that complained it lost out on a bid due to "an illegal joint venture designed to influence the market for operating systems technology." *Id.* at 277-78. In other words, Addamax was not complaining on the basis of its status as an employee of the defendants.

**1. Right of action and damages.** Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action. If the court finds for the plaintiff, the plaintiff shall recover 3 times the amount of the damages sustained and cost of suit, including necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorney's fees.

**2. Injunction.** The Attorney General may institute proceedings in equity to prevent and restrain violations of sections 1101, 1102 and 1102-A.

> **A.** These proceedings may be by way of petitions setting forth the case and praying that the violation shall be enjoined or otherwise prohibited.

> **B.** The action may be advanced on the docket and receive priority over other cases when the court determines that the interests of justice so require.

> **C.** Pending the petition and before final decree, the court may at any time make such temporary restraining order or prohibition as considered just under the circumstances.

> **D.** Any person who violates the terms of an injunction issued under this section must forfeit and pay to the State, to be applied in carrying out this chapter, a civil penalty of not more than $50,000 for each violation.

10 M.R.S. § 1104(1)-(2).

Maine courts have consistently held that 10 M.R.S. §§ 1101-08 were modeled after federal law, that the provisions are analogous to 15 U.S.C. §§ 1-2, and 18, and that these federal statutes are helpful when interpreting the state counterparts. *See, e.g., Envtl. Exch., Inc. v. Casella Waste Sys.*, No. CV-05-25, 2005 Me. Super. LEXIS 140, at *9 (Oct. 24, 2005) ("Section 1102 is materially identical to section 2 of the federal Sherman Act, 15 U.S.C. § 2. Thus, the court draws on federal interpretive authority in construing the Maine statute"); *Karofsky v. Abbott Labs.*, No. CV-95-

1009, 1997 Me. Super. LEXIS 316, at *13 (Oct. 15, 1997) ("The Maine Anti-Trust Statute parallels the Sherman Act") (citing *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993)); *State v. McCain Foods Ltd.*, No. CV-87-342, 1987 WL 119744, at *1 (Me. Super. Dec. 11, 1987) (referring to section 1101 as the "mini-Sherman Act"). Similarly, federal courts have also consistently construed Maine antitrust laws in accordance with federal law. *See, e.g., Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 42 n.1 (1st Cir. 2001) ("Augusta treats the Maine antitrust claim as co-extensive with its federal claims so we do not address it separately"); *Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have analyzed claims thereunder according to the doctrines developed in relation to federal law") (quoting *Tri-State Rubbish, Inc.*, 998 F.2d at 1081). Therefore, Plaintiffs have no standing to bring claims under Maine antitrust law on the basis of loss of employment. However, the question remains whether they may bring an action for injunctive relief under Maine antitrust law as indirect purchasers.

On this point, Maine courts have held that the antitrust remedy provisions under federal and state law are not analogous. Verso relies on a 2001 case from the Cumberland County Superior Court to support its position. *Melnick*, 2001 Me. Super. LEXIS 293. In that case, Justice Mills concluded that section 1104 "does not provide for a private right of action for injunctive relief." *Id.* at *9-10. She reasoned that the statute "does not state that a private right of action exists for injunctive relief. The legislative history does not reveal an intent to provide such a private right of action.

. . . Implying the existence of such a private right of action would be inconsistent with the legislative scheme." *Id.* at *11 (citing *Charlton v. Town of Oxford*, 2001 ME 104, ¶¶ 15, 17-18, 774 A.2d 366; *In re Wage Payment Litig.*, 2000 ME 162, ¶ 7, 759 A.2d 217).

More recently, the Law Court came to the same conclusion. In *State v. MaineHealth*, Central Maine Medical Center (CMMC) sought to intervene in an antitrust enforcement action brought by the state of Maine. 2011 ME 115, ¶ 1, 31 A.3d 911. The *MaineHealth* Court explained that "the Attorney General may seek injunctive relief" under section 1104(2), and that "'any person . . . injured directly or indirectly in its business or property' by an antitrust violation [may] sue for the injury in a separate civil action for treble damages and reasonable costs and fees." *Id.* ¶ 8 (quoting 10 M.R.S. § 1104(1)). In addition, the court explained that "[t]he statute does not . . . authorize private entities to file complaints seeking injunctive relief." *Id.* Moreover, the Maine Law Court noted that "CMMC acknowledges that no Maine statute authorizes it to seek injunctive relief against the MaineHealth entities as a remedy for antitrust violations." *Id.* ¶ 9.

The Maine Supreme Judicial Court's interpretation of Maine law is authoritative: Plaintiffs may not pursue injunctive relief under Maine antitrust law. Section 1104 and 15 U.S.C. § 26 do not read identically or similarly, unlike the federal and state antitrust statutes that are often analogized by Maine courts. Whereas § 26 indicates that "[a]ny person . . . or association shall be entitled to sue for and have injunctive relief," section 1104 gives the right solely to the Attorney General. Private

parties, such as the Plaintiffs, have the right to proceed under section 1104(1) but only for damages. 2011 ME 115, ¶ 8, 31 A.3d 911.

Therefore, the Court dismisses all claims for injunctive relief by Plaintiffs pursuant to 10 M.R.S. §§ 1101-1102-A.

### 4. Conclusion

Having found that Plaintiffs have standing to assert their claims only as (1) indirect purchasers and (2) under federal antitrust law, the Court turns to whether it should grant the relief Plaintiffs request.

### B. Legal Standard for Preliminary Injunctions and Temporary Restraining Orders

In determining whether to issue a TRO or preliminary injunction, the Court examines the same four factors. *Aftermarket Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc.*, No. 1:12-cv-00258-NT, 2012 U.S. Dist. LEXIS 143685, at *3 (D. Me. Oct. 4, 2012); *OfficeMax, Inc. v. Cnty. Qwick Print, Inc.*, 709 F. Supp. 2d 100, 106 (D. Me. 2010). The key differences between a TRO and a preliminary injunction are that (1) a TRO may be issued without notice to the adverse party; and (2) if a TRO is issued without notice, it may only last for 14 days and the Court must hold a preliminary injunction hearing. FED. R. CIV. P. 65(a)-(b). At the same time, "'[a] preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right.'" *Peoples Fed. Savings Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).

To succeed on their motion, Plaintiffs must establish four necessary factors:

> (i)　　[T]he movant's likelihood of success on the merits of its claims;
> (ii)　　whether and to what extent the movant will suffer irreparable harm if the injunction is withheld;
> (iii)　　the balance of hardships as between the parties; and
> (iv)　　the effect, if any, that an injunction (or the withholding of one) may have on the public interest.

*Harnett*, 731 F.3d at 9; *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) ("The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor"). Moreover, "trial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief. *Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).[13]

### 1.　　Likelihood of Success on the Merits

Although there are four factors, they "are not entitled to equal weight in the decisional calculus; rather, '[l]ikelihood of success is the main bearing wall of the four-factor framework.'" *Harnett*, 731 F.3d at 9-10 (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity"). To meet their burden on this factor, Plaintiffs "must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato*

---

[13]　　Although Verso argued in its opposition that the Court should apply the heightened standard for a mandatory preliminary injunction, the Court declines to decide this point as it concluded that even without applying the higher standard, Plaintiffs' claims do not demonstrate a strong likelihood of success on the merits.

*Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (quoting

*Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

Additionally, "at the preliminary injunction stage, [a court] need not predict

the eventual outcome on the merits with absolute assurance." *Ross-Simons*, 102 F.3d

at 16. Instead, a court's conclusions "are to be understood as statements of probable

outcomes" only. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991).

Therefore, "a party losing the battle on likelihood of success may nonetheless win the

war at a succeeding trial on the merits." *Id.*

### a.    15 U.S.C. § 18

Under Section 7 of the Clayton Act, a merger or acquisition may be blocked

where "the effect of such acquisition may be substantially to lessen competition, or to

tend to create a monopoly." 15 U.S.C. § 18. A court may order a preliminary

injunction to prevent a merger or acquisition under 15 U.S.C. § 18 but only after "a

showing that the danger of irreparable loss or damage is immediate." *Id.* § 26. The

Supreme Court articulated nearly a century ago that "Section 7 of the Clayton Act,

as its terms and the nature of the remedy prescribed plainly suggest, was intended

for the protection of the public against the evils which were supposed to flow from the

undue lessening of competition." *Int'l Shoe Co. v. F.T.C.*, 280 U.S. 291, 297-98 (1930).

Thus, "[t]he core question is whether a merger may substantially lessen competition,

and necessarily requires a prediction of the merger's impact on competition, present

and future. . . . The section can deal only with probabilities, not with certainties."

*F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967).

Plaintiffs argue that Verso's attempt to shut down the Bucksport Mill and pending deal with AIM tends to create a monopoly as regards coated paper in North America and the specialized labor force in the state of Maine. To support their claims, Plaintiffs point to the MIPA between Verso and AIM (section 1.01 and "Buyer's Intended Use"), as well as prior dealings, which they say demonstrate an intent to substantially lessen competition or tend to create a monopoly, and as demonstrated by the fact that Verso-NewPage will control more than 50% of the North American coated paper market (or as low as 35.8% if the Mill is sold to AIM). Verso counters that market power cannot be created in the relevant market in a situation such as this because AIM is not a competitor, supplier, or distributor in the market; that is, there has been no "horizontal acquisition" or "vertical acquisition."

Verso tends to simplify the application of Section 7. Section 7 of the Clayton Act covers "[a]ll mergers," including those "classified as horizontal, vertical, conglomerate or other." *Id.* Horizontal acquisitions are those "acquisitions involving competing corporations." *U.S. v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 613 (1957). "The effect on competition of such an arrangement depends, of course, upon its character and scope." *Brown Shoe Co. v. United States*, 370 U.S. 294, 334 (1962). Vertical acquisitions are those acquisitions of a supplier in the production chain or a distributor in the distribution chain (i.e., the companies are in the same business but focus on different aspects of that business). *See E. I. du Pont de Nemours & Co.*, 353 U.S. at 590-92; *see also* BLACK'S LAW DICTIONARY 1508 (10th ed. 2014) (defining "vertical restraint" as "[a] restraint of trade imposed by agreement between firms at

different levels of distribution (as between manufacturer and retailer")).  Finally, "[a] pure conglomerate merger is one in which there are no economic relationships between the acquiring and the acquired firm."  *Procter & Gamble Co.*, 386 U.S. at 577 n.2.

The Court agrees that the pending deal between AIM and Verso is not a horizontal or vertical acquisition.  The Court does not reach whether AIM's potential acquisition is a "conglomerate or other" acquisition as the parties have not briefed the issue, and the Court deems the issue waived.[14]  Instead, the Court concludes that Plaintiffs have failed to show a "strong likelihood" that they will prevail under Section 7 of the Clayton Act.

As regards the MIPA provision relied upon by Plaintiffs, it provides under "Buyer's Intended Use":

> for the generation of steam and electricity and for the marketing and sale of electric power and ancillary products and services, including electric generating capacity and renewable energy credits, (ii) Buyer's or the Companies' (or any of their respective assignees' or successors') use and operation of the Landfill as a landfill consistent with [Verso Bucksport]'s operations thereof in connection with [Verso Bucksport]'s operation of the Facilities prior to the date hereof, and (iii) activities involving the Mill that are consistent with Buyer's and its Affiliates' current principal business operations.

---

[14]     During oral argument, Plaintiffs' counsel was asked whether he had argued the relevance of a conglomerate merger or acquisition in his filings, to which he responded, "yeah, we refer to *Procter & Gamble* Clorox in our brief . . . we may not have used the word conglomerate, for which I apologize." *Tr. of Proceedings* 55:3-18.  Mere citation to caselaw without articulating the applicable contention(s) is insufficient, and the Court will not predict counsel's arguments.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever holds its peace") (internal citations and quotation marks omitted).

*MIPA* § 1.01. There is no dispute that AIM is in the principal business of "sourcing scrap metal through the purchase of discontinued manufacturing facilities, salvage of the recoverable metal, and preparation of the site for further disposition." *McGlin Decl.* ¶ 5. AIM also does not sell or produce coated paper. *Id.* ¶ 7. However, Mr. McGlin asserted AIM's willingness to sell the Mill to a purchaser in the papermaking industry:

> AIM has not agreed with Verso that it will dismantle the mill. AIM is at liberty to resell the mill at any time after closing, and would sell to a buyer intending to operate the mill to make paper, if the offer represented a better economic opportunity than salvage of the mill. Since it will take some time to commence and complete salvage operations, there will be a period of opportunity after closing for a buyer to purchase the mill from AIM before the mill is dismantled.

*Id.* ¶ 13. Furthermore, AIM's counsel indicated during oral argument that section 1.01 is "not a covenant or a representation that AIM makes to Verso" regarding its post-sale use. *Tr. of Proceedings* 60:8-13. These statements undercut Plaintiffs' position that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. It could be that AIM will actively attempt to sell the Mill to a purchaser in the papermaking industry if one exists at the right price. According to Plaintiffs' own witness, Mr. Warren-Boulton, this may be an attractive option for AIM because "a new [owner] could find it profitable to operate Bucksport and would be willing to pay more for Bucksport than AIM is willing to pay." *Warren-Boulton Decl.* at 4. AIM's counsel affirmed during oral argument that, under the MIPA, "nothing would prevent AIM today from assigning its rights under the purchase agreement to a ready, willing, and able buyer

who wanted to run that mill, if any such entity existed." *Tr. of Proceedings* 57:19-24. Although, in that instance, AIM would need Verso's consent to assign its rights, the MIPA also states that Verso cannot unreasonably withhold consent. *Id.* 57:25-58:3; *MIPA* § 11.05 ("Buyer may assign this Agreement in whole to an Affiliate of Buyer or, with the written consent of Sellers (which consent may not be unreasonably withheld, delayed or conditioned), to any other Person . . . .").

In addition, the Court disagrees with Plaintiffs that their claims regarding prior dealings, or so-called "scrapping endeavors" between AIM and Verso, are sufficient to enjoin the sale at this stage. Ultimately, there is simply too much conflicting evidence to conclude that Plaintiffs have met their burden. At the preliminary injunction stage, without more, the Court cannot conclude that Plaintiffs have shown a "strong likelihood" of success on the merits under Section 7 of the Clayton Act. *See Guilbert*, 934 F.2d at 6.

To the extent Plaintiffs argue that NewPage-Verso will control more than 50% of the North American coated paper market (or 38.2% or 38.5%), they have not demonstrated what this allegedly illegal merger has to do with the Bucksport Mill's closure and subsequent sale to AIM. A fair read of the evidence suggests the merger would have occurred regardless of whether the Bucksport Mill shut down, at least based on the conflicting state of the record before the Court. In addition, the DOJ concluded that the closing of the Bucksport Mill was not a result of the merger. *Competitive Impact Statement* at 3 n.1. Although Plaintiffs have invited the Court to question the DOJ's conclusion on this point, it declines. When asked during oral

argument whether Plaintiffs' position—that "the DOJ simply punted" on the issue of the merger's relation to the sale of the Mill—was "based on an inference or evidence," counsel conceded he "would call it inference." *Tr. of Proceedings* 62:18-25. To obtain an injunction, the moving party in this case must present the Court with more than just an inference.

The Court concludes that Plaintiffs have not met their burden to demonstrate a strong likelihood of success on the merits of their claims under 15 U.S.C. § 18.

### b.      15 U.S.C. § 2

Under 15 U.S.C. § 2, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." Once again, a court may order a preliminary injunction but only after "a showing that the danger of irreparable loss or damage is immediate." *Id.* § 26. Because the statute contemplates two scenarios—an attempt to monopolize and a conspiracy to monopolize—and both are alleged applicable, the Court addresses each.

### i.      Attempt to Monopolize

"[I]t is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc.*, 506 U.S. at 456. "The gravamen of a section 2 claim is the deliberate use of market power by a

competitor to control or exclude competition." *Mercy-Peninsula Ambulance, Inc. v. San Mateo Cnty.*, 791 F.2d 755, 759 (9th Cir. 1986). "An attempted monopolization claim can be supported by proof of various types of conduct, including refusing to deal, price fixing, and predatory pricing." *Casella Waste Sys.*, 2005 Me. Super. LEXIS 140, at *10. Furthermore, "[a] predatory price is one that is below some measure of cost, under which the actor foregoes short-term profits and then raises prices later to recoup losses." *Id.* at *11 (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224-245 (1993)). The *Spectrum Sports* Court noted that "to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." 506 U.S. at 456.

Plaintiffs contend that all three *Spectrum Sports* elements have been met here. First, they claim they have proven that Verso engaged in predatory or anticompetitive conduct based on its shutting down and selling the Mill at below-market value for salvage, and based on its public statements that it would not sell the Mill to another competitor. Second, they argue they have proven a specific intent to monopolize based again on Verso's statements that it would not sell the Mill to another competitor, and the timing of the shutdown. Third, they claim to have proven that there is a dangerous probability of Verso-NewPage achieving monopoly power because Verso will control more than 50% of the North American market (or 38.2% or 35.8% depending on whether the Mill is sold) and coated groundwood paper prices have already risen. In opposition, Verso argues (1) it made a legitimate and

unilateral business decision to close the Mill; (2) it will not be able to exercise market power once the Mill is closed and that will not change now that the merger with NewPage is finalized; and (3) that the closure of an unprofitable paper mill can never give rise to an attempt to monopolize, and in fact, the Mill's closure will increase competition in the market by creating additional opportunities for Verso's competitors.

The Court concludes that Plaintiffs have not demonstrated a "strong likelihood" that they will succeed on the merits of this claim. First, as regards the first *Spectrum Sports* element, the fact that Verso shut down the Mill and sold it to AIM for allegedly below-market value does not by itself prove an attempt to monopolize. Based on the conflicting evidence before the Court, it could simply be an indicator of the market. In other words, it could be that Verso could not sell the Mill for as much as it may have in the past based on current market conditions. *See, e.g.*, *Paterson Decl.* ¶ 15 (explaining he "would not expect" a purchaser in the papermaking industry to buy the Mill "at any price above $60 million"); *Hay Decl.* ¶¶ 7, 9-10 (explaining that "North American demand for publication papers is declining rapidly primarily due to the proliferation of tablet computers, e-readers, internet-based publications and advertising, and electronic mail," and there is and will continue to be a trend of paper mill closures across North America). Although the recent statement by the Governor's Office suggests that there is or was a purchaser in the papermaking industry willing to buy the Mill, and perhaps for more than $58 million, the Court will not intervene and stop a private sale between two businesses based on

mere alleged interest in purchasing the Mill by an unknown buyer for an unknown price at an unknown time. This is particularly true because there is a suggestion from the parties that such judicial action could cause the Verso/AIM sale to collapse. *See AIM's Opp'n* at 8.

In addition, Plaintiffs' reliance on Mr. Castonguay's statement that the Mill would not be sold to a competitor is equally unavailing. The Supreme Court has stated that, notwithstanding some exceptions, "there is no duty to aid competitors." *Trinko*, 540 U.S. at 411. In *Trinko*, it was alleged "that Verizon denied interconnection services to rivals in order to limit entry," in violation of 15 U.S.C. § 2. *Id.* at 407. However, the *Trinko* Court explained that "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Id.* In addition,

> compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."

*Id.* at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

The exception to this general rule is found in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In that case, the plaintiff and defendant had an ongoing business relationship in the ski industry whereby they shared proceeds by issuing a joint-ticket for use of their mountain areas; the defendant cancelled the joint ticket when its demands for increased proceeds were denied; the plaintiff offered to buy the defendant's tickets at retail price out of concern that it

would lose business if the joint ticket was not reinstated; and the defendant refused. *Id.* at 591-94. The *Aspen Skiing* Court upheld a jury award for plaintiff, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 608.

The case at hand does not fall within the exception outlined in *Aspen Skiing Co.* As explained by the *Trinko* Court, "*Aspen Skiing* is at or near the outer boundary of § 2 liability. The Court there found significance in the defendant's decision to cease participation in a cooperative venture." 540 U.S. at 409. Here, there was no "cooperative venture" between Verso and Plaintiffs. In addition, the *Trinko* Court observed that the *Aspen Skiing* Court found that "[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original). Finally, "the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* (emphasis in original). Plaintiffs could conceivably argue that Mr. Castonguay's statement suggests that Verso would be unwilling to sell to a papermaking competitor for more than $58 million if such an offer existed, but the Court will not speculate by invoking a limited exception "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.* at 408.

Because Plaintiffs rely on Mr. Castonguay's statement to support their position that the second *Spectrum Sports* element has been met, and the Court has already rejected the significance of his statement without more context, the Court adopts its analysis above. As for the timing of the sale, the Court will not enjoin this private sale on the basis of speculation and inference.

Finally, regarding the third *Spectrum Sports* element, Plaintiffs cite two cases for the proposition that there is a dangerous probability of Verso-NewPage achieving monopoly power in the North American coated paper market based on percentage of control. In *Hayden*, the Second Circuit wrote "that a party may have monopoly power in a particular market, even though its market share is less than 50%." 730 F.2d at 69 n.7. In *Valley Liquors, Inc.*, the Seventh Circuit explained that "a substantial percentage of the sales is usually at least 50%," and cited a number of authorities to support this assertion. 822 F.2d at 666-67. However, Plaintiffs suggested in their corrected reply that a more accurate figure of control is somewhere between 35.8% and 38.2% of North American capacity, not including imports. Nevertheless, they still argue that the Court may find this element is satisfied even using 35.8% as the correct estimated figure, and citing an array of caselaw. *See Pls.' Corrected Reply* at 20-21. Plaintiffs' cited cases, both in their motion and reply, are unimpressive. The *Valley Liquors* Court indicated that market control "is usually at least 50%," and the Second Circuit noted "the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share," but also observed that sometimes "it will be useful to suggest that a market share below 50% is rarely

evidence of monopoly power." *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981).

### ii.        Conspiracy to Monopolize

To prove a conspiracy to monopolize under 15 U.S.C. § 2, Plaintiffs must demonstrate "(1) concerted action; (2) overt acts in furtherance of the conspiracy; and (3) specific intent to monopolize." *Boston Scientific Corp.*, 983 F. Supp. at 268. Plaintiffs argue that the first element has been satisfied because the MIPA between AIM and Verso demonstrates that the Mill will only be used as a power plant, landfill and for salvage; the second element has been met because of prior dealings and this pending sale; and the third element has been satisfied based on Mr. Castonguay's statement, and the sale of the Mill "at far below market value." Verso repeats its arguments regarding the allegations of attempt to monopolize.

Plaintiffs have cited the same evidence that the Court has previously rejected as unpersuasive. The Court rejects these arguments with equal force regarding Plaintiffs' claims that they constitute a "conspiracy to monopolize."

### iii.        Conclusion

The Court concludes that Plaintiffs have not met their burden to prove a strong likelihood of success on the merits of their claims under 15 U.S.C. § 2.

### c.        15 U.S.C. § 1

To make out a claim under 15 U.S.C. § 1, Plaintiffs must show a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . ." Once again, a court may order a preliminary injunction but only after "a showing

that the danger of irreparable loss or damage is immediate." *Id.* § 26. "[W]hether a restraint is effected by such a combination or conspiracy in violation of § 1, the crucial question is whether the challenged anticompetitive conduct stems from an independent decision or from an agreement, tacit or express." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (internal citations and quotation marks omitted). In addition, "[a]n agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)).

"In alleging conspiracy, an antitrust plaintiff may present either direct or circumstantial evidence of defendants' 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (quoting *Monsanto Co.*, 465 U.S. at 764). However, when a plaintiff brings a claim under 15 U.S.C. § 1 involving "refusal-to-deal" claims, "joint or concerted action must be sufficiently alleged since '[a] manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.* (quoting *Monsanto Co.*, 465 U.S. at 761).

Plaintiffs argue that Verso's alleged agreement with NewPage to shut down the Bucksport Mill and reduce output constitutes concerted action in restraint of trade. According to them, this is so because (1) Verso and NewPage are competitors and by joining forces they are attempting to reduce output by not offering the Mill for purchase to any other competitor; (2) Verso could not shut down the Bucksport Mill

68

without the written consent of NewPage; and (3) Verso and NewPage knew that reducing their market share by shutting down the Mill would improve their chances at gaining DOJ approval, as demonstrated by NewPage agreeing to sell two of its paper mills. In their most recent filing, Plaintiffs conclude that "the only reason that Verso decided to close Bucksport" was because of its merger with NewPage. *Pls.' Corrected Reply* at 33.

Plaintiffs' first contention is not supported by the record evidence before the Court. Absent evidence, they are asking the Court to rule on argument. Plaintiffs' second contention is also not supported by the record. According to Verso, both in its filings and during oral argument, under section 5.6(c) of the merger agreement between it and NewPage, Verso and NewPage had equal responsibility to obtain written consent from one another before selling any assets to gain DOJ approval. However, there is no evidence that Verso needed the written consent of NewPage to close the Mill; in fact, the evidence suggests the contrary. *Tr. of Proceedings* 65:1-12; *Paterson Decl.* ¶ 22 ("Verso neither sought nor received the written consent of NewPage for the sale of the Bucksport mill"). In addition, the DOJ's findings that the closing of the Mill was not a result of the merger suggests that written consent was unnecessary, unlike the two mills that NewPage sold to comply with DOJ requirements. Plaintiffs' third contention is mere speculation, as well as its bare contention that "the only reason that Verso decided to close" the Mill was due to the merger.

The Court concludes that Plaintiffs have not met their burden to demonstrate a strong likelihood of success on the merits of their claims under 15 U.S.C. § 1.

### d.    Conclusion

The Court concludes that Plaintiffs have not met their burden to prove a strong likelihood of success on the merits of their claims under federal antitrust law.

### 2.    Conclusion

Because the Court has concluded that Plaintiffs have not satisfied the first necessary element for a TRO or preliminary injunction, it need not analyze the final three elements.  "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *New Comm Wireless Servs., Inc.*, 287 F.3d at 9.

The Court denies Plaintiffs' requested relief.

## IV.    CONCLUSION

The Court DENIES Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction Pursuant to F.R.C.P. 65 (ECF No. 4).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of January, 2015

# ADDENDUM

After the record closed on the pending motion, the Court received five letters: (1) a letter dated January 16, 2015 from Paul R. LePage, Governor of the state of Maine, (2) a letter dated January 16, 2015 from Rosaire Pelletier, Senior Forest Products Advisor, Department of Economic and Community Development, state of Maine, (3) a letter dated January 16, 2015 from Rahul Kejriwal of Kejriwal Singapore International, (4) a memorandum dated January 19, 2015 from Stephen R. Read, Senior Advisor/Development Partner, Minimill Technologies, Inc., and (5) a letter dated January 16, 2015 from Robert Pederzani, Owner, Fibre Technologies LLC. These letters came directly from the authors, not from the lawyers for the parties, and were addressed to this Judge and were not copied to the parties. The Court entered each letter on the docket (ECF Nos. 93 and 94), and has attached each letter as an exhibit to this Opinion.

On January 20, 2015, the Court held a conference of counsel to determine first what, if any, impact the letters should have upon the pending motion. *Minute Entry* (ECF No. 95). Having received argument of counsel, the Court concludes it is not authorized under Rule 65 to consider these letters as part of its ruling on the pending motion. Rule 65(b) limits the Court's consideration of a motion for temporary restraining order to affidavits or the allegations in a verified complaint. FED. R. CIV. P. 65(b)(1)(A). Similarly, as noted in the body of this Opinion, a court's consideration of facts for purposes of ruling on a motion for preliminary injunction must be limited

to stipulated facts, the contents of affidavits, or similar matters of evidentiary weight. *Supra* note 4.

At the January 20, 2015 hearing, Plaintiffs asked for twenty-four hours to contact the authors of these letters and submit the contents in affidavit form. The Court denied that request. First, Governor LePage and Mr. Pelletier have forcefully reiterated the state of Maine's extreme disappointment regarding the closing of the Mill and their willingness to assist any new buyer willing to continue to operate the Mill to produce paper. The Court respects and appreciates the contents of the Governor's and Mr. Pelletier's letters, but neither, even if true, changes the merits of the pending motion. As regards the letters from prospective buyers, each is an expression of interest, not an offer, and each is too vague to change the facts upon which the Court must base its Order. Even if these letters were submitted in affidavit form, they would not change the Court's decision.

Finally, at the January 20, 2015 hearing, the Court expressed the view that the unique juxtaposition of the many interests in this case may offer an opportunity for Verso, AIM, the unions, the potential purchasers, and state Government to arrive at a global resolution of this difficult problem. If all interested parties were to get in the same room and negotiate, the Court wondered whether some resolution could be arrived at, perhaps with the assistance of state officials, in which Verso and AIM walked away with the benefit of their negotiated contract, one of the interested purchasers bought the Mill and operated it to make paper, and perhaps not all, but some of Verso's approximately 500 employees remained employed at Bucksport. To

this end, the Court offered the mediation services of other federal judges, if the parties thought it would be worthwhile. As Verso and AIM were not inclined to mediate and demanded a decision on the pending motion, the Court has issued the Order. However, the Court continues to offer the possibility of court mediation if the parties later conclude that such a global mediation would be helpful.