UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, LOCAL LODGE NO. 1821, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:14-cv-00530-JAW |
| VERSO CORP., et al., | ) ) ) | |
| Defendants. | ) | |

**ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION AND REQUEST FOR CERTIFICATION**

This case arose from an agreement between Verso Paper Corp. and Verso Paper LLC (Verso) and AIM Development USA, LLC (AIM) in which Verso agreed to sell and AIM to purchase Verso's Bucksport, Maine Paper Mill. While the sale was pending, Verso ceased paper mill operations in Bucksport, and former Verso employees of the Bucksport Paper Mill and their union sought a declaratory judgment and injunctive relief against Verso concerning their right to timely payment of severance pay and final wages, including accrued 2015 vacation pay, in accordance with time frames they said, and continue to say, are established under state law. The Court dismissed Plaintiffs' claims for severance pay because it concluded that Maine law precluded them from proceeding once the state of Maine Director of Bureau of Labor Standards (Director) brought suit in state court against the Defendants, and the Court dismissed their claims for vacation pay because it concluded that state

rather than federal court, was a better venue for adjudicating that claim. Plaintiffs now ask the Court to reconsider that Order relating only to their claims for timely severance pay, or in the alternative, to certify the case for review by the Maine Law Court or the First Circuit Court of Appeals. The Court denies Plaintiffs' motion.

## I.    PROCEDURAL BACKGROUND

On January 6, 2015, the Court dismissed a motion for declaratory judgment and injunctive relief and a motion for attachment and trustee process brought by the International Association of Machinists and Aerospace Workers, AFL-CIO, Local Lodge No. 1821 (IAM or IAMAW), and 58 Local No. 1821 Members (Plaintiffs). *Order Dismissing Pls.' Mot. for Declaratory and Injunctive Relief; and Dismissing Pls.' Mot. for Attach. and Trustee Process* at 85 (ECF No. 73) (*Severance Order*). On January 20, 2015, Plaintiffs filed a motion for reconsideration and request for certification. *Pls.' Mot. for Recons., Certification to the Maine Supreme Judicial Ct., or Certification of Appeal for Interlocutory Review of the Severance Pay Claims in Count 9* (ECF No. 97) (*Pls.' Mot.*). Verso filed its response in opposition on February 10, 2015. *Defs. Verso Paper Corp. and Verso Paper LLC's Opp'n to Pls.' Mot. for Recons., Certification to the Maine Supreme Judicial Ct., or Certification of Appeal for Interlocutory Review of the Severance Pay Claims in Count 9* (ECF No. 100) (*Defs.' Opp'n*). Plaintiffs replied on February 27, 2015. *Pls.' Reply to the Verso Defs.' Opp'n to Their Mot. for Recons., Certification to the Maine Supreme Judicial Ct., or Certification of Appeal for Interlocutory Review of the Severance Pay Claims in Count 9* (ECF No. 111) (*Pls.' Reply*). On March 5, 2015, Verso filed a surreply. *Defs. Verso Paper Corp. and Verso*

*Paper LLC's Surreply in Further Opp'n to Mot. for Recons., Certification to the Maine Supreme Judicial Ct., or Certification of Appeal for Interlocutory Review of the Severance Pay Claims in Count 9* (ECF No. 119) (*Defs.' Surreply*).[1]

## II.   FACTUAL BACKGROUND

### A.   The Severance Order

The IAMAW and the five named individual Plaintiffs filed this action on December 15, 2014. *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*). On December 22, 2014, Plaintiffs filed an amended complaint, which added 53 Local No. 1821 Members as plaintiffs and included additional allegations. *First Am. Compl. for Declaratory and Injunctive Relief* (ECF No. 29) (*First Am. Compl.*). In their First Amended Complaint,[2] Plaintiffs alleged that Verso refused "to comply with the laws of the State of Maine governing the timely payment of severance pay and final wages, including accrued 2015 vacation time," in violation of 26 M.R.S. §§ 625-B and 626."[3] *Id.* ¶ 6. On December 23, 2014, the state of Maine and the Director filed a complaint against Verso in Kennebec County Superior Court, and a proposed consent order; Superior Court Justice Robert Mullen signed and dated the Consent Order the day it was filed. *Def. Verso Paper Corp. and Verso Paper LLC's Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and*

---

[1]   On April 29, 2015, Verso provided notice to the Court that its name of "Verso Paper Corp." has been altered to "Verso Corporation." *Notice of Name Change of Verso Paper Corp.* (ECF No. 130).

[2]   In their First Amended Complaint, Plaintiffs also alleged antitrust violations and filed a motion for a temporary restraining order and preliminary injunction. The Court denied Plaintiffs' motion on January 20, 2015. *Order Denying Pls.' Mot. for a TRO and Prelim. Inj. and Addendum* (ECF No. 96). That ruling is not the subject of Plaintiffs' motion.

[3]   Plaintiffs brought the alleged violations of 26 M.R.S. §§ 625-B and 626 against Verso only, not against AIM.

*Req. for Prelim. and Permanent Inj.* Attach. 2 *Compl.* (ECF No. 40) (*Director Compl.*); *id.* Attach. 3 *Consent Order.*

The Court was tasked with ruling on several issues.  First, it held that "it ha[d] diversity jurisdiction over all claims" brought by Plaintiffs.  *Severance Order* at 56.

Second, and most relevant to this Order, the Court addressed whether Plaintiffs' pending prior-filed suit for timely severance pay had to be dismissed in light of the subsequent complaint filed by the state of Maine and the Director in Kennebec County Superior Court, in accordance with 26 M.R.S. § 625-B(5).  *Id.* at 57-81.  In concluding that Plaintiffs' suit for timely severance pay had to be dismissed under Maine law, the Court first considered the organization of the statute in general and section 625-B in particular.  *Id.* at 59-61.  Next, the Court considered comparative federal laws, Supreme Court caselaw interpreting those federal laws, Maine and United States Supreme Court caselaw interpreting section 625-B, the plain language of section 625-B, and the legislative history of section 625-B presented by the parties to determine what is meant by the "right to maintain an action" in relation to 26 M.R.S. § 625-B(4)[4] and 26 M.R.S. § 625-B(5).[5]  *Id.* at 61-70.  The Court discussed nine different policy reasons in support of its conclusion that Plaintiffs' suit for timely severance pay had to be dismissed.  *Id.* at 70-80.  In addition, the Court considered

---

[4]    Subsection 4 provides that an "[a]ction to recover the liability may be maintained against any employer in any state or federal court . . . by any one or more employees for and on behalf of himself or themselves and any other employees similar situated.  Any labor organization may also maintain an action on behalf of its members."  26 M.R.S. § 625-B(4).

[5]    Subsection 5 provides that "[t]he right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under this subsection, unless the action is dismissed without prejudice by the director."  *Id.* § 625-B(5).

abstaining from ruling on Plaintiffs' severance claims; however, it explained that "Plaintiffs properly made the point that they would be filing their state lawsuit after the Director had filed her lawsuit and under their own interpretation of subsection 5, they would have been precluded from filing suit." *Id.* at 85 n.22. The Court agreed with their analysis, and out of "fairness to Plaintiffs," issued a ruling on the merits rather than abstaining on this part of their claim. *Id.*

Third, the Court abstained from ruling on the vacation pay issue, reasoning that the Consent Order filed in Kennebec County Superior Court addressed the timing of vacation pay, and "there are matters of state law more properly resolved in state [rather] than federal court." *Id.* at 83-84.

### B.    Events Following the Court's Severance Order

After the Court issued the Severance Order on January 6, 2015, several events took place. First, the Consent Order required severance payments to be made in two installments, the first due on January 8, 2015. *Consent Order* ¶ 10. Verso made these payments in accordance with the Consent Order. *Defs.' Opp'n* Attach. 1 *Decl. of Charles Welch in Support of the Verso Defs.' Opp'n to Pls.' Mot. for Recons., Certification to the Maine Supreme Judicial Ct., or Certification of Appeal for Interlocutory Review of the Severance Pay Claims in Count 9* ¶ 4 (*Welch Decl.*). Second, the Court denied Plaintiffs' motion for a temporary restraining order and preliminary injunction as to the antitrust portion of the suit on January 20, 2015. *Order Denying Pls.' Mot. for a TRO and Prelim. Inj. and Addendum* (ECF No. 96). Third, Verso completed its sale of the Bucksport Mill to AIM on January 29, 2015.

*Welch Decl.* ¶ 6. Fourth, the Consent Order required the second installment of severance payments to be made by the earlier of the fifth business day after Verso's sale of the Bucksport Mill, or by March 19, 2015. *Consent Order* ¶ 11. The final severance payments were due by February 5, 2015, and Verso says it made these payments in accordance with the Consent Order. *Welch Decl.* ¶ 7. In Verso's view, all severance payments have now been made to every eligible individual Plaintiff.[6] *Id.* ¶¶ 8-9.

On February 19, 2015, in accordance with paragraph 14 of the Consent Order, Plaintiffs filed "a formal challenge regarding the accuracy and adequacy of the payments to . . . 53 individuals . . . with the Director of the Bureau of Labor Standards." *Gilley Decl.* ¶ 35. The same was also filed in Kennebec County Superior Court on February 22, 2015. *Id.* According to Plaintiffs, they are collectively owed an additional $357,158.53. *Pls.' Reply* Attach. 4 *RE: Bucksport Mill Verso's Failure to Fully Pay Severance Payments to Members of IAMAW Local Lodge # 1821* at 1. In addition, the Attorney General filed a motion to dismiss the State's claim against Verso with prejudice in Kennebec County Superior Court, and in response, Plaintiffs

---

[6] One possible exception is a man named David Lowell. Verso maintains that Mr. Lowell is ineligible to receive severance payments, and according to Charles Welch, the Human Resources Manager for the Bucksport Mill, it is his understanding that the "IAM intends to pursue a grievance on Mr. Lowell's behalf concerning his claim for severance pay under the grievance procedures set forth in the collective bargaining agreement between the IAM and Verso." *Welch Decl.* ¶¶ 2, 10-11. Richard Gilley, one of the individual Plaintiffs and members of the IAMAW, confirmed that the grievance process has been initiated regarding Mr. Lowell. *Pls.' Reply* Attach. 1 *Decl. of Richard Gilley Regarding Severance Payments from Verso* ¶¶ 2-3, 23 (*Gilley Decl.*). Mr. Lowell confirmed this as well. *Id.* Attach. 2 *Decl. of David Lowell Regarding Severance Payments from Verso* ¶ 25 (*Lowell Decl.*). To Mr. Welch's knowledge, "the Maine Department of Labor has not raised any complaint with respect to the timing or amount of the severance payments Verso has made in accord with the terms of the Consent Order." *Welch Decl.* ¶ 13.

filed an objection, seeking dismissal without prejudice, pursuant to 26 M.R.S. § 625-B(5), on February 22, 2015. *Id.* Attach. 3 *Objection of Interested Parties (IAMAW Local Lodge No. 1821 On Behalf of Its Members Who are the Beneficiaries) to Dismissal with Prejudice and Mot. for Dismissal Without Prejudice* at 1.

Plaintiffs explain in their briefing that Justice Mullen held a telephonic hearing with the parties on February 23, 2015, whereby he "urged Verso to provide all employees with the data needed to determine the accuracy of the severance and vacation time pay that Verso has made to date." *Pls.' Reply* at 6. The following day, Justice Mullen entered an order, ruling that no action will be taken by the superior court regarding the pending motions to dismiss or the objection until after a telephone conference scheduled for April 8, 2015.[7] *Defs.' Surreply* Attach. 2 *Order of Ct.* at 1.

## III.   THE PARTIES' POSITIONS

### A.   Plaintiffs' Motion

Plaintiffs request the Court to reconsider its Severance Order.[8] *Pls.' Mot.* at 2. They ask it to "reconsider its decision not to certify the State law questions relating to the proper interpretation" of section 625-B, which they claim was made "on primarily 'public policy' grounds." *Id.* Alternatively, Plaintiffs seek certification for interlocutory appeal to the First Circuit under 28 U.S.C. § 1292(b) or to the Maine Law Court. *Id.* Plaintiffs explain:

---

[7]      Presumably by this time, Justice Mullen has acted further, but the parties have failed to inform the Court what, if anything, happened, and the Court assumes the decision not to update this Court is strategic by the parties.

[8]      Plaintiffs explained that they are not seeking reconsideration or certification regarding the Court's decision to abstain from deciding the timing of vacation pay under 26 M.R.S. § 626. *Pls.' Mot.* at 2 n.1.

Plaintiffs request that, rather than this Court attempting to interpret these provisions of Maine law, and attempt to determine the intent of the Maine Legislature, based on an incomplete submission of the legislative history of amendments to 26 M.R.S.A. § 625-B (as it has evolved since 1971), this Court should reconsider its [Severance Order] . . . or vacate that order and certify all questions . . . to the Maine Supreme Judicial Court . . . [or grant certification for an interlocutory appeal].

*Id.*

They go on to argue that because there was no "definitive precedent from the"

Law Court on the proper interpretation of section 625-B, certification is proper to

answer five questions:

(1) Whether the filing of a Director's action pursuant to 26 M.R.S.A. § 625-B, sub-§ 5, terminates a pending prior-filed action maintained by a labor organization on behalf of its members or by employees on behalf of themselves, or all other similarly situated employees, pursuant to subsection 4;

(2) Whether the Maine Legislature intended the right to bring and maintain actions provided in 26 M.R.S.A. § 625-B, sub-§§ 4 and 5 to be interpreted consistently with virtually identical provisions in the federal Fair Labor Standards Act (FLSA) and Age Discrimination in Employment Act (ADEA);

(3) Whether the Maine Legislature intend[ed] the mitigation of liability described in 26 M.R.S.A § 625-B, sub-§ 3(B) to require actual payment of severance "under the terms of" an express agreement, in an amount equal to or greater than the amount mandated in subsection 2, within one regular pay period after the employees' last full day of work or sooner; and

(4) Whether the "last full day of work" is the last day physically worked or whether an employee can defer the triggering of the time for payment of severance by paying gratuitous remuneration to employees after they no longer have the ability or right to work at the facility.

(5) Whether the Maine Legislature has determined that payment of attorneys' fees and costs mandated in 26 M.R.S.A. § 625-B, sub-§ 4, is contrary to public policy if paid to litigants in a prior-filed subsection 4

case, after a Director's action has been filed or such fees are consistent with encouraging private enforcement of the MSPA.

*Id.* at 3-4.

According to Plaintiffs, in reaching its ruling, the Court only had legislative history from the 1975 and 2003 amendments to section 625-B and they criticize the Court's public policy discussion for not citing "public policy statements from members of the Maine Legislature in floor debates," and instead, "express[ing] *its own view* of the relative merit of various public policy choices." *Id.* at 4-5 (citing Severance Order at 80) (emphasis in Plaintiffs' original). Citing *Shapiro Brothers Shoe Co., Inc. v. Lewiston-Auburn Shoeworkers Protective Ass'n*, 320 A.2d 247, 257 (Me. 1974), Plaintiffs suggest that the Court improperly opined on the "efficacy or wisdom" of section 625-B. *Pls.' Mot.* at 5. They also believe that if the Court certified their proposed questions to the Law Court, it would "conclude the FLSA does apply and under the FLSA (which would not terminate a pending action), intervention in an action filed by the Secretary is not permitted – a line of cases Verso will no doubt raise to oppose intervention by Plaintiffs in the Verso-State action now." *Id.* at 5-6. Moreover, Plaintiffs say "the Court has left the Plaintiffs with no ability to enforce their right to timely payment of severance in State or federal court now," nor are they able "to challenge the amount of payments that Verso has made to date, or will make in the future, in the Director's action." *Id.* at 6-7 (citing *Dinan v. Alpha Networks Inc.*, 857 F. Supp. 2d 162, 163 (D. Me. 2012)).

Next, Plaintiffs "submit that the complete legislative history of the Maine Severance Pay Statute" (they attached in part as an exhibit to their motion) proves

"an unequivocal legislative intent to expand the rights provided to employees under this statute." *Id.* at 7. Viewed in its entirety, Plaintiffs argue that "[n]othing in the complete legislative history of the MSPA supports the Court's" public policy analysis. *Id.* at 7-8. In addition, Plaintiffs state that "the legislative history of the MSPA evidences an express legislative intent to prohibit negotiations by employers to pay any amount that is either less than or in a time frame later than the express requirements in the [A]ct." *Id.* at 8. This means, Plaintiffs say,

> the Director's purported authority to negotiate a different severance payment scheme than the time limit mandated by [subsection 2] – that the court in its [Severance] Order is so keen to protect, preserve and defend – is simply not within the authority conferred on the Director (or Attorney General) in the MSPA.

*Id.* In fact, Plaintiffs contend that the legislative history from 1999 "suggests that the Director exceeded her authority under the MSPA in fashioning the Consent Decree entered on December 23, 2014." *Id.* at 9. Plaintiffs then provide a summary of the evolution of the MSPA and its corresponding legislative history, including that the Legislature expanded the right under subsection 4 to include unions on behalf of their members. *Id.* at 9-18. Notably, while the Court considered as part of its public policy discussion the likely difference in the amount of money collected under the FLSA compared to the MSPA as a distinguishing factor, Plaintiffs assert that "not in 1999 and not in any other year, has the Maine Legislature indicated any intent to adopt an interpretation of this law different from the FLSA, just because the sums to be collected are large . . . thus, employing the FLSA and ADEA is completely consistent with this law." *Id.* at 15. In addition, Plaintiffs criticize the Court's

reasoning regarding the right to attorney's fees to "litigants who file a subsection 4 private action prior to a Director's action [as being] contrary to public policy and will encourage or reward 'litigiousness'" on the basis that it "is utterly without support in the history of this statute over the past forty years of its evolution since the 1975 post-*Shapiro Shoe* amendments." *Id.* at 18. They say "the fee award has been mandatory not discretionary since 1975," and the Director's action does not change this requirement. *Id.*

In closing, Plaintiffs ask the Court for three alternatives: (1) reconsider and reverse its prior Severance Order "based on an incomplete legislative record"; (2) certify the case to the Law Court pursuant to 4 M.R.S. § 57; or (3) certify the case to the First Circuit for interlocutory review. *Id.*

### B.   Verso's Opposition

Verso counters that the Court should not reconsider and vacate its Severance Order because Plaintiffs have not identified "how the Court misapprehended the arguments previously presented by the parties." *Defs.' Opp'n* at 2. Instead, Verso says, Plaintiffs' presentation of additional legislative history not brought before the Court prior to its Severance Order represents "new legal arguments that [they] could have presented the first time around," and are attempting "a second bite at the apple." *Id.* at 2-7 (citing *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) and additional caselaw). According to Verso, Plaintiffs do not attempt to explain how they meet the legal standard for reconsideration. *Id.* at 5 (citing *United States v. Poulin*, No. 1:08-cr-00050-JAW, 2014 WL 1642269, at *2 (D. Me. Apr. 24, 2014)). It also

11

contends that Plaintiffs' "request for declaratory judgment is now moot because each of the Plaintiffs eligible for severance has received that severance." *Id.* at 3. Verso cites the Declaration of Verso Human Resources Manager Charles Welch (attached to Verso's opposition) as proof that it has complied with the terms of the Consent Order filed by the state of Maine and the Director in Kennebec County Superior Court, including that it has made full payment of severance to all eligible employees (except for one disputed employee, Mr. Lowell). *Id.* at 9 & n.5. Thus, according to Verso, an order from the Court based on new analysis or allowing certification that would lead to a new order from this Court "would be a pure advisory opinion, disconnected from any live case or controversy." *Id.* at 3.

Regarding Plaintiffs' request for certification to the Law Court, Verso asserts that "their request is procedurally improper, unfair and proposes to tax the judicial resources of now a second court system, simply because Plaintiffs, having pushed aggressively to have this legal issue addressed by this Court, do not like the ruling they received." *Id.* In response to Plaintiffs' submission of additional legislative history to support their position for certification, Verso counters that their contention

> does not change the two key conclusions underpinning the Court's determination: (1) that the specific legislative history of the [section] 625-B(5) termination provision strongly supports the determination that the Director's lawsuit displaces existing actions; and (2) that policy considerations, and the structure of the statute, cut in favor of an interpretation of [section] 625-B that privileges the Director, acting in the public interest, over private litigants who got to the courthouse first.

*Id.* at 11. Verso says that Plaintiffs' "new argument does not cast any different light on the Maine Legislature's express intent" regarding the Director's ability to displace

suits of individual employees and, citing footnote 18 from the Court's Severance Order, "there is no relationship between this change to the statute [in 1975 where the Legislature altered the MSPA to permit unions to bring actions on behalf of their members] and the change that permits suits by the Director to terminate previously-filed private actions." *Id.* Regarding Plaintiffs' emphasis on the 1999 amendments, Verso argues that they "do not explain how this amendment is inconsistent with the Court's correct conclusion that the statute prioritizes suits brought by the Director over suits brought by private parties." *Id.* at 12. Verso contends that "none of the changes relied on by Plaintiffs is inconsistent with the Court's determination that the Maine Legislature considers the Director better positioned to enforce the statutory scheme than private litigants." *Id.* Verso also points out that it was Plaintiffs who insisted that the Court "issue a ruling on their severance pay claim within four weeks of the filing of their lawsuit," and they "at no time requested certification to the Law Court or even suggested that certification might be appropriate." *Id.* at 13. Furthermore, Verso views Plaintiffs' request for certification as "seek[ing] a heads-we-win-tails-you-lose process, whereby the standard for Law Court certification would be little more than the receipt of an unwelcome ruling." *Id.* at 14. In essence, Verso argues that Plaintiffs may not request an expedited ruling, lose on the merits, and now claim it should have been certified to the Law Court all along. *Id.* at 14-15.

Finally, as regards Plaintiffs' request for certification for an interlocutory appeal, Verso says that their request was waived because their pending motion "provides no legal basis for the relief requested, and contains literally no argument

13

explaining why certification is appropriate here." *Id.* at 4, 15 (citing *Joyce v. Postmaster Gen.*, 846 F. Supp. 2d 268, 289 n.25 (D. Me. 2012)). In the alternative, it argues that the request should be denied on the merits. *Id.* at 4. Specifically, Verso argues that their request "falls short of the exacting standard that governs requests for certification under § 1292(b)." *Id.* at 15-16 (citing an array of caselaw from this district and the First Circuit). Verso points out that "Plaintiffs did not seek any § 1292(b) certification prior to the Court's issuance of the Order and so the Order does not include the certification Plaintiffs now seek, as is required by the statute." *Id.* at 16 n.10 (citing 28 U.S.C. § 1292(b); *Widi v. United States Dep't of Justice*, No. 1:11-cv-00113-JAW, 2011 WL 5877543, at *4 (D. Me. Nov. 23, 2011)).

### C.   Plaintiffs' Reply

In their reply, Plaintiffs claim that "the amount of severance paid is now of relevance to the pending motion for Reconsideration." *Pls.' Reply* at 2. They explain:

> Plaintiffs assert that, in addition to omitting Mr. Lowell, this action is not moot because Verso has still failed to pay all sums due to Plaintiffs and the State Court action failed to address the timing of such payments – indeed, under the terms of the state settlement, no Bucksport employees received all severance due them within the time prescribed by State law. Verso failed to ever provide the IAM with the weekly payment records of its members needed to determine the number of weeks within which each member worked during the 12-month period prior to each individual's last full day of work.

*Id.* (citing *Gilley Decl.* ¶ 31). They also assert that several errors have been made in calculating their severance payments. *Id.* at 3-4 (citing *Gilley Decl.* ¶¶ 32-33). In addition, Plaintiffs claim that for those IAMAW members that have received their

severance payments, "the amount paid differs from the amount that Verso indicated would be paid on Exhibit A of the Consent Order." *Id.* at 4.

Expanding on their position that this case has not been mooted by Verso's severance payments to former employees, Plaintiffs argue that the Consent Order never attempted to resolve when full payment was due (which Plaintiffs believe should have been December 24, 2014 or January 8, 2015), and "***even under the terms of the State Consent Order, each and every Bucksport employee was still denied timely payment of all severance due them by Verso under Maine law – at least half of all severance owed to every employee was untimely paid after January 8, 2015.***" *Id.* at 7-8 (emphasis in original).

Alternatively, if the Court were to find the case moot, Plaintiffs assert that the Severance Order should be vacated pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) (*Munsingwear* Doctrine). *Pls.' Reply* at 8. Plaintiffs say this doctrine stands for the proposition that

> a party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment. . . . [C]ourts have almost uniformly held that the same is true when mootness results from the unilateral action(s) of the party who prevailed below.

*Id.* at 8-9. As an example, Plaintiffs cite a 2013 Law Court case, *Thanks But No Tank v. Department of Environmental Protection*, 2013 ME 114, ¶ 12, 86 A.3d 1, which considered and rejected a request to vacate a superior court ruling rendered moot. *Pls.' Reply* at 11-12. Plaintiffs argue that, unlike that case, where the Law Court reasoned that vacatur was inappropriate because the plaintiff had not demonstrated

it would be unable to litigate similar issues or that public policy would be harmed, they will be unable to litigate similar issues if the Director's suit is dismissed from Kennebec County Superior Court with prejudice, and public policy will be harmed because it would go against the legislative history to section 625-B.  *Id.* at 12.

Next, contrary to Verso's argument, Plaintiffs say that their motion is not based on a new argument they could have made previously.  *Id.* at 15.  They claim that initially, "up to and including the oral argument of the Severance Claims, the history and public policy underlying the enactment, and all amendments to, the MSPA was not at issue."  *Id.*  They go on:

> The only provisions and amendments that were placed at issue by either party were the 2003 amendments to 26 M.R.S.A. § 625-B, sub-§ 3(B) and the 1975 amendments to 26 M.R.S.A. § 625-B, subsections 4 and 5.  It was the Court which placed the public policy underlying the [A]ct as it has evolved since 1971 at issue, when the Court entered the January 6 Order dismissing the Severance Pay claims based on the Court's interpretation of public policy implications of imposing a State mandated amount of severance (which the court appeared to indicate it found "ill-advised").  Further, the Court (not Verso) suggested that the FLSA case law did not apply because the amounts in controversy in FLSA cases were small and in MSPA actions were in the millions of dollars – this distinction raised by the Court was the first time the Legislature's knowledge about the amount of potential recoveries under the MSPA and its impact on the right to maintain an action was placed at issue to require an examination of the legislative history.  An examination of the legislative record revealed that the Maine Legislature has long been on notice about the aggregated size of MSPA recoveries – although, like FLSA recoveries, the amounts to be recovered by individual employees is still in the thousands[,] *not in the millions*.

*Id.* (emphasis in original).

Regarding certification to the Law Court, Plaintiffs believe that "an expeditious resolution of the time-for-payment question raised by this case, was the

sole basis that this Court gave for its decision not to certify the relevant State law interpretations to the Law Court." *Id.* at 16. Nevertheless, Plaintiffs also say that because they "have received some (but not all) severance due them through the State-Verso settlement, the time pressure that formed the foundation of the expedited calendar in the federal action no longer exists." *Id.* at 17.

Finally, regarding their request for an interlocutory appeal, Plaintiffs say that during a telephone conference with the Court on December 16, 2014, "the Court stated that, it would litigate the Cou[n]t 9 claims first and, regardless of its ruling on the severance issues, the Court would certify those issues as appropriate for interlocutory appeal by the losing party in any decision." *Id.* Thus, Plaintiffs explain that this is why they did not present any arguments or relevant caselaw in their motion supporting their position, based on this "agreed procedural decision." *Id.*

### D.   Verso's Surreply

Addressing Plaintiffs' argument that the case is not moot, Verso counters that their "arguments concerning the dispute over the amount of severance pay are irrelevant to the mootness analysis . . . because, as Plaintiffs have made clear, Plaintiffs' Count 9 seeks only equitable relief concerning the *timing* of payment." *Defs.' Surreply* at 3 (emphasis in original). In addition, because Plaintiffs have presented their objections regarding the sufficiency of severance payments to the Maine Department of Labor and Justice Mullen, there is no "effectual relief" to be obtained in this Court. *Id.* (quoting *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 422 (D. Me. 2010)).

17

Regarding the *Munsingwear* Doctrine (which it also notes was "clarified" by *United States Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994)), Verso asserts that it "does not apply to proceedings before a district court," only appellate courts. *Defs.' Surreply* at 4 (citing *Overseas Military Sales Corp., Ltd. v. Giralt-Armada*, 503 F.3d 12, 17 (1st Cir. 2007); 28 U.S.C. § 2106; *Bancorp*, 513 U.S. at 21). It says other district courts have concluded the same. *Id.* at 4-5 (citing *Keeler v. Mayor and City Council of Cumberland*, 951 F. Supp. 83 (D. Md. 1997); *Ry. Labor Execs.' Ass'n v. Wheeling & Lake Erie Ry. Co.*, 756 F. Supp. 249, 252 n.8 (E.D. Va. 1991)). Even if permissible to apply *Munsingwear*, Verso contends that Plaintiffs have not met the criteria for vacatur. *Id.* at 5 (citing *Bancorp*, 513 U.S. at 25-26). In Verso's view, Plaintiffs are merely attempting to "relentlessly bounce between this Court and the state court, playing one proceeding off of the other, until they find a way to undo this Court's holding that Plaintiffs do not have the right to pursue their severance claims." *Id.* at 6-7.

Finally, addressing Plaintiffs' contention that the Court promised to grant an interlocutory appeal to the losing party, Verso says it was its understanding

> that it was contemplated by the Court and parties that [the Severance Order] would constitute a final adjudication of the Count 9 severance and vacation pay claims. Verso believes Plaintiffs are mistaken, however, to the extent they are stating or suggesting that the Court identified § 1292(b) as the appropriate vehicle for any potential appeal. Instead, Verso believes the Court indicated that it may be willing to enter final judgment on the Count 9 severance and vacation pay claims pursuant to Fed. R. Civ. P. 54(b), thus creating the right to an immediate appeal. Verso does not object to the Court entering final judgment against Plaintiffs on Count 9 pursuant to Rule 54(b).

*Id.* at 7.

18

## IV.    DISCUSSION

### A.    The Bases for the Court's Severance Order

Because Plaintiffs have raised several issues regarding what the Court did and did not do in its Severance Order, the Court summarizes the bases upon which it dismissed Plaintiffs' suit for timely severance payments pursuant to 26 M.R.S. § 625-B(5).

#### 1.    Subsections 4 and 5 of Section 625-B

Subsection 4 of section 625-B, entitled "Suits by employees," expressly allowed Plaintiffs (both the individual employees and their union) to bring suit in this Court to enforce their statutory right to severance pay:

> Any employer who violates the provisions of this section shall be liable to the employee or employees affected in the amount of their unpaid severance pay. Action to recover the liability may be maintained against any employer in any state or federal court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and any other employees similarly situated. Any labor organization may also maintain an action on behalf of its members.

26 M.R.S. § 625-B(4).

Subsection 5 of section 625-B, entitled "Suits by the director," similarly allowed the Director to bring an enforcement action in "any court of competent jurisdiction" against Verso to enforce the provisions of the MSPA:

> The director is authorized to supervise the payment of the unpaid severance pay owing to any employee under this section. The director may bring an action in any court of competent jurisdiction to recover the amount of any unpaid severance pay.

*Id.* § 625-B(5).

19

Neither party disputed the other's rights under section 625-B; instead, they disputed the impact of the Director's lawsuit on the Plaintiffs' lawsuit. *Severance Order* at 58-59. The critical language from subsection 5 provides:

> The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under this subsection, unless the action is dismissed without prejudice by the director.

26 M.R.S. § 625-B(5). As the Court explained, Plaintiffs' "contention is a narrow one: that the subsection 5 termination provision does not apply to pending lawsuits." *Severance Order* at 59.

### 2.    Title 26 and Section 625-B

To resolve the dispute, the Court first considered the organization of title 26 and section 625-B, and the power granted to the Director. *Id.* at 59-61. The Court observed that sections 41 through 44 "contemplate[] an active role for the Director of the Bureau of Labor Standards in enforcing the employment laws of the state of Maine." *Id.* at 60. The Court also noticed that chapter 7 of title 26, the same chapter whereby section 625-B is found, "sometimes directs the Director . . . to enforce those laws." *Id.*

Turning to the organization of section 625-B, the Court noted that in addition to the authority granted to the Director under subsection 5 (including the right of the Director to supervise payment of any unpaid severance pay owed to any employee), the statute allows the Director in "'any investigation or proceeding . . . in addition to

20

all other powers granted by law, the authority to examine books and records of any employer affected by this section. . . .'" *Id.* at 61 (quoting 26 M.R.S. § 625-B(7)).

### 3. *Breuer* and the FLSA

The Court turned to the heart of Plaintiffs' argument: that an action that "may be maintained" by employees and their union under subsection 4 is not terminated by the termination provision under subsection 5 because that subsection discusses the right "to bring an action," not "maintain" an action. *Id.* at 61-62. The Court reviewed the Supreme Court case of *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691 (2003), which essentially adopted Plaintiffs' interpretation regarding nearly identical language from a FLSA provision, 29 U.S.C. § 216(b). *Severance Order* at 62-66 ("With minor adjustments, the language in the corresponding subsections of the Maine severance pay statute is identical to the language in the FLSA"). In *Breuer*, Justice Souter concluded that the right to "maintain" under 29 U.S.C. § 216(b) means "to continue" as opposed "to commence,"[9] and noted that the legislative history suggested an intent to allow employees to maintain or continue their litigation despite a subsequent suit by the Secretary of Labor. *Id.* at 64-66 (citing *Breuer*, 538 U.S. at 695 n.1, 700).

### 4. Plain Language, Maine and Supreme Court Caselaw, and Legislative History

---

[9]     In the Court's Severance Order, it mistakenly stated that "the *Breuer* Court concluded that the term 'maintain' in § 216(b) means 'to commence,' not 'to continue,' and thus, the Supreme Court allowed the employer to remove the case to federal court." *Severance Order* at 64; *see also Breuer*, 538 U.S. at 695 & n.1 (explaining that "'[t]o maintain an action' may mean 'to continue' to litigate, as opposed to 'commence' an action," and then proceeding in a footnote to say that "there is reason to think that this sense of 'maintain' was intended" under the FLSA).

Next, applying standard statutory analysis, the Court parsed the plain language of section 625-B. *Id.* at 66-68. The Court concluded that subsections 4 and 5, when read together, were ambiguous, as "[t]he statute does not differentiate between suits under subsection 4 not yet filed as opposed to pending when the Director initiated suit." *Id.* at 67.

The Court reviewed Maine and United States Supreme Court caselaw, all of which supported Verso's interpretation: *Director of Bureau of Labor Standards v. Fort Halifax Packing Co.*, 510 A.2d 1054, 1057 (Me. 1986); *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 5 (1987); and *Viking Freight, Inc. v. Moberg*, 1998 Me. Super. LEXIS 191, at *1-2, 16-17 (July 27, 1998). *Severance Order* at 68-69. Even so, the Court explained that "the legislative intent behind section 625-B remains ambiguous. In light of this ambiguity," the Court observed that "Justice Souter turned to legislative history [in *Breuer*] and the Court does the same." *Id.* at 69.

Discussing the legislative history, the Court concluded that it appeared the Legislature's intent was to terminate all suits once the Director filed an action, pending or not. *Id.* at 69-70. The Court relied on language from the history surrounding the 1975 amendment to subsection 5, where the stated purpose was to "'[a]llow suits by the Director of the Bureau of Labor to obtain judgments (in particular, the director's suit may take the place of the individual suits of a large number of employees) and to enforce the judgments.'" *Id.* at 70 (quoting Comm. Amend. A to H.P. 1082, L.D. 1362, No. H-674 (107th Legis. 1975)). As the Court explained, this language "strongly suggests that the Legislature intended that the

Director's lawsuit would replace pending litigation because the Director's lawsuit would not take the place of a lawsuit that had not yet been filed." *Id.* The Court also observed in a footnote that the Legislature amended subsection 4 in 1975 to allow unions to maintain an action on behalf of its members but concluded that "[t]his portion of the rationale for the 1975 amendments does not appear relevant to the issues before the Court in this lawsuit." *Id.* at 70 n.18.

### 5. Public Policy Considerations

Finally, the Court discussed nine public policy considerations. *Id.* at 70-80. First, the Court considered reasons in favor of exempting pending litigation from the termination provision. *Id.* at 70-73. It noted that it was unclear why the Legislature would exempt pending employee or labor union litigation from the termination provision provided under section 625-B(5). *Id.* at 71. The Court also expressed skepticism regarding Plaintiffs' point that exemption would promote the right to attorney's fees, explaining "it would be unusual for the law to exalt attorney's fees over the ability of the Director to supervise the dispute." *Id.* at 73. Ultimately, the Court concluded that "public policy reasons against Plaintiffs' position . . . substantially overwhelm any public benefit in favor of their position." *Id.*

Second, the Court explained why public policy would not support interpreting the FLSA provision identically with section 625-B. *Id.* at 73-75. The Court emphasized differences between the two statutes, including that "[t]he stakes . . . are often unusually high in the Maine severance pay situations, circumstances not often

seen in FLSA lawsuits.  In short, the Maine severance pay law, by its terms, deals with a markedly different set of circumstances than most FLSA claims." *Id.* at 75.

Third, the Court discussed the public policy implications in relation to the role of the Director based on the framework of the statute.  *Id.* at 75-76.  Observing that the statute "grants the Director reporting requirements, investigative authority, the right to file suit for affected employees, and overall supervisory authority," the Court concluded that she properly exercised her authority by entering into a settlement agreement with Verso, one supported by a majority of millworkers.  *Id.* at 75. Therefore, the Court reasoned, "[t]he impact on the Director's ability to exercise her statutory authority by allowing employees or labor unions to persist with a severance pay lawsuit would be considerable . . . making a global resolution less likely." *Id.* at 76.  In addition, the Court explained that such a result could also leave the employer defending multiple lawsuits rather than trying to resolve the issues at hand.  *Id.*

Fourth, the Court reasoned that adopting Plaintiffs' position would encourage "a race to the courthouse" and "an immediate resort to litigation." *Id.* at 76-77.

Fifth, the Court discussed the potential for "a fight among friends," which was on display in this suit between Plaintiffs and members of the United Steelworkers who, unlike Plaintiffs, supported the settlement agreement.  *Id.* at 77.

Sixth, the Court explained that Plaintiffs' view rewards the litigious, and "[t]he law rarely so rewards litigation over negotiation, especially where the state government itself is authorized to act on behalf of the private parties." *Id.*

Seventh, the Court observed that section 625-B contains a bankruptcy escape clause for an employer that files a Chapter 11 bankruptcy petition. *Id.* at 77-79. The Court reasoned that the Director, who "has been granted investigative authority to 'examine books and records of any employer' affected by this law, . . . is in a better position to demand and obtain sensitive financial information from the employer" rather than private parties, to determine whether a threat of bankruptcy is real. *Id.* at 78-79 (quoting 26 M.R.S. § 625-B(7)).

Eighth, the Court observed that "Plaintiffs are presenting an interpretation of a Maine statute with a significant practical effect on the Director and the Director is not a party to the litigation." *Id.* at 79.

Ninth, the Court observed that "Plaintiffs' interpretation virtually guarantees simultaneous litigation over the same issue in multiple forums." *Id.* Such a consequence may lead to "a plethora of quickly-filed lawsuits in different courts and different jurisdictions, each in different stages, some resulting in conflicting court orders." *Id.* at 80.

In sum, the Court concluded that

> the balance of policy considerations in favor of interpreting the Maine severance pay law to include pending employee/union lawsuits in the termination provision of subsection 5 weighs strongly in favor of Verso's view. This does not mean that the policy considerations necessarily carry the day. The Maine Legislature in its wisdom is free to enact laws on behalf of the people of Maine that seem to this Court in its best judgment to be markedly ill-advised. Nevertheless, where the benefits of Plaintiffs' interpretation of a law are so elusive, the drawbacks are so obvious, and the advantages of the Verso interpretation so apparent, the Court factors these policy considerations into its statutory analysis in substantial support of Verso's position.

*Id.*

### B.   The Court's Discussion of Public Policy Considerations and Plaintiffs' Request that the Court Reconsider and Reverse the Severance Order

Plaintiffs take issue with the Court's public policy discussion contained in the Severance Order, arguing that the Court improperly expressed its own view of section 625-B and did not cite any floor debates regarding the statute's amendments, that the Order was made "primarily" on public policy grounds, and had the Court been presented with a complete legislative history, it would have seen that the legislative history does not support its analysis.  The Court addresses each contention in turn after reviewing the legal standard for a motion for reconsideration.

#### 1.   Legal Standard

A motion for reconsideration "'is not a vehicle to force the court to think twice; it is not an opportunity for the losing party simply to press his unsuccessful arguments a second time in the hope that, by repetition, the court will see them his way.'" *Poulin*, 2014 U.S. Dist. LEXIS 56987, at *5 (quoting *Widi v. McNeil*, 2:12-cv-00188-JAW, 2014 U.S. Dist. LEXIS 19778, at *3 (D. Me. Feb. 18, 2014)).  "Instead, the motion provides the court with an opportunity to correct 'manifest errors of law or fact or to present newly discovered evidence.'"  *Id.* (quoting *Lakshman v. Univ. of Me. Sys.*, 338 F. Supp. 2d 162, 164 (D. Me. 2004)).  Furthermore, "a motion for reconsideration's utility is limited to: (1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to

correct a clear error of law or to prevent manifest injustice." *Id.* at *6 (internal quotation marks omitted).

### 2. Lack of Citation to Floor Debates and the Court's Viewpoint

The Court turns to the Plaintiffs' contention that the Court improperly expressed its own view of section 625-B without support from any floor debates. The Court was presented with briefing regarding the legislative history of subsection 3(B),[10] but that subsection became irrelevant once the Court concluded that Plaintiffs' suit must be dismissed in accordance with subsection 5, and that the legislative history of subsection 3(B) did not illuminate the issue before the Court. As regards subsections 4 and 5, the Court was presented with and considered legislative history from 1975, which discussed the purpose of suits brought by the Director (i.e., suits by the Director "may take the place of the individual suits of a large number of employees"). The Court had the discretion to consider legislative history once it concluded that subsections 4 and 5 were ambiguous. *United States v. Commonwealth Energy Sys. and Subsidiary Cos.*, 235 F.3d 11, 15 (1st Cir. 2000) (explaining that if statutory language is ambiguous, a court "may seek evidence of [legislative] intent in the legislative history"); *Fuhrmann v. Staples Office Superstore E., Inc.*, 2012 ME 135, ¶ 23, 58 A.3d 1083 ("Only when we determine that a statute is ambiguous do we look beyond the plain language of the statute and the context of the whole statutory

---

[10]     Subsection 3(B) provides that an employer may mitigate its severance pay liability if "[t]he employee is covered by, and has been paid under the terms of, an express contract providing for severance pay that is equal to or greater than the severance pay required by this section." 26 M.R.S. § 625-B(3)(B).

scheme to indicia of legislative intent such as the statute's history and its underlying policy") (internal quotation marks omitted).  As the Court concluded in its Severance Order, the stated purpose of the Director's suit is that such suit "may take the place of the individual suits of a large number of employees," and therefore, implicates both pending and non-pending suits of employees because "the Director's lawsuit would not take the place of a lawsuit that had not yet been filed."  *Severance Order* at 70. The Court discussed this point when analyzing the legislative history, and to the extent Plaintiffs argue the Court should have cited it again in its public policy discussion, their argument for citation repetition raises form over substance.

Plaintiffs also say the Court should have factored in the 1975 amendment to subsection 4, allowing unions to bring suits on behalf of its members.  However, the Court reviewed this amendment, and concluded in its Severance Order that this point did not address the impact of the Director's suit on employees' pending lawsuits, and the Court still finds no reason to conclude otherwise.  *See id.* at 70 n.18 (explaining that "[t]his portion of the rationale for the 1975 amendments does not appear relevant to the issues before the Court in this lawsuit").

In addition, Plaintiffs argue that the Court improperly expressed its own views when laying out its public policy discussion, relying particularly on the Court's remarks that the Legislature may enact laws "that seem to this Court in its best judgment to be markedly ill-advised."  *Id.* at 80.  Plaintiffs cite the Law Court decision of *Shapiro Brothers*, where it stated that "'[i]t is not our duty to sit in judgment as to

28

the efficacy or wisdom of the statute.'" *Pls.' Mot.* at 5 (quoting *Shapiro Bros.*, 320 A.2d at 257).

The Plaintiffs' point is unclear. The Court's formulation—that the Legislature has the right to enact unwise laws—is another way of saying that judges do not "sit in judgment as to the efficacy or wisdom of the statute." Furthermore, the Court was free to explore public policy reasons the Legislature may have considered in designing section 625-B in relation to the Director's authority, absent express reasons from the Legislature, as "extrinsic factors to ascertain legislative intent." *Thompson v. Shaw's Supermarkets, Inc.*, 2004 ME 63, ¶ 7, 847 A.2d 406 (explaining that where proper interpretation of a statute cannot be determined based on its plain meaning, "'we then consider the statute's history, underlying policy, and other extrinsic factors to ascertain legislative intent'") (quoting *In re Wage Payment Litig.*, 2000 ME 162, ¶ 4, 759 A.2d 217).

### 3.    Plaintiffs' Contention that the Court's Severance Order was Decided "Primarily" on Public Policy Grounds

Next, regarding Plaintiffs' contention that the Court's Severance Order was decided "primarily" on public policy grounds, the Court disagrees. As discussed above, the Court considered numerous factors in addition to public policy. *See* Section IV.A, *supra*. In fact, the Court could have ruled against Plaintiffs as soon as it concluded that the legislative history demonstrated an intent to terminate both pending and non-pending employee suits, with no discussion of public policy. Instead, the Court analyzed potential public policy considerations as to why the Legislature did not exempt pending employee actions, and concluded its discussion by noting that

29

"the Court factors these policy considerations into its statutory analysis in substantial support of Verso's position." *Severance Order* at 80.

### 4. Additional Legislative History

Finally, Plaintiffs present the Court with an abundance of legislative history that they say demonstrates "an unequivocal legislative intent to expand the rights provided to employees under this statute" and that "[n]othing in the complete legislative history of the MSPA supports the Court's" public policy analysis. *Pls.' Mot.* at 7-8. They also claim that the legislative history confirms that an employer may not negotiate for any less than the payment amounts or time frames prescribed by the statute, and thus, this limited the Director's authority to do so as well. *Id.* at 8. This additional legislative history, as well as these arguments, were not before the Court at the time it issued its Severance Order. Verso contends that the Court should not consider any of these arguments because they represent impermissible new arguments that could have and should have been raised before, not after the Severance Order. *Defs.' Opp'n* at 2-7. Plaintiffs counter that the legislative history and public policy underlying the enactment was never at issue until the Court issued its Severance Order. *Pls.' Reply* at 15.

The First Circuit has explained that new arguments that could have and should have been raised before the issuance of a district court ruling are not appropriate in a motion for reconsideration:

> Litigation is not a game of hopscotch. It is generally accepted that a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling. This principle has deep prudential roots. Litigants

30

normally must frame the issues in a case before the trial court rules. After that point, a litigant should not be allowed to switch from theory to theory like a bee in search of honey.

*Cochran*, 328 F.3d at 11 (internal citations omitted).

Plaintiffs cannot claim that they did not know the legislative history of or public policy implications behind section 625-B would be considered by the Court in its Severance Order. Once the Director filed a complaint and proposed consent order in Kennebec County Superior Court on December 23, 2014, the interpretation of subsections 4 and 5 became the heart of the issue before the Court. Plaintiffs recognized the critical significance of this issue of statutory interpretation in their supplemental reply filed on December 26, 2014, which included an extensive discussion of *Breuer*. *Pls.' Reply to the Verso Defs.' Dec. 24, 2014 Supplement Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Preliminary and Permanent Inj. Regarding Severance and 2015 Vacation Time Pay* at 15-19 (ECF No. 44).

Moreover, Plaintiffs are simply incorrect in asserting that policy considerations were not presented and argued before the severance decision. On December 29, 2014, the Court heard oral argument. *Minute Entry* (ECF No. 56). The Court explicitly asked Plaintiffs' counsel for her take on public policy considerations regarding the role of the Director in relation to the statute:

> I'm talking more of the policy matter. I am trying to get you to sort of get above this because it's not just the case before me. It's also some policy considerations about the authority of the director to act under the statute.

>       So let's assume, for example, that the director of the Department of
>       Labor for the state looks at a broader set of interests than the individual.
>       . . . You have a broader brush from the director even acting under the
>       statute, at least arguably than the individual employee.  That's where I
>       am coming from; do you agree with that or not?

*Tr. of Proceedings* 28:24-29:3, 29:18-21 (ECF No. 99) (*Oral Argument Tr.*).  After

Plaintiffs' counsel conceded that the settlement reached by the Director was a

"concession of reality" and did not contend that she acted beyond her authority

(unlike the argument being made at present), the Court went on:

>       [I]f it's true that the director of – as you just concede was acting
>       appropriately through the attorney general and recognizing reality,
>       then why shouldn't I say that the statute, apart from the – just take the
>       timing out of it for a moment, just talk about policy for a moment, why .
>       . . shouldn't I say the statute contemplates that, that the statute
>       contemplates exactly what happened here, that the director comes in
>       and the director representing all of the – some individual employee may
>       say, I don't like this because I don't get my money either way – under
>       the timing that I think I should be entitled to it, but the statute says
>       something different.  The statute says that in these situations that the
>       director of the Department of Labor, through the attorney general of the
>       state of Maine, has a right to come in and negotiate the best deal and
>       everybody has to eat it.  Why isn't that the way I should look at the
>       statute?

*Id.* 30:9-11, 30:20-31:12.  Plaintiffs' counsel responded that the Court should not look

at the statute in the way it proposed because "the public policy issue mediates against

that."  *Id.* 31:13-14.

       Later, during the oral argument, the Court noted its concern to Plaintiffs'

counsel, as it did in the Severance Order, that "[t]he person who is most affected by

[Plaintiffs' interpretation] is the director.  And the authority of the director to act in

the future, but the director isn't a part of that process."  *Id.* 33:1-4.  In other words,

the Court observed it may make "a ruling that affects the . . . state attorney general's

32

ability to act on behalf of the best interest of employees in the future, but the attorney general hasn't been heard." *Id.* 33:5-8; *see also Severance Order* at 79. Plaintiffs' counsel responded that they "don't actually look at this case as a challenge to the director's ability to make the settlement they made." *Oral Argument Tr.* 33:9-11. Subsequently, the Court posed the question of whether Plaintiffs' interpretation "place[s] the ability of the director to negotiate with the employer or the employer's willingness to negotiate with the director at a disadvantage[.]" *Id.* 34:1-4; *see also Severance Order* at 75-76.

When the Court turned to Verso's counsel for comments, he directed the Court's attention to the 1975 amendments, and "suggest[ed] that the legislative history eliminates doubt concerning the state's ability to displace private plaintiffs and it – and I think the language was drafted to reflect the very public policy concerning what Your Honor was putting its finger on." *Oral Argument Tr.* 35:25-36:4. Regarding *Breuer* and the language of 29 U.S.C. § 216(b), Verso's counsel conceded that the plain language of the statute was identical to the relevant subsections of section 625-B, but contended that even so, "you can't then just sweep into that analysis the legislative history of the federal statutes when you have . . . a clear and unequivocal legislative history of the Maine statute, which makes very clear a very, very different intent." *Id.* 38:2-10. The Court explained it would be hard pressed not to construe section 625-B in the same light as the FLSA provision "unless the policy considerations of the statutes are so markedly different." *Id.* 40:19-21.

33

The Court turned back to Plaintiffs' counsel, and explicitly asked her to give it "an idea, what could possibly be the policy behind all this?" *Id.* 43:8-9. After Plaintiffs' counsel avoided the question, the Court once again asked: "What's the . . . policy behind allowing a pending action to be maintained by an employee or a union and not allowing, once a director files an action, a separate lawsuit, what's the policy behind that?" *Id.* 44:10-14. After Plaintiffs' counsel again failed to answer the Court's question, it essentially repeated the question. *Id.* 44:21-23. The Court could not have been more explicit that it was concerned with the potential public policy implications behind Plaintiffs' interpretation and, as described above, it tipped off Plaintiffs' counsel during oral argument regarding specific public policy concerns that ultimately appeared in the Severance Order.

Following oral argument, the Court permitted the parties to file additional supplemental memoranda in light of the issues discussed. In Plaintiffs' briefing, they chose to focus on the argument that: (1) adopting Verso's interpretation (and ultimately, the Court's interpretation) would raise serious constitutional issues; (2) the plain meaning of 26 M.R.S. § 625-B was not ambiguous but the 1975 legislative history was; (3) the Court should apply *Breuer* and its interpretation of the FLSA to the MSPA; and (4) in their view, public policy supported their position. *Pls.' Reply to the Verso Defs.' Third Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Preliminary and Permanent Inj.* (ECF No. 61). Presumably, it was a strategic choice by Plaintiffs to include some arguments and not others, but they may not argue now what they could have argued then. Given that

34

the Court was only presented with the 1975 and 2003 amendments and the Plaintiffs had demanded a ruling only one week after oral argument (and with a federal holiday and weekend in between), the Court relied upon the legislative history that the parties themselves had provided.

Furthermore, the parties, including the Plaintiffs, had to be aware that the Court might not agree that the *Breuer* analysis applies here.  While it is true that Maine courts have recognized that some comparative Maine laws are to be construed in line with the FLSA, this is not always the case.  *See Affo v. Granite Bay Care, Inc.*, Nos. 2:11-CV-482-DBH, 2:12-CV-115-DBH, 2013 U.S. Dist. LEXIS 76019, at *27-28 (D. Me. May 30, 2013) (explaining that "the First Circuit has consistently recognized the extraordinarily broad scope of FLSA coverage" and the Maine Legislature has not incorporated all FLSA definitions into Maine law).

In sum, the Court concludes that Plaintiffs' argument—that a review of the entire legislative record demonstrates an intent by the Legislature to exempt pending employee and union lawsuits from the termination provision of subsection 5—could have and should have been presented to the Court before it issued its Severance Order, not after.  The Court concludes that the Plaintiffs waived this late-pressed argument.

Nevertheless, for the sake of completeness, the Court has reviewed the complete legislative history provided by Plaintiffs with this motion, and concludes that the ruling would have been the same.  Although the Court agrees that, overall, the complete legislative history demonstrates an intent to expand the rights of

35

employees under the MSPA, the scope is too narrow and isolated because it does not speak to the Director's power and authority under the statute. In fact, the organization of title 26, chapter seven, and section 625-B suggests that the rights of employees under the statute are not absolute. It was proper for the Court to consider the broad power granted to the Director under title 26, chapter seven, and section 625-B in concluding that pending litigation comes within the purview of the termination provision. *See Finks v. Me. State Highway Comm'n*, 328 A.2d 791, 795 (Me. 1974) ("Every statute must be construed in connection with the whole system of which it forms a part and all legislation on the same subject matter must be viewed in its overall entirety in order to reach a[] harmonious result which we presume the Legislature intended"). In short, it was proper for the Court to consider the public policy implications of adopting Plaintiffs' interpretation in light of the "whole system of which it forms a part."

In their pending motion, Plaintiffs also provided the Court with the 1999 amendments and corresponding legislative history. *Pls.' Mot.* Attach. 1 (*1999 Leg. History*). First, they say that "not in 1999 and not in any other year, has the Maine Legislature indicated any intent to adopt an interpretation of this law different from the FLSA, just because the sums to be collected are large . . . thus, employing the FLSA and ADEA is completely consistent with this law." *Pls.' Mot.* at 15. Even if true, the Court did not conclude its public policy discussion on this basis alone. It also noted that "severance claims under Maine law are often more serious, complex and dire than claims for overtime and minimum wages under the FLSA." *Severance*

36

*Order* at 74. In addition, the Court observed that, unlike the FLSA, the MSPA is not triggered unless the facility being shut down has at least 100 employees and, by its citation to *Affo*, 2013 U.S. Dist. LEXIS 76019, at *27-28, the Court was making the additional point that Maine statutes are not always construed in the same light as the FLSA, especially when, as here, they are not identical federal and state counterparts. *Severance Order* at 74-75.

To Plaintiffs' argument that the legislative history indicates that an employer may not negotiate for any less than the payment amounts or time frames prescribed by the statute, and therefore, the Director was prohibited from doing so, the Court also concludes that this is a new argument, not proper in a motion for reconsideration. In fact, it is the opposite of the argument they made before the Court issued its Severance Order. Plaintiffs' counsel indicated during oral argument that they "don't actually look at this case as a challenge to the director's ability to make the settlement they made." *Oral Argument Tr.* 33:9-11. The Court asked whether Plaintiffs' counsel was suggesting she wanted both the benefits of the settlement agreement and what section 625-B provides: "You want your cake and eat it, too?" *Id.* 33:16. Plaintiffs' counsel responded: "Absolutely, Your Honor. What good is cake without eating it? That is absolutely true. That is our position. We have a right to both." *Id.* 33:17-19. The Court will not entertain an entirely opposite argument now that the Severance Order has issued, because Plaintiffs "should not be allowed to switch from theory to theory like a bee in search of honey." *Cochran*, 328 F.3d at 11.

### 5.    Conclusion

Having concluded that Plaintiffs have not presented new evidence not previously available, any intervening change in controlling law, or arguments requiring the Court to correct a clear error of law or to prevent manifest injustice, the Court concludes that it need not change its underlying analysis, conclusions and ruling in its Severance Order. *Poulin*, 2014 U.S. Dist. LEXIS 56987, at *6. The Court declines to reconsider and reverse the Severance Order.

## C.   The Suitability of Certification to the Maine Supreme Judicial Court

As an alternative, the Plaintiffs request that the Court vacate the Severance Order and certify five questions to the Law Court for review. *See* Section III.A, *supra*. Plaintiffs also blame the Court for their current situation, contending that it "has left [them] with no ability to enforce their right to timely payment of severance" in any court, nor can they "challenge the amount of payments that Verso has made to date, or will make in the future, in the Director's action." *Pls.' Mot.* at 6. In response, Verso believes certification is improper, as Plaintiffs are merely unhappy with the Court's Severance Order ruling. *Defs.' Opp'n* at 3. Essentially, Verso contends that Plaintiffs cannot request an expedited ruling, lose, and then claim it should have been certified to the Law Court all along. *Id.* at 14-15.

### 1.    Legal Standard for Certification Under 4 M.R.S. § 57

Section 57 of title 4 of the Maine Revised Statutes provides, in part:

> When it appears to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there is involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court,

> such federal court may certify any such questions of law of this State to
> the Supreme Judicial Court for instructions concerning such questions
> of state law, which certificate the Supreme Judicial Court sitting as the
> Law Court may, by written opinion, answer.

4 M.R.S. § 57. "'Consideration of the merits of certified questions is not automatic.'"
*Dinan*, 857 F. Supp. 2d at 169 (quoting *Brown v. Crown Equip. Corp.*, 2008 ME 186,
¶ 12, 960 A.2d 1188).   Instead, "[t]he Law Court, at its discretion, exercises
jurisdiction over a question where '(1) there is no dispute as to the material facts at
issue; (2) there is no clear controlling precedent; and (3) our answer, in at least one
alternative, would be determinative of the case.'"   *Id.* (quoting *Darney v. Dragon
Prods. Co., LLC*, 2010 ME 39, ¶ 10, 994 A.2d 804).   On the other hand, rather than
certification, "a federal court sitting in diversity may . . . undertake its prediction [of
the state law issue], 'when the [route] [the] state courts would take is reasonably
clear.'"   *Lyons v. Nat'l Car Rental Sys., Inc. (of Delaware)*, 30 F.3d 240, 245 (1st Cir.
1994) (quoting *Vanhaaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 3 (1st Cir.
1993) (citation omitted)).   To make such a prediction, "a federal court may consider
'analogous decisions, considered dicta, scholarly works, and any other reliable data
tending convincingly to show how the highest court in the state would decide the issue
at hand.'"   *Fischer v. Bar Harbor Banking & Trust Co.*, 857 F.2d 4, 7 (1st Cir. 1988)
(quoting *Michelin Tires, etc. v. First Nat'l Bank of Boston*, 666 F.2d 673, 682 (1st Cir.
1981)).   Ultimately, "[t]he decision whether to certify lies within the sound discretion
of the federal court."   *Darney v. Dragon Prods. Co., LLC*, 640 F. Supp. 2d 117, 125 (D.
Me. 2009) (internal quotation marks omitted); *see also Fischer*, 857 F.2d at 7 (same).

## 2.   Analysis

The Plaintiffs' current position is inconsistent with the record.  The Plaintiffs filed their Complaint in this Court on December 15, 2014, *Compl.*, and simultaneously filed a motion for a temporary restraining order and preliminary injunction, and a motion for expedited declaratory judgment and preliminary and permanent injunction.  *Mot. for a TRO and a Prelim. Inj. Pursuant to F.R.C.P. 65* (ECF No. 4) (*Pls.' TRO Mot.*); *Pls.' Mot. for* Expedited *Declaratory J. and Req. for Prelim. and Permanent Inj.* (ECF No. 6).  The Plaintiffs stressed that "[e]xpedited review and disposition of this Motion and matter is requested in the interest of justice" and that "this deal may be consummated at anytime, and therefore destruction of the Bucksport Mill could begin at anytime, and immediate relief is necessary."  *Pls.' TRO Mot.* at 1, 10.  The Plaintiffs also moved for expedited review.  *Pls.' Mot. Requesting* <u>Expedited</u> *Review of All Pleadings and Mots. Relating to the* <u>Time</u>*ly Payment of Severance and Accrued 2015 Vacation Time Pay* (ECF No. 7).  In that motion, the Plaintiffs highlighted the urgency of a prompt resolution:

> This case is all about *time* and *delay* and how both are being used by Verso to evade the requirements of Maine law to timely pay the Bucksport Mill employees, including the Plaintiffs, the severance pay and accrued 2015 vacation time pay to which they are entitled under 26 M.R.S.A. §§ 625-B and 626, ***on or by January 8, 2015***.

*Id.* at 2 (emphasis in original).  To accommodate the Plaintiffs, the Court put aside its other work and scheduled an immediate telephone conference of counsel, which it held on December 16, 2014.  *Minute Entry* (ECF No. 13).

First, to the extent Plaintiffs argue that the Court's Severance Order has made it impossible for them to "challenge the amount of payments that Verso has made to

40

date, or will make in the future, in the Director's action," this is simply not true. Paragraph 14 of the Consent Order filed in Kennebec County Superior Court provides:

> If any employee contests the accuracy of calculations of the amount of his or her severance pay or vacation pay, or his or her inclusion on or exclusion from the list of affected hourly employees, he or she or their collective bargaining representative may, within 60 days of the date of this Order, bring this disagreement to the attention of the Director, who shall make an independent determination, which shall be binding on Defendants, provided it is based on a reasonable interpretation of the statutory methodology.

*Consent Order* ¶ 14. Pursuant to this paragraph, Plaintiffs indicated through Mr. Gilley's affidavit that they filed their objections with the Director and the superior court, and Justice Mullen was waiting to rule on the Attorney General's pending motion to dismiss with prejudice until he received a status update on April 8, 2015. *See* Section II.B, *supra*. Plaintiffs foresaw using this mechanism to challenge the amount of severance payments during oral argument as well. *See Oral Argument Tr.* 19:21-20:3 ("There is a mechanism through the state for resolving disputes on individual claims. We're looking for a question of timing of those claims, both through the consent decree mechanism and through the normal state rules. We will dispute through the normal state process the amount each individual is entitled to at that time. And the state consent decree talks about people have 60 days in which to file a claim for that").

Second, Plaintiffs made it clear in this Court that they were not disputing the amount of severance pay, only its timing:

> We are not seeking this court to play bookkeeper of 58 claims or 520 claims. All we are seeking in this court is declaratory judgment and injunctive relief telling them to pay whatever that amount is on time. What the amount is on individual claims, we will resolve through the state mechanisms that exist, not to trouble this court with. This is an issue over right. It's an issue over the right to timely payment.

*Id.* 20:4-11; *see also id.* 22:24-23:2 ("I believe that how much they can pay can be resolved through the Department of Labor. It does not need to be in this court's jurisdiction to mediate each individual person's amount"); *id.* 23:22-23 ("[T]he exact dollar amount, I don't believe this court needs to address"). The Court relied on this representation in its Severance Order in concluding that Plaintiffs could proceed in federal court on the basis of diversity jurisdiction. *Severance Order* at 55-56 ("Here, however, Plaintiffs have not asked the Court to determine the specific amount of their individual severance or vacation payments from Verso, a demand that may have jeopardized their claim of a common and undivided interest; instead they have only asked the Court to rule on the timing of those payments. . . . [B]y restricting their claims and requested relief, Plaintiffs have fit themselves well within the 'common and undivided interest' rubric for purposes of the jurisdictional amount under 28 U.S.C. § 1332"). Plaintiffs' accusations are baseless.

Third, several of the proposed questions posed by Plaintiffs do not meet all three prongs for certification outlined by the Law Court. Plaintiffs' proposed question two—whether the Legislature intended the right to bring and maintain actions under subsections 4 and 5 were to be interpreted in line with the FLSA and ADEA—is not determinative of the cause. It is really a sub-question to Plaintiffs' question one, which the Court discusses in more detail below. Plaintiffs' proposed question four—

regarding proper interpretation of the "last full day of work" under subsection 2—rests on material facts that remain in dispute between the parties, and is not determinative of the cause. Plaintiffs' proposed question five—whether the Legislature has determined that payment of attorney's fees and costs under subsection 4 is contrary to public policy in a situation such as this one—is not determinative of the cause. It does not address the interpretation of the termination provision in relation to prior-pending actions. This leaves the Court with two proposed questions to consider for certification: Question one—whether the Legislature intended that an action filed by the Director under subsection 5 would terminate a prior-pending action under subsection 4, and question three—regarding mitigation of liability under subsection 3(B).

Once the Director filed her action against Verso in state court, Plaintiffs argued that they wanted this Court to rule on their claims for severance pay to avoid the termination provision of subsection 5. In their reply memorandum regarding whether the Court should abstain, Plaintiffs answered in the negative, arguing that, in light of the Director's subsequent action in Kennebec County Superior Court, "if this Court abstains, and sends the Plaintiffs to State Court, Plaintiffs' ability to obtain timely payment of all of the severance due them will be lost forever, because of the termination language" under the statute. *Pls.' Reply to the Verso Defs.' Second Supplemental Mem. of Law in Opp'n to Pls.' Mot. for Expedited Declaratory J. and Req. for Prelim. and Permanent Inj.* at 6 (ECF No. 53). They further argued that a ruling from this Court would be beneficial regarding timing of severance pay, as it

"will assist the State in prior enforcement actions against future employers who refuse to comply with the MSPA and all the Bucksport Mill's employees all have the benefits of at least the compromise payments that the Director obtained through the consent decree to tide them over." *Id.* at 10. Although not raised by Plaintiffs before now, presumably they would have also objected to the Court certifying the case to the Law Court given the time constraints and desire for an expedited ruling.

The Court agreed with Plaintiffs' concerns, noting during oral argument that it "would not want to abstain where I would . . . so dramatically affect the rights of the parties." *Oral Argument Tr.* 49:11-13. It reiterated this again later on: "I am close to abstention, but I am not going to abstain if it's going to affect the rights of the parties, and namely [Plaintiffs' counsel's] right to raise the argument that she has raised about pre or post." *Id.* 51:24-52:2. In its Severance Order, the Court also wrote that given the fact that the "timeframe for a judicial decision is so narrow," certification to the Law Court would be "unrealistic." *Severance Order* at 57 n.15. Finally, the Court also noted in its Severance Order that "the implications of Plaintiffs' arguments affect the authority of the Director and the Attorney General to act under a state statute, so there is even more of a compelling argument for abstention than in the vacation pay matter." *Id.* at 85 n.22. However, the Court explained that "in fairness to Plaintiffs, they deserved a decision on the merits, [and] the Court has declined to abstain on the Maine severance pay law issue." *Id.*

Under the circumstances of a different case with a different procedural history, the Court may have certified Plaintiffs' proposed questions one and three. Here,

however, the Court concludes that certifying these questions to the Law Court would be inappropriate. The Court's prior conclusion that abstention would have been appropriate but-for the Director's filing an action in state court was not a suggestion that Plaintiffs would be entitled to certification if the Court ruled against them. Abstention and certification are two distinct concepts. In addition, while Plaintiffs argue that certification is no longer "unrealistic" because the previous time constraints placed on the Court no longer exist, Plaintiffs cannot ignore the adverse ruling. The Court issued an eighty-six page Order under the onerous time constraints that the Plaintiffs in particular imposed on the Court, considering numerous authorities and factors, including analogous cases and dicta from the Maine Superior and Law Courts, as well as the United States Supreme Court, federal laws with nearly identical language, the framework of section 625-B as it fits within the entire picture of title 26 and chapter 7, the plain language of the statute, legislative history and public policy, all of which "tending convincingly to show how the highest court in the state would decide the issue at hand." *Fischer*, 857 F.2d at 7 (internal quotation marks omitted).

Furthermore, it was Plaintiffs who chose to institute proceedings in federal rather than state court. Plaintiffs should have "had knowledge of the state of the law under [their] theories for recovery, and had the choice of forums to file suit, either in the local courts or the federal court under diversity jurisdiction, 28 U.S.C. § 1332." *Id.* at 8. Plaintiffs indicated during oral argument that they chose to file in federal rather than state court based on their assumption that Verso would remove the case

45

to federal court anyway, resulting in a loss of time. *Oral Argument Tr.* 67:11-16. The Court recognizes that Plaintiffs may not have anticipated the Director's subsequent suit in state court. Nevertheless, as explained by the First Circuit:

> [O]ne who chooses the federal courts in diversity actions is in a peculiarly poor position to seek certification. We do not look favorably, either on trying to take two bites at the cherry by applying to the state court after failing to persuade the federal court, or on duplicating judicial effort.

*Fischer*, 857 F.2d at 8 (quoting *Cantwell v. Univ. of Mass.*, 551 F.2d 879, 880 (1st Cir. 1977)). The Court will not "duplicat[e] judicial effort" by certifying Plaintiffs' proposed questions to the Law Court.[11]

### D.    The Suitability of an Interlocutory Appeal to the First Circuit

Because the Court has declined to reverse the Severance Order or to certify Plaintiffs' proposed questions to the Law Court, it now considers Plaintiffs' final request that it grant them an interlocutory appeal to the First Circuit under 28 U.S.C. § 1292(b).

#### 1.    Rewritten History

First, the Plaintiffs' position rewrites history. *See* Section IV.C.2, *supra* (discussing the procedural history of this case that occurred on December 15, 2014 and December 16, 2014).

#### 2.    The December 16, 2014 Telephone Conference with Counsel

---

[11]     In its response, Verso argued that because the employees have now been paid, the payment issue is moot. In their reply, the Plaintiffs raised the so-called *Munsingwear* Doctrine, which allows a court to dismiss a judgment in order to avoid its preclusive effect, where the issue has become moot by virtue of intervening events. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 40-41 (1950). As the Court has denied Plaintiffs' request for certification on alternative grounds, it need not discuss the issues of mootness and the *Munsingwear* Doctrine.

The Plaintiffs have asserted that the Court promised during the December 16, 2014 telephone conference that it would allow an interlocutory appeal to the First Circuit.  Plaintiffs say the Court promised "regardless of its ruling . . . [to] certify those issues as appropriate for interlocutory appeal by the losing party in any decision." *Pls.' Reply* at 17.  Based on this so-called "agreed procedural decision," Plaintiffs say that they did not present any arguments or caselaw in support of their position. *Id.*

During this telephone conference, the Court stated, in relevant part:

> It strikes me too that if I – that whichever way I rule on that [severance], that may be one of the Rule 54(b) exceptions where you – I could give the losing party the opportunity to take it right up to the First Circuit and you could have – you could make your pitch to have an expedited resolution of that, whichever way I jump on that issue.

*Tr. of Proceedings* 3:21-4:1 (ECF No. 125) (*Dec. 16, 2014 Tr.*).  Verso noted in its briefing that it "does not object to the Court entering final judgment against Plaintiffs on Count 9 pursuant to Rule 54(b)." *Defs.' Surreply* at 7.

### 3.  Analysis

In fact, the Court never promised the parties the right for the losing party to proceed under § 1292(b) for an interlocutory appeal.  There is a difference between judicial musing and a court order.  Addressing the parties for the first time the day after the Plaintiffs had filed their Complaint, the Court was brainstorming with counsel a possible course in the litigation, thoughts eclipsed by subsequent events.  What the Court had in mind on December 16, 2014 is that the parties, particularly the Plaintiffs, would prefer a quick decision from the Court, one they could present

47

on an emergency basis to the Court of Appeals because the Plaintiffs were demanding immediate action to prevent the mill from closing and to obtain more timely severance payments. Thus, the Court was considering obtaining the speedy guidance of the Court of Appeals to address emergency legal issues.

But, by the parties' own actions, this is not what happened. Instead, the parties, including the Plaintiffs, elected to fully litigate issues before this Court and they pressed this Court for an immediate answer. On January 6, 2015, the Court issued an eighty-six page order, resolving a plethora of legal issues. Then, on January 20, 2015, the Court issued a seventy-three page order on the Plaintiffs' motion for temporary restraining order and preliminary injunction. In other words, the Plaintiffs made the strategic choice to make a full court press in district court, rather than to obtain a quick trial court ruling and then proceed rapidly under § 1292(b) to the Court of Appeals. From the Court's perspective, § 1292(b)'s utility was obviated by the actions of the parties, again, particularly the Plaintiffs. Moreover, if the Plaintiffs had wanted a § 1292(b) review, they should have asked for it immediately following the first decision of January 6, 2015, not in a motion to reconsider two weeks later, and just after the second decision of January 20, 2015. The Court discusses additional reasons why Plaintiffs' request for § 1292(b) review is improper in more detail below.

Although "[t]he basic design of Section 1292(b) is similar to Rule 54(b)," these provisions "address two different situations." 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2658.2 (4th ed.

2014).   Section 1292(b) only addresses those "orders that would be considered interlocutory even if presented in a simple single-claim, two party case," whereas Rule 54(b) "applies only to adjudications that would be final under Section 1291 if they occurred in an action having the same limited dimensions."  *Id.*  Thus,

> if an order is final under Section 1291, Section 1292(b) cannot apply and resort must be had to Rule 54(b) in the multiple-party or multiple-claim situation.  Conversely, if an order is interlocutory, Rule 54(b) has no bearing on any determination that might be made under Section 1292(b).

*Id.*  Nevertheless, "it may be appropriate for a district judge to certify under both the rule and the statute in an action with multiple claims or multiple parties" when finality is unclear, and furthermore, "[i]f the court would have been prepared to review a judgment under Rule 54(b), it achieves little to deny Section 1292(b) review."  *Id.*  Although Plaintiffs erroneously believed the Court was discussing the possibility of interlocutory review under § 1292(b) during the December 16, 2014 telephone conference, the Court will consider it nevertheless.

### a.    28 U.S.C. § 1292(b)

Section 1292(b) applies to "an order not otherwise appealable under this section," and where a district judge is

> of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . .

28 U.S.C. § 1292(b).  If a district judge is of such an opinion, "he shall so state in writing in such order."  *Id.*  The Severance Order makes no mention of § 1292(b).  As this Court has previously noted, "[t]he language of the statute suggests that the

49

certification should be contemporaneous with the order," and moreover, "[t]here is no express authority for a disappointed litigant to request certification after the order has issued and the Court is uncertain whether it has the authority to act on this motion." *Widi*, 2011 U.S. Dist. LEXIS 135517, at *11.[12]

In this case though, there is good reason for the Court to deem Plaintiffs' argument waived on the issue of interlocutory review and deny their request on that basis alone. Simply put, the Plaintiffs presented no argument or caselaw to support their position. Not only did the Court not contemplate certification under § 1292(b), but it also explicitly told the parties that they would need to present argument before it would grant such a request under Rule 54(b). *Dec. 16, 2014 Tr.* 3:23-4:1 ("I could give the losing party the opportunity to take it right up to the First Circuit and you could have – you could make your pitch to have an expedited resolution of that, whichever way I jump on that issue"). Thus, even if the Court at one time contemplated certification under § 1292(b), at no time did it indicate to the parties that they need not present any argument to support their position. Lack of developed arguments are commonly deemed waived. *See Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7, 10 (1st Cir. 2011) ("'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). The Court deems Plaintiffs' request for § 1292(b) certification waived.

---

[12]     The Court ultimately addressed the merits of the motion for certification for interlocutory appeal despite this uncertainty in *Widi*. 2011 U.S. Dist. LEXIS 135517, at *11-12.

In any event, the Court would deny their request on the merits.  As explained by the First Circuit, interlocutory appeals under § 1292(b) are "hen's-teeth rare" and "require, among other things, leave of both the trial and appellate courts."  *Camacho v. P.R. Ports Auth.*, 369 F.3d 570, 573 (1st Cir. 2004).  In addition:

> Only rare cases will qualify for the statutory anodyne; indeed, it is apodictic in this circuit that interlocutory certification of this sort should be used sparingly and only in exceptional circumstances, and where the proposed intermediate appeal presents one or more difficult and pivotal questions of law not settled by controlling authority.

*In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1010 n.1 (1st Cir. 1988) (internal quotation marks omitted).  Furthermore, "[t]here is a preference against piecemeal litigation, and the procedures available under section 1292(b) should be granted sparingly."  *United States ex rel. McDermott v. Genentech, Inc.*, 518 F. Supp. 2d 289, 290 (D. Me. 2007).  Here, granting Plaintiffs' request would not "materially advance the ultimate termination of the litigation," in fact, it would likely prolong it.

### b.   Federal Rule of Civil Procedure 54(b)

Plaintiffs made no argument in their memoranda regarding application of Rule 54(b), but Verso noted that it would not object to the Court entering a final judgment pursuant to Rule 54(b).  Nevertheless, the Court draws the same conclusion about the issuance of a Rule 54(b) judgment that it has about § 1292(b) certification.  In 1946, the advisory committee stated that "Rule 54(b) was originally adopted in view of the wide scope and possible content of the newly created 'civil action' in order to avoid the possible injustice of a delay in judgment of a distinctly separate claim to await adjudication of the entire case."  FED. R. CIV. P. 54(b) advisory committee's note

51

(1946).  The committee warned, however, against the "piecemeal disposition of an action."  *Id.*  Citing the "universal policy against piecemeal appeals," the First Circuit has expressed the same concern.  *In re Northern Transatlantic Carrier Corp.*, 423 F.2d 139, 141 (1st Cir. 1970).  The Court declines to issue a Rule 54(b) judgment because it is not convinced that doing so will expedite the final resolution of the multiple controversies between the parties.

## V.    CONCLUSION

The Court DENIES Plaintiffs' Motion for Reconsideration, Certification to the Maine Supreme Judicial Court, or Certification of Appeal for Interlocutory Review of the Severance Pay Claims in Count 9 (ECF No. 97).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of August, 2015