UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, LOCAL LODGE NO. 1821, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | 1:14-cv-00530-JAW |
| VERSO CORPORATION, et al., | ) ) ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS TO DISMISS**

A paper company and scrap metal operator move to dismiss claims that the purchase and sale of a paper mill violates § 1 and § 2 of the Sherman Act and § 7 of the Clayton Act. The Court first concludes that the pending lawsuit is now moot because the sale has been fully consummated and even if the Plaintiffs have an abstract right, they have no realistic remedy. Next, if their claims are not moot, their Sherman Act claims must still fail because the Plaintiffs' critical allegations are conclusions of law, not statements of fact, and are not sufficient under *Twombly*[1] standards. Furthermore, despite their protests to the contrary, the Plaintiffs' Sherman Act claims are premised on the erroneous notion that the paper company had the legal obligation to sell the mill to a competitor. Finally, the Court rejects the Plaintiffs' Clayton Act claim because it is grounded in the incorrect contention that

---
[1]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

the Clayton Act covers a sale to a non-competitor as opposed to the acquisition of a competitor.

## I.     BACKGROUND

On December 15, 2014, the International Association of Machinists and Aerospace Workers AFL-CIO Local Lodge No. 1821 (IAMAW) and other individual Plaintiffs (collectively Plaintiffs) filed suit against Verso Paper LLC, now Verso Paper Corporation[2] (Verso), and AIM Development USA, LLC (AIM) claiming that an agreement entered into between Verso and AIM in which Verso agreed to sell its Bucksport, Maine mill to AIM violated federal antitrust law (Counts One, Two, and Three), the Clayton Act (Count Four), violated state of Maine antitrust law (Counts Five, Six, Seven, and Eight), and violated state of Maine severance and vacation pay law (Count Nine). *Compl. for Declaratory and Injunctive Relief* (ECF No. 1).   On December 22, 2014, the Plaintiffs filed an amended complaint, which added Fifty-Three Local No. 1821 Members and included additional allegations. *First Am. Compl. for Declaratory and Injunctive Relief* (ECF No. 29) (*Am. Compl.*).

The parties' initial focus was the Plaintiffs' claims for severance and vacation pay under Maine law.   On January 6, 2015, the Court concluded that the state law claims belonged in state court and dismissed the portion of the Plaintiffs' amended complaint insofar as it sought relief under Maine law. *Order Dismissing Pls.' Mot. for Declaratory and Injunctive Relief; and Dismissing Pls.' Mot. for Attach. and*

---

[2]      On April 29, 2015, Verso filed a notice of name change of Verso Paper Corp., substituting the name Verso Corporation for Verso Paper Corp. *Notice of Name Change of Verso Paper Corp.* (ECF No. 130).  The Court granted the motion on May 1, 2015. *Order Granting Mot. to Substitute Party* (ECF No. 131).

*Trustee Process* (ECF No. 73).  The Court's decision did not sit well with the Plaintiffs. On January 20, 2015, the Plaintiffs filed a motion for reconsideration.  *Pls.' Mot. for Recons., Certification to the Maine Supreme Judicial Ct., or Certification of Appeal for Interlocutory Review of the Severance Pay Claims In Count 9* (ECF No. 97).  On August 3, 2015, the Court denied the Plaintiffs' motion for reconsideration.  *Order Denying Pls.' Mot. for Recons. and Req. for Certification* (ECF No. 133).

Meanwhile, after the Plaintiffs filed a stipulation, dismissing the state antitrust counts, leaving only the federal antitrust claims along with the severance and vacation pay count, *Stipulation of Voluntary Dismissal of Counts 5 Through 8 (State Antitrust Claims) of Pls.' First Am. Compl.* (ECF No. 106), on March 2, 2015, the Defendants filed motions to dismiss the federal antitrust claims.  *Mot. of AIM Development (USA) LLC to Dismiss Pls.' First Am. Compl.* (ECF No. 113) (*AIM Mot.*); *Defs. Verso Paper Corp. and Verso Paper LLC's Mot. to Dismiss Pls.' First Am. Compl. for Declaratory and Injunctive Relief* (ECF No. 114) (*Verso Mot.*).  On March 23, 2015, the Plaintiffs filed their response.  *Pls.' Consolidated Resp. in Opp'n to Defs.' Separate Mots. to Dismiss Pls.' First Am. Compl. Pursuant to Rule 12(b)(6)* (ECF No. 123) (*Pls.' Opp'n*).  The Defendants responded on April 6, 2015.  *Reply Mem. of AIM Development (USA) LLC in Support of its Mot. to Dismiss Pls.' First Am. Compl.* (ECF No. 128) (*AIM Reply*); *Defs. Verso Paper Corp. and Verso Paper LLC's Reply in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl. for Declaratory and Injunctive Relief* (ECF No. 129) (*Verso Reply*).

## II.    THE PARTIES' POSITIONS

A. **The Defendants' Motions**

1. **Verso's Motion**

In its motion, Verso observes that it sold the Bucksport mill to AIM on January 29, 2015 and claims that because it no longer owns the Bucksport mill, it "no longer has the legal right to possess or manipulate any of the mill's physical assets." *Verso Mot.* at 1-2. The effect of the sale, in Verso's view, is to erase the premise of the lawsuit because the Court is unable to "preserve a mill that Verso no longer owns and to prevent the sale of a mill that Verso already has sold." *Id.* at 2. Next, Verso argues that Count One, based on Section 1 of the Sherman Act, fails because Plaintiffs have not alleged the existence of a contract, combination, or conspiracy to restrain trade under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2006). *Id.* Verso also argues that Counts Two and Three, based on Section 2 of the Sherman Act, are not actionable under *Verizon Communications Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). *Id.* Verso says the same is true of the Plaintiffs' claims in Count Four based on Section 7 of the Clayton Act because the Plaintiffs failed to allege "either that the sale of the Bucksport mill to AIM would lessen competition in the market where AIM competes or that the acquisition will harm competition." *Id.* Finally, Verso contends that if any of the federal antitrust claims are allowed to proceed, the Plaintiffs must be limited to claims as consumers, not employees. *Id.*

2. **AIM's Motion**

In its companion motion, AIM first observes that, because Counts One and Two are directed only against Verso, the only counts now pending against AIM are Counts

Three and Four of the Amended Complaint. *AIM Mot.* at 1-2. AIM contends that the Plaintiffs' antitrust lawsuit is founded upon a faulty premise: "namely, that any reduction of capacity by a manufacturer or discontinuance of a manufacturing facility threatens competition because it reduces manufacturing supply and therefore might lead to higher prices." *Id.* at 3. AIM asserts that this theory "is incorrect as a matter of law." *Id.* Finally, AIM argues that the Plaintiffs' antitrust claims "are now largely moot." *Id.*

### 3.   The Plaintiffs' Response

In their response, the Plaintiffs contend that four groups—Verso's parent, Apollo Global Management (Apollo); Verso and its entities; NewPage Holdings, Inc. (NewPage); and AIM—have all engaged in "known anticompetitive acts" demonstrating a "pattern of conduct" in violation of "Sections 1 and 2 of Sherman and Section 7 of Clayton." *Pls.' Opp'n* at 2. The Plaintiffs allege that Apollo acquired NewPage's debt and that it "used its acquisition of NewPage's second lien debt to exert improper influence over NewPage, to force a merger with Verso and to reduce capacity in the highly concentrated coated paper markets in North America in anticipation and preparation for that merger." *Id.* The Plaintiffs say that "[t]his acquisition and exertion of influence reduced competition and had the intent to further Verso's monopoly power over the North American coated paper markets, in violation of Sections 1 and 2 of the Sherman Act and Section 7 of the [C]layton Act." *Id.* Turning to AIM's role, the Plaintiffs maintain that AIM "was the instrument Verso and NewPage used to ensure that any reductions in capacity in these markets

5

was permanent, by selling these mills to a scrapper rather than competitors willing to pay a higher price to continue to operate the mills in the production of coated paper products." *Id.*

The Plaintiffs concede that they "did not name Apollo or NewPage as defendants in this action, nor did [they] challenge the merger of Verso and NewPage." *Id.* at 6. They explain that the "legality of the Verso-NewPage merger was the subject of a long-running, and on-going investigation by the Antitrust Division of the U.S. Department of Justice (DOJ)" and "[r]ather than attempt to undertake a challenge to the Verso-NewPage merger, Plaintiffs' antitrust counsel communicated Plaintiffs' concerns regarding the closure and scrapping of the Bucksport Mill to DOJ in early November, 2014" and "requested that DOJ condition the approval of the Verso-NewPage merger on divestiture of the Bucksport Mill and sale to a competitor." *Id.*

The Plaintiffs argue that the sale of the Bucksport mill to AIM does not render their Amended Complaint moot because they contend that the Court retains the authority to "find the sale to AIM to be illegal and (i) order rescission of the Verso-AIM contract; or (ii) mandate divestiture of the Bucks[]port Mill *as a going concern by AIM*, so that the Mill could be sold to a Verso competitor or any new entrant into the coated printed paper market (e.g., a foreign paper maker or a North American producer of other paper products)." *Id.* at 27 (emphasis in original).

The Plaintiffs turn to each of the Counts and maintain that their amended complaint survives dismissal. *Id.* at 29-41.

### 4.   Verso's Reply

In its reply, Verso begins by characterizing the Plaintiffs' contentions:

> The First Amended Complaint contains essentially three antitrust claims: (1) Verso and NewPage conspired to close the Bucksport mill in violation of Section 1 of the Sherman Act; (2) Verso attempted to monopolize the North American coated paper market (and conspired with AIM to do so) by selling the Bucksport mill to AIM in violation of Section 2 of the Sherman Act; and (3) Verso sold the Bucksport mill to AIM—a noncompetitor in the North American coated paper market—in violation of Section 7 of the Clayton Act.

*Id.* at 1.  Verso then summarizes its response:

> Verso moved to dismiss the [First Amended Complaint] because (1) all of Plaintiffs' claims against Verso are now moot; (2) the Section 1 claim fails because Plaintiffs do not satisfy the pleading standard set forth in *Twombly*; (3) the Section 2 claims fail because Plaintiffs allege no conduct besides a purported refusal to deal with competitors, which is not a violation of the antitrust laws under *Trinko*; and (4) the Section 7 claim fails because it is nothing more than an effort to make an end-run around *Trinko*.

*Id.* at 1-2.  Contending that the Plaintiffs have sought to defend the Verso motion to dismiss by adding new allegations in their opposition brief, Verso asserts that the Plaintiffs have engaged in a "wholesale attempt" to "fundamentally change the nature of their case by and through their opposition to the pending motion to dismiss," which Verso says is "improper under *Twombly*."  *Id.* at 3.

Citing as authority *Mad Men*,[3] Verso accuses the Plaintiffs of attempting to "change the conversation" by making a series of allegations in their opposition that is not contained in their First Amended Complaint.  *Id.* at 2 n.1, 4-9.  First, Verso insists that the allegations about Apollo are "not properly before the Court because they are not in the [First Amended Complaint], nor are they relevant to the question

---

[3]     *Mad Men: Love Among the Ruins* (AMC television broadcast Aug. 23, 2009).

of whether Verso, one of many portfolio companies that Apollo owns, conspired with NewPage to close the Bucksport mill." *Id.* at 5-6.  Next, Verso expresses skepticism that the Plaintiffs have not claimed that Verso has refused to deal with a competitor as the refusal to do so is not a Section 2 violation under *Trinko*.  *Id.* at 6-8.  Third, Verso objects to the Plaintiffs' reference to Verso's acquisition of NewPage, rather than Verso's sale of the Bucksport mill to AIM.  *Id.* at 8-9.

### 5.     AIM's Reply

In its reply, AIM focuses on the Plaintiffs' asserted failure to respond to AIM's analysis of the Membership Interests Purchase Agreement (MIPA), where AIM contended that "AIM did not make the 'promise' to Verso that Plaintiffs allege AIM made, and on which their entire claim of conspiracy hangs—a promise that AIM would salvage the Mill." *AIM Reply* at 2.  AIM points out that "it requires no conspiracy for AIM to agree to purchase a mill and then to salvage it; that is AIM's business." *Id.* at 2-3.  AIM rejects the Plaintiffs' attempts to distinguish the Verso sale to AIM from *Trinko*.  *Id.* at 3.  Regarding the Clayton Act, AIM writes that the Plaintiffs "point to no case that says an asset owner violates the Clayton Act by selling its own asset to a non-competitor (or refusing to sell its own asset to a competitor)." *Id.* at 4.

## III.   LEGAL STANDARD

### A.     Motion to Dismiss

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a court must

determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio–Hernández v. Fortuño–Burset,* 640 F.3d 1, 7 (1st Cir. 2011) (citing FED. R. CIV. P. 12(b)(6)).  A court need not assume the truth of conclusory allegations, and the complaint must state at least a "plausible claim for relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009).  However, "[n]on-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible." *Ocasio–Hernández,* 640 F.3d at 12.  A court may not "attempt to forecast a plaintiff's likelihood of success on the merits". *Id.* at 13.

In 2007, the United States Supreme Court issued *Twombly*, which emphasized the need for a plaintiff's complaint to marshal sufficient facts to demonstrate a "plausible entitlement to relief."  550 U.S. at 559.  It is noteworthy that *Twombly* is an antitrust case in which the plaintiff claimed a violation of § 1 of the Sherman Act. *Id.* at 548.  In stressing the need for plausibility, the *Twombly* Court observed that an antitrust action "can be expensive," *id.* at 558, and the Supreme Court worried that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching" the summary judgment or trial stages. *Id.* at 559.

Two years later, in *Iqbal*, the United States Supreme Court refined the dismissal standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

556 U.S. at 678 (internal quotation marks and citations omitted).  The *Iqbal* Court suggested that courts when considering motions to dismiss could "chose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.  Having isolated "the well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

In 2013, the First Circuit described the *Twombly* and *Iqbal* decisions as "watershed cases." *García-Catalán v. United States*, 734 F.3d 100, 101 (1st Cir. 2013).  The "plausibility standard," the First Circuit wrote, has become "the 'new normal' in federal civil practice." *Id.* (quoting *A.G. v. Elsevier, Inc.*, 732 F.3d 77, 78-79 (1st Cir. 2013)).  The First Circuit explained that "the plausibility inquiry necessitates a two-step pavane." *Id.* at 103 (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

**B.   The Complaint and Attached Documents**

In evaluating the sufficiency of a complaint, a court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the

plaintiffs." *Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). *See also Town of Barnstable v. O'Connor*, 786 F.3d 130, 141 n.12 (1st Cir. 2015) (discussing *Waterson*). "Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Federal Rule of Civil Procedure 56." *Waterson*, 987 F.2d at 3 (citing FED. R. CIV. P. 12(b)(6)). At the same time, there are "narrow exceptions" for "documents the authenticity of which are not disputed by the parties; for official records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* at 3 (citations omitted). The Court has applied these restrictions in its review of the allegations and documents in this case.[4]

## C.   Additional Facts

In its motion, Verso contends that even though certain additional facts are not alleged in the Amended Complaint, the Court may and should consider them for purposes of ruling on the motion to dismiss. *Verso Mot.* at 5-6. These facts include: (1) that "the DOJ approved the Verso/NewPage transaction and, in doing so, concluded that Verso's decision to sell the Bucksport mill to AIM was unrelated to Verso's acquisition of NewPage"; (2) that "Verso's acquisition of NewPage closed on January 7, 2015"; and (3) that "Verso's sale of the Bucksport mill to AIM closed on

---

[4]   In its opposition, the Plaintiffs intimated that they are "likely to again amend the Complaint and conform the Complaint to the additional facts that have occurred since December 22 that evidence a violation of the antitrust laws . . . . However, even as currently [pled], Plaintiffs respectfully maintain that Plaintiffs' First Amended Complaint adequately states a cause of action for violation of Section 1 and 2 of the Sherman Act and Section 7 of the Clayton Act against these defendants on which relief can be granted." *Pls.' Opp'n* at 26 n.36. The Court must rule on the complaint before it, not on one that might have been filed or might be amended. *See Maine Springs, LLC v. Nestlé Waters N. Am., Inc.*, No. 2:14-cv-00321-GZS, 2015 U.S. Dist. LEXIS 33259, at *1 n.1, 2015 WL 1241571, at *1 n.1 (D. Me. Mar. 18, 2015).

January 29, 2015." *Id.* The Plaintiffs do not directly respond to Verso's assertion that the Court should consider these facts. However, regarding DOJ's approval of the Verso/NewPage transaction, the Plaintiffs attached to their response to the motion to dismiss a copy of DOJ's December 31, 2014 Competitive Impact Statement (CIS). *Pls.' Opp'n* Attach. 9 *DOJ Competitive Impact Statement* (ECF No. 123).[5] Accordingly, as the Plaintiffs and Verso both cite the DOJ's CIS, the Court has considered it under the *Waterson* exception for public documents. Similarly, the Plaintiffs and Verso agree that the Verso/NewPage merger took place on January 7, 2015 and that the Verso/AIM sale was completed on January 29, 2015. *See Pls.' Opp'n* Attach. 1 *Factual Chronology*, at 7 (ECF No. 123); *Order Denying Pls.' Mot. for Recons. and Req. for Certification* at 5-6 (ECF No. 133) ("Third, Verso completed its sale of the Bucksport Mill to AIM on January 29, 2015"). The Court considered these two additional facts because they are based on documents falling within the *Waterson* exceptions for documents the authenticity of which is not disputed by the parties and for documents central to the Plaintiffs' claims.

## IV.   DISCUSSION

### A.   Mootness

In their Amended Complaint, the Plaintiffs seek the following relief:

1) a declaration that the Verso agreement with NewPage to close the Bucksport mill is an illegal restraint of trade;

---

[5]     The Plaintiffs note that "DOJ published the notice in the Federal Register of the Verso-NewPage merger Complaint, divestiture and Consent Decree, as well as the CIS, on January 14, 2015." *Pls.' Opp'n* at 19.

2) a declaration that the Verso agreement with AIM to sell the mill is an illegal conspiracy to monopolize the market;

3) a declaration that Verso's contemplated actions to destroy the productive capacity of the Bucksport mill, its refusal to offer the mill for sale as a going concern, and its agreement to sell the mill to AIM for salvage amount to an illegal attempted monopolization;

4) an injunction prohibiting Verso from taking steps that would damage the mill as a going concern or to impede the sale of the mill to a competitor;

5) an injunction that prohibits Verso's sale of the mill to AIM, prohibits Verso and AIM from rejecting reasonable bona fide offers from a buyer willing to continue operating the mill as a paper mill, requires Verso to work with the Maine Department of Economic and Community Development or a neutral to seek prospective buyers;

6) an injunction that prohibits Verso and AIM from taking actions that would render the Bucksport mill inoperable on a cost basis;

7) an injunction that prohibits Verso from attributing costs from other Verso facilities, including the Jay mill, to the Bucksport mill;

8) an injunction that prohibits Verso and AIM from selling or trying to sell the electric power plant except as part of a sale of the whole mill; and

9)  an injunction that requires Verso to publicize the availability of the

Bucksport mill for sale at a reasonable price to a bona fide buyer.

*Am. Compl.* at 86-88.

Verso asserts that now that its sale to AIM is complete, the Court is powerless

to grant the Plaintiffs the remedies it is seeking.  *Verso Mot.* at 8-11.  The Plaintiffs

respond that:

> [e]ven if some of the requested relief delineated in the prayer for relief
> in the [First Amended Complaint] has now been rendered ineffective or
> unobtainable against Verso[,] as a consequence of the sale of the
> Bucksport Mill to AIM, the Court still could find the sale to AIM to be
> illegal and (i) order rescission of the Verso-AIM contract; or (ii) mandate
> divestiture of the Bucksport Mill *as a going concern by AIM*, so that the
> Mill could be sold to a Verso competitor or any new entrant into the
> coated printed paper market (e.g., a foreign papermaker or a North
> American producer of other paper products).

*Pls.' Opp'n* at 27 (emphasis in original).

The United States Supreme Court observed in 1876 that "[a] court of equity is

always reluctant to rescind, unless the parties can be put back *in statu quo*.  If this

cannot be done, it will give such relief only where the clearest and strongest equity

imperatively demands it."  *Grymes v. Sanders*, 93 U.S. 55, 62 (1876).  Based on the

record before the Court, there is no basis to conclude that an order rescinding the

Verso-AIM contract would place the parties in the position they were in before the

sale.  In fact, as the Plaintiffs acknowledged when they filed suit:

> Once AIM takes control of the Bucksport Mill, it will be nearly
> impossible for Plaintiffs to obtain the relief they seek in their lawsuit,
> which is a limited injunction against the destruction or sale of the
> Bucksport Mill to any entity which does not intend to continue to use it
> for the production of paper until at least June 1, 2015, so that a paper-

manufacturer has adequate time to make a bona fide offer for the Bucksport Mill.

*Mot. for a TRO and a Prelim. Inj. Pursuant to F.R.C.P. 65* at 4 (ECF No. 4) (*Pls.' TRO Mot.*).  In their Amended Complaint and in support of the temporary restraining order, the Plaintiffs alleged that such actions as wiping the hard drives, failing to release tension on the belts and felts, failing to maintain heated water in all tanks, and failing to rotate and lubricate all metal rollers would "*permanently destroy* the papermaking capability of the Bucksport Mill, rendering this facility incapable of being sold to a competitor able to operate as a paper mill . . . ." *Am. Compl.* ¶¶ 53-54. Taking these allegations as true, as is required in ruling on a motion to dismiss, the Plaintiffs have not stated a basis for contract rescission as the sale to AIM has taken place.  There is no basis to conclude that if Verso were to resume ownership of the Bucksport mill tomorrow, the mill could be used to make paper.  In short, the damage has been done.

As a second potential remedy, the Plaintiffs urge the Court to order AIM to divest itself of the Bucksport mill property and sell it to a competitor to restore the mill as "a productive contributor to the North American coated paper market." *Pls.' Opp'n* at 27.  As the Plaintiffs correctly point out, courts retain the power to order divestiture for an antitrust violation. *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404 (1st Cir. 1985).  However, the divestiture remedy would be available only against AIM as AIM now owns the Bucksport mill.  The Court may not order Verso to divest itself of something it no longer owns.

15

As regards AIM, again the allegations in the Amended Complaint—taken as true for purposes of the motion to dismiss—establish that now that the sale has taken place, it is "nearly impossible for Plaintiffs to obtain the relief they seek in their lawsuit," *Pls.' TRO Mot.* at 4, because the facility has been rendered "incapable of being sold to a competitor able to operate [it] as a paper mill." *Am. Compl.* ¶¶ 53-54. Even if the Court could theoretically order AIM to sell what remains of the operating mill to a Verso competitor, the Court would not do so on this record because the Court is convinced based on the allegations in the Amended Complaint that such an order would not provide any "effectual relief." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992).

The First Circuit has taught that "[t]he doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint was filed.'" *ACLU of Mass. v. United States Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) (quoting *Manqual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (quoting *Steffel v. Thompson*, 415 U.S. 452, 460 n.10 (1974))). "If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case." *Manqual*, 317 F.3d at 60. In *Gilpin v. American Federation of State*, 875 F.2d 1310 (7th Cir. 1989), the Seventh Circuit wrote that "[e]ven the United States Court of Appeals for the Seventh Circuit cannot make time run backwards." *Id.* at 1313. What is true for the Seventh Circuit is even more so for the district court in Maine. Here, based on the allegations in the Amended Complaint, there is nothing to suggest that if this Court were to

rescind the Verso/AIM contract, place Verso back in ownership of the Bucksport mill, and order Verso to sell the mill to a competitor, that it could be reasonably sold as an operable paper mill. "[I]f an event occurs while a case is pending . . . that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Church of Scientology*, 506 U.S. at 12). *See also Matt v. HSBC Bank USA, N.A.*, 783 F.3d 368, 372 (1st Cir. 2015).

This leaves the Plaintiffs with an abstract right but no realistic remedy. The remaining request is for a declaration of rights, but Article III of the United States Constitution limits the federal court to adjudicating "only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Here, "even if this court decided the questions" raised by the Plaintiffs, "the pragmatic dispute between the parties would be unaffected." *United States v. Reid*, 369 F.3d 619, 624 (1st Cir. 2004).

The Court concludes that the Plaintiffs' claims against Verso and AIM are now moot. However, in excess of caution, the Court addresses the merits of the motions to dismiss.

## B.  Allegations in the Plaintiffs' Memorandum That Are Not in the Plaintiffs' Amended Complaint

In the Plaintiffs' response, they put forth a series of alleged facts that tracks the genesis of the Bucksport mill's sale and demolition to 2010, when, they say, Apollo Global Management, Verso's parent, acquired NewPage's second lien debt. *Pls.' Opp'n* at 29. As NewPage was a major competitor of Verso in 2010, the Plaintiffs say

that Apollo's acquisition of NewPage's debt was anticompetitive. *Id.* at 30. In fact, the Plaintiffs observe that Apollo's acquisition of a competitor's debt was challenged in the United States District Court for the Southern District of New York in 2003. *Id.* (citing *Vantico Holdings S.A. v. Apollo Mgmt.*, 247 F. Supp. 2d 437 (S.D.N.Y. 2003)). The Plaintiffs maintain that the district court in *Vantico* recognized "the established precedents that hold that acquisition of a competitor's debt can violate antitrust laws." *Id.* The Plaintiffs then assert that beginning in 2011, Apollo used its influence as the holder of NewPage's debt to "compel a Verso-NewPage merger." *Id.* In four detailed paragraphs, the Plaintiffs set forth these factual assertions, concluding that these "facts meet the parallel plus probability standard in *Twombly*" and therefore "dismissal of Plaintiff[]s' Section 1 claims is not appropriate." *Id.* at 30-32. The Plaintiffs repeat these allegations in their discussion of their theory of liability under § 2 of the Sherman Act. *Id.* at 38.

In its reply, Verso complains that these factual allegations about Apollo and its ownership of NewPage debt are nowhere in the Plaintiffs' Amended Complaint and should not be considered by the Court. Verso says that the Plaintiffs' new allegations in their opposition brief are "a thinly disguised attempt by Plaintiffs to amend the [First Amended Complaint] through their brief." *Verso Reply* at 2. Verso maintains that in ruling on the motions to dismiss, the Court may consider only the "well-pleaded facts as they appear in the complaint." *Id.* at 3-4 (quoting *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992)).

Verso is correct.  In ruling on a motion to dismiss, a court is restricted to the allegations in the plaintiffs' complaint, and the Court construes "the well-pleaded facts in the light most favorable to the plaintiffs, . . . accepting their truth and drawing all reasonable inferences in plaintiffs' favor." *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 67-68 (1st Cir. 2014) (quoting *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014)).  At the same time, the plaintiffs may argue what "reasonable inferences" should be drawn from those "well-pleaded facts" to provide greater context.  The Court has considered the facts in the Plaintiffs' response but not alleged in the Amended Complaint only to the extent they shed light on the facts and theories actually alleged in the Amended Complaint.  A Rule 12(b)(6) motion tests the sufficiency of the facts and inferences in a complaint, not the sufficiency of the facts and inferences in a lawyer's memorandum.

### C.    Count One—The Sherman Act Section One

#### 1.    The Section 1 Allegations in the First Amended Complaint

In their amended complaint, the Plaintiffs allege that Verso "entered into an unlawful agreement to restrain trade with NewPage under Section 1 of the Sherman Act." *Am. Compl.* ¶ 5.  The Plaintiffs spell out the charge in Count One of the Amended Complaint.  *Id.* ¶¶ 168-74.  First, they say that Verso and NewPage "are the leading competitors in the market for coated printing papers in North America" and that they "have cooperated extensively in implementing the terms of their merger agreement and seeking to obtain approval of the NewPage Acquisition by the DOJ and other relevant authorities." *Id.* ¶ 169.  The Plaintiffs point out provisions in the

January 3, 2014 merger agreement between Verso and NewPage that conditioned the merger on "certain debt-restructuring transactions" and the NewPage's sale of two paper mills, one in Biron, Wisconsin and the other in Rumford, Maine, "in order to address antitrust considerations related to the NewPage acquisition." *Id.* (quoting Verso's Form 8-K filing of October 30, 2014). The Plaintiffs also say that the merger agreement provided that "NewPage and Verso would use their reasonable best efforts to obtain regulatory approval, and would not sell, dispose or divest any assets without the written consent of the other." *Id.*

> The heart of the Plaintiffs' § 1 allegation is that:
>
> Verso's decision to shut down the Bucksport Mill, announced on October 1, 2014, was part of a cooperation agreement between Verso and NewPage designed (i) to assure that Verso's financial condition remained satisfactory until closing of the NewPage Acquisition (as apparently required by the Verso-NewPage merger agreement) and (ii) to increase future coated printing paper prices and thereby make the NewPage Acquisition more attractive to Verso economically than it otherwise would have been.

*Id.* ¶ 170. To this end, the Plaintiffs claim, Verso entered into an agreement with AIM to sell the Bucksport mill, knowing that AIM intended to demolish it and sell it as scrap, which the Plaintiffs maintain will reduce competition for coated printing paper in North America and will eliminate demand for skilled papermaking workers. *Id.* ¶ 172. The Plaintiffs allege that the closure of the Bucksport mill would reduce Verso's own coated printing paper production capacity in 2014 by about 26% "as a way of implementing its merger-related understandings with NewPage." *Id.* ¶ 173. The closure was, in the Plaintiffs' view, an "unreasonable contract, combination or

conspiracy in restraint of trade that is *per se* illegal under Section 1 of the Sherman Act . . . ." *Id.*

They go on to claim that "[e]ven if Verso's decision to shut down the Bucksport Mill pursuant to its broader cooperation agreement with NewPage were found to be subject only to the Rule of Reason, the facts surrounding the decision clearly establish that it is an unreasonable restraint of trade." *Id.* ¶ 174.  This is so, they say, because shutting down the Bucksport mill and selling it to a company that intends to demolish it, will "reduc[e] productive capacity thereby generating higher prices in the market where [Verso] will be the clearly leading supplier."  *Id.*

## 2.    Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ."[6]  15 U.S.C. § 1.  Section 1 of the Sherman Act "does not prohibit all unreasonable restraints of trade, but 'only restraints effected by a contract, combination or conspiracy.'"  *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (quoting *Twombly*, 550 U.S. at 553) (quoting *Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752, 775 (1984)).

To prove that Verso's acquisition of NewPage constituted an unreasonable restraint of trade, the Plaintiffs allege that Verso's decision to close the Bucksport mill and sell it to a business that would in turn sell it for scrap implemented an understanding with NewPage to reduce competition for coated paper in North

---

[6]     The principal author of the Sherman Act was Ohio Senator John Sherman, whose brother was the legendary Civil War general, William Tecumseh Sherman.

America and to eliminate the demand for skilled labor. *Am. Compl.* ¶ 172. This critical allegation, however, is not anchored by fact. The Plaintiffs point to no provision in the Verso/NewPage acquisition documents and no assertion by Verso/NewPage executives that proves such an agreement ever existed. As the Court observed earlier, "there is no evidence that Verso needed the written consent of NewPage to close the Mill; in fact, the evidence suggests the contrary." *TRO Order* at 69.

Instead, the Plaintiffs speculate that "discovery of internal communications between Verso and NewPage, and depositions of executives for both parties which were engaged in discussions between the parties, is likely to provide evidentiary support to show that Verso and NewPage unlawfully agreed to shut down and sell the Bucksport Mill to a non-paper manufacturer in order to make the pending NewPage acquisition more attractive economically to Verso." *Id.* ¶ 171. But the *Twombly* Court warned against reliance on discovery in an antitrust case to cross the critical line from possible to plausible. Instead, the *Twombly* Court ruled that an antitrust complaint must contain "enough factual matter (taken as true) to suggest that an agreement *was made*." *Twombly*, 550 U.S. at 556 (emphasis supplied). Here, the Plaintiffs have hypothesized about what agreements could have been made and what discovery could reveal about these supposed agreements. To survive dismissal under *Twombly*, the allegations must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* (footnote omitted). Here, the Court

concludes that the allegations in the Amended Complaint fall short and do not raise such a reasonable expectation.

In their memorandum, the Plaintiffs also claim that their allegations "meet the parallel plus probability standard in *Twombly*." *Pls.' Opp'n* at 32. The Plaintiffs state that the "[First Amended Complaint] and Chronology summarize the parallel actions." *Id.* at 30. The Plaintiffs then argue that Apollo used its acquisition of NewPage's debt to "compel a Verso-NewPage merger" and then set about engaging in "anticompetitive and coordinated actions to reduce capacity in various North American coated paper markets." *Id.* at 30-31. They say that Verso and NewPage acted in furtherance of "the Apollo-Verso-NewPage-AIM scheme to reduce capacity in advance of the desired and anticipated Verso-NewPage merger." *Id.* at 31. They conclude that the "only reason that Verso decided to close Bucksport and Sartell Mills (Verso's only unionized facilities), was because of its planned merger with NewPage— because, but/for that merger . . . closing neither the Bucksport nor Sartell Mill—i.e. representing at least 50% of Verso's business assets in 2012—would have made no economic sense." *Id.*

The first problem with the Plaintiffs' parallel plus argument is that it relies on some facts not alleged in the First Amended Complaint. The First Amended Complaint makes passing reference to Apollo as Verso's parent, but it does not set out the chronology that is attached to their memorandum. There is, for example, no allegation in the First Amended Complaint about Apollo purchasing NewPage's debt to force a merger with Verso. Furthermore, the Plaintiffs elected not to name Apollo

or NewPage as party defendants in this case.  *Pls.' Opp'n* at 6 ("Plaintiffs did not name Apollo or NewPage as defendants in this action, nor did Plaintiffs challenge the merger of Verso and NewPage").

But the major problem is that the Plaintiffs' parallel plus argument, especially when the focus is on the allegations and inferences in the First Amended Complaint, is that it is replete with accusation but scarce on facts.  In *Twombly*, the Supreme Court cautioned:

> [L]awful parallel conduct fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. at 556-57.  Without some more concrete allegation, the mere fact that both Verso and NewPage closed paper mills is not enough under *Trombly* to withstand dismissal.

### D.    Counts Two and Three—The Sherman Act Section 2

#### 1.    The Section 2 Allegations in the Amended Complaint

##### a.    Count Two: Attempted Monopolization

In Count Two, the Plaintiffs allege that Verso "entered into a corporate acquisition agreement with its largest competitor in the industry, NewPage, in order to become the dominant supplier in the declining market for coated printing papers in North America."  *Am. Compl.* ¶ 176 (footnote omitted).  They say that "[i]f the

24

NewPage Acquisition is permitted by DOJ to go forward, even subject to the announced divestitures of two NewPage mills, Verso would have more than doubled in size and become the clear market leader with about a 50% share of the relevant market for coated paper in North America." *Id.* The Plaintiffs assert that:

> Verso's actions and statements . . . demonstrate that Verso has the specific intent to monopolize the North American market for 'coated printing paper' by intentionally closing the Bucksport Mill, refusing to discuss potential offers for the Bucksport Mill from any entities wishing to continue using Bucksport to produce paper, and finally selling the Bucksport Mill to an entity that specializes in scrap metal and has no experience or intention of continuing to operate the Bucksport Mill as a paper-manufacturing facility.

*Id.* ¶ 177. The Plaintiffs claim that "Verso's purpose in deliberately destroying the Bucksport Mill's productive capacity is to prevent continued operation of Bucksport by a smaller competitor in the coated printing paper market or a qualified potential competitor into that market, and thereby generate higher prices made possible by reduced industry capacity in the North American market for coated printing paper." *Id.*

They assert that "Verso's 'decommissioning' plans to disable the Bucksport Mill from continued capability to produce coated printing paper, coupled with its deliberate efforts to prevent its sale as a going concern and its intentional sale of the Bucksport Mill to a scrap metal company, constitute an illegal attempt to monopolize the North American market for coated printing paper in violation of Section 2 of the Sherman Act." *Id.* ¶ 178. The Plaintiffs go on to maintain that "Verso's acts and statements . . . show that Verso has engaged in predatory and/or anticompetitive conduct, and that it has the specific intent to monopolize the North American coated

printing paper market." *Id.* ¶ 179.  Verso's "specific purpose," the Plaintiffs say, in refusing to sell the Bucksport mill to any competitor and its decision to sell the mill to AIM is "anticompetitive." *Id.*  They allege that Verso's "clear purpose" is "to profit by reducing productive capacity and thus generating higher prices in the market for North American coated printing paper where Verso will be the leading supplier, especially if the Verso-NewPage merger is allowed to proceed." *Id.*

Finally, the Plaintiffs refer to Verso's "prior destruction of printing paper capability in Sartell, Minnesota, and its acquisition of its largest competitor (NewPage—who has also used AIM to perpetrate a similar scheme to reduce supply in Kimberly, WI)." *Id.* ¶ 180.  They claim that Verso's "additional destruction of the Bucksport Mill's productive capability creates a dangerous probability that an already dominant Verso will be able to become a monopoly, and/or achieve monopoly power, in the North American market for coated printing paper in the future after any merger with NewPage." *Id.*

### b.   Count Three: Conspiracy to Monopolize

In Count Three, the Plaintiffs allege that "Verso and AIM are participants in an ongoing undertaking to help Verso monopolize the North American coated printing paper market by destroying paper mills historically committed to producing coated printing papers." *Id.* ¶ 182.  They allege that this "is not the first time that Verso has contracted with AIM to reduce coated printing paper making capacity." *Id.* ¶ 183.  They say that in 2012, "Verso contracted with AIM to take over Verso's closed printing paper making plant in Sartell, Minnesota," which had been closed due to a

fire, but then "unexpectedly—Verso announced it would sell the Sartell Mill to AIM." *Id.* The Plaintiffs allege that AIM then "proceeded to scrap and demolish the Sartell mill's papermaking capacity." *Id.*

Paragraph 184 sets out AIM's "extensive experience in buying up closed printing paper mills and making sure they are never committed again to the market," including the purchase and demolition of the NewPage printing paper mill in Kimberly, Wisconsin. *Id.* ¶ 184. On information and belief, the Plaintiffs say that AIM never attempted to sell the Kimberly or Sartell mills as operational paper mills. *Id.* ¶ 185. The Plaintiffs allege that "NewPage's President and CEO reportedly told federal and state legislators that it would only lease to a 'non-competing firm.'" *Id.* (footnote omitted).

The Plaintiffs assert that the December 5, 2014 contract between Verso and AIM makes it "very clear that Verso expects AIM to destroy the Bucksport Mill as a potential producer of coated printing paper going forward and AIM promises to do it, while retaining only Bucksport's power plant as an operational facility." *Id.* ¶ 186. Finally, the Plaintiffs maintain that Verso's "steadfast refusal to sell the Bucksport Mill as a going concern, and instead to contract with AIM to have it destroyed is plainly exclusionary because it prevents (i) potential new entry into the North American market for coated paper or (ii) expansion of capacity by one of the small competitors already in the market." *Id.* ¶ 187. The Plaintiffs conclude that "the collective acts and statements of Verso and AIM . . . show that each party has the

specific intent that Verso should monopolize the North American coated printing paper market and has agreed to take actions to achieve that end." *Id.* ¶ 188.

### 2.    Section 2 of the Sherman Act

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2.

As the Court understands the allegations in Counts Two and Three of the Amended Complaint, the Plaintiffs make two overriding points in their § 2 claims. First, they assert that Verso was determined to reduce coated printing paper capacity in North America to make the product scarcer and thus more expensive, and to carry out its plan, Verso resolved to shut down and demolish the Bucksport mill. It thereafter refused to consider selling the mill to any of its competitors, large or small, and instead sold the mill to a company in the business of demolishing mills. Second, the Plaintiffs allege that Verso and NewPage engaged in illegal parallel conduct before they merged, since each of them destroyed a paper mill, Verso in Sartell, Minnesota, and NewPage in Kimberly, Wisconsin.

Despite the Plaintiffs' disavowal, the Court still views the Plaintiffs' first theory as premised on the unsupported notion that Verso had a legal duty to sell the Bucksport mill to one of its competitors. This is simply not the law. In *Pacific Bell Telephone Company v. linkLine Communications, Inc.*, 555 U.S. 438 (2009), the United States Supreme Court reiterated the general principle that "[s]imply

possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 447-48 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). In *Trinko*, the United States Supreme Court flatly reiterated that "there is no duty to aid competitors." 540 U.S. at 411. The *Trinko* Court explained:

> [C]ompelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."

*Id.* at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). As the *Pacific Bell* Court phrased it: "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms and conditions of that dealing."[7] *Pac. Bell*, 555 U.S. at 448 (citing *Colgate & Co.*, 250 U.S. at 307).

The Plaintiffs are at pains to claim that they are not contesting *Tinko*, *Pacific Bell*, or *Aspen Skiing*. *Pls.' Opp'n* at 34-39. Instead, they cite *United States v. American Tobacco Company*, 221 U.S. 106 (1911) for the proposition that it is illegal for a business to acquire production capacity for the purpose of destroying it. *Pls.' Opp'n* at 34 (citing *Am. Tobacco*, 221 U.S. at 183).

---

[7]   There is a limited exception to this general rule, which is set forth in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-11 (1985). In its Order denying the Plaintiffs' motion for TRO and for preliminary injunction, the Court discussed the *Aspen Skiing* exception and determined it did not apply. *TRO* at 64-65. In their response, the Plaintiffs concede that *Aspen Skiing* does not apply. *Pls.' Opp'n* at 34.

In the Court's view, the Plaintiffs' overstate this single factor in the *American Tobacco* analysis and its applicability to this case. In 1911, the Supreme Court listed six factors that led to the conclusion that the American Tobacco Company had violated the Sherman Act, *Am. Tobacco*, 221 U.S. at 182-83, and among those factors was the "persistent expenditure of millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade." *Id.* at 183. It is one thing for a business to purchase a manufacturing plant, to operate that plant for years, and to conclude that it is necessary to close the plant; it is another for a business to purchase a manufacturing plant in order to shut it down. Here, there is no evidence that Verso acquired the Bucksport mill in order to shut it down. Furthermore, even though AIM may have bought the Bucksport mill to scrap and demolish it, AIM is not a papermaker and whatever motivated AIM's decision making, there is no suggestion that it is related to the price or supply of coated paper.

Nor is American Tobacco's control over tobacco in the early Twentieth Century analogous to Verso's control over coated paper production. The *American Tobacco* Court recites a litany of monopolistic actions, including the use of corporate forms to obscure American Tobacco's control; the placement of aspects of the tobacco industry into seemingly independent contractors, which in fact were controlled by American Tobacco; the creation of perpetual barriers to the entry of others into the tobacco trade; and the entering into of numerous lengthy, non-compete agreements with manufacturers, employees and stockholders. *Id.* at 182-83. In fact, the Supreme

Court later cited *American Tobacco* as addressing a plan in which "American tobacco corporations agreed in England with a British company to divide world markets." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004). The Supreme Court and the First Circuit have emphasized that the rule of reason must be read into the antitrust statutes. *Standard Oil Co. v. United States*, 221 U.S. 1, 62 (1911); *Fraser v. Major League Soccer*, 284 F.3d 47, 70-71 (1st Cir. 2002). Here, even as alleged in Plaintiffs' Amended Complaint, Verso's alleged monopolistic conduct is a pale shadow of American Tobacco's attempt to divide the world tobacco market with a competitor.

Turning to parallel conduct, the Court arrives at the same conclusion for the same reasons concerning § 2 that it reached concerning § 1. The bulk of the allegations run afoul of *Trinko*'s ruling that "there is no duty to aid competitors." 540 U.S. at 411. Once the allegations that assert Verso, NewPage, and AIM had a duty to seek out and sell the Bucksport mill to a competitor are winnowed, there is little left, and the claim, which is full of adjectives but short on facts, runs against the *Twombly* Court's admonition that a mere allegation of conspiratorial parallel conduct is insufficient to state an antitrust claim absent "facts adequate to show illegality." 550 U.S. at 557. Here, the Court concludes that the allegations are too conclusory to survive dismissal.

### E. Count Four: Violation of The Clayton Act

#### 1. The Clayton Act Allegations in the First Amended Complaint

31

In Count Four, the Plaintiffs alleged that AIM is a salvage company that has never operated a paper mill and, pursuant to its agreement with Verso, agreed to scrap the papermaking equipment at the Bucksport mill and demolish the buildings dedicated to papermaking. *Am. Compl.* ¶ 190.  The Plaintiffs say that the "competitive effect of the AIM Acquisition is to permanently remove 350,000 metric tons of printing paper capacity from the North American coated printing paper market." *Id.* ¶ 191.  They allege that the "likely (and intended) competitive effect of this significant reduction in capacity caused by the AIM Acquisition is that future consumers of coated printing paper will pay higher prices than they would if the Bucksport Mill remained operational in Verso's hands or those of a competitor." *Id.* ¶ 192.

Quoting § 7 of the Clayton Act, the Plaintiffs assert that because the AIM Acquisition permanently eliminates the possibility that the Bucksport mill will be used to produce printing paper, it violates the Clayton Act. *Id.* ¶ 193.  The Plaintiffs claim that Verso and AIM are both engaged in interstate commerce and that the "relevant product market in which the AIM Acquisition 'may. . . substantially lessen competition' is the market for 'coated printing papers' and the relevant geographic market is 'North America' or the 'United States.'" *Id.* ¶ 194.  They say that neither Verso nor AIM can "claim that the AIM Acquisition, by eliminating competitive facilities from the market, somehow generates efficiencies that would benefit consumers of coated printing paper." *Id.* ¶ 195.

### 2.    The Clayton Act

The critical language of the Clayton Act provides:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.  The parties' positions view the Verso to AIM transaction in mirror images: Verso and AIM focus on the impact from the sale on the buyer's market, while the Plaintiffs focus on the impact from the sale on the seller's market.  In Verso and AIM's view, AIM's acquisition of the Bucksport mill could not lessen competition because AIM does not compete in the coated printing paper business.   In the Plaintiffs' view, Verso's sale of the Bucksport mill lessens competition because the sale effected the scrapping of the Bucksport mill and its papermaking capacity, thereby reducing the overall supply of coated printed paper and escalating the price of paper.

The parties have engaged in vigorous adjectival advocacy in their memoranda, but they have cited very little illuminating law on the critical point: whether the Clayton Act contemplates a determination of the impact of the acquisition of the property on the market of the selling party's business.  *See AIM Reply* at 4-7 ("This recasting of their Clayton Act claim is in vain and inappropriate"; "Plaintiffs dislike AIM's purchase of the Mill, because it lays bare the fact that their jobs—lost before AIM ever got involved—are not coming back"; "Plaintiffs' ginned-up claims of

lessened competition"; "Plaintiffs' claim of standing is nothing but a trick"); *Verso Reply* at 8-9 ("And in one of the few accurate statements in their opposition brief, Plaintiffs acknowledge that the [First Amended Complaint] does not challenge Verso's acquisition of NewPage"; "Plaintiffs have all but conceded that they otherwise cannot state a claim for relief under Section 7 of the Clayton Act"); *Pls.' Opp'n* at 39-41 ("Defendants misstate the applicable standard").

The language of the Clayton Act supports Verso and AIM's argument because it uses the terms "acquire" or "acquisition," which place the statutory focus on the impact of the transaction on the buyer, not the seller:

> No person engaged in commerce or in any activity affecting commerce <u>shall acquire</u>, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission <u>shall acquire</u> the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, <u>the effect of such acquisition</u> may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18 (emphasis supplied).  If Congress had intended to capture the monopolizing effect of the divestiture of property, it could easily have done so.[8]  But it did not.  *See Goss Int'l Americas, Inc. v. MAN Roland Inc.*, No. Civ. 03-CV-513-SM, 2005 WL 2998531, at *3-4 (D.N.H. Nov. 8, 2005) ("Section 7 focuses on unlawful acquisition, holding entities acquiring assets, but not those relinquishing assets, in

---

[8]     The Court acknowledges that divestiture may be a remedy to an antitrust violation, *see, e.g., United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 330 (1961) (describing divestiture as "the most important of antitrust remedies").  At the same time, divestiture is considered a "far-reaching and drastic remedy."   *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222, 229 (9th Cir. 1978). In this case, where Verso has divested itself of an asset by selling it to a non-competitor, the Plaintiffs have presented the Court with no authority that it should order the non-competitor to divest its newly acquired asset.

violation") (citing *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222, 227 (9th Cir. 1978); *Dailey v. Quality Sch. Plan, Inc.*, 380 F.2d 484 (5th Cir. 1967));[9] *Addamax Corp. v. Open Software Found., Inc.*, 888 F. Supp. 274, 285 (D. Mass. 1995) ("It is true that the Clayton Act, by its own terms, applies only where there has been an acquisition of assets, stock, or other share capital") (citing 15 U.S.C. § 18).

Judge Newman's seminal opinion in *SCM Corporation v. Xerox Corporation* contains language that supports the Defendants' view: "Section 7 is concerned with undue concentrations of power and the anti-competitive effects of permitting one entity with market power to strengthen its position by acquisition." 463 F. Supp. 983, 1001-02 (D. Conn. 1978) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)), *aff'd on other grounds* 645 F.2d 1195 (2d Cir. 1981). More precisely, Judge Newman wrote: "But simply transferring the exclusionary power of valid patents from an inventor to a research institute to a company with manufacturing and marketing

---

[9]     As a general proposition, § 7 of the Clayton Act focuses on buyers, not sellers. However, relying on Ninth Circuit authority, the United States District Court of New Hampshire observed that "[i]n certain instances, courts may maintain jurisdiction over entities relinquishing assets to allow for the equitable remedy of rescission." *Goss Int'l*, 2005 WL 2998531, at *4 (citing *Coca-Cola*, 575 F.2d at 229). The *Coca-Cola* Court conducted an interlocutory review to decide whether rescission is available as a remedy in § 7 cases. *Coca-Cola*, 575 F.2d at 227. The Ninth Circuit perceived a congressional intent to bind "third parties" whose conduct was "so related to the anti-competitive effects at which the act was directed . . . ." *Id.* at 228. Thus, it ruled that "rescission is not without the pale of equitable discretion in appropriate circumstances," though "[t]he fact that sellers in [§] 7 cases are not technical violators of the law is itself a strong equity consideration against rescission." *Id.* at 230. Shortly after the Ninth Circuit decided *Coca-Cola*, another court interpreted that decision as "merely stand[ing] for the proposition that a court can maintain as a Clayton [§] 7 defendant any party whose presence is necessary to effectuate relief." *Palmer News, Inc. v. ARA Servs., Inc.*, 476 F. Supp. 1176, 1193 (D. Kan. 1979). The general proposition holds on these facts.
        The Court assumes that it would have the power to rescind the Verso-AIM contract if necessary to do so to "eliminate the effects of an acquisition offensive to the statute." *Coca-Cola*, 575 F.2d at 229 (citations omitted). In the unusual case in which a court decides to exercise jurisdiction over a seller, it must first find an anticompetitive conduct to remedy. Here, however, the Court can discern no recognized theory of such conduct on the facts before it. Thus, it is without a basis on which to conclude that the transaction at issue—i.e., the sale of the mill to a noncompetitor—is the sort of anticompetitive conduct calling for a remedy under § 7 of the Clayton Act.

potential does not create damage liability under § 7 when the acquiring company has no market power in the relevant product market." *Id.* at 1002. "It is highly questionable," Judge Newman continued, "whether a § 7 violation occurs at all when a company acquires patents prior to the existence of a relevant product market or acquires patents at a time when it has no market power in a relevant product market." *Id.* The *SCM* case presented a closer question than the issue in this case because the plaintiff SCM was a direct potential competitor with Xerox. Here, AIM, the buyer, is not in the business of producing coated printing paper. Thus, in Judge Newman's words, AIM has "no market power in the relevant product market," nor is it ever likely to have any market power in that market.

It may be that the notable absence of caselaw in the parties' submissions reflects the novelty of the Plaintiffs' theory of Clayton Act liability: that Verso is cornering the coated printing paper market, not by expanding, but by contracting. Verso's memorandum describes three traditional types of Clayton Act violations: (1) a horizontal merger, *Verso Mot.* at 20 (citing *United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963)); (2) a vertical merger, *id.* at 20-21 (citing *Brown Shoe Co.*, 370 U.S. 294); and (3) a conglomerate or harm to potential competition merger. *Id.* at 21 (citing Richard A. Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 COLUM. L. REV. 282, 319 (1975)). *See also* WILLIAM C. HOLMES & MELISSA H. MANGIARACINA, ANTITRUST LAW HANDBOOK § 6:2 (2015) (identifying three varieties of Clayton Act claims: horizontal mergers, vertical mergers, and conglomerate mergers).

Without a sale to a potential competitor, none of these recognized forms of Clayton Act liability applies.

It appears that the Plaintiffs are seeking to create a new class of Clayton Act violation, whereby the monopoly is created not by controlling a greater percentage of the overall market by expanding production, but by curtailing it. The notion that a business could increase its market power by downsizing is at least counterintuitive. However academically valid, this theory of monopoly power has not found its way into federal statute or caselaw. In *Brown Shoe Co.*, the Supreme Court undertook a detailed review of the legislative history behind the Clayton Act and observed that Congress passed the Act due to "evidence of the danger to the American economy in unchecked corporate expansions through mergers." 370 U.S. at 315 (footnote omitted). *See Philadelphia National Bank*, 374 U.S. at 363 (addressing a potential merger between two Philadelphia area banks where the result would have been "a single bank controlling at least 30% of the commercial banking business in the four-county Philadelphia metropolitan area"). The Court is unable to fit the Plaintiffs' theory of Clayton Act liability into the language of the statute or the caselaw that has interpreted it.

Accordingly, the Court concludes that the Plaintiffs have not stated a potential Clayton Act violation by alleging that Verso, a papermaking corporation, sold a papermaking mill, to AIM, a scrap metal operation, because AIM's purchase of the Bucksport mill is not an "acquisition" the effect of which is "substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

### F.      Vacation Pay and Severance Pay Claims

As a final housekeeping matter, Verso points out that in its January 6, 2015 Order, the Court dismissed only the Plaintiffs' motion for expedited declaratory judgment and their requests for preliminary and permanent injunction and did not formally dismiss Count Nine, the Maine severance pay and vacation pay counts. *Verso Mot.* at 23-24 (citing *Order Dismissing Pls.' Mot. for Declaratory and Injunctive Relief; and Dismissing Pls.' Mot. for Attach. and Trustee Process* at 85 (ECF No. 73)). The Plaintiffs did not respond to this portion of Verso's motion.  To the extent Count Nine remains viable, the Court agrees it should be dismissed without prejudice for the reasons set forth in its January 6, 2015 and August 3, 2015 orders.

## V.      CONCLUSION

The Court GRANTS Motion of AIM Development (USA) LLC to Dismiss Plaintiffs' First Amended Complaint (ECF No. 113) and Defendants Verso Paper Corp. and Verso Paper LLC's Motion to Dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (ECF No. 114).  The Court DISMISSES without prejudice Count Nine in Plaintiffs' First Amended Complaint.

The Clerk shall enter Judgment in favor of Defendants Verso Paper Corp., Verso Paper LLC, and AIM Development (USA) LLC and against Plaintiffs.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 14th day of December, 2015